# EXHIBIT A

EXECUTION COPY

## SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT ("Agreement"), made and entered into as of this 16th day of April_____, 2007, by and among ST PAPER, LLC, a Delaware limited liability company (the "Buyer"), OCONTO FALLS TISSUE, INC., a Wisconsin corporation (the "Company"), TISSUE PRODUCTS TECHNOLOGY CORP., a Wisconsin corporation ("TPTC"), and PARTNERS CONCEPTS DEVELOPMENT, INC., a Wisconsin corporation ("PCDI") (the Company, TPTC and PCDI, individually a "Seller" and collectively, the "Sellers"). ST PAPER HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), shall be a party to this Agreement solely for purposes of Paragraph 12.12.

WITNESSETH:

WHEREAS, the parties to this Agreement entered into that certain Asset Purchase Agreement dated as of September 19, 2006 (the "Original Asset Purchase Agreement") and amended and restated the Original Asset Purchase Agreement by entering into that certain Amended and Restated Asset Purchase Agreement dated as of December 5, 2006 (the "Amended and Restated Agreement"); and

WHEREAS, the parties now wish to amend and restate the Amended and Restated Agreement in its entirety in the manner set forth herein; and

WHEREAS, TPTC owns all of the issued and outstanding shares of the One Cent ($.01) par value common stock of the Company; and

WHEREAS, PCDI owns all of the issued and outstanding shares of the One Cent ($.01) par value common stock of TPTC; and

WHEREAS, Ronald H. Van Den Heuvel owns a majority of the issued and outstanding shares of capital stock of PCDI; and

WHEREAS, the Company desires to sell to the Buyer and the Buyer desires to purchase from the Company substantially all of the assets owned or used by the Company in the operation of its business, upon the terms and conditions set forth herein; and

WHEREAS, TPTC and PCDI and others will benefit financially from the transactions contemplated herein and desire to consummate such purchase and sale.

NOW, THEREFORE, the Buyer and the Sellers, in consideration of the mutual promises hereinafter set forth, do hereby promise and agree as follows:

### ARTICLE I

Assets To Be Purchased

1.1.    Subject Assets.  Subject to the terms and conditions set forth in this Agreement, the Company agrees to sell to the Buyer and the Buyer agrees to purchase from the Company at

mw1287686_2

the Closing all of the assets owned or used by the Company in connection with the operation of its business other than the Excluded Assets (collectively, the "Subject Assets"), including, without limitation (except to the extent such assets are Excluded Assets), the following:

(a)    all tangible assets of every kind and description, including, without limitation, all fixed assets, machinery, equipment, tools, tooling, molds, leasehold improvements, fixtures, furniture, furnishings, vehicles, computer hardware and software, servers, modems, data processing equipment and other items of similar character, wherever located, including, without limitation, those assets described on **Exhibit 1.1(a)**;

(b)    all real estate, fixtures and improvements, including all rights, privileges and easements appurtenant thereto, including, without limitation, the real estate, fixtures, improvements, rights, privileges and easements described on **Exhibit 1.1(b)**;

(c)    all supplies, packaging materials, marketing and sales literature, advertising materials, catalogues, consumable materials and other items of similar character;

(d)    all Records other than corporate minute books, stock ownership records and tax returns;

(e)    all customer lists and supplier lists;

(f)    all logos, product specifications, blue-prints, drawings, formulae, patents, patent applications, domain name addresses, trade names, trademarks, trademark registrations and any applications therefor, copyrights, copyright registrations and applications therefore (in each case, whether issued or pending), and all inventions, improvements, manufacturing know-how, trade secrets and technical knowledge, intangible assets relating to web sites, and all other similar interests to which the Company has any right of ownership or use;

(g)    any and all goodwill;

(h)    to the extent their transfer is permitted by Law, all governmental licenses, permits, approvals, license applications and product registrations and, to the extent permitted by Law, the benefit of those governmental licenses, permits, approvals, license applications and product registrations which are not transferable;

(i)    all of the Company's right, title and interest in, to and under those purchase orders, sales orders, licenses, supply agreements, leases and other agreements set forth on **Exhibit 1.1(i)** (the "Assumed Contracts"), including, without limitation, any right to receive payment for products sold or services rendered pursuant to such contracts and to assert claims and to take other rightful actions in respect of breaches, defaults and other violations of such contracts and otherwise;

(j)    to the extent such items are not related to the Excluded Assets or Excluded Liabilities, all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by the Company with respect to the ownership, use,

ST PAPER 0640

function or value of any Subject Asset, whether arising by way of counterclaim or otherwise;

(k)    to the extent such items are not Excluded Assets or related to the Excluded Assets or Excluded Liabilities, all guarantees, warranties, indemnities and similar rights in favor of the Company with respect to any Subject Asset, and all claims, deposits, unemployment compensation account balances of the Company to the extent transferable, refunds, rebates, rights of recovery, rights of recoupment and other rights of action against third parties of the Company;

(l)    to the extent their transfer is permitted by Law, all of the Company's rights in, to and under any contract with any of the current and former employees, consultants, agents, representatives, customers, suppliers, vendors or otherwise, regarding non-competition, non-solicitation, and/or confidentiality of trade secrets, proprietary or other information;

(m)    to the extent such items are transferable, any and all other rights and assets owned by the Company and/or used by the Company in the operation of its business, including all rights of the Company to conduct its business as it exists at the Closing, including the right to pursue orders resulting from quotations to customers outstanding at the Closing, other than the Excluded Assets;

(n)    all prepaid items, expenses and accruals;

(o)    all inventories, wherever located, including without limitation, raw materials, work in process and finished goods; and

(p)    all spares, spare parts and storeroom materials.

1.2.    Excluded Assets.  The provisions of Paragraph 1.1, above, notwithstanding, the Subject Assets shall not include the assets set forth in **Exhibit 1.2** (collectively, the "Excluded Assets").

## ARTICLE II

### Closing; Purchase Price; Assumed Liabilities

2.1.    Closing.  The Closing shall be held at the offices of Godfrey & Kahn, S.C. located at 333 Main Street, Green Bay, Wisconsin, at 9:00 a.m. on the third business day after the satisfaction or waiver of each of the conditions set forth in Article III or at such other place, time or date as the Sellers and the Buyer may agree; provided, however, that the parties shall use their commercially reasonable efforts to close the transactions contemplated hereby by April 30, 2007.

2.2.    Purchase Price.  The aggregate purchase price (the "Purchase Price") for the Subject Assets shall be an amount equal to Eighty Six Million Four Hundred Thousand Dollars ($86,400,000).

ST PAPER 0641

2.3.    Payments at Closing.  At the Closing, the Buyer shall pay the Purchase Price as follows:

(i)     Buyer shall pay Fifty-Five Million Eight Hundred Eleven Thousand and 00/100 Dollars ($55,811,000.00) less the amount of the Company's debt obligations assumed by the Buyer, as described on Exhibit 2.6 attached hereto, if any, in immediately available U.S. dollars directly to the applicable lenders and other creditors of the Company in order for the Buyer to obtain clear title to the Subject Assets in accordance with payoff letters provided to the Buyer by such lenders and creditors (which shall not relieve the Company from providing clear title to the Subject Assets in accordance with Paragraph 3.1(f)(vi), below).

(ii)    Buyer shall assume the Company's debt obligations described on **Exhibit 2.6** attached hereto, if any.

(iii)   Buyer shall deliver a subordinated promissory note in the original principal balance of Thirty Million Five Hundred Eighty Nine Thousand and 00/100 Dollars ($30,589,000.00), in the form attached hereto as **Exhibit 2.3** (the "Note").

2.4.    [Intentionally Left Blank]

2.5.    Allocation of Purchase Price.  The Purchase Price shall be allocated among the Subject Assets and the noncompetition provisions set forth in Article VIII, below according to the mutual agreement of the parties.  The Buyer and the Sellers shall make all required submissions to governmental agencies, including the filing of all tax returns, on a basis consistent with such allocation unless there is a "determination," as such term is defined in Section 1313(a) of the Code that requires a different allocation.

2.6.    Liabilities Being Assumed.  As partial consideration for the Subject Assets, the Buyer shall assume and perform only the liabilities and obligations of the Company under the Assumed Contracts which accrue after the Closing and such other liabilities as set forth in **Exhibit 2.6** (the "Assumed Liabilities").

2.7.    Liabilities Not Being Assumed.  Anything contained herein to the contrary notwithstanding (except for the Assumed Liabilities and Assumed Contracts), the Assumed Liabilities shall not include the following (the "Excluded Liabilities"):

(a)     any trade accounts payable, notes payable or accrued liabilities of the Company or any other Seller;

(b)     any liability of the Company or any other Seller for Taxes;

(c)     any accrued liabilities of the of the Company or any other Seller for brokers', attorneys' or accountants' fees incurred in connection with the transactions contemplated herein or any other expenses of the Company or any other Seller relating hereto (including those described in Paragraph 12.1, below);

ST PAPER 0642

(d)    any liabilities or obligations of the Company or any other Seller arising under this Agreement;

(e)    any liabilities or obligations of the Company or any other Seller arising with respect to current employees and/or former employees (including all retirees) of the Company under any Plan, including, without limitation, any defined benefit program, deferred compensation arrangements, profit sharing plans;

(f)    any liabilities or obligations of the Company or any other Seller for dividends or other distributions to their respective shareholders (whether for Tax or otherwise);

(g)    any liabilities or obligations of the Company or any other Seller relating in any way to the Excluded Assets; and

(h)    any liabilities or obligations of the Company or any other Seller (whether incurred in the ordinary course of business or otherwise) which are not specifically assumed by the Buyer hereunder.

## ARTICLE III

### Conditions Precedent to Closing

3.1.    <u>Conditions Precedent to the Buyer's Obligation</u>.  The obligation of the Buyer to consummate the transactions contemplated herein is subject to the satisfaction as of the Closing of the following conditions:

(a)    The representations and warranties of the Sellers made in this Agreement shall be true and correct in all respects as of the date hereof and on and as of the Closing, as though made on and as of the Closing Date; the Sellers shall have performed in all respects the covenants of the Sellers contained in this Agreement required to be performed on or prior to the Closing; and the Sellers shall each have delivered to the Buyer a certificate dated the Closing Date and signed by the Sellers or an authorized officer of each Seller confirming the foregoing.  The statements contained in such certificates shall be a warranty of the Sellers which shall survive the Closing for the period provided in <u>Paragraph 4.2</u>, below.

(b)    No suit, action, investigation, inquiry or other legal or administrative proceeding by any governmental authority or other person shall have been instituted or threatened which seeks to enjoin, restrain or prohibit, or which questions the validity or legality of, the transactions contemplated hereby or which otherwise seeks to affect or could affect the transactions contemplated hereby or impose damages or penalties upon any party hereto if such transactions are consummated.

(c)    The Buyer or any Affiliate of the Buyer shall have obtained financing, on terms and conditions satisfactory to the Buyer or any Affiliate of the Buyer, for the transactions contemplated herein.

ST PAPER 0643

(d)     Between the date hereof and the Closing Date, there shall be no material adverse change in the business or assets of the Company and none the Sellers shall have received any notice or indication that a material customer or material supplier of the Company intends to cease doing business or to materially reduce the business transacted with the Company or intends to terminate any agreements with the Company.

(e)     [Intentionally Left Blank.]

(f)     The Sellers shall have delivered to the Buyer the following:

(i)     Consents, in a form reasonably satisfactory to the Buyer and all other consents, approvals, authorizations, permits and licenses which the Buyer deems necessary to operate the Company's business, if any, all in a form satisfactory to the Buyer.

(ii)     A binding commitment to issue a current ALTA form owner's policy of title insurance for each parcel of Real Estate.  Such commitment shall be issued by a title carrier acceptable to the Buyer and licensed in the State of Wisconsin.  Such commitment shall (i) be in current ALTA form, (ii) show title to the Real Estate to be vested in the Company free and clear of all liens and encumbrances except Permitted Real Estate Encumbrances, (iii) provide extended coverage insuring over the standard preprinted exceptions including an endorsement insuring title through the Closing Date (gap coverage), and (iv) contain such other special endorsements as may be reasonably required by the Buyer or its financing sources.

(iii)     A copy of all existing surveys in the Company's or any other Seller's possession and control for the Real Estate, which surveys shall not reveal any matters which could adversely impact the Buyer's occupancy of the Real Estate.

(iv)     Constructive possession of all passbooks, keys and other data of the Company or articles required for access thereto and the combinations for all safes, vaults and other places of safekeeping or storage of the Company.

(v)     Physical possession of all of the Subject Assets.

(vi)     Duly executed satisfactions, termination statements and/or releases, in forms reasonably satisfactory to the Buyer, to the extent required to release any existing liens, claims and encumbrances against the Subject Assets other than the Permitted Liens and Permitted Real Estate Encumbrances.

(vii)     An opinion from Stellpflug, Janssen, Hammer, Kirschling & Bartels, S.C., legal counsel to the Sellers, dated as of the Closing Date, in the form attached hereto as **Exhibit 3.1(f)(vii)**.

(viii)     A Certificate from the Secretary (or similar officer) of the Company, TPTC and PCDI, in a form satisfactory to the Buyer, setting forth the

ST PAPER 0644

resolutions of the Board of Directors (or similar governing body) of the Company, TPTC and PCDI authorizing the execution of this Agreement and all documents to be executed in connection herewith and the taking of any and all actions deemed necessary or advisable to consummate the transactions contemplated herein and the true, complete and correct copies of the Articles of Incorporation and By-laws of such entities, and all amendments thereto.

(ix)    An Amendment to Amended and Restated Sales and Marketing Agreement, in the form attached hereto as **Exhibit 3.1(f)(ix)** (the "Sales and Marketing Agreement"), duly executed by TISSUE TECHNOLOGY, LLC, a Wisconsin limited liability company ("TTL").

(x)    Warranty bills of sale, general assignments, specific assignments of Intellectual Property, warranty deeds for Real Estate, certificates of title for vehicles owned by the Company, and such other instruments of conveyance as the Buyer shall reasonably require, in forms reasonably satisfactory to the Buyer, duly executed by the Company, to convey to the Buyer the Subject Assets.

(xi)    An assignment and assumption agreement, in a form reasonably satisfactory to Buyer and the Company, pursuant to which the Company assigns to the Buyer and the Buyer assumes from the Company, all of the Company's right, title and interest in, to and under the Assumed Contracts and the Buyer assumes the Assumed Liabilities (the "Assignment and Assumption Agreement"), duly executed by the Company.

In the event that any of the foregoing conditions to Closing shall not have been satisfied, the Buyer may elect to:  (i) terminate this Agreement without liability to the Buyer; or (ii) consummate the transactions contemplated herein despite such failure.  Regardless of whether the Buyer elects to terminate this Agreement or consummate the transactions described herein, if such failure shall be as a result of a breach of any provision of this Agreement by the Company or any other Seller (including, without limitation, the failure of the Company or any other Seller to execute and/or deliver to the Buyer any item described in Paragraph 3.1(f), above), the Buyer may seek appropriate remedies for any and all damages, costs and expenses incurred by the Buyer by reason of such breach including, without limitation, indemnification pursuant to Article IX, below.

3.2.    Conditions Precedent to the Sellers' Obligation.  The obligation of the Sellers to consummate the transactions contemplated herein is subject to the satisfaction as of the Closing of the following conditions:

(a)    The representations and warranties of the Buyer made in this Agreement shall be true and correct in all respects as of the date hereof and on and as of the Closing, as though made on and as of the Closing Date; the Buyer shall have performed in all respects the covenants of the Buyer contained in this Agreement required to be performed on or prior to the Closing; and the Buyer shall have delivered to the Sellers a certificate dated the Closing Date and signed by an authorized officer of the Buyer confirming the

mw1287686_2                                      7

ST PAPER 0645

foregoing.  The statements contained in such certificate shall be a warranty of the Buyer which shall survive the Closing for the period provided in Paragraph 5.2, below.

(b)     No suit, action, investigation, inquiry or other legal or administrative proceeding by any governmental authority or any other person shall have been instituted or threatened which seeks to enjoin, restrain or prohibit, or which questions the validity or legality of, the transactions contemplated hereby or which otherwise seeks to affect or could affect the transactions contemplated hereby or impose damages or penalties upon any party hereto if such transactions are consummated.

(c)     The waiting period (and any extension thereof) applicable to the transactions contemplated hereby under the HSR Act shall have been terminated or shall have expired, and approvals under all similar competition or merger control laws that are reasonably determined by Buyer to be to be applicable to the transactions contemplated hereby shall have been obtained.

(d)     [Intentionally Left Blank]

(e)     The Buyer shall have delivered to the Sellers the following:

(i)     The Buyer shall deliver to the Company the payment of the Purchase Price in the manner required by Paragraph 2.3, above.

(ii)     The Sellers shall have received a certificate from the Secretary (or other similar officer) of the Buyer, in a form reasonably satisfactory to the Sellers, setting forth the resolutions of the Board of Directors (or other similar governing body) of the Buyer authorizing the execution of this Agreement, and all agreements, documents and instruments to be executed in connection herewith and the taking of any and all actions deemed necessary or advisable to consummate the transactions contemplated herein.

(iii)     TPTC shall have received the Sales and Marketing Agreement, duly executed by the Buyer.

(iv)     TPTC and PCDI shall have received a Non-Competition Agreement, in the form of **Exhibit 3.2(e)(iv)** attached hereto, setting forth the Buyer's agreement not to engage in the business of tissue converting on the terms set forth therein, duly executed by the Buyer.

(v)     An opinion from Godfrey & Kahn, S.C., legal counsel to the Buyer, dated as of the Closing Date, in the form attached hereto as **Exhibit 3.2(e)(v)**.

(vi)     The Assignment and Assumption Agreement, duly executed by the Buyer.

In the event that any of the foregoing conditions to Closing shall not have been satisfied, the Sellers may elect to:  (i) terminate this Agreement without liability to the Sellers; or (ii)

mw1287686_2                                              8

ST PAPER 0646

consummate the transactions contemplated herein despite such failure.  Regardless of whether the Sellers elect to terminate this Agreement or consummate the transactions described herein, if such failure shall be as a result of a breach of any provision of this Agreement by the Buyer (including, without limitation, the failure of the Buyer to execute and/or deliver to the Sellers any item described in Paragraph 3.2(e), above), the Sellers may seek appropriate remedies for any and all damages, costs and expenses incurred by the Sellers by reason of such breach including, without limitation, indemnification pursuant to Article IX, below.

**ARTICLE IV**

Warranties and Representations of the Sellers

4.1.   Warranties and Representations.  The Sellers hereby jointly and severally warrant and represent to the Buyer, which warranties and representations shall survive the Closing for the period set forth in Paragraph 4.2, below, as follows:

4.1.1.  Authority of the Sellers.  The Company has full right, power and authority to sell, transfer and deliver to the Buyer the full legal and beneficial ownership in the Subject Assets to be sold by the Company pursuant to this Agreement, and each of the Sellers has full right, power and authority to consummate the transactions contemplated herein.  This Agreement has been, and each Ancillary Agreement to which each Seller is a party hereto will be, duly and validly executed and delivered by each Seller and this Agreement and such Ancillary Agreements are and shall constitute the legal, valid and binding obligation of each Seller enforceable against each Seller in accordance with their respective terms.  Except as set forth in Section 4.1.1 of the Schedule of Exceptions, the execution, delivery and performance of this Agreement and the Ancillary Agreements to which each Seller is a party does not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof and thereof by the Sellers will not (i) conflict with, or result in a breach or violation of, any Laws, or any judgment, order or decree applicable to any Seller or the Subject Assets, or (ii) violate or conflict with, or result in a breach under, or result in the imposition of any lien, claim or encumbrance upon any of the Subject Assets pursuant to, any agreement, instrument or document to which any Seller is a party or is subject, or which affects any Seller or the Subject Assets and which is not otherwise waived.  No action, consent, approval, order or authorization of or registration, declaration, or filing with, any court or governmental or administrative body or agency or other third party is required to be obtained or made in connection with the execution and delivery of this Agreement and the Ancillary Agreements by the Sellers or the consummation by the Sellers of the transactions contemplated hereby.

4.1.2.  Shareholder Agreements.  Except for this Agreement and the Ancillary Agreements executed in connection herewith, there are no voting trust agreements, powers of attorneys, proxies or any other contracts, agreements, arrangements, commitments, plans or understandings, written or oral, restricting or otherwise relating to the management of the Company, or otherwise granting any person any right in respect of such Subject Assets and there are no existing restrictions on the transfer of the Subject Assets.

4.1.3.  Litigation Against Sellers.  Except as set forth in Section 4.1.3 of the Schedule of Exceptions, there is no claim, action, suit, proceeding, arbitration, investigation or inquiry before

ST PAPER 0647

any court or governmental or administrative body or agency, any securities or commodities exchange, other regulatory body or any private arbitration tribunal now pending or, to the knowledge of the Sellers, threatened, against or relating to any Seller which would affect the ability of the Sellers to consummate the sale of the Subject Assets or the other transactions contemplated by this Agreement.

4.1.4.   Corporate Matters. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of Wisconsin. The Company has the power and authority to own or lease its properties and to carry on all business activities now or proposed to be conducted by it. The Company is duly qualified and in good standing in each jurisdiction in which the nature of its business or the ownership, leasing or holding of its assets makes such qualification necessary. Attached hereto as **Exhibit 4.1.4** is a true, complete and correct list of all jurisdictions in which the Company is qualified to do business as a foreign corporation. Except as set forth in Section 4.1.4 of the Schedule of Exceptions, the consummation of the transactions contemplated hereby and compliance with the terms hereof will not (a) conflict with, or result in any breach or violation of (i) any provision of the Articles of Incorporation or By-Laws of the Company, or (ii) any applicable Law or any judgment, order or decree applicable to or which affects or binds the Company or its assets or properties; (b) require any consent, approval, authorization, license, permit, registration, filing, recording or waiver under any order, writ, judgment, injunction, decree, determination, award or Law which affects or binds the Company or under any governmental or judicial license, franchise, permit or approval held by the Company or which binds or may affect the Company or any of the Company's assets; or (c) violate or conflict with, or result in a breach under, or result in the imposition of any lien, claim or encumbrance upon any of the Company's assets pursuant to, any agreement, instrument or document to which the Company is a party or is subject or which affects the Company or its assets or properties which has not otherwise been waived.

4.1.5.   Title To and Condition of the Subject Assets. The Company has good and marketable title to all of the Subject Assets, personal and real, tangible and intangible, free and clear of all liens, claims, encumbrances and security interests whatsoever other than those liens described in Section 4.1.5 of the Schedule of Exceptions (the "Permitted Liens"). The Subject Assets are sufficient for the operation of the Company's business in the ordinary course of business and are suitable for the purpose for which they are being used. Any leased personal property included within the Company's assets is in the condition required of such property by the terms of the lease applicable thereto during the term of the lease and upon the expiration thereof. No Affiliate of the Company has any interest in any right, property or asset used or required by the Company in the operation of the Company's business.

4.1.6.   Real Estate. Except as set forth in Section 4.1.6 of the Schedule of Exceptions, with respect to the Real Estate:

(a)   subject to Permitted Liens and Permitted Real Estate Encumbrances, the Company has good and marketable fee title, free and clear of any security interest, mortgage, pledge, option, right of first refusal, encumbrance, charge, easement, covenant, or other lien or restriction;

mwl287686_2                                    10

(b)     neither the Real Estate nor the Company's use thereof is in violation of any applicable Law;

(c)     Subject to Permitted Liens and Permitted Real Estate Encumbrances, none of the Real Estate is subject to any lease, option to purchase or rights of first refusal;

(d)     except for liens for taxes not yet due and payable and the Permitted Real Estate Encumbrances, there are no (i) actual or, to the Sellers' knowledge, proposed special assessments; (ii) pending or, to the Sellers' knowledge, threatened condemnation proceedings; (iii) pending or, to the Sellers' knowledge, threatened litigation or administrative actions; (iv) mechanics' or materialman's liens; (v) material structural or mechanical defects in any of the buildings located on the Real Estate; (vi) planned or commenced improvements which may result in an assessment or otherwise affect the Real Estate; (vii) governmental agency or court orders requiring the repair, alteration or correction of any existing condition with respect to the Real Estate or any portion thereof; or (viii) pending or, to the Sellers' knowledge, threatened changes in any zoning Laws or ordinances which may affect the Real Estate;

(e)     the legal descriptions set forth on attached **Exhibit 4.1.6(e)** accurately describes each parcel of the Real Estate; (ii) the buildings and improvements on the Real Estate are located within the boundary lines of such the Real Estate, are not in violation of applicable setback requirements or zoning Laws, and do not encroach on any easements which may affect the Real Estate; (iii) none of the Real Estate serves any adjoining property for any purpose inconsistent with the use of such parcel; and (iv) none of the Real Estate is located within any flood plain or any area containing wetlands or subject to any similar type of restriction for which all applicable permits or licenses necessary to use thereof have not been obtained; and

(f)     the buildings, fixtures and other improvements on the Real Estate have been approved by all necessary governmental authorities and are in good operating condition, working order and repair, ordinary wear and tear excepted, and suitable for the purpose for which they are being used by the Company.

4.1.7.  <u>Litigation against the Company</u>.  Except as set forth in Section 4.1.7 of the Schedule of Exceptions, there is no claim, action, suit, inquiry, arbitration, proceeding or investigation or other legal or administrative proceeding pending or, to the Sellers' knowledge, threatened against the Company before any federal, state, municipal or other court or government or administrative body or agency, any securities or commodities exchange, other regulatory body or any private arbitration tribunal.  The Company is not subject to any order, writ, judgment, injunction or decree of any governmental authority or instrumentality or any court.

4.1.8.  <u>Intellectual Property</u>.

(a)     **Exhibit 4.1.8** attached hereto sets forth:  (i) all U.S. and foreign issued design patents, utility patents and other patents, and all pending applications relating to same, and all reissues, divisions, continuations, continuations-in-part and extensions of

ST PAPER 0649

them; (ii) all registered trademarks, registered service marks, registered trade dress, trademark, service mark, and trade dress applications, unregistered trademarks and service marks, trade names, trade dress, logos and designs, and unique product configurations; (iii) all registered copyrights' and copyright applications and all renewals and extensions; and (iv) a general identification of all material trade secrets and know-how including, without limitation, invention disclosures, new product development information, formulas, software and vendor and customer lists, owned by the Company or used in the Company's business or in which the Company has an interest and the nature of such interest thereof (items (i) through (iv) hereinafter collectively referred to as "Intellectual Property"). The Sellers have delivered to the Buyer correct and complete copies of all such patents, trademarks or copyright registrations, applications, licenses, agreements and permissions (as amended to date) and have made available to the Buyer correct and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item of Intellectual Property.

(b)     **Exhibit 4.1.8** attached hereto also sets forth all licenses, franchises and permits granted by or to the Company and all other agreements to which the Company is a party, which create rights in the Company or in any third party regarding any Intellectual Property specifically or other intellectual property generally including, without limitation, trademarks, patents, copyrights, trade secrets and know-how (hereinafter collectively referred to as "Licenses").

(c)     Except as set forth in Section 4.1.8 of the Schedule of Exceptions, (i) The Company is the sole and exclusive owner, free and clear of all liens, claims and encumbrances, of all right, title and interest in the Intellectual Property and the Company has the absolute right to use and assign those rights without seeking the approval or consent of any third party and without payments to any third party; (ii) all registrations and applications for the Intellectual Property are in full force and effect; (iii) there are no other items of intellectual property that are material to the Company's business; (iv) there are no existing or, to the Sellers' knowledge, threatened claims or proceedings by any person relating to the use by the Company of the Intellectual Property or challenging its ownership of the same; (v) none of the Intellectual Property is subject to any outstanding order, decree, judgment, stipulation, written restriction, undertaking or agreement limiting the scope or use of the Intellectual Property or declaring any of it abandoned; (vi) to the Sellers' knowledge, there are no infringing or diluting uses of the Intellectual Property, and no investigations are pending concerning the possibility of such infringing or diluting use; and (vii) except for the Licenses, the Company has not granted any license, franchise, permit or other right to any third party to use any of the Intellectual Property.

(d)     The Company has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any intellectual property rights of third parties, and neither the Company nor any other of the Sellers has received any charge, complaint, claim, or notice alleging any such interference, infringement, misappropriation or violation.

ST PAPER 0650

4.1.9.   Financial Statements.  Except as set forth in Section 4.1.9 of the Schedule of Exceptions, the Financial Statements attached hereto as **Exhibit 4.1.9** are true, correct and complete, and fairly represent the financial condition of the Company on the dates designated thereon and the results of operations for the periods designated therein and were prepared in accordance with GAAP (subject to those footnotes to the Financial Statements by the Company's accounting firm) subject, in the case of interim financial statements, to appropriate year-end adjustments.  There has been no material change in the capitalization, assets, liabilities, business prospects, gross margin, profitability, or methods of doing business of the Company since the Balance Sheet Date other than changes in the ordinary course of business since the Balance Sheet Date (none of which ordinary course changes have had or will have a Material Adverse Effect on the business, prospects or condition, financial or otherwise, of the Company's business).

4.1.10.   Taxes.  All Tax returns, reports and forms due prior to the date hereof have been timely and properly filed and properly reflect the Tax liability and/or net operating loss of the Company.  Except as set forth in Section 4.1.10 of the Schedule of Exceptions, the Company has not requested any extension of time within which to file returns in respect of any Taxes.  Except as set forth in Section 4.1.10 of the Schedule of Exceptions, all Taxes and withholding amounts due and payable by the Company prior to the Closing, and all Taxes for which the Company may otherwise be liable, will have been paid in full prior to the Closing.  The Company has withheld and paid over all Taxes required to have been withheld and paid over, and complied with all information reporting and backup withholding requirements, including maintenance of required records with respect thereto, in connection with amounts paid or owing to any employee, creditor, independent contractor or other third party.  The provision made for Taxes on the Financial Statements attached hereto as a part of **Exhibit 4.1.9**, is sufficient for the payment of all accrued and unpaid Taxes payable by the Company for the periods ending on such dates and for all periods prior thereto.  No Tax deficiencies have been proposed or assessed against the Company.  There are no pending or, to the Sellers' knowledge, threatened audits, investigations or claims for or relating to any liability in respect of Taxes and there are no matters under discussion with any governmental authorities with respect to Taxes that are likely to result in an obligation by the Company to pay any additional amount of Taxes.  No Tax liens have been filed on any asset owned by the Company.  The Company is not, and never has been, a party to a Tax sharing agreement.  The Company is not liable for the unpaid Taxes of any other Person whether by contract, operation of law or otherwise.

4.1.11.  Undisclosed Commitments or Liabilities.  There are no commitments, liabilities or obligations relating to the Company, whether accrued, absolute, contingent or otherwise including, without limitation, guaranties by the Company of the liabilities of third parties, for which specific and adequate provisions have not been made on the Financial Statements, except those incurred in or as a result of the ordinary course of business since the Balance Sheet Date (none of which ordinary course obligations have had or will have a Material Adverse Effect on the Company).

4.1.12.  Contracts and Other Agreements.  **Exhibit 4.1.12** attached hereto sets forth a true and complete list of all of the following with respect to which the Company is a party or by which any of the Real Estate or any of the Company's assets are bound (collectively, the "Contracts"):  (i) all purchase orders and sales orders not in the ordinary course of business and

ST PAPER 0651

all purchase and sales orders in excess of Twenty Five Thousand Dollars ($25,000.00), all arrangements or agreements, whether written or oral, between the Company and any of the other Sellers or any other Affiliate, loan agreements, supply agreements, sole source arrangements, security agreements, notes, guarantees, mortgages, licenses, technology agreements, royalty agreements, licensing agreements, authorizations, construction permits, leases, employment agreements, compensation agreements, covenants not to compete, confidentiality agreements, commission agreements, sales representative, distributorship or marketing agreements, employee benefit plans, profit sharing plans, pension plans, group insurance, bonus plans or other contracts or agreements (excluding purchase and sales orders except as described above) made in the ordinary course of business for an amount greater than Five Thousand Dollars ($5,000.00) over the term of such Contract or extending more than sixty (60) days from the Closing Date, and (ii) all other contracts or agreements, whether written or oral, not made in the ordinary course of business. True and correct copies (or memoranda describing each with respect to oral agreements or plans) of each of the Contracts, and all amendments and modifications thereof, have been delivered to the Buyer. Each Contract is valid, binding and in full force and effect in accordance with its terms. Except as set forth in Section 4.1.12 of the Schedule of Exceptions, neither the Company, and to the Sellers' knowledge, no other party to any Contract is in breach or default under any Contract (with or without the lapse of time, or the giving of notice, or both).

4.1.13. <u>Products</u>. No claim for product liability has been asserted against the Company during the five (5) year period immediately preceding the date hereof and no event has occurred which might give rise to the assertion of any such claim. There is no deficiency or inadequacy in the manufacture, design or formulation of any of the products of the Company which may result in any such claim. All products sold by the Company have been manufactured in compliance with all applicable manufacturing and quality control procedures.

4.1.14. <u>Product Warranties</u>. All products and services manufactured and/or sold by the Company (and the delivery thereof) prior to the date hereof have been in conformity with all applicable contractual commitments and all expressed or implied warranties. No liability for any warranty claims exists for the repair or replacement thereof or other damages in connection with such services, sales or deliveries, except for any such claims incurred in the ordinary course of business consistent in amount and character with past experience of the Company. All product labeling of the Company is in conformity with all applicable Laws. Copies of the standard terms and conditions of sale, delivery or lease of the Company (including all warranty provisions) are attached hereto as **Exhibit 4.1.14**.

4.1.15. <u>Employees</u>. **Exhibit 4.1.15** attached hereto contains:

(a)     a list of all employee handbooks and/or manuals relating to the employees of the Company, true and correct copies of which have been delivered to the Buyer; and

(b)     a list of all employees of the Company, together with their job descriptions, rates of salary, wages or commissions, vacation benefits and accrual rates, and each bonus, deferred compensation, stock option, incentive compensation, severance or termination pay agreement or employment benefit applicable to each such employee, whether formal or informal.

ST PAPER 0652

4.1.16. <u>Labor Practices</u>.  With respect to the employees of the Company:

(a)     The Company is in compliance with all applicable Laws relating to employment discrimination, employee welfare and labor standards.  There is no basis for any claim by any past or present employee of the Company that such employee was subject to a wrongful discharge or any employment discrimination by the Company or its management arising out of or relating to such employee's race, sex, age, religion, national origin, ethnicity, handicap or any other protected characteristic under applicable Law.

(b)     The Company is in compliance with the Federal Occupational Safety and Health Act, the regulations promulgated thereunder and all other applicable Laws relating to the safety of employees or the workplace or relating to the employment of labor, including, without limitation, any provisions thereof relating to wages, bonuses, collective bargaining, equal pay and the payment of social security and similar payroll taxes.  No proceedings are pending before any court, government agency or instrumentality or arbitrator relating to labor matters, and there is no pending investigation by any governmental agency or, to the knowledge of the Sellers, threatened claim by any such agency or other person relating to labor or employment matters.

(c)     The Company is not a party to any understanding (whether written or oral), agreement or contract with any union, labor organization, employee group, or other entity or individual which affects the employment of employees of the Company, including but not limited to, any collective bargaining agreements or labor contracts.

(d)     To the Sellers' knowledge, none of the employees of the Company are in the process of being organized by or into labor unions or associations.  The Company has not been subject to a strike, slowdown or other work stoppage during the three (3) year period immediately preceding the date hereof and, to the Sellers' knowledge, there are no strikes, slow-downs or work stoppages threatened against the Company.

(e)     To the knowledge of the Sellers, no key employee or group of employees has expressed plans to terminate employment with the Company.

4.1.17. <u>ERISA</u>.

(a)     **Exhibit 4.1.17** attached hereto lists all profit sharing, pension or retirement plans, programs, arrangements or agreements, and each other employee benefit plan, program or agreement maintained or contributed to or required to be contributed to for the benefit of any employee or terminated employee of the Company, whether formal or informal (the "Plan" or "Plans").  The Company does not have any formal plan or commitment, whether legally binding or not, to create any additional Plan or modify or change any existing Plan that would affect any employee or terminated employee of the Company.

(b)     No Plans are covered by Title IV of ERISA, nor has the Company ever maintained any such a plan covering employees or former employees of the Company.

ST PAPER 0653

(c)     The Company has heretofore delivered to the Buyer a true and complete copy of each Plan (including all amendments thereto).

(d)     Full payment has been made of all amounts which the Company is required to pay under the terms of each of the Plans for the most recent plan year thereof ended prior to the date of this Agreement, and all such amounts payable with respect to the portion of the current plan year ending on the Closing Date will be paid by the Company on or prior to the Closing Date.

(e)     Each of the Plans conforms to, and has been operated and administered in accordance with, all applicable Laws, including but not limited to, ERISA and the Code. Each of the Plans which is intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and is the subject of a currently effective favorable determination letter issued by the Internal Revenue Service with respect to the qualification of such Plan under the Code.

(f)     Neither the Company nor any of the Plans, nor any trust created thereunder, nor any trustee or administrator thereof, has engaged in a transaction in connection with the Company, or any trustee or administrator or any such trust, or any party dealing with the Plans or any such trusts, which could be subject to either a material civil penalty assessed pursuant to Section 502(i) of ERISA or a material tax imposed pursuant to Section 4975 of the Code.  There are not pending, or to the Sellers' knowledge, threatened claims by or on behalf any of the Plans by any employee or beneficiary covered under any such Plan or otherwise involving any such Plan (other than routine claims for benefits) and there have not been any "prohibited transactions" under the meaning of ERISA or the Code with respect to any Plan.

(g)     The Company does not contribute to or participate in any multi-employer plan (within the meaning of Section 4001(a)(3) under ERISA) covering employees or former employees of the Company.

4.1.18. Events Since Balance Sheet Date.  Except as set forth in Section 4.1.18 of the Schedule of Exceptions, since the Balance Sheet Date, the Company has not suffered any material adverse change in its assets, business or prospects and the Company has been operated only in the normal and ordinary course consistent with past practice and have not done any of the following:  (i) incurred or agreed to incur any obligations or liabilities, absolute, incurred, contingent or otherwise, whether due or to become due, except (a) current payables and accruals and (b) the obligations contemplated by this Agreement; (ii) mortgaged, pledged or subjected to, or agreed to mortgage, pledge or subject to, any lien, charge, security interest or any other encumbrance or restriction, any of its assets, except for this Agreement; (iii) sold, transferred, leased or otherwise disposed of or agreed to sell, transfer, lease or otherwise dispose of any of its assets (except sales of inventory in the ordinary course of business), or cancelled or compromised, or agreed to cancel or compromise, any debt or claim, or waived or released, or agreed to waive or release, any right of substantial value; (iv) suffered any damage, destruction or loss (whether or not covered by insurance) having a Material Adverse Effect; (v) transferred or granted, or agreed to transfer or grant, any rights under, or entered into or agreed to enter into, any settlement regarding the breach or in infringement of any lease, license, patent, copyright,

ST PAPER 0654

trademark, trade name, invention or similar rights relating to such entity, or modified or agreed to modify any existing rights with respect thereto; (vi) made, or agreed to make, any direct or indirect change (including any general form increase) in the rate of compensation, commission, bonus or other remuneration payable, or paid or agreed to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance pay, to any employee other than raises, bonuses and increases in compensation granted in the ordinary course of business consistent with past practices; (vii) acquired or agreed to acquire any assets which, individually or in the aggregate, are in excess of Ten Thousand Dollars ($10,000.00) or made or agreed to make any capital expenditures or capital additions or betterments; (viii) discharged or satisfied, or agreed to discharge or satisfy, any lien, charge or encumbrance, or paid or agreed to pay any obligation or liability, whether absolute, accrued, contingent or otherwise, whether due or to become due, other than current liabilities shown on the balance sheet as at the Balance Sheet Date and current liabilities incurred since the date of such balance sheet in the ordinary course of business; (ix) made or agreed to make any forward purchase commitments in excess of the requirements of such entity for normal operating inventories of quantity and quality consistent with past practices, or at prices higher than current market prices; (x) deferred, extended or failed to pay, any indebtedness when and as the same became due or allowed the level of indebtedness to increase in any material respect; (xi) suffered any labor trouble adversely affecting the Company's business; (xii) made any change in the manner which extends discounts or credits to customers or suppliers or distributors or otherwise deals with customers or suppliers or distributors; (xiii) made any change in its selling, pricing or advertising practices inconsistent with its prior practice and prudent business practices prevailing in the industry; or (xiv) made or agreed to make any modification or amendment to any of the Contracts or terminated or agreed to terminate any Contract.

4.1.19. <u>Compliance With Environmental Laws</u>. Except as set forth in Section 4.1.19 of the Schedule of Exceptions:

(a)      Except in compliance with all Environmental Laws, there are no and, to the knowledge of the Sellers, there have never been any Hazardous Substances (A) at, on, in, above or under the Real Estate or (B) on any adjacent property including, without limitation, Hazardous Substances originating or emanating from any other property that are present in, on, under or above the Real Estate or Hazardous Substances originating or emanating from the Real Estate that are present in, on, under or above any other property and no Hazardous Substances have ever been generated, treated, stored, disposed of, handled on, spilled, discharged or released on or from or removed from the Real Estate by the Company or any of the other Sellers and, to the knowledge of the Sellers, by any third party;

(b)      The Company has not and, to the knowledge of the Sellers, no current or former owner of the Real Estate has, received any notice from any governmental agency or any third party notifying of (A) any Hazardous Substances which have been generated, treated, stored, handled or removed from or disposed of on the Real Estate, or (B) any Hazardous Substance which has migrated on, in, under, above or to the Real Estate from any adjacent property or which has migrated, emanated or originated from the Real Estate onto any other property or (C) any violation of any actual or potential liability,

ST PAPER 0655

responsibility or obligation arising out of or relating to any Environmental Law with respect to the Company or the Real Estate.

(c)     The Company has obtained all necessary Governmental Approvals required for the operation of the Company's business and the use of the Real Estate required by any Environmental Law;

(d)     No Environmental Claim with respect to the Company or Real Estate is pending or, to the knowledge of the Sellers, threatened;

(e)     No action concerning any Environmental Law has been taken or is threatened against the Company, or to the knowledge of the Sellers, current or previous owners of the Real Estate by any governmental department or agency or third party;

(f)     The Company and the Company's assets are, and at all times in the past, have been in compliance with each Environmental Law and with all Governmental Approvals issued in connection with the operation of the Company's business and the use of the Real Estate;

(g)     The consummation of the transactions contemplated by this Agreement does not (A) impose any obligations on the Company under any Environmental Law, including without limitation, for the investigation or cleanup of the Real Estate, or (B) require notification to or consent of any governmental authority or third party pursuant to any Environmental Law;

(h)     None of the Real Estate contains and, to the knowledge of the Sellers, has never contained any (A) underground or aboveground storage tanks, (B) asbestos-containing material, PCB's, radon, or urea formaldehyde foam, (C) landfill or dumps, (D) septic systems or wells of any type, or (E) a hazardous waste management facility as defined pursuant to RCRA or any comparable state law;

(i)     No action or failure to act by the Company or any of the other Sellers, or to the knowledge of the Sellers, the current or former owners of the Real Estate has occurred with respect to the Real Estate which, with the passage of time, the giving of notice, or both, would constitute a violation of any Environmental Law or give rise to an Environmental Claim;

(j)     To the knowledge of the Sellers, none of the Company's assets are required to be upgraded, modified or replaced to be in compliance with any existing or proposed Environmental Law; and

(k)     Attached as part of **Exhibit 4.1.19** is a copy of all Environmental Claims, reports, studies, assessments and audits or the like of, in the possession of or available to the Company or any of the other Sellers with respect to any environmental matter associated with the Company's business, the Real Estate or any of the Company's assets.

4.1.20. Insurance. The Company maintains policies of fire and casualty, liability and other forms of insurance and bonds in such amounts, with such deductibles, and against such

ST PAPER 0656

risks and losses as are reasonable for the business and the assets of the Company.  A true and complete list of all such insurance and bonds currently maintained by the Company is attached hereto as **Exhibit 4.1.20**.  Each such insurance policy and bond is in full force and effect and the Company has not received notice of and is not otherwise aware of any cancellation or threat of cancellation of such insurance or bond.  **Exhibit 4.1.20** attached hereto also sets forth all property damage, personal injury, workers' compensation, products liability or other claims that have been made against the Company in the last five (5) years or which are pending against the Company or, to the Sellers' knowledge, threatened against the Company.

4.1.21. Licenses; Permits.  The Company is in compliance with and has all permits, registrations and authorizations required by all applicable Laws in the operation of the Company's business.  Attached hereto as **Exhibit 4.1.21** is a true and complete list of all licenses, permits, registrations and authorizations issued or granted to the Company by local, state or federal government authorities or agencies.  The Company is not in breach or violation of any applicable Law relating thereto and all such licenses, registrations, permits and authorizations are current and effective.

4.1.22. Compliance With Laws.  The operation of the Company's business and the sale and distribution of all goods and services by the Company are and have been in compliance with all Laws.  No notice has been issued nor any investigation or review is pending or, to the Sellers' knowledge, threatened by any governmental entity (i) with respect to any alleged violation by the Company or any representative of any of the Company of any Law, or (ii) with respect to any alleged failure to have all permits, certificates, licenses, approvals or other authorizations required by Law in connection with the operation of the Company's business.

4.1.23. Customers; Suppliers.  **Exhibit 4.1.23** attached hereto sets forth, with respect to the last two (2) fiscal years of the Company and with respect to the six (6) month period ended June 30, 2006, a list of (i) the dollar amount derived from each of the ten (10) largest (based on dollar amounts purchased from the Company) customers of the Company, and (ii) the dollar amount purchased from the ten (10) largest (based on dollar amounts purchased by the Company) suppliers of the Company.  Neither the Company nor any other Seller has any reason to believe or has received any notice or indication of the intention of any of the customers, suppliers or third parties to material contracts of the Company, to cease doing business or reduce in any material respect the business transacted with the Company or to terminate or modify any agreements with the Company (whether upon consummation of the transactions contemplated hereby or otherwise).

4.1.24. Brokers; Agents.  None of the Sellers have dealt with any agent, finder, broker or other representative in any manner which could result in the Buyer being liable for any fee or commission in the nature of a finder's fee or originator's fee in connection with the subject matter of this Agreement.

4.1.25. Warranties True and Correct.  No warranty or representation by the Sellers contained in this Agreement, the Exhibits and Schedule of Exceptions attached hereto, any Ancillary Agreement or in any writing to be furnished pursuant hereto contains or will contain any untrue statement of fact or omits or will omit to state any material fact required to make the warranties or representations therein contained not misleading and there is no fact or condition

ST PAPER 0657

that has not been disclosed in writing to the Buyer that adversely affects or is reasonably likely to adversely affect the Company or the ability of the Sellers to perform their obligations hereunder or thereunder.

4.2.    <u>Warranties Survive Closing</u>.  Notwithstanding any investigation by or information supplied to the Buyer, the warranties and representations of the Sellers contained herein and in any document delivered pursuant hereto, shall be true and correct on the date hereof and shall survive the Closing as follows:  (i) for the representations and warranties described in Paragraphs 4.1.1 and 4.1.4, and the first sentence and last sentence of Paragraph 4.1.5, and any representation or warranty fraudulently made, indefinitely, (ii) for the representations and warranties described in Paragraphs 4.1.10, 4.1.17(e)-(g) and 4.1.19, for four (4) years, and (iii) for all other representations and warranties, for eighteen (18) months.  Any claim for indemnification under Paragraph 9.1(a) hereof made in writing prior to the expiration of such applicable survival period, and the rights of indemnity with respect thereto shall survive such expiration until resolved or judicially determined; and any such claim not so made in writing prior to the expiration of such applicable survival period shall be deemed to have been waived.

4.3.    <u>Knowledge of the Sellers</u>.  For those warranties and representations set forth in this Article IV which are subject to the qualification "to Sellers' knowledge," or similar terms, the Sellers shall be deemed to have knowledge of a matter if (i) any of the Sellers and/or any officer, director and/or management personnel of the Company has knowledge of the matter, or (ii) such matter has come, or should reasonably be expected to have come, to the attention of any of the Sellers or any officer, director or management personnel of the Company if such party had conducted a reasonable due diligence review of the Company's operations and business including reasonable inquiries to key personnel and a review of, and discussions with key personnel regarding, the books, records and operations of the Company.

## ARTICLE V

## <u>Warranties and Representations of the Buyer</u>

5.1.    <u>Warranties and Representations</u>.  The Buyer hereby warrants and represents to the Sellers, which warranties and representations shall survive the Closing for the period set forth in Paragraph 5.2, below, as follows:

5.1.1.    <u>Authority</u>.  The Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware, and has the power and authority to carry on all business activities currently conducted by it.  The Buyer has the power and authority to enter into this Agreement and the Ancillary Agreements to be signed by it and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the Ancillary Agreements to which the Buyer are a party and the consummation of the transactions contemplated hereby by the Buyer have been approved by all necessary limited liability company action on the part of the Buyer and are and shall constitute valid and legally binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

ST PAPER 0658

5.1.2.  <u>No Conflict</u>.  The execution and delivery of this Agreement and the Ancillary Agreements by the Buyer does not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof by the Buyer will not: (a) conflict with, or result in any breach or violation of:  (i) any provision of the Certificate of Organization or operating or similar governing agreement of the Buyer, or (ii) any judgment, order, decree, or Law, applicable to the Buyer, or (b) violate or conflict with, or result in a breach under, any agreement, instrument or document to which the Buyer is a party or are subject not otherwise waived.  No action, consent, approval, order or authorization of, or registration, declaration or filing with, any federal, state, municipal or other court or governmental or administrative body or agency, or other third party is required to be obtained or made in connection with the execution and delivery of this Agreement and the Ancillary Agreements by the Buyer or the consummation by the Buyer of the transactions contemplated hereby.

5.1.3.  <u>Brokers; Agents</u>.  The Buyer has not dealt with any agent, finder, broker or other representative in any manner which could result in the Sellers being liable for any fee or commission in the nature of a finder's or originator's fee in connection with the subject matter of this Agreement.

5.1.4.  <u>Warranties True and Correct</u>.  No warranty or representation by the Buyer contained in this Agreement, the Exhibits attached hereto, any Ancillary Agreement or in any writing to be furnished pursuant hereto contains or will contain any untrue statement of material fact or omits or will omit to state any material fact required to make the statements therein contained not misleading.

5.2.  <u>Warranties Survive Closing</u>.  Notwithstanding any investigation by or information supplied to the Sellers, the warranties and representations of the Buyer contained herein and in any document delivered pursuant hereto, shall be true and correct on the date hereof and shall survive the Closing as follows:  (i) for the representations and warranties described in Paragraphs 5.1.1 and 5.1.2, indefinitely, and (ii) for all other representations and warranties, for eighteen (18) months.  Any claim for indemnification under clause (i) of Paragraph 9.2 hereof made in writing prior to the expiration of such applicable survival period, and the rights of indemnity with respect thereto, shall survive such expiration until resolved or judicially determined; and any such claim not submitted in writing prior to the expiration of such survival period shall be deemed to have been waived.

**ARTICLE VI**

<u>Schedule of Exceptions</u>

The schedules and information set forth in the Schedule of Exceptions attached hereto (the "Schedule of Exceptions") specifically refer to the paragraph of this Agreement to which such schedule and information is responsive and each such schedule and information shall not be deemed to have been disclosed with respect to any other paragraph of this Agreement or for any other purpose.  All capitalized terms used in the Schedule of Exceptions and not otherwise defined therein shall have the same meanings as are ascribed to such terms in this Agreement.  The Schedule of Exceptions shall not vary, change or alter the literal meaning of the representations and warranties of the Sellers contained in this Agreement, other than creating

ST PAPER 0659

exceptions thereto which are directly responsive to the language of the warranties and representations contained in this Agreement.

## ARTICLE VII

### Covenants

7.1.     Access.   Prior to the Closing, the Buyer (including its officers, directors, employees, accountants, consultants, legal counsel, financing sources, agents and other representatives) shall be entitled to have such access to the officers, employees, agents, assets, properties, business, operations, books, records, commitments and contracts of the Company as is reasonably necessary or appropriate in connection with the Buyer's investigation of the business operations of the Company and the Subject Assets with respect to the transactions contemplated hereby.  No investigation by the Buyer shall diminish or obviate any of the representations, warranties, covenants or agreements of the Sellers contained in this Agreement. In order that Buyer may have full opportunity to make such investigation, the Sellers shall furnish the representatives of the Buyer during such period with all such information and copies of such documents concerning the affairs of the Company as such representatives may reasonably request and cause its officers, employees, consultants, agents, accountants and attorneys to cooperate fully with such representatives in connection with such investigation.

7.2.     Conduct of Business in the Ordinary Course.   Until the Closing, the Company shall, and the other Sellers shall use their best efforts to cause the Company to, carry on its business diligently and substantially in the manner as heretofore conducted, and shall not make or initiate any unusual or novel methods of purchase, sale, management, accounting or operation, or make any adjustments in the pricing or advertising of their products or services not consistent with their past business practices.  The Company shall not, and the other Sellers shall not cause the Company to, enter into any contract or commitment to engage in any transaction not in the ordinary course of its business or not consistent with its past business practice.  The Company shall, and the other Sellers shall use their best efforts to, preserve for the Buyer the Company's business organization, including present key employees, and the Company's relationship with suppliers, customers and others having business relations with the Company.  Without limiting the scope of the foregoing, the Company shall, and the other Sellers shall cause the Company to, until the Closing:

(a)     Use, preserve and maintain its properties and assets on a basis consistent with past practices.

(b)     Maintain all insurance covering any of its business, properties or assets in full force and effect through the close of business on the Closing Date.

(c)     Continue to purchase raw materials and supplies in accordance with current production schedules and in quantities and qualities consistent with past practices and not in excess of its reasonable requirements.

ST PAPER 0660

     (d)     Pay all debts and obligations as the same became due and payable, except to the extent contested in good faith by appropriate proceedings and (and with appropriate reserves established therefor).

     (e)     Maintain books, accounts and records in the usual manner and on a basis consistent with past practices.

Furthermore, and without limiting the scope of the foregoing, the Company will not, and the other Sellers will not cause the Company to, without the prior written consent of the Buyer:

     (f)     Make any capital expenditures, or commitments with respect thereto (including, without limitation, capital leases), in excess of Twenty-Five Thousand Dollars ($25,000) for individual items, or in excess of One Hundred Thousand Dollars ($100,000) in the aggregate (other than in connection with the repair of control cables).

     (g)     Sell, transfer, lease or otherwise dispose of or agree to sell, transfer lease or otherwise dispose of any of the Subject Assets (other than sales of inventory made in the ordinary course of business) or cancel or compromise, or agree to cancel or compromise, any debt or claim, or waive or release, or agree to waive or release, any right of substantial value relating to the Company or the Subject Assets.

     (h)     Make or agree to make, any direct or indirect change (including any general increase) in the rate of compensation, commission, bonus or other remuneration payable, or grant any severance or termination pay to, or increase benefits payable under any existing severance or termination pay policies to, or enter into or modify any employment agreements with any employees, agents and/or representatives or pay any employee bonuses or make any profit sharing contributions prior to the Closing Date.

     (i)     Adopt or amend or increase compensation or benefits payable under, or take any actions which might result in an adverse Tax or other consequences with respect to, any bonus, profit sharing, compensation, stock option, pension, retirement, deferred compensation, collective bargaining agreement or other plan, agreement, trust, fund or arrangement for the benefit of any employee or class of employees.

     (j)     Commit any act or omit to do any act, or permit any act or omission to act, which will or may cause a breach of any Assumed Contract or make or agree to make any modification or amendment to any of the Assumed Contracts or terminate or agree to terminate any Assumed Contract.

     (k)     Change the prices charged for services or products except in accordance with past practices or change credit policies.

     (l)     Incur any indebtedness other than indebtedness for accounts payable to trade creditors or to third party lenders, in each case, incurred in the ordinary course of business in connection with obtaining materials or services.

ST PAPER 0661

(m)     Mortgage, pledge or subject to, or agree to mortgage, pledge or subject to, any lien, charge, security interest or any other encumbrance or restriction on any of the Subject Assets; or

(n)     Transfer or grant, or agree to transfer or grant, any rights under, or enter into or agree to enter into, any settlement regarding the breach or infringement of any Intellectual Property or similar rights relating to the Company or the Subject Assets or modify or agree to modify any existing rights with respect thereto.

7.3.    Retention of Employees.  The Company shall, and the other Sellers shall use their best efforts to, assist the Buyer in retaining those employees of the Company which the Buyer elects to hire in connection with the operation of the business operations of the Company by the Buyer subsequent to the Closing.

7.4.    No Shop Provision.  The Sellers agree that they shall not solicit or initiate any proposal with, negotiate, discuss or otherwise communicate with, or furnish or cause to be furnished any information to, or otherwise cooperate with or enter into any contract or agreement with any person, corporation, firm or entity with respect to any proposal for the disposition of all or a substantial portion of the assets, stock or interest of any of the Sellers.  These obligations shall continue until the Closing Date or, if earlier, the date on which this Agreement is terminated by mutual agreement of the parties hereto or in accordance with the provisions of Paragraphs 3.1 or 3.2, above, as a result of the failure of any Closing condition to be satisfied.

7.5.    Mutual Covenants.  Each Seller and the Buyer covenant and agree as follows:

(a)     The Buyer and the Sellers shall cooperate with each other and shall cause their respective officers, employees, agents, accountants and representatives to cooperate with each other after the Closing to ensure the orderly transition of the ownership of the Subject Assets and the business operations of the Company to the Buyer and to minimize any disruption to the business of the Buyer and the Sellers that might result from the transactions contemplated hereby.

(b)     On the Closing Date, the Sellers will deliver or cause to be delivered to the Buyer all original Records in the possession or control of any of the Sellers.  After the Closing, upon reasonable written notice, the Buyer and the Sellers agree to furnish or cause to be furnished to each other and their respective representatives, employees, counsel and accountants access, during normal business hours, to such information (including Records pertinent to the Company) and assistance relating to the Company as is reasonably necessary for financial reporting and accounting matters, the preparation and filing of any returns, reports or forms or the defense of any Tax claim or assessment; provided, however, that such access does not unreasonably disrupt the normal operations of the Buyer or the Sellers.

(c)     The Sellers agree that they shall make no public release or announcement concerning the transactions contemplated hereby.  The Buyer shall have the sole right to determine what, if any, public announcements shall be made.

ST PAPER 0662

(d)     From time to time, as and when requested by a party hereto, each party hereto shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary to consummate the transactions contemplated by this Agreement.

7.6.    <u>Consents</u>. In the event any Consent is not obtained on or prior to the Closing Date, and the Buyer elects to consummate the transactions contemplated herein despite the Sellers' failure or inability to obtain such Consent, the Sellers shall continue to use commercially reasonable efforts to obtain any such assignment or consent after the Closing Date.  Until such time as such assignment or approval has been obtained, the Sellers will cooperate with the Buyer in any lawful and economically feasible arrangement to provide that the Buyer shall continue to receive interest in the benefits under any Assumed Contract; provided, however, that the Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent the Buyer would have been responsible therefor if such consent or assignment had been obtained.

7.7.    <u>Employees</u>.

(a)     The Company shall, and the other Sellers shall use their best efforts to, assist the Buyer in retaining those employees of the Company that the Buyer wishes to hire.  Any offers of employment made by the Buyer shall be on terms and conditions as are acceptable to the Buyer in its sole discretion.  The Sellers jointly and severally covenant and agree to pay all wages and benefits (including, without limitation, any accrued and unused vacation or sick time) through the Closing Date to each employee hired by the Buyer.  Nothing contained in this Agreement shall be deemed to grant any such employee any right to continued employment after the Closing Date.

(b)     The Sellers, jointly and severally, shall be responsible for, and shall indemnify and hold the Buyer harmless against and in respect of any liability, loss, claim, damage or deficiency that arises under the WARN Act or other similar statutes or regulations of any jurisdiction ("WARN Liabilities") which arose on or prior to the Closing Date or as a result of or in connection with the transactions contemplated herein.  The Buyer shall be responsible for, and shall indemnify and hold the Sellers harmless against and in respect of any WARN Liabilities which arise after the Closing Date with respect to those employees of the Company hired by the Buyer.

7.8.    <u>Collection of Accounts Receivable</u>.  If, following the Closing, the Sellers shall collect any accounts receivable belonging to the Buyer, the Sellers shall hold the same in trust and shall promptly pay the same over to the Buyer.

7.9.    <u>Risk of Loss</u>.  Risk of loss, damage or destruction to any of the Subject Assets shall be upon the Sellers until the Closing Date and thereafter upon the Buyer.  In the event of any damage, destruction or loss of or to any of the Subject Assets on or prior to the Closing Date, the Sellers shall take steps to repair, replace and restore the damaged, destroyed or lost property to its former condition and at Closing the Sellers shall assign to the Buyer all of their respective rights under any insurance and all proceeds of insurance (excluding business interruption

ST PAPER 0663

proceeds for periods prior to the Closing Date) covering the property damage, destruction or loss not so repaired, replaced or restored prior to Closing and shall at Closing reimburse the Buyer for any deductible under such insurance. In the event of any damage, destruction or loss of or to any of the Subject Assets prior to the Closing Date which would cause a Material Adverse Effect upon the Subject Assets or materially interfere with the continued operation of the business of the Company ("Event of Loss") and such property or asset is not replaced or else repaired or restored to substantially the condition it was in prior to the Event of Loss on or before the Closing Date, the Buyer may: (a) elect to consummate the Closing on the Closing Date and accept the property in its then condition, in which event the Purchase Price shall be reduced by an amount equaling the repair and/or replacement value (as reasonably determined by the Buyer) for all property damaged, destroyed or lost in such Event of Loss less all insurance proceeds received by Buyer from Sellers, or (b) elect to terminate this Agreement, in which event all parties shall be released from all liabilities and obligations hereunder, except for liabilities for pre-termination breaches hereof; provided, however, that the Buyer and Sellers may mutually elect to extend the Closing Date for a reasonable period not to exceed sixty (60) days necessary to allow the Sellers to complete any such replacement, repair or restoration.

7.10.   <u>HSR Act</u>.  On October 19, 2006, the Sellers and the Buyer each filed with the United States Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice (the "DOJ") the required Notification and Report Forms relating to the transactions contemplated herein required by the HSR Act.  The parties acknowledge that they received notification from the FTC that it granted early termination of the waiting period with respect to the transactions contemplated herein on October 30, 2006.

7.11.   <u>Use of Name</u>.  As soon as practical after the Closing, and in any event within six (6) months following the Closing, the Buyer shall cease to use the name "Oconto Falls Tissue" in connection with the operation of its business.

## ARTICLE VIII

### Covenant Not to Compete

8.1.   <u>Non-Competition</u>.  The Sellers and Ronald H. Van Den Heuvel (the "Restricted Parties") acknowledge and agree that at no time for a period of five (5) years after the Closing Date shall any of them, either directly or indirectly (including, without limitation, through an Affiliate or any family member), whether as agent, stockholder (except as the holder of not more than five percent (5%) of the equity securities of a publicly held enterprise as long as such party does not render advice or assistance to such enterprise), employer, employee, consultant, representative, trustee, partner, proprietor or otherwise:

(a)   Acquire an ownership interest in, work for, render advice or assistance to or otherwise engage in the business of the manufacture and/or sale of tissue, medium, white top, linerboard or gypsum, or procuring contracts related thereto or related to pulp processing from any "Competitor" (as hereinafter defined); or

(b)   Contact, solicit or entice, or attempt to contact, solicit or entice, any current supplier, customer or prospective customer of the Company (or any Person that

ST PAPER 0664

was a supplier or customer of the Company during the two (2) year period immediately prior to the Closing) so as to cause, or attempt to cause, any of said suppliers, customers or prospective customers not to do business with the Buyer or to purchase products or services sold by the Buyer from any source other than the Buyer; or

      (c)     Induce, or attempt to induce, any person who is currently an employee of the Company to leave the employ of the Buyer (if hired by the Buyer following the Closing) and/or to accept employment elsewhere.

For purposes of this Paragraph 8.1, the term "Competitor" shall mean any business, incorporated or otherwise, other than the Buyer or an Affiliate of the Buyer, which makes, sells or offers products or services competitive with those manufactured, sold or offered by the Company as of the date hereof.  This Paragraph 8.1 shall not prohibit the Restricted Parties from temporarily operating tissue, gypsum and/or linerboard facilities or machines upon start-up of the facilities or machines in connection with a Restricted Party's construction projects.

    8.2.    Non-Disclosure of Confidential Information.  The Restricted Parties each acknowledge and agree that none of them shall, at any time following the date hereof, disclose any Confidential Information (as hereinafter defined) to anyone other than to employees and representatives of the Buyer except any such Confidential Information which is required to be disclosed by any Restricted Party in connection with any court action or any proceeding before any administrative body or pursuant to any Law, and then only after such Restricted Party has given written notice to the Buyer of the intention so to disclose such Confidential Information and has given the Buyer a reasonable opportunity to contest the need for such disclosure, and the Restricted Parties shall cooperate with the Buyer in connection with any such contest.  For purposes of this Paragraph 8.2, the term "Confidential Information" shall mean all non-public and all proprietary information relating to the Company, their customers and products and services including, without limitation, the following: (i) all formulations, test results, manufacturing and engineering specifications, production and manufacturing information and know-how and all other technical information relating to the manufacture, formulation or production of the products or services; (ii) all information and records concerning products or services being researched by, under development by or being tested but not yet offered for sale; (iii) all information concerning the Intellectual Property; (iv) all information concerning pricing policies, the prices charged to their customers, the volume or orders of such customers and other information concerning the transactions with their customers or proposed customers; (v) customer lists; (vi) financial information; (vii) information concerning salaries or wages paid to, the work records of and other personnel information relative to employees; (viii) information concerning marketing programs or strategies; and (ix) all other confidential and proprietary information of the Company.

    8.3.    Enforcement.  In addition to all other legal remedies available to the Buyer for the enforcement of the covenants of this Article VIII, the Restricted Parties acknowledge and agree that the Buyer shall be entitled to temporary and permanent injunctive relief by any court of competent jurisdiction without the necessity of posting any bond or other security to prevent or restrain any breach or threatened breach hereof. The Restricted Parties further agree that if any of the covenants set forth herein shall at any time be adjudged invalid to any extent by any court

ST PAPER 0665

of competent jurisdiction, such covenant shall be deemed modified to the extent necessary to render it enforceable.

## ARTICLE IX

### Indemnification

9.1.    <u>Indemnification of the Buyer</u>.  The Sellers jointly and severally agree to indemnify the Buyer and to hold it harmless from and against any and all Losses of or against the Buyer resulting from:

(a)    any misrepresentation or breach of warranty on the part of any Seller in this Agreement or in any Ancillary Agreement delivered hereunder on the part of any Seller;

(b)    any breach or nonfulfillment of any agreement or covenant contained herein or in any Ancillary Agreement delivered hereunder on the part of any Seller;

(c)    any failure of the Sellers to pay and/or perform any liability or obligation of the Sellers other than the Assumed Liabilities; and/or

(d)    in addition to the indemnification available under <u>Paragraphs 9.1(a)</u>, <u>9.1(b)</u> and <u>9.1(c)</u>, above, for:

(i)    any liability or obligation for product liability claims for goods or services manufactured or sold by the Company on or before the Closing Date;

(ii)    any liability or obligation under any Plans relating to events prior to the Closing Date;

(iii)    any Tax liabilities or obligations of the Company;

(iv)    any liabilities or obligations arising under any Environmental Law or any Environmental Claim applicable to the Company or its operations and relating to events or circumstances existing prior to the Closing Date, including without limitation, (A) all liabilities or obligations related to any enforcement action by the Wisconsin Department of Natural Resources related to the Company's waste water treatment facilities, (B) all liabilities and obligations incurred by the Buyer in upgrading the Real Estate and manufacturing facilities of the Company in order to obtain and/or comply with applicable permits required and Environmental Laws, and (C) any liabilities or obligations arising in connection with those matters described on <u>Section 4.1.19</u> of the Schedule of Exceptions or any matter that should have been described thereunder;

(v)    any liabilities or obligations arising under the litigation matters described on <u>Section 4.1.3</u> or <u>Section 4.1.7</u> of the Schedule of Exceptions or any matters that should have been described thereunder; and

ST PAPER 0666

       (vi)    any costs incurred to bring the Yankee dryer at the Company's facility into good operating condition and repair relative to the necessary repairs of which the parties have knowledge as of the date of this Agreement.

    9.2.    <u>Indemnification of the Sellers</u>.  The Buyer agrees to indemnify the Sellers and to hold each of them harmless from and against any and all Losses of or against the Sellers resulting from (i) any misrepresentation or breach of warranty on the part of the Buyer in this Agreement or in any Ancillary Agreement executed and/or delivered by the Buyer in connection herewith; or (ii) any non-fulfillment of any agreement or covenant contained herein or in any Ancillary Agreement delivered hereunder on the part of the Buyer.

    9.3.    <u>Procedure Relative to Indemnification</u>.

    (a)    In the event that any party hereto shall claim that it is entitled to be indemnified pursuant to the terms of this <u>Article IX</u>, it (the "Claiming Party") shall so notify the party or parties against which the claim is made (the "Indemnifying Party") in writing of such claim within ninety (90) days after the Claiming Party receives notice of any action, proceeding, demand or assessment or otherwise has received notice of any claim of a third party that may reasonably be expected to result in a claim for indemnification by the Claiming Party against the Indemnifying Party; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually prejudiced as a result of such failure.  Such notice shall specify the breach of representation, warranty or agreement claimed by the Claiming Party and the Losses incurred by, or imposed upon the Claiming Party on account thereof.  If such Losses are liquidated in amount, the notice shall so state and such amount shall be deemed the amount of the claim of the Claiming Party.  If the amount is not liquidated, the notice shall so state and in such event a claim shall be deemed asserted against the Indemnifying Party on behalf of the Claiming Party, but no payment shall be made on account thereof until the amount of such claim is liquidated and the claim is finally determined.

    (b)    Subject to the conditions set forth in <u>Paragraph 9.3(c)</u>, below, the following provisions shall apply to claims of the Claiming Party which are based upon (i) a suit, action or proceeding filed or instituted by any third party, or (ii) any form of proceeding or assessment instituted by any governmental entity:

    (i)    The Indemnifying Party shall, upon receipt of such written notice and at its expense, defend such claim in its own name or, if necessary, in the name of the Claiming Party; provided, however, that if the proceeding involves a matter solely of concern to the Claiming Party in addition to the claim for which indemnification under this <u>Article IX</u> is being sought, such matter of sole concern shall be within the sole responsibility of the Claiming Party and its counsel.  The Claiming Party will cooperate with and make available to the Indemnifying Party such assistance and materials as may be reasonably requested of it, and the Claiming Party shall have the right, at its expense, to participate in the defense. The Indemnifying Party shall have the right to settle and compromise such claim

ST PAPER 0667



only with the consent of the Claiming Party, which consent shall not be unreasonably withheld provided that each of the following is satisfied:

      (A)    the terms of such settlement and compromise require no more than the payment of money (i.e., such settlement does not require the Claiming Party to admit to any wrongdoing or take or refrain from taking any action);

      (B)    the full amount of such monetary settlement will be paid by the Indemnifying Party; and

      (C)    the Claiming Party receives as part of such settlement a legally binding and enforceable unconditional satisfaction and/or release, in a form and substance reasonably satisfactory to the Claiming Party, providing that the claim and any claimed liability of the Claiming Party with respect thereto is being fully satisfied by reason of such settlement and compromise and that the Claiming Party is being released from any and all obligations or liabilities it may have with respect thereto.

      (ii)    In the event the Indemnifying Party shall not be entitled to defend any claim made against the Claiming Party pursuant to the provisions of this Article IX or the Indemnifying Party shall notify the Claiming Party that it disputes any claim made by the Claiming Party and/or it shall fail to defend such claim actively and in good faith, then the Claiming Party shall have the right to conduct a defense against such claim and shall have the right to settle and compromise such claim upon three (3) days notice to, but without the consent of, the Indemnifying Party. Once the amount of such claim is liquidated and the claim is finally determined, the Claiming Party shall be entitled to pursue each and every remedy available to it at law or in equity to enforce the indemnification provisions of this Article IX and, in the event it is determined, or the Indemnifying Party agrees, that it is obligated to indemnify the Claiming Party for such claim, the Indemnifying Party agrees to pay all costs, expenses and fees, including all reasonable attorneys' fees which may be incurred by the Claiming Party in attempting to enforce indemnification under this Article IX, whether the same shall be enforced by suit or otherwise.

      (c)    Notwithstanding anything to the contrary contained in this Article IX, the Indemnifying Party shall have no right to defend or control the settlement of any claim unless each of the following conditions is satisfied:

      (i)    the claim seeks only monetary damages and does not seek any injunction or other equitable relief against the Claiming Party;

      (ii)    the Indemnifying Party unconditionally acknowledges, in writing in a notice of election to contest or defend the claim given to the Claiming Party within ten (10) days after the Claiming Party gives the Indemnifying Party notice of such claim, that the Indemnifying Party is (jointly and severally in the case of

ST PAPER 0668

multiple Indemnifying Parties) obligated to indemnify the Claiming Party in full with respect to the claim;

        (iii)    the Indemnifying Party is not then in default of any of its obligations to the Claiming Party under this Agreement; and

        (iv)    the legal counsel chosen by the Indemnifying Party to defend the claim is reasonably satisfactory to the Claiming Party.

    9.4.   Set-Off.  Tissue Technology, LLC, the Sellers and the Buyer acknowledge and agree that the Buyer shall be entitled, in addition to any other remedies which may be available to it, to set-off against amounts payable to any Seller or any of Seller's Affiliates (including, without limitation, any amounts due and owing to the Sellers under the Note, amounts due and owing to any of Seller's Affiliates under any other promissory notes, amounts due and owing to the Sellers by any Affiliate of the Buyer, and those amounts due and owing to Tissue Technology, LLC under the Sales and Marketing Agreement) the amount of any claim by the Buyer for which the Buyer seeks, in good faith, indemnification under Paragraph 9.1, above.

    9.5.   Limitations.  The Sellers shall not be required to provide indemnification with respect to Paragraph 9.1(a), unless the Losses from all claims for indemnification made pursuant to Paragraph 9.1(a) shall exceed in the aggregate $100,000 and then only for amounts in excess of such amount.  In no event shall the Sellers' aggregate liability with respect to all claims for indemnification made pursuant to Paragraph 9.1(a) exceed an aggregate amount of $10,000,000. In no event shall the limitations described in this Paragraph 9.5 apply to a breach of the representations and warranties described in Paragraph 4.2(i), above, or if the Sellers committed fraud in connection with such breach or the failure to disclose such breach.

# ARTICLE X

## Definitions

    "Affiliate" means with reference to any person or entity, another person or entity controlled by, under the control of or under common control with that person or entity.

    "Agreement" means this Asset Purchase Agreement, as the same may be amended or modified from time to time.

    "Ancillary Agreements" means as to any party the agreements, documents and instruments to be executed and delivered by such party pursuant to this Agreement.

    "Assumed Liabilities" has the meaning set forth in Paragraph 2.6.

    "Balance Sheet Date" means December 31, 2005.

    "Buyer" has the meaning set forth in the preface above.

    "Closing" means the closing of the purchase and sale contemplated herein.

ST PAPER 0669

"Closing Date" means the date on which the Closing occurs.

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof.

"Company" has the meaning set forth in the preface above.

"Confidential Information" has the meaning set forth in Paragraph 8.2.

"Consents" means agreements, from the parties to those Assumed Contracts which by their terms prohibit assignment by the Company or which specifically require consent for such assignment, consenting to the assignment to the Buyer of such Assumed Contracts under the same terms and conditions as are applicable to the Company and without amendment, acceleration or modification of the Assumed Contracts.

"Contracts" has the meaning set forth in Paragraph 4.1.12.

"Environmental Claim" means any investigation, notice, violation, demand, allegation, action, suit, injunction, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (i) pursuant to, or in connection with, an actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Substances; (iii) from any abatement, removal, remedial, corrective or other response action in connection with Hazardous Substances, Environmental Law or other order of a governmental authority; or (iv) from any actual or alleged damage, injury, threat, or harm to health, safety, natural resources, wildlife or the environment.

"Environmental Law" means any of the federal, state, foreign and local statutory laws, ordinances, codes, rules, regulations, approvals or requirements of any governmental authority, court orders, administrative orders, executive orders, consent decrees, injunctions, judgments, and common law pertaining to (i) health, safety, natural resources, wildlife or the environment, (ii) the Occupational Safety and Health Administration, the U.S. Environmental Protection Agency, the Nuclear Regulatory Commission and the Wisconsin Department of Natural Resources and any similar state agency or department, or (iii) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, release, threatened release, abatement, removal, remediation or handling of, or exposure to, any petroleum products or Hazardous Substances (as hereinafter defined) and all amendments, modifications and additions thereto, in each case as amended to date including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, codified at 42 U.S.C. 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, the Solid Waste Disposal Act, codified at 42 U.S.C. 6901 et seq., as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendment of 1984 ("RCRA"), the Toxic Substances Control Act of 1976, codified at 15 U.S.C. 2601 et seq., the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, codified at 33 U.S.C. 1251 et seq., the Clean Air Act of 1966, codified at 42 U.S.C. 741 et seq., the Hazardous Materials Transportation Act, codified at 49, U.S.C. 651 et seq., the Oil Pollution Act of 1990, codified at 33 U.S.C. 2701 et seq., the Emergency Planning and Community Right-To-Know Act of 1986, codified at 42 U.S.C. 11001, et seq., the National Environmental Policy Act of 1969, codified at 42 U.S.C. 4321, et seq., the

ST PAPER 0670

Occupational Safety and Health Act of 1970, and the Safe Drinking Water Act of 1974, codified at 42 U.S.C. 300(f), et seq., the Atomic Energy Community Act of 1955, the Atomic Testing Liability Act, the Atomic Energy Damages Act, the Atomic Energy Omnibus Act, the Atomic/Nuclear Waste Policy Act of 1982, the Atomic/Nuclear Waste Policy Amendments of 1987 or any similar, implementing or successor law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended through the date hereof, and the rules and regulations promulgated thereunder.

"Event of Loss" has the meaning set forth in Paragraph 7.9.

"Excluded Assets" has the meaning set forth in Paragraph 1.2.

"Excluded Liabilities" has the meaning set forth in Paragraph 2.7.

"Financial Statements" means the financial statements of the Company attached hereto as **Exhibit 4.1.9**, including without limitation, the financial statements of the Company in and for the fiscal periods ended December 31, 2004, 2005 and 2006 and the interim financial statements for the period ended February 28, 2007.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Approval" shall mean any permit, license, variance, certificate, closure, exemption, decision, action or approval of a governmental authority.

"Hazardous Substances" shall mean and include any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, material, pollutant or contaminant which is hazardous, toxic or otherwise harmful to health, safety, natural resources, wildlife or the environment including, without limitation, asbestos, PCB's, radon and urea formaldehyde foam, petroleum and petroleum products, hazardous waste source, byproduct or special nuclear material, and raw materials which include hazardous constituents, or any other similar substances, or materials which are now, or in the future, included under or regulated by any Environmental Law.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indemnifying Party" has the meaning set forth in Paragraph 9.3(a).

"Intellectual Property" has the meaning set forth in Paragraph 4.1.8.

"Law" means any constitution, statute, law, ordinance, regulation or rule of any local, state, federal, foreign, territorial or other government body, subdivision, agency, department, commission, board, bureau or instrumentality of a governmental body.

"Licenses" has the meaning set forth in Paragraph 4.1.8(b).

ST PAPER 0671

"Losses" means all damages, losses, deficiencies, actions, demands, judgments, fines, fees, costs and expenses, including, without limitation, attorneys' and accountants' fees.

"Material Adverse Effect" means an event, condition, circumstance, act, omission or effect which, individually or in the aggregate with other similar events, conditions, circumstances, acts, omissions or effects:  (i) after taking into consideration the relative amount, the absolute amount and the nature of the item would cause a reasonably prudent buyer to conclude that such effect adversely affects the financial condition, assets, liabilities, obligations or operations of the Company in a manner or amount which would be material, or (ii) has or will have a direct financial consequence of Ten Thousand Dollars ($10,000.00) or more.

"Note" has the meaning set forth in Paragraph 2.3.

"Permitted Liens" has the meaning set forth in Paragraph 4.1.5.

"Plan" has the meaning set forth in Paragraph 4.1.17.

"PCDI" has the meaning set forth in the preface above

"Permitted Real Estate Encumbrances" means (i) real estate taxes for the year of the Closing, and (ii) municipal and zoning ordinances, recorded utility easements and other items of record (other than any encumbrances related to debt obligations (except for the Assumed Liabilities) or judgment liens of or against the Sellers or their Affiliates) which do not render the Real Estate unusable as a manufacturing and distribution facility consistent with past practices and (iii) real estate taxes to be paid at Closing.

"Purchase Price" has the meaning set forth in Paragraph 2.2.

"Real Estate" shall mean the real estate, fixtures, improvements, rights, privileges and easements described on **Exhibit 1.1(b)**.

"RCRA" has the meaning set forth in the definition of Environmental Law in this Article X.

"Records" means all books, records, manuals and other materials of the Company, including, without limitation, all sales, manufacturing and customer records, personnel and payroll records, accounting records, purchase and sale records, price lists, correspondence, quality control records and all research and development files, wherever located.

"Restricted Parties" has the meaning set forth in Paragraph 8.1.

"Sales and Marketing Agreement" has the meaning set forth in Paragraph 3.1(f)(ix).

"Schedule of Exceptions" has the meaning set forth in Article VI.

"Seller" has the meaning set forth in the preface above.

"Subject Assets" has the meaning set forth in Paragraph 1.1.

ST PAPER 0672

"Subsidiaries" with respect to any person, means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) 50% or more of (i) the outstanding capital stock or other equity interest having voting power to elect a majority of the Board of Directors of such corporation or persons having a similar role as to an entity that is not a corporation, (ii) the interest in the profits of such partnership or joint venture, or (iii) the beneficial interest of such trust or estate are at such time directly or indirectly owned by such person or one or more of such person's Subsidiaries.

"Tax" means all federal, state, county, local, foreign and other taxes or assessments, however, denominated, including, without limitation, income, estimated income, business, occupation, franchise, property (real and personal), sales, employment, gross receipts, use, transfer, ad valorem, profits, license, capital, payroll, employee withholding, unemployment, excise, goods and services, severance, stamp and including interest, penalties and additions in connection therewith for which the Sellers, or the Company, is or may be required to pay, withhold or collect.

"TPTC" has the meaning set forth in the preface above.

## ARTICLE XI

### Sellers' Agent

11.1.  Appointment.  Each Seller hereby irrevocably constitutes and appoints Ronald H. Van Den Heuvel and Steve Peters as such Seller's agent (the "Sellers' Agent") for the purpose of performing and consummating the transactions contemplated by this Agreement.  The appointment of Ronald H. Van Den Heuvel and Steve Peters as the Sellers' Agent is coupled with an interest and all authority hereby conferred shall be irrevocable and shall not be terminated by any or all of the Sellers without the consent of the Buyer, which consent may be withheld for any reason, and the Sellers' Agent is hereby authorized and directed to perform and consummate on behalf of the Sellers all of the transactions contemplated by this Agreement.

11.2.  Authority.  Not by way of limiting the authority of the Sellers' Agent, each and all of the Sellers, for themselves and their respective heirs, executors, administrators, successors and assigns, hereby authorize the Sellers' Agent to:

(a)  Waive any provision of this Agreement which the Sellers' Agent deems necessary or desirable;

(b)  Execute and deliver on the Seller's behalf all documents and instruments which may be executed and delivered pursuant to this Agreement;

(c)  Make and receive notices and other communications pursuant to this Agreement and service of process in any legal action or other proceeding arising out of or related to this Agreement or any of the transactions contemplated hereunder;

(d)  Settle any dispute, claim, action, suit or proceeding arising out of or related to this Agreement or any of the transactions hereunder;

ST PAPER 0673

(e)     Appoint or provide for successor agents; and

(f)     Pay expenses incurred or which may be incurred by or on behalf of the Sellers in connection with this Agreement.

In the event of the failure or refusal of Ronald Van Den Heuvel or Steve Peters to act as the Sellers' Agent (or upon the death of Ronald Van Den Heuvel, Steve Peters or any successor), the Sellers shall promptly appoint one of the Sellers as their agent for purposes of this Article XI, and failing such appointment within ten (10) days, the Buyer may, by written notice to the Sellers at the last address of the Sellers applicable for purposes of Article XII hereof, designate PCDI as such agent.

11.3.   Disputes.  Any claim, action, suit or other proceeding, whether in law or equity, to enforce any right, benefit or remedy granted to the Sellers under this Agreement may be asserted, brought, prosecuted or maintained only by the Sellers' Agent.  Any claim, action, suit or other proceeding, whether in law or equity, to enforce any right, benefit or remedy granted to the Buyer under this Agreement, including without limitation any right of indemnification provided in Paragraph 9.1 hereof, may be asserted, brought, prosecuted or maintained by the Buyer against the Sellers or the Sellers' Agent by service of process on the Sellers' Agent and without the necessity of serving process on, or otherwise joining or naming as a defendant in such claim, action, suit or other proceeding, any Seller.  With respect to any matter contemplated by this Article XI, the Sellers shall be bound by any determination in favor of or against the Sellers' Agent or the terms of any settlement or release to which the Sellers' Agent shall become a party.

## ARTICLE XII

### Miscellaneous

12.1.   Expenses.  Except as otherwise specifically provided herein, the parties hereto shall pay their own expenses, including, without limitation, accountants' and attorneys' fees incurred in connection with the negotiation and consummation of the transactions contemplated by this Agreement.  The Sellers shall be jointly and severally liable for and shall pay and discharge when due:  (i) any sales, use or transfer taxes (including those related to the Real Estate) incurred and/or payable in connection with the purchase and sale of the Subject Assets pursuant to this Agreement; (ii) the costs of the title commitment and title insurance contemplated by Paragraph 3.1(f)(ii) hereof; (iii) all fees, commissions and expenses payable to Stellpflug, Janssen, Hammer, Kirschling & Bartels, SC (iv) expenses imposed on the Sellers, the Company or the Buyer related to obtaining the Consents and other consents and estoppel certificates from third parties enabling the Buyer to receive the benefits of any contracts, leases, or other third-party agreements related to the Company's business.

12.2.   Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered to be given and received in all respects when hand delivered, when sent by prepaid express or courier delivery service, when sent by facsimile transmission actually received by the receiving equipment or three (3) days after deposited in the United States mail, certified mail, postage prepaid, return receipt requested, in

ST PAPER 0674

each case addressed as follows, or to such other address as shall be designated by notice duly given:

IF TO BUYER:                     Attention:  Sharad K. Tak
                                 1555 Glory Road
                                 Green Bay, WI  54304
                                 Fax No.:  (920) 347-2228
                                      and
                                 Attention:  Sharad K. Tak
                                 401 Professional Drive, Suite 110
                                 Gaithersburg, MD  20879
                                 Fax No.:  (301) 840-0749

With a Copy to:                  Godfrey & Kahn, S.C.
                                 Attention:  Timothy F. Nixon
                                 333 Main Street
                                 Green Bay, WI  54301
                                 Fax No.:  (920) 436-7988

IF TO SELLERS:                   c/o Tissue Products Technology Corp.
                                 Attn:  Ronald H. Van Den Heuvel
                                 1555 Glory Road
                                 Green Bay, WI  54304
                                 Fax No.:  (920) 347-2228

With a Copy to:                  Stellpflug, Janssen, Hammer, Kirschling & Bartels, SC
                                 Attention:  C. David Stellpflug
                                 P.O. Box 5637
                                 De Pere, WI 54115-5637
                                 Fax No.:  (920) 336-5769

12.3.   Right to Specific Performance.  The parties agree that the Subject Assets constitute unique property, that there is no adequate remedy at law for the damage which any of them might sustain for the failure of the others to consummate this Agreement, and, accordingly, that each of them is entitled to the remedy of specific performance to enforce such consummation.

12.4.   Entire Agreement.  This Agreement, the exhibits attached hereto and Ancillary Agreements constitute the entire agreement between the parties hereto relating to the subject matter hereof, and all prior agreements, correspondence, discussions and understandings of the parties (whether oral or written, and including, without limitation, the Original Asset Purchase Agreement) are merged herein and made a part hereof, it being the intention of the parties hereto that this Agreement and the instruments and agreements contemplated hereby shall serve as the complete and exclusive statement of the terms of their agreement together.  No amendment, waiver or modification hereto or hereunder shall be valid unless in writing signed by an authorized signatory of the party or parties to be affected thereby.

mw1287686_2                      37

ST PAPER 0675

12.5.   <u>Assignment</u>.  No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties, except that Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any Subsidiary of Buyer and may collaterally assign its rights hereunder to any financial institution.

12.6.   <u>Binding Effect</u>.  This Agreement shall be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.

12.7.   <u>Paragraph Headings</u>.  The headings in this Agreement are for purposes of convenience and ease of reference only and shall not be construed to limit or otherwise affect the meaning of any part of this Agreement.

12.8.   <u>Severability</u>.  The parties agree that if any provision of this Agreement shall under any circumstances be deemed invalid or inoperative, this Agreement shall be construed with the invalid or inoperative provision deleted, and the rights and obligations of the parties shall be construed and enforced accordingly.

12.9.   <u>Applicable Law</u>.  This Agreement and all questions arising in connection herewith shall be governed by and construed in accordance with the internal laws of Wisconsin.

12.10.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered but one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

12.11.  <u>Bulk Sales</u>.  The Sellers and the Buyer hereby waive compliance by the Buyer and the Seller with the provisions of the Bulk Sales Law of the States of Wisconsin, and the Sellers jointly and severally warrant and covenant to pay and discharge when due all claims of creditors which could be asserted against the Buyer by reason of such noncompliance to the extent that such liabilities are not specifically assumed by the Buyer under this Agreement.

12.12.  <u>Assignment to ST Paper</u>.  The Sellers acknowledge that as of December 5, 2006, ST Paper, LLC changed its legal name to "ST Paper Holdings, LLC." The Sellers agree that all rights, obligations and responsibilities of ST Paper Holdings, LLC under this Agreement are hereby assigned to "ST Paper, LLC," a wholly-owned subsidiary of ST Paper Holdings, LLC, effective as of the date of this Agreement.

[signatures follow on next page]

ST PAPER 0676

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day, month and year first above written.

**BUYER:**

ST PAPER, LLC

By: _____
Name: Sharad K. Tak
Its: President

**SELLERS:**

TISSUE PRODUCTS TECHNOLOGY CORP.

By: _____
Name:  Ronald H. Van Den Heuvel
Its:  President

PARTNERS CONCEPTS DEVELOPMENT, INC.

By: _____
Name:  Ronald H. Van Den Heuvel
Its:  President

OCONTO FALLS TISSUE, INC.

By: _____
Name:  Ronald H. Van Den Heuvel
Its:  President

**HOLDINGS:**

ST PAPER HOLDINGS, LLC
(solely for purpose of Paragraph 12.12)

By: _____
Name: Sharad K. Tak
Its: Manager

mw1287686_2                                        39

ST PAPER 0677

## JOINDER

The following individual hereby joins in the execution of this Agreement for purposes of Article VIII only:

_____

Ronald H. Van Den Heuvel

The following party hereby joins in the execution of this Agreement for purposes of Section 9.4 only, and hereby warrants and represents that the execution and delivery of this Agreement has been duly authorized and shall constitute the legal, valid and binding obligation of such party:

TISSUE TECHNOLOGY, LLC

By: _____

Ronald H. Van Den Heuvel, Manager

mw1287686_2                                                   40

ST PAPER 0678

**List of Exhibits**

Exhibit 1.1(a) – Fixed Assets

Exhibit 1.1(b) – Real Estate

Exhibit 1.1(i) – Assumed Contracts

Exhibit 1.2 – Excluded Assets

Exhibits 2.3 – Note

Exhibit 2.6 – Assumed Liabilities

Exhibit 3.1(f)(vii) – Opinion of Sellers' Counsel

Exhibit 3.1(f)(ix) – Form of Sales and Marketing Agreement

Exhibit 3.2(e)(iv) – Form of Non-Competition Agreement

Exhibit 3.2(e)(v) – Opinion of Buyer's Counsel

Exhibit 4.1.4 - Jurisdictions in which the Company is Qualified to do Business as Foreign Entity

Exhibit 4.1.6(e) – Legal Descriptions of the Real Estate

Exhibit 4.1.8 – Intellectual Property

Exhibit 4.1.9 – Financial Statements

Exhibit 4.1.12 – Contracts and Other Agreements

Exhibit 4.1.14 – Product Warranties

Exhibit 4.1.15 – Employees

Exhibit 4.1.17 – ERISA

Exhibit 4.1.19 – Environmental Claims

Exhibit 4.1.20 – Insurance

Exhibit 4.1.21 –License and Permits

Exhibit 4.1.23 – Customers and Suppliers

ST PAPER 0679