# EXHIBIT B

EXECUTION VERSION

**CREDIT AGREEMENT**

**dated as of April 16, 2007**

**among**

**ST PAPER, LLC,**
**a Delaware limited liability company,**
**as Borrower,**

**VARIOUS LENDERS**

**and**

**GOLDMAN SACHS CREDIT PARTNERS L.P.,**
**as Administrative Agent, Collateral Agent,**
**Sole Lead Arranger, Sole Bookrunner and Syndication Agent**

**<u>Senior Secured Credit Facilities</u>**

**$65,000,000 Term Loan Facility**
**$5,000,000 Revolving Credit Facility**

ST PAPER9214

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| Section 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 1.1. | Definitions | 1 |
| 1.2. | Accounting Terms | 30 |
| 1.3. | Interpretation, etc. | 30 |
| | | |
| Section 2. | LOANS | 31 |
| 2.1. | Term Loans | 31 |
| 2.2. | Revolving Loans | 31 |
| 2.3. | Pro Rata Shares; Availability of Funds | 32 |
| 2.4. | Use of Proceeds | 33 |
| 2.5. | Evidence of Debt; Register; Lenders' Books and Records; Notes | 33 |
| 2.6. | Interest on Loans | 34 |
| 2.7. | Conversion/Continuation | 35 |
| 2.8. | Default Interest | 36 |
| 2.9. | Fees | 36 |
| 2.10. | Scheduled Payments | 36 |
| 2.11. | Voluntary Prepayments/Commitment Reductions | 37 |
| 2.12. | Mandatory Prepayments | 38 |
| 2.13. | Application of Prepayments/Commitment Reductions | 40 |
| 2.14. | General Provisions Regarding Payments | 41 |
| 2.15. | Ratable Sharing | 42 |
| 2.16. | Making or Maintaining Eurodollar Rate Loans | 42 |
| 2.17. | Increased Costs; Capital Adequacy | 44 |
| 2.18. | Taxes; Withholding, etc. | 45 |
| 2.19. | Obligation to Mitigate | 48 |
| 2.21 | Removal or Replacement of a Lender | 49 |
| | | |
| Section 3. | CONDITIONS PRECEDENT | 50 |
| 3.1. | Closing Date | 50 |
| 3.2. | Conditions to Each Credit Event | 56 |
| 3.3. | Conditions Precedent to Each Project Improvement Credit Event | 56 |
| 3.4. | No Approval of Work | 58 |
| | | |
| Section 4. | REPRESENTATIONS AND WARRANTIES | 58 |
| 4.1. | Organization; Requisite Power and Authority; Qualification | 58 |
| 4.2. | Equity Interests and Ownership | 58 |
| 4.3. | Single Purpose, Debt, Contracts, Joint Ventures, etc. | 58 |
| 4.4. | Separateness | 59 |
| 4.5. | Solvency | 59 |
| 4.6. | Due Authorization | 59 |
| 4.7. | Binding Obligation | 60 |
| 4.8. | No Conflict | 60 |
| 4.9. | Operative Documents | 60 |

i

ST PAPER9215

| | | |
|---|---|---|
| 4.10. | No Adverse Proceedings, etc. | 61 |
| 4.11. | No Defaults | 61 |
| 4.12. | No Material Adverse Effect | 61 |
| 4.13. | Compliance with Legal Requirements | 61 |
| 4.14. | Disclosure | 62 |
| 4.15. | Properties | 62 |
| 4.16. | Utilities and Other Facilities | 63 |
| 4.17. | Intellectual Property | 63 |
| 4.18. | Security Interests | 63 |
| 4.19. | Payment of Taxes | 64 |
| 4.20. | Governmental Approvals | 64 |
| 4.21. | Government Grants, Loans, Tax Credits, etc. | 65 |
| 4.22. | Financial Statements | 65 |
| 4.23. | Hazardous Materials; Environmental Matters | 65 |
| 4.24. | Governmental Regulation | 67 |
| 4.25. | Margin Stock | 67 |
| 4.26. | The PATRIOT Act, Etc. | 67 |
| 4.27. | Employee Matters | 67 |
| 4.28. | Employee Benefit Plans | 67 |
| | | |
| Section 5. | AFFIRMATIVE COVENANTS | 68 |
| 5.1. | Existence | 68 |
| 5.2. | Project Improvements | 68 |
| 5.3. | Operation and Maintenance of Project; Annual Operating Budget | 69 |
| 5.4. | Project Documents | 70 |
| 5.5. | Information Delivery | 70 |
| 5.6. | Governmental Approvals | 76 |
| 5.7. | Compliance with Legal Requirements | 76 |
| 5.8. | Insurance | 76 |
| 5.9. | Payment of Taxes and Claims | 76 |
| 5.10. | Books and Records; Inspections | 76 |
| 5.11. | Lenders Meetings | 76 |
| 5.12. | Independent Consultants | 77 |
| 5.13. | Maintenance of Collateral; Title | 77 |
| 5.14. | Environmental Matters | 77 |
| 5.15. | Intellectual Property | 78 |
| 5.16. | Cooperation; Further Assurances | 78 |
| 5.17. | Use of Proceeds | 78 |
| 5.18. | Interest Rate Protection | 79 |
| 5.19. | Separateness | 79 |
| 5.20. | Application of Revenues, Etc | 79 |
| 5.21. | Independent Committee Members | 79 |
| 5.22. | Major Loss Event | 80 |
| 5.23. | Borrower Subsidiaries | 80 |
| | | |
| Section 6. | NEGATIVE COVENANTS | 80 |
| 6.1. | Conduct of Business | 80 |

ST PAPER9216

| | | |
|---|---|---|
| 6.2. | Indebtedness | 80 |
| 6.3. | Liens | 81 |
| 6.4. | Equity Interest | 83 |
| 6.5. | Asset Disposition | 83 |
| 6.6. | Distributions | 83 |
| 6.7. | Financial Covenants | 83 |
| 6.8. | Fundamental Changes | 86 |
| 6.9. | Accounts; Permitted Investments; Expenditures | 86 |
| 6.10. | Subsidiaries | 86 |
| 6.11. | Project Improvement Budget Amendments | 86 |
| 6.12. | Change Orders | 87 |
| 6.13. | Completion, Etc. | 88 |
| 6.14. | Modification of Project Documents | 89 |
| 6.15. | Modification of Organizational Documents | 89 |
| 6.16. | Assignment | 89 |
| 6.17. | Additional Project Documents | 89 |
| 6.18. | Transactions with Associated Parties | 90 |
| 6.19. | Use of Premises | 90 |
| 6.20. | Hazardous Materials | 90 |
| 6.21. | Acquisition of Real Property | 90 |
| 6.22. | Fiscal Year | 91 |
| 6.23. | Subordinated Indebtedness | 91 |
| 6.24. | Sales and Lease-Backs | 91 |
| Section 7. | EVENTS OF DEFAULT | 91 |
| 7.1. | Events of Default | 91 |
| Section 8. | AGENTS | 95 |
| 8.1. | Appointment of Agents | 95 |
| 8.2. | Powers and Duties | 95 |
| 8.3. | General Immunity | 96 |
| 8.4. | Agents Entitled to Act as Lenders | 97 |
| 8.5. | Lenders' Representations, Warranties and Acknowledgment | 97 |
| 8.6. | Right to Indemnity | 98 |
| 8.7. | Successor Administrative Agent and Collateral Agent | 98 |
| 8.8. | Collateral Documents | 100 |
| Section 9. | MISCELLANEOUS | 101 |
| 9.1. | Notices | 101 |
| 9.2. | Expenses | 102 |
| 9.3. | Indemnity | 102 |
| 9.4. | Set-Off | 103 |
| 9.5. | Amendments and Waivers | 103 |
| 9.6. | Successors and Assigns; Participations | 105 |
| 9.7. | Independence of Covenants | 108 |
| 9.8. | Survival of Representations, Warranties and Agreements | 108 |
| 9.9. | No Waiver; Remedies Cumulative | 108 |

NY\1218924.18

ST PAPER9217

9.10.   Marshalling; Payments Set Aside ......................................................109
9.11.   Severability ...................................................................................109
9.12.   Obligations Several; Independent Nature of Lenders' Rights ............................109
9.13.   Headings .......................................................................................109
9.14.   APPLICABLE LAW ...........................................................................109
9.15.   CONSENT TO JURISDICTION...............................................................109
9.16.   WAIVER OF JURY TRIAL.....................................................................110
9.17.   Confidentiality .................................................................................110
9.18.   Usury Savings Clause .........................................................................111
9.19.   Counterparts ....................................................................................112
9.20.   Effectiveness ...................................................................................112
9.21.   The PATRIOT Act..............................................................................112
9.22.   Electronic Execution of Assignments ......................................................112

NY\1218924.18

ST PAPER9218

**APPENDICES:**    A-1    Term Loan Commitments
    A-2    Revolving Commitments
    B    Notice Addresses

**SCHEDULES:**    3.1(c)    Closing Date Consents
    3.1(c)(ii) Asset Transfer Documents
    3.1(d)    Released Liens
    3.1(f)(i)  Project Improvement Budget
    3.1(f)(ii) Project Improvement Schedule
    3.1(p)    Industrial Revenue Bonds
    4.2    Ownership Structure
    4.3(c)    Existing Indebtedness
    4.3(d)    Existing Liens
    4.9    Operative Documents
    4.15    Real Estate Assets
    4.20    Governmental Approvals
    4.21    Government Grants, etc.
    4.29    Associated Party Transactions
    5.8    Insurance Requirements

**EXHIBITS:**    A-1    Funding Notice
    A-2    Conversion/Continuation Notice
    B-1    Term Loan Note
    B-2    Revolving Loan Note
    C    Compliance Certificate
    D    Assignment Agreement
    E    Certificate Re Non-Bank Status
    F    Closing Date Certificate
    G    Solvency Certificate
    H    Consent and Agreement
    I-1    Independent Engineer's Reliance Letter
    I-2    Insurance Consultant's Certificate
    J    PATRIOT Act and Other Required Information
    K    Joinder Agreement
    L    Landlord Waiver and Consent Agreement
    M-1    Perfection Certificate of Borrower
    M-2    Perfection Certificate of Pledgor

NY\1218924.18

ST PAPER9219

# CREDIT AGREEMENT

This **CREDIT AGREEMENT**, dated as of April 16, 2007 (this "**Agreement**"), is entered into by and among **ST PAPER, LLC**, a Delaware limited liability company ("**Borrower**"), the Lenders party hereto from time to time, **GOLDMAN SACHS CREDIT PARTNERS L.P.** ("**GSCP**"), as administrative agent (in such capacity, together with its permitted successors in such capacity, "**Administrative Agent**"), as sole lead arranger and sole bookrunner (in such capacity, "**Arranger**"), as syndication agent (in such capacity, "**Syndication Agent**"), and as collateral agent (in such capacity, together with its permitted successors in such capacity, "**Collateral Agent**").

## RECITALS:

**WHEREAS,** Borrower intends to acquire a paper production facility in Oconto, Wisconsin and certain other assets related thereto pursuant to the Asset Transfer described below (such acquired assets, the "**Acquired Assets**") and to make the Project Improvements described below (such Project Improvements, together with the Acquired Assets, the "**Project**"); and

**WHEREAS**, in order to finance the Asset Transfer and the construction and installation of the Project Improvements, among other purposes, Borrower has requested the Lenders to extend, and the Lenders have agreed to extend, certain credit facilities to Borrower in an aggregate principal amount not to exceed $70,000,000, consisting of Term Loans in an aggregate principal amount of $65,000,000 and Revolving Commitments in an aggregate principal amount of up to $5,000,000.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## AGREEMENT

## SECTION 1. DEFINITIONS AND INTERPRETATION

**1.1.** **Definitions.** The following terms used herein, including in the preamble, recitals, appendices, exhibits and schedules hereto (unless otherwise defined therein), shall have the following meanings:

"**Account Control Agreement**" has the meaning given in Section 6.9(a).

"**Account Withdrawal Certificate**" has the meaning given in the Security Deposit Agreement.

"**Accounts**" has the meaning given in the Security Deposit Agreement.

"**Additional Major Project Document**" means (i) each Additional Project Document that requires payment by or to Borrower in excess of $1,000,000 per annum and (ii) each Additional Project Document the loss of which would reasonably be expected to have a Material Adverse Effect; provided that, for purposes of this definition, any series of related transactions

ST PAPER9220

shall be considered one transaction, and all Additional Project Documents in respect of such transaction shall be considered one Additional Project Document.

"**Additional Other Project Documents**" means all Additional Project Documents that are not Additional Major Project Documents.

"**Additional Project Document**" means any contract or agreement related to the development, construction, improvement, refurbishment, operation, maintenance, management, administration, ownership or use of the Project, the provision of services therefor or the sale of Products therefrom entered into by Borrower and any other Person, or assigned to Borrower, subsequent to the Closing Date.

"**Adjusted EBITDA**" means, for any period, an amount determined for Borrower and its Subsidiaries equal to the sum, without duplication, of the amounts for such period of (a) Net Income, *plus* (b) to the extent deducted in calculating Net Income, (i) Interest Expense, (ii) total depreciation expense, (iii) total amortization expense, and (iv) other non-Cash charges reducing Net Income (excluding any such non-Cash charge to the extent that it represents an accrual or reserve for potential Cash charge in any future period or amortization of a prepaid Cash charge that was paid in a prior period), *minus* (c) the sum of other non-Cash items increasing Net Income for such period (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for a potential Cash gain in any prior period), all calculated on a consolidated basis in conformity with GAAP.  Notwithstanding the foregoing, Adjusted EBITDA for the second Fiscal Quarter of 2007 shall be equal to the Adjusted EBITDA for such period (as calculated pursuant to the foregoing sentence) divided by a fraction the numerator of which is the number of days from and including the Closing Date to and including the last day of such Fiscal Quarter and the denominator of which is the total number of days in such Fiscal Quarter.

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (and rounding upward to the next whole multiple of 1/16 of 1%) (i) (A) the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Telerate Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being page number 3750) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (B) if the rate referenced in the preceding clause (A) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (C) if the rates referenced in the preceding clauses (A) and (B) are not available, the rate per annum (rounded to the nearest 1/100 of 1%) equal to the offered quotation rate to first class banks in the London interbank market by Citibank, N.A. for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the

2

ST PAPER9221

applicable Loan, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (A) one *minus* (B) the Applicable Reserve Requirement.

"**Administrative Agent**" has the meaning given in the preamble.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Borrower) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Borrower, threatened against or affecting Borrower or any property of Borrower.

"**Affected Lender**" has the meaning given in Section 2.16(b).

"**Affected Loans**" has the meaning given in Section 2.16(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agent**" means any of Administrative Agent, Collateral Agent, Syndication Agent and Arranger, as the context requires.

"**Agent Affiliates**" has the meaning given in Section 9.1(b)(iii).

"**Aggregate Amounts Due**" has the meaning given in Section 2.15.

"**Agreement**" has the meaning given in the preamble.

"**Annual Operating Budget**" has the meaning given in Section 5.3(b).

"**Applicable Governmental Approval**" means, at any time, any Governmental Approval, including any zoning, land use, environmental protection, pollution (including air, water or noise), sanitation, import, export, safety, siting or building Governmental Approval that is necessary under applicable Legal Requirements or any of the Operative Documents to be obtained by or on behalf of Borrower, in connection with the operation of the Project or the construction and installation of the Project Improvements, as applicable, to construct, install, improve, test, operate, maintain, repair, own or use the Project or any portion thereof as contemplated by the Operative Documents, to sell Products from the Project or deliver inputs to the Project, or for Borrower to enter into any Operative Document or consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements.

ST PAPER9222

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic, marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D of the Board of Governors) under regulations issued from time to time by the Board of Governors or other applicable banking regulator.   Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate is to be determined or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans.   A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.   The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Applicable Third Party Governmental Approval**" means, at any time, any Governmental Approval, including any zoning, land use, environmental protection, pollution (including air, water or noise), sanitation, import, export, safety, siting or building Governmental Approval that is necessary to be obtained by any Person (other than Borrower) that is a party to a Major Project Document or a Credit Document in order to perform such Person's obligations thereunder (other than Governmental Approvals necessary to conduct its business generally and maintain its existence and good standing), or in order to consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Agents or to the Lenders by means of electronic communications pursuant to Section 9.1(b).

"**Acquired Assets**" has the meaning given in the preamble.

"**Arranger**" has the meaning given in the preamble.

"**Asset Purchase Agreement**" means the Second Amended and Restated Asset Purchase Agreement, dated as of April 16, 2007,  between Borrower, as the purchaser, and Oconto Falls Tissue, Inc., Tissue Products Technology Corp. and Partners Concepts Development, Inc., as the sellers, as the same is in effect on the Closing Date.

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of Borrower's businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed other than (i) inventory sold or leased or licensed out in the ordinary course of business (excluding any such sales, leases or licenses out by operations or divisions discontinued or to be discontinued), and (ii) sales, leases or licenses out of other assets for

4

ST PAPER9223

aggregate consideration of less than $500,000 with respect to any transaction or series of related transactions and less than $1,000,000 in the aggregate during any Fiscal Year.

"**Asset Sellers**" means Oconto Falls Tissue, Inc., Tissue Products Technology Corp. and Partners Concepts Development, Inc., as the sellers under the Asset Purchase Agreement.

"**Asset Transfer**" means the transfer to Borrower from the Asset Sellers of the Acquired Assets pursuant to the respective Asset Purchase Agreements.

"**Asset Transfer Documents**" means each of the Asset Purchase Agreements and each other document or agreement entered into by any Person in connection with the Asset Transfer, as set forth on Schedule 3.1(c)(ii).

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent.

"**Assignment Effective Date**" has the meaning given in Section 9.6(b).

"**Associated Party**" means, with respect to any specified Person, any Affiliate of such Person and any counterparty of such Person under any Project Document, and in the case of a Person who is an individual, such individual's immediate family members, and the respective directors, officers, managers, employees, agents, advisors and consultants of such Person and such Person's Affiliates, Project Document contract counterparties and the immediate family members of each of the foregoing.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), secretary, chief financial officer or treasurer of such Person.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Base Case Projections**" has the meaning given in Section 3.1(m)(ii).

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (i) the Prime Rate in effect on such day and (ii) the Federal Funds Effective Rate in effect on such day *plus* ½ of 1%. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"**Borrower**" has the meaning given in the preamble.

ST PAPER9224

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Expenditures**" means, for any period as applied to any Person, the aggregate of, without duplication, all expenditures of such Person during such period for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person; provided that the term "Capital Expenditures" shall not include expenditures made in connection with any Remediation Action to the extent financed from Loss Proceeds paid on account of a Loss Event and applied in accordance with Section 3.8 of the Security Deposit Agreement.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of such Person.

"**Cash**" means money, currency or a credit balance in any Deposit Account.

"**Cash Equivalents**" means, as of any date of determination, (i) (A) marketable securities issued by the United States government and supported by the full faith and credit of the U.S. Treasury, either by statute or an opinion of the Attorney General of the United States or (B) marketable debt securities, rated Aaa by Moody's and/or AAA by S&P, issued by U.S. government-sponsored enterprises, U.S. federal agencies, U.S. federal financing banks, and international institutions whose capital stock has been subscribed for the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (A) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (B) has "Tier 1 capital" (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (A) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (B) has net assets of not less than $500,000,000, and (C) has the highest rating obtainable from either S&P or Moody's.

"**Casualty Event**" has the meaning given in the Security Deposit Agreement.

6

ST PAPER9225

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit E.

"**Change of Control**" means the occurrence of any event the result of which is that (i) the Sponsor and its Related Parties shall, collectively, cease to directly and beneficially own and control on a fully diluted basis at least 51% of the economic interest in the Equity Interests of Pledgor; (ii) Sponsor shall cease to directly or beneficially own and control on a fully diluted basis 100% of both the voting interest and economic interest in the Equity Interests in Tak Investments, Inc; (iii) Tak Investments, Inc. shall cease to directly and beneficially own and control on a fully diluted basis 100% of the voting interest in the Equity Interests of Pledgor; (iv) Pledgor shall cease to directly and beneficially own and control on a fully diluted basis 100% of both the voting interest and economic interest in the Equity Interests of Borrower; or (v) a "change of control" shall occur under and as defined or described in any Subordinated Indebtedness or other material debt agreement of Borrower or any of its Subsidiaries (and, in each case, such change of control shall not have been cured within 30 days of the occurrence thereof) or any Major Project Document (and such change of control shall not have been cured within 60 days of the occurrence thereof). For purposes of this definition, "Related Party" means (1) any spouse or child of Sponsor or any trust of which a child of Sponsor is the sole beneficiary and (2) any Subsidiary of Sponsor in which Sponsor holds at least 80% of both the voting interest and economic interest in the Equity Interests thereof.

"**Change of Law**" means any change occurring after the Closing Date in the interpretation or administration of any Governmental Rule by any Governmental Authority or the imposition after the Closing Date of any new Governmental Rule by any Governmental Authority.

"**Change Order**" means any change order under the EPC Contract.

"**Class of Loans**" means the Term Loans or the Revolving Loans, each of which is a class of Loans.

"**Closing Date**" has the meaning given in Section 3.1.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit F.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" has the meaning given in the preamble.

"**Collateral Documents**" means the Security Deposit Agreement, the Security Agreement, the Pledge Agreement, the Landlord Waiver and Consent Agreement (if any), the Mortgage and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

NY\1218924.18

ST PAPER9226

"**Commitment**" means any Term Loan Commitment or Revolving Commitment.

"**Completion**" means, with respect to the Project Improvements, that each of the following conditions has been satisfied, as certified by Borrower and the Independent Engineer: (i) each of the Performance Tests under the EPC Contract shall have been achieved; (ii) the Project is "Substantially Complete" under, and as such term is defined in, the EPC Contract, with all work under the EPC Contract having been completed substantially in accordance with the plans and specifications provided therein and the requirements of all Applicable Governmental Approvals; and (iii) each of the milestones set forth on Exhibit A (*Milestone Schedule*) to the EPC contract have been achieved, other than the final milestone designated as "Final Completion of EPC."

"**Completion Date**" means the date on which Completion occurs.

"**Completion Date Milestone**" means the date which is 14 months after Borrower's delivery to EPC Contractor of the "Notice to Proceed."

"**Compliance Certificate**" means a certificate of the chief financial officer of Borrower substantially in the form of Exhibit C.

"**Consents**" means the third party consents listed on Schedule 3.1(c) and each other third party consent executed in connection with an Additional Major Project Document if required pursuant to Section 6.17, in each case substantially in the form of Exhibit H or as otherwise reasonably acceptable to Administrative Agent.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Conversion/Continuation Date**" means the effective date of a conversion or continuation, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Credit Date**" means the date of a Credit Event.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, the Guaranty, the Seller Subordination Agreement and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent or any Lender in connection herewith, including the documents, instruments and agreements listed on Part A.1. of Schedule 4.9.

"**Credit Event**" means any Credit Extension or any Project Improvement Credit Event.

"**Credit Extension**" means the making of a Loan.

ST PAPER9227

"**Credit Party**" means each of Borrower and ST Paper Holdings, LLC, in its capacities as Pledgor and Guarantor.

"**Cumulative Adjusted EBITDA**" means, as of any date of determination, the cumulative amount of Adjusted EBITDA from the Closing Date through such date.

"**Debt Service**" means, for any period, the sum of (i) all fees (other than fees paid on the Closing Date) payable during such period to the Agents and the Lenders, (ii) interest on Loans payable during such period less net payments, if any, received during such period pursuant to Interest Rate Hedging Agreements, (iii) scheduled Loan principal payments (as reduced to reflect actual voluntary prepayments through the date of such calculation) payable during such period, and (iv) net payments, if any, payable during such period pursuant to Interest Rate Hedging Agreements.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (A) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-*pro rata* application of any voluntary prepayments or mandatory prepayments of the Loans in accordance with the terms of Section 2.11 and Section 2.12 or by a combination thereof) and (B) such Defaulting Lender shall have delivered to Borrower and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitments, and (iii) the date on which Borrower, Administrative Agent and the Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Defaulted Loan**" has the meaning given in Section 2.20.

"**Defaulting Lender**" has the meaning given in Section 2.20.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Depositary Bank**" means Wilmington Trust Company in its capacity as depositary agent, bank and securities intermediary for the Secured Parties, together with any permitted successor or assign thereof in such capacities, under the Security Deposit Agreement.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified

9

ST PAPER9228

Equity Interests), in whole or in part, (iii) provides for the scheduled payments of dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Term Loan Maturity Date.

"**Distributions**" means, with respect to any period (computed without duplication), any distributions, dividends, credits or transfers of any kind to the extent received or available to be received by Pledgor, Sponsor or any other Affiliate of Borrower, from Borrower.

"**Distribution Conditions**" means, with respect to each proposed Distribution, each of the following conditions:

(i)     no Default or Event of Default shall have occurred and be continuing on the date of the proposed Distribution;

(ii)     the proposed Distribution shall be made only from funds on deposit in the Distribution Suspense Account on the date of such Distribution;

(iii)     after giving effect to the proposed Distribution, the Leverage Ratio shall not exceed 3.0 to 1.0;

(iv)     after giving effect to the proposed Distribution, Borrower shall be in compliance with the financial covenants set forth in Sections 6.7(a), (b) and (c);

(v)     a Distribution may be made only once during any Fiscal Year and only during the 30-day period following Borrower's delivery to Administrative Agent of the audited financial statements for the immediately preceding Fiscal Year required to be so delivered pursuant to Section 5.5(c)(ii);

(vi)     no Revolving Loans shall be outstanding on the date of the proposed Distribution; and

(vii)     Borrower shall have delivered an Officer's Certificate to Administrative Agent at least three Business Days prior to the date of the proposed Distribution certifying that each of the foregoing conditions has been satisfied as of such date, accompanied by such calculations and other information as necessary, or as reasonably requested by Administrative Agent, to verify the satisfaction of the conditions described in the foregoing clauses (iii) and (iv).

"**Dollars**" and the sign "$" mean the lawful money of the United States of America.

"**ECF Prepayment Amount**" has the meaning given in the Security Deposit Agreement.

"**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), or (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as part of its businesses; provided that no Affiliate of Borrower or Sponsor shall be an Eligible Assignee.

NY\1218924.18

ST PAPER9229

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Borrower or any ERISA Affiliate of Borrower.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material (including any exposure thereto) or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Consultant**" means ENVIRON International Corporation or any replacement environmental consultant reasonably acceptable to Administrative Agent and, so long as no Event of Default shall have occurred and be continuing, Borrower.

"**Environmental Laws**" means any and all applicable current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, Governmental Rules, or any other requirements of Governmental Authorities relating to (i) pollution, the protection of the environment or any other environmental matters, including any laws relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of, or exposure to, Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare. "Environmental Laws" includes any of (i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Section 9601 *et seq.*) ("CERCLA"); (ii) the Federal Water Pollution Control Act (33 U.S.C. Section 1251 *et seq.*); (iii) the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 *et seq.*); (iv) the Clean Air Act (42 U.S.C. Section 7401 *et seq.*); (v) the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 11001 *et seq.*); (vi) the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. Section 136 *et seq.*); (vii) the Oil Pollution Act of 1990 (P.L. 101-380, 104 Stat. 486); (viii) the Safe Drinking Water Act (42 U.S.C. Section 300f *et seq.*); (ix) the Toxic Substances Control Act (15 U.S.C. Section 2601 *et seq.*); (x) the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 *et seq.*); and (xi) the Occupational Safety and Health Act (29 U.S.C. Section 651 *et seq.*).

"**Environmental Report**" means the Phase I Environmental Site Assessment and Limited Compliance Report, dated March 2007, prepared by the Environmental Consultant for Borrower.

"**EPC Contract**" means the Fixed Priced Engineering, Procurement and Construction Agreement – Oconto Falls, Wisconsin (Upgrades), dated as of February 20, 2007, by and between Borrower and the EPC Contractor.

"**EPC Contractor**" means Spirit Construction Services, Inc., a Delaware corporation, together with any permitted successor or assign thereof under the EPC Contract.

"**Equity Contribution**" has the meaning given in Section 3.1(b).

NY\1218924.18

ST PAPER9230

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent or analogous ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as now and hereafter in effect, or any successor statute.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Borrower shall continue to be considered an ERISA Affiliate of Borrower within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Borrower and with respect to liabilities arising after such period for which Borrower could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Borrower or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in material liability to Borrower or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Borrower or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Borrower or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential material liability therefor, or the receipt by Borrower or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Borrower or any of its ERISA Affiliates of fines, penalties, taxes or

12

ST PAPER9231

related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Borrower or any of its ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; or (xii) any other event or condition with respect to an Employee Benefit Plan or Multiemployer Plan that would be reasonably expected to result in Borrower or any Subsidiary of Borrower incurring liability outside the ordinary course of business.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Abandonment**" means either of the following: (i) the voluntary abandonment by Borrower of the Project or the construction and installation of the Project Improvements without the consent of all of the Lenders for more than 60 days; or (ii) the suspension of all or any substantial part of Borrower's activities with respect to the Project or the Project Improvements for more than 60 days, except as expressly permitted under the Credit Documents or in connection with an event of force majeure.

"**Event of Default**" has the meaning given in Section 7.1.

"**Event of Eminent Domain**" has the meaning given in the Security Deposit Agreement.

"**Excess Cash Flow**" has the meaning given in the Security Deposit Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as now and hereafter in effect, or any successor statute.

"**Existing Indebtedness**" has the meaning given in Section 4.3(c).

"**Existing Liens**" has the meaning given in Section 4.3(d).

"**Federal Funds Effective Rate**" means, for any day, the rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average of the quotations for the day of such

ST PAPER9232

transactions received by Administrative Agent from three federal funds brokers of recognized national standing selected by it.

"**Final Acceptance**" has the meaning given in the EPC Contract.

"**Final Completion**" has the meaning given in the EPC Contract.

"**Financial Officer Certification**" means, with respect to any Person, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of such Person that such financial statements fairly present, in all material respects, the financial condition of such Person as at the dates indicated and the results of such Person's operations and its cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower ending on December 31 of each calendar year.

"**Fixed Charges**" means, for any period, the sum, without duplication, of the amounts determined for Borrower equal to (i) Interest Expense, (ii) scheduled payments of principal on Total Debt and (iii) Capital Expenditures, all calculated on a consolidated basis in conformity with GAAP.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, on behalf of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Funding Default**" has the meaning given in Section 2.20.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States of America generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Approval**" means any action, approval, consent, waiver, exemption, variance, franchise, order, permit, license, authorization, plan, directive, consent order or consent decree of, from or issued by any Governmental Authority.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any

NY\1218924.18

ST PAPER9233

government or any court, in each case whether associated with a state of the United States of America, the United States of America or a foreign entity or government.

"**Governmental Rule**" means any legally binding constitution, code, statute, law, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement, directive, guideline, treaty, judgment, policy or requirement of, or other governmental restriction or any similar form of decision of or determination by, or any interpretation or administration of any of the foregoing by, any Governmental Authority.

"**GSCP**" has the meaning given in the preamble.

"**Guarantor**" means ST Paper Holdings, LLC, as the guarantor under the Guaranty.

"**Guaranty**" means the Guaranty, dated as of the Closing Date, made by Guarantor in favor of Collateral Agent.

"**Hazardous Materials**" means any waste, chemical, material or substance, the Release of which or the exposure to which is prohibited, limited or regulated by any Governmental Authority or Governmental Rules or which may or could pose a hazard to the health and safety of the owners, occupants or any persons in the vicinity of the Project or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**IE Requisition Certificate**" means an IE Requisition Certificate substantially in the form of Exhibit B to the Security Deposit Agreement.

"**Improvements**" means, collectively, the "Improvements" as defined in the Mortgage.

"**Increased-Cost Lenders**" has the meaning given in Section 2.21.

"**Indebtedness**," as applied to any Person as of the time of determination, means, without duplication:

(i)   all indebtedness for borrowed money of such Person;

NY\1218924.18

ST PAPER9234

(ii)     that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet of such Person in conformity with GAAP;

(iii)    notes payable and drafts accepted representing extensions of credit to such Person whether or not representing obligations for borrowed money;

(iv)    any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument;

(v)     all indebtedness secured by any Lien on any property or asset owned or held by such Person regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is non-recourse to the credit of such Person;

(vi)    the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(vii)   the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of any obligation of another Person;

(viii)  any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof;

(ix)    any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under sub-clause (A) or (B) of this clause (ix), the primary purpose or intent thereof is as described in clause (viii) above;

(x)     any Disqualified Equity Interests; and

(xi)    all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Interest Rate Hedging Agreement, whether entered into for hedging or speculative purposes;

provided that in no event shall obligations under any Interest Rate Hedging Agreement be deemed "Indebtedness" for any purpose under Section 6.7.

**"Indemnified Liabilities"** means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study,

16

ST PAPER9235

sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel to Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Operative Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof), or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral); (ii) any engagement letter delivered by any Agent to Borrower, Pledgor or Sponsor with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any activity, operation, land ownership or practice of Borrower or Pledgor or otherwise related to the Project, Premises, Improvements, or other Mortgaged Property or any Real Estate Asset.

"**Indemnitee**" has the meaning given in Section 9.3.

"**Independent Consultants**" means, collectively, the Environmental Consultant, the Independent Engineer and the Insurance Consultant.

"**Independent Engineer**" means Poyry Forest Industry Consulting Inc. or any replacement independent engineer reasonably acceptable to Administrative Agent and, so long as no Event of Default shall have occurred and be continuing, Borrower.

"**Independent Member**" means, in respect of the membership of Borrower's management committee, any individual who would qualify as an independent director under the standards set forth in Section 303A.02 of the New York Stock Exchange Listed Company Manual, with such standards being deemed to apply to a member of a management committee of a limited liability company rather than a member of a board of directors of a corporation; provided that in no event shall an individual be deemed to be an "Independent Member" if such individual or any of his or her immediate family members has ever (i) been employed by or otherwise received income from Borrower or any of its Affiliates or (ii) entered into business relations with Borrower or any of its Affiliates.

"**Industrial Revenue Bonds**" means, collectively, the industrial revenue bonds issued under the (i) $24,000,000 Bond Agreement, dated as of December 1, 1997, among Community Development Authority of the City of Oconto Falls, Wisconsin, as issuer, Oconto Falls Tissue, Inc., as borrower, and Associated Trust Company, Inc. (now known as Associated Trust Company, National Association), as trustee; (ii) $4,000,000 Bond Agreement, dated as of June 1, 1999, as supplemented October 1, 1999, among Community Development Authority of the City of Oconto Falls, Wisconsin, as issuer, Oconto Falls Tissue, Inc., as Borrower, and Associated

ST PAPER9236

Trust Company, National Association, as trustee; (iii) $5,000,000 Indenture of Trust, dated as of November 1, 2001, between Community Development Authority of the City of Oconto Falls, Wisconsin and Bank One Trust Company, National Association, as trustee; and (iv) $1,965,000 Indenture of Trust, dated as of July 1, 2002, between Community Development Authority of the City of Oconto Falls, Wisconsin and U.S. Bank National Association, Milwaukee, Wisconsin, as trustee.

"**Information Memorandum**" means the confidential information memorandum dated December 2006, used by Arranger in connection with the syndication of the Commitments.

"**Installment**" has the meaning given in Section 2.10.

"**Insurance Consultant**" means Aon Corporation or any replacement insurance consultant reasonably acceptable to Administrative Agent and, so long as no Event of Default shall have occurred and be continuing, Borrower.

"**Interest Coverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Adjusted EBITDA for the four-Fiscal Quarter period then ended to (ii) Interest Expense for such four-Fiscal Quarter period.

"**Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Borrower with respect to all outstanding Indebtedness of Borrower, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Hedging Agreements, but excluding, however, any amount not payable in Cash and any amounts referred to in Section 2.9(b) payable on or before the Closing Date.

"**Interest Payment Date**" means with respect to (i) any Base Rate Loan, each March 31, June 30, September 30 and December 31 of each year, commencing on the first such date to occur after the Closing Date, and the final maturity date of such Loan; and (ii) any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one-, two-, three-, or six-months, as selected by Borrower in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided that (A) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (B) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clauses (C) and (D) of this definition, end on the last Business Day of a calendar month; (C) no Interest Period with respect to any portion of any Term Loans

NY\1218924.18

ST PAPER9237

shall extend beyond the Term Loan Maturity Date; and (D) no Interest Period with respect to any portion of any Revolving Loans shall extend beyond the Revolving Commitment Termination Date.

"**Interest Rate Hedging Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is entered into by Borrower with a Lender Counterparty for the purpose of hedging the interest rate exposure associated with Borrower's operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as now and hereafter in effect, or any successor statute.

"**Investment**" means (i) any direct or indirect purchase, redemption, retirement or other acquisition by Borrower of, or of a beneficial interest in, any of the Securities of any other Person; and (ii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Borrower to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets and did not arise from sales to that other Person in the ordinary course of business.  The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Joinder Agreement**" means an agreement substantially in the form of Exhibit K.

"**Landlord Waiver and Consent Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit L with such amendments or modifications as may be approved by Collateral Agent.

"**Leasehold Property**" means any leasehold interest of Borrower as lessee under any lease of real property.

"**Legal Requirements**" means, as to any Person, the Organizational Documents of such Person, any requirement under a Governmental Approval and any Governmental Rule, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its property is subject.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**Lender Counterparty**" means each Lender or Agent or any Affiliate of a Lender or Agent counterparty to an Interest Rate Hedging Agreement (including any Person who is a Lender or Agent, and any Affiliate thereof, as of the Closing Date but subsequently, whether

NY\1218924.18

ST PAPER9238

before or after entering into an Interest Rate Hedging Agreement, ceases to be a Lender or Agent) that enters into a Joinder Agreement.

"**Leverage Ratio**" means, as of any date, the ratio as of the last day of the most recently ended Fiscal Quarter (or other date of determination) of (i) Total Debt of Borrower as of such day to (ii) Adjusted EBITDA for the four-Fiscal Quarter period ending on such day (or if such date of determination is not the last day of a Fiscal Quarter, then as of the most recently concluded Fiscal Quarter) of Borrower, all calculated on a consolidated basis in conformity with GAAP.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease, sublease or occupancy agreement in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a Term Loan or a Revolving Loan, as the context requires.

"**Local O&M Account**" has the meaning given in Section 6.9(a).

"**Loss Event**" has the meaning given in the Security Deposit Agreement.

"**Loss Proceeds**" has the meaning given in the Security Deposit Agreement.

"**Major Loss**" has the meaning given in the Security Deposit Agreement.

"**Major Maintenance**" means labor, materials and other direct expenses for any overhaul of, or major maintenance procedure for, the Project (i) in accordance with Prudent Operating Practices, (ii) pursuant to manufacturers' requirements to avoid voiding any warranty of any such manufacturer or (iii) pursuant to any applicable Legal Requirement.

"**Major Project Document**" means each agreement listed on Part A.3. of <u>Schedule 4.9</u> and each Additional Major Project Document.

"**Major Project Participant**" means each Credit Party and each counterparty to any Major Project Document.

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, properties, assets, condition (financial or otherwise) or prospects of Borrower and its Subsidiaries, taken as a whole; (ii) the ability of any Credit Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against any Credit Party of a Credit Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent, Lender or other Secured Party under any Credit Document.

ST PAPER9239

"**Mechanical Completion**" has the meaning given in the EPC Contract.

"**Monthly Payment Date**" has the meaning given in the Security Deposit Agreement.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means the Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the Closing Date, by and between Borrower and Collateral Agent, pertaining to the Premises.

"**Mortgaged Property**" has the meaning given in the Mortgage.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Borrower in the form prepared for presentation to senior management thereof for the applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Borrower or any of its Subsidiaries in connection with such Asset Sale, *minus* (ii) any bona fide direct costs incurred by Borrower or any of its Subsidiaries in connection with such Asset Sale, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Permitted Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Borrower in connection with such Asset Sale.

"**Net Income**" means, for any period, (i) the net income (or loss) of Borrower and its Subsidiaries for such period taken as a single accounting period determined on a consolidated basis in conformity with GAAP, *minus* (ii) (a) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Subsidiaries or that Person's assets are acquired by Borrower or any of its Subsidiaries, (b) the income of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (c) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan, and (d) (to the extent not included in clauses (a) through (c) above) any net extraordinary gains or net extraordinary losses.

ST PAPER9240

"**Non-Public Information**" means information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD, as promulgated by the United States Securities and Exchange Commission under the Securities Act and the Exchange Act as in effect from time to time.

"**Non-US Lender**" has the meaning given in Section 2.18(c).

"**Note**" means a Term Loan Note or a Revolving Loan Note, as the context requires.

"**Notice to Proceed**" has the meaning given in the EPC Contract.

"**O&M Costs**" has the meaning given in the Security Deposit Agreement.

"**Obligations**" means all obligations of every nature of each Credit Party under any Credit Document or Interest Rate Hedging Agreement, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), payments for early termination of Interest Rate Hedging Agreements, fees, expenses, indemnification or otherwise.

"**Offered Mandatory Prepayment Date**" has the meaning given in Section 2.12(e).

"**Officer's Certificate**" has the meaning given in the Security Deposit Agreement.

"**Operating Budget Category**" means (a) individually, any line item category set forth in that part of the then-current Annual Operating Budget showing sources and uses of Project Revenues, and (b) collectively, all line item categories set forth in that part of the then-current Annual Operating Budget showing sources and uses of Project Revenues.

"**Operative Documents**" means the Credit Documents, the Project Documents and the Asset Transfer Documents.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended, and, in the case of Borrower, the committee charters of its management committee and audit committee. If any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Project Documents**" means each agreement listed on Part A.4. of <u>Schedule 4.9</u> and each Additional Other Project Document.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

22

ST PAPER9241

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Perfection Certificate**" means a certificate in the form of Exhibit M-1 or Exhibit M-2, as applicable, delivered by an Authorized Officer of the applicable Credit Party.

"**Performance Test Report**" has the meaning given in Section 5.2(c).

"**Performance Tests**" has the meaning given in the EPC Contract.

"**Permitted Construction Financing**" means any Indebtedness incurred by Borrower or any Affiliate of Borrower and approved by all of the Lenders within the two-year period commencing on the Closing Date in an aggregate principal amount of at least $50,000,000 exclusively for the purpose of (i) financing a material portion of the anticipated cost of construction of any of the paper mill projects Borrower intends to construct in Oconto Falls, Wisconsin, St. George, Utah and Uniontown, Pennsylvania or other locations after the Closing Date; (ii) refinancing the Loans in connection with the transactions described in the foregoing clause (i); (iii) paying fees and expenses incurred in connection with transactions described in foregoing clauses (i) and (ii); and (iv) the provision of a working line of credit and the funding of interest during construction of those facilities described in clause (i) above.

"**Permitted Investments**" means any of the following:

(i)     Cash Equivalents;

(ii)    the Accounts, together with all Investments, funds and other property on deposit therein or credited thereto;

(iii)   any Interest Rate Hedging Agreement; and

(iv)    the Project Documents to the extent the same constitute Investments.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.3.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Platform**" has the meaning given in the last paragraph of Section 5.5.

"**Pledgor**" means ST Paper Holdings, LLC, the direct parent of Borrower and the pledgor under the Pledge Agreement.

"**Pledge Agreement**" means the Pledge Agreement, dated as of the Closing Date, among Pledgor and Collateral Agent.

"**Preliminary Acceptance**" has the meaning given in the EPC Contract.

ST PAPER9242

"**Premises**" means the "Premises" as defined in the Mortgage.

"**Prime Rate**" means the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (defined on the date hereof as the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks), as in effect from time to time.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means Administrative Agent's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

"**Principal Payment Date**" has the meaning given in the Security Deposit Agreement.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term Loans of any Lender, the percentage obtained by dividing (A) the Term Loan Exposure of that Lender by (B) the aggregate Term Loan Exposure of all Lenders; and (ii) with respect to all payments, computations and other matters relating to the Revolving Commitment or Revolving Loans of any Lender, the percentage obtained by dividing (A) the Revolving Exposure of that Lender by (B) the aggregate Revolving Exposure of all Lenders.  For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (1) an amount equal to the Total Exposure of that Lender by (2) an amount equal to the Total Exposure of all Lenders.

"**Products**" means any paper, linerboard or pulp products or products related thereto produced at the Project for sale pursuant to any contract or market transaction.

"**Project**" has the meaning given in the recitals.

"**Project Documents**" means the Major Project Documents and the Other Project Documents.

"**Project Improvement**" means the improvements, upgrades and refurbishments to be made to the Project and a new wood-fired burner and other equipment and machinery to be installed at the Project, in each case pursuant to the EPC Contract.  "Project Improvements" shall not include any improvements, upgrades and refurbishments performed under the EPC Contract that relate to assets located in De Pere, Wisconsin.

"**Project Improvement Account**" has the meaning given in the Security Deposit Agreement.

"**Project Improvement Budget**" has the meaning given in Section 3.1(f).

"**Project Improvement Costs**" means the costs and expenses incurred by Borrower under the EPC Contract in connection with the construction and installation of the Project Improvements, which costs and expenses shall be funded from the Project Improvements

ST PAPER9243

Account in accordance with the Security Deposit Agreement and the Project Improvement Budget.

"**Project Improvement Credit Event**" has the meaning given in Section 3.3.

"**Project Improvement Requisition**" has the meaning given in the Security Deposit Agreement.

"**Project Improvement Schedule**" has the meaning given in the Section 3.1(f).

"**Project Revenues**" means, for any applicable period, determined on a cash basis and without duplication, all income and receipts of Borrower derived from the sale of Products and the ownership and operation of the Project, including payments received by Borrower under the Project Documents (including damages, liquidated damages and other similar payments), proceeds of any delay in start-up or business interruption or liability insurance (to the extent such liability insurance proceeds represent reimbursement of third party claims previously paid by Borrower), but *excluding* (i) net payments, if any, received by Borrower under Interest Rate Hedging Agreements, (ii) any receipts derived from the sale of any property pertaining to the Project or incidental to the operation of the Project, as determined in conformity with cash accounting principles, (iii) Loss Proceeds and (iv) proceeds arising as a result of the exercise of rights or remedies under the Collateral Documents.

"**Prudent Operating Practices**" means those reasonable practices, methods and acts, as they may change from time to time, which (i) are commonly used to manage, operate and maintain deinked pulp and paper production, distribution, equipment and associated facilities of the type that comprise the Project in a manner that is safe, reliable and efficient and in compliance with applicable Legal Requirements, manufacturers' warranties and manufacturers' recommendations and (ii) are consistent with the exercise of the reasonable judgment, skill, diligence, foresight and care expected of an operator of substantially similar facilities as those referred to in clause (i) above in order to efficiently accomplish the desired result consistent with safety standards, applicable Legal Requirements, manufacturers' warranties, manufacturers' recommendations and the Project Documents, in each case taking into account the location of the Project, including climatic, environmental and general conditions.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by Borrower in any real property.

"**Register**" has the meaning given in Section 2.5(b).

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous

NY\1218924.18

ST PAPER9244

Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Remediation Action**" has the meaning given in the Security Deposit Agreement.

"**Replacement Lender**" has the meaning given in Section 2.21.

"**Requisite Lenders**" means one or more Lenders having or holding more than 50% of the Total Exposure and (i) with respect to any amendment, waiver, consent, approval or other action which would disproportionately affect the Term Loan Lenders, one or more Term Loan Lenders having or holding more than 50% of the Term Loan Exposure, and (ii) with respect to any amendment, waiver, consent, approval or other action which would disproportionately affect the Revolving Lenders, one or more Revolving Lenders having or holding more than 50% of the Revolving Exposure; provided that if any such Lender shall be a Defaulting Lender at such time, there shall be excluded from the determination of Required Lenders at such time, as the context requires, (A) such Lender's Total Exposure outstanding at such time, (B) such Lender's Term Loan Exposure outstanding at such time or (C) such Lender's Revolving Exposure outstanding at such time.

"**Revenue Account**" has the meaning given in the Security Deposit Agreement.

"**Revolving Commitment**" means the commitment of a Lender to make or otherwise fund any Revolving Loan and "**Revolving Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Commitments as of the Closing Date is $5,000,000.

"**Revolving Commitment Fee**" has the meaning given in Section 2.9(a).

"**Revolving Commitment Period**" means the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"**Revolving Commitment Termination Date**" means the earliest to occur of (i) March 31, 2013 (or if such day is not a Business Day, the next succeeding Business Day), (ii) the date the Revolving Commitments are permanently reduced to zero pursuant to Section 2.13 as a result of voluntary and/or mandatory prepayments of the Revolving Loans pursuant to Sections 2.11 and/or 2.12 and (iii) the date that all Revolving Loans shall become due and payable in full and all Revolving Commitments shall terminate hereunder, whether by acceleration or otherwise.

"**Revolving Exposure**" means, with respect to any Lender, as of any date of determination, (i) prior to the termination of the Revolving Commitments, such Lender's undrawn Revolving Commitment *plus* the outstanding principal of any Revolving Loans of such Lender and (ii) after the termination of the Revolving Commitments, the outstanding principal amount of the Revolving Loans of such Lender.

"**Revolving Lender**" means, at any time, any Lender with a Revolving Commitment or with a Revolving Loan that is outstanding at such time.

26

ST PAPER9245

"**Revolving Loan**" means a Loan made by a Lender to Borrower pursuant to Section 2.2(a).

"**Revolving Loan Note**" means a promissory note in the form of <u>Exhibit B-2</u>.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

"**SCA Contracts Guaranty**" means the Guaranty, dated as of the Closing Date, made by Pledgor in favor of SCA Tissue North America, LLC, as the same is in effect on the Closing Date and as it may be supplemented or amended hereafter in accordance with the terms hereof.

"**Secured Parties**" means the Agents, the Lenders and each Lender Counterparty and each of their respective successors, transferees, participants and assigns.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as now and hereafter in effect, and any successor statute.

"**Security Agreement**" means the Pledge and Security Agreement, dated as of the Closing Date, by and between Borrower and Collateral Agent.

"**Security Deposit Agreement**" means the Security Deposit Agreement, dated as of the Closing Date, by and among Borrower, Collateral Agent, Administrative Agent and Depositary Bank.

"**Seller Notes**" means, collectively, the four unsecured subordinated promissory notes, dated the Closing Date, issued by Borrower to Oconto Falls Tissue, Inc. pursuant to the Asset Purchase Agreement, in the aggregate principal amounts of $8,000,000, $8,000,000, $8,000,000 and $6,589,000, respectively, as the same are in effect on the Closing Date.

"**Seller Subordination Agreement**" means the Subordination Agreement, dated as of the Closing Date, by and between Oconto Falls Tissue, Inc., Borrower, Administrative Agent and Collateral Agent, as the same is in effect on the Closing Date and as it may be supplemented or amended hereafter in accordance with the terms hereof.

"**Solvency Certificate**" means a Solvency Certificate signed by the chief financial officer of the applicable Credit Party, substantially in the form of <u>Exhibit G</u>.

"**Solvent**" means, with respect to any Credit Party, that as of any date of determination, (i) the sum of such Credit Party's debt (including contingent liabilities) does not exceed the

NY\1218924.18

ST PAPER9246

present fair saleable value of such Credit Party's present assets; (ii) such Credit Party's capital is not unreasonably small in relation to its business on such date or as reflected in the Base Case Projections or with respect to any transaction contemplated or undertaken after such date; and (iii) such Credit Party has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise).   For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standards No. 5).

"**Sponsor**" means Sharad Tak.

"**Subordinated Indebtedness**" means the Indebtedness of Borrower under, and as evidenced by, the Seller Notes, as the same are in effect on the Closing Date.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; <u>provided</u>, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Substantial Completion**" has the meaning given in the EPC Contract.

"**Syndication Agent**" has the meaning given in the preamble.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, including any and all penalties and interest related thereto; <u>provided that</u> "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by any jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise and including any franchise taxes or branch profits taxes imposed in lieu of net income taxes) of that Person (and/or, in the case of a Lender, its applicable lending office) of such Person, or any similar or alternative tax.

"**Term Loan**" means a Loan made by a Lender to Borrower pursuant to Section 2.1(a).

"**Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Term Loan and "**Term Loan Commitments**" means such commitments of all Lenders in

ST PAPER9247

the aggregate. The amount of each Lender's Term Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Term Loan Commitments as of the Closing Date is $65,000,000.

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender; provided that at any time prior to the making of the Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

"**Term Loan Lender**" means, at any time, each Lender with a Term Loan Commitment or with a Term Loan that is outstanding at such time.

"**Term Loan Maturity Date**" means the earlier of (i) March 31, 2013 (or if such day is not a Business Day, the next succeeding Business Day) and (ii) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Term Loan Note**" means a promissory note in the form of Exhibit B-1.

"**Terminated Lender**" has the meaning given in Section 2.21.

"**Title Insurer**" means Green Bay Title Company, Inc. or any replacement title insurance company reasonably acceptable to Administrative Agent.

"**Title Policy**" has the meaning given in Section 3.1(g)(ii).

"**Total Debt**" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Borrower and its Subsidiaries determined on a consolidated basis in conformity with GAAP.

"**Total Exposure**" means (i) with respect to any Lender, the sum of such Lender's Term Loan Exposure and Revolving Exposure, and (ii) with respect to all Lenders, the sum of the Term Loan Exposure and Revolving Exposure of all Lenders.

"**Total Utilization of Revolving Commitments**" means, as of any date of determination, the aggregate principal amount of all outstanding Revolving Loans.

"**Type of Loan**" means with respect to either Term Loans or Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan.

"**Unadjusted Eurodollar Rate Component**" means that component of the interest costs to Borrower in respect of a Eurodollar Rate Loan that is based upon the rate obtained pursuant to clause (i) of the definition of Adjusted Eurodollar Rate.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than

ST PAPER9248

the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority (but not attachment) and for purposes of definitions related to such provisions.

"**Unsatisfied Conditions**" means a material condition in a Governmental Approval that has not been satisfied and that either (i) must be satisfied before such Governmental Approval can become effective or (ii) must be satisfied as of a future date but with respect to which facts or circumstances exist which, to Borrower's knowledge, could reasonably be expected to result in a failure to satisfy such Governmental Approval condition.

"**U.S.A. PATRIOT Act**" means (i) the Trading with the Enemy Act, as amended, and each of the foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001.

"**U.S. Lender**" has the meaning given in Section 2.18(c)(ii).

"**Warehouse Lease**" means the Warehouse Lease, dated February 1, 2005, between Borrower and SCA Tissue North America, LLC.

**1.2.    Accounting Terms.**    Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Borrower pursuant to Sections 5.6(a) and 5.6(b) shall be prepared in conformity with GAAP as in effect at the time of such preparation.

**1.3.    Interpretation, etc.**    Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Credit Documents:

(a)     Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

(b)     References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, Appendix, Schedule or Exhibit, as the case may be, hereof or hereto unless otherwise specifically provided.

(c)     The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

(d)     The term "or" is not exclusive.

NY\1218924.18

ST PAPER9249

(e)     References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments and agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, amended and restated, supplemented or otherwise modified from time to time and in effect at any time.

(f)     All references to times of the day shall be deemed to be references to New York City time unless otherwise indicated.

## SECTION 2.  LOANS

### 2.1.    Term Loans.

(a)     <u>Term Loan Commitments</u>.  Subject to the terms and conditions hereof, each Term Loan Lender severally agrees to make, on the Closing Date, a Term Loan to Borrower in an amount equal to such Lender's Term Loan Commitment.  Borrower may make only one borrowing of Term Loans, which shall be on the Closing Date.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.11(a) and 2.12, all amounts owed hereunder with respect to Term Loans shall be paid in full no later than the Term Loan Maturity Date.  Each Lender's Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Term Loan Commitment on such date.

(b)     <u>Borrowing Mechanics for Term Loans</u>.

(i)     Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than three Business Days prior to the Closing Date if Borrower requests Term Loans that are Eurodollar Loans and no later than one Business Day prior to the Closing Date if Borrower requests Term Loans that are Base Rate Loans.  Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(ii)     Each Term Loan Lender shall make its Term Loan available to Administrative Agent not later than 12:00 p.m. on the Closing Date, by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Term Loans available to Borrower on the Closing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Borrower at the Principal Office designated by Administrative Agent or to such other account as may be designated in writing to Administrative Agent by Borrower.

### 2.2.    Revolving Loans.

(a)     <u>Revolving Commitments</u>.  During the Revolving Commitment Period, subject to the terms and conditions hereof, each Revolving Lender severally agrees to make Revolving Loans to Borrower on any Business Day after the Closing Date in an aggregate amount up to but not exceeding such Lender's Revolving Commitment; <u>provided that</u> Borrower

NY\1218924.18

ST PAPER9250

may not request any Revolving Loans in an amount that exceeds the undrawn Revolving Commitments in effect at the time of such request. Amounts borrowed pursuant to this Section 2.2(a) may be repaid and reborrowed during the Revolving Commitment Period, subject to the terms and conditions hereof. Each Lender's Revolving Commitment, if any, shall expire on the Revolving Commitment Termination Date and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Loans and the Revolving Commitments shall be paid in full no later than such date.

          (b)     <u>Borrowing Mechanics for Revolving Loans</u>.

          (i)     Revolving Loans shall be made in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

          (ii)     Whenever Borrower desires that the Revolving Lenders make Revolving Loans, Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than 10:00 a.m. at least three Business Days in advance of the proposed Credit Date in the case of a Eurodollar Rate Loan, and at least one Business Day in advance of the proposed Credit Date in the case of a Base Rate Loan.

          (iii)     Notice of receipt of each Funding Notice in respect of Revolving Loans, together with the amount of each Revolving Lender's Pro Rata Share thereof and the applicable interest rate, shall be provided by Administrative Agent to each Revolving Lender by facsimile with reasonable promptness, but not later than 2:00 p.m. on the same day as Administrative Agent's receipt of such Funding Notice from Borrower if Administrative Agent shall have received such Funding Notice by 10:00 a.m. on such day.

          (iv)     Each Revolving Lender shall make the amount of its Revolving Loan available to Administrative Agent not later than 12:00 p.m. on the applicable Credit Date, by wire transfer of same day funds in Dollars, at the Principal Office designated by Administrative Agent. Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Revolving Loans available to Borrower on the applicable Credit Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Revolving Loans received by Administrative Agent from Revolving Lenders to be deposited to the Revenue Account or, at Borrower's request, to the Local O&M Account (subject to the cap on the amount of funds that may be on deposit in the Local O&M Account set forth in Section 6.9(a)), all in accordance with the terms of the Security Deposit Agreement.

    **2.3.    Pro Rata Shares; Availability of Funds.**

          (a)     <u>Pro Rata Shares</u>. All Loans shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder.

          (b)     <u>Availability of Funds</u>. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to

ST PAPER9251

make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Borrower a corresponding amount on such Credit Date. If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate. If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrower and Borrower shall immediately pay such corresponding amount to Administrative Agent, together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans for the applicable Class of Loans. Nothing in this Section 2.3(b) shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

**2.4.    Use of Proceeds.** All of the proceeds of the Term Loans made on the Closing Date shall be applied by Borrower to fund a portion of the purchase price of the acquisition of the Acquired Assets pursuant to the Asset Transfer and to pay transaction costs incurred in connection therewith and herewith.

**2.5.    Evidence of Debt; Register; Lenders' Books and Records; Notes.**

(a)    <u>Lenders' Evidence of Debt</u>. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower to the extent such recordation is consistent with the recordations in the Register, absent manifest error; <u>provided that</u> the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any applicable Loans; and <u>provided, further</u>, that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>. Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at the Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the "**Register**"). The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Commitments and Loans in accordance with the provisions of Section 9.6, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; <u>provided that</u> failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any Loan. Borrower hereby designates GSCP to serve as Borrower's agent solely for purposes of maintaining the

ST PAPER9252

Register as provided in this Section 2.5(b), and Borrower hereby agrees that, to the extent GSCP serves in such capacity, GSCP and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "**Indemnitees**."

(c)   Notes.  If so requested by any Lender by written notice to Borrower (with a copy to Administrative Agent) at least one Business Day prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 9.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Term Loans and/or Revolving Loans, as the case may be.

### 2.6.  Interest on Loans.

(a)   Except as otherwise set forth herein, each Class of Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)   if a Base Rate Loan, at the Base Rate *plus* 5% per annum; or

(ii)   if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate *plus* 6% per annum.

(b)   The basis for determining the rate of interest with respect to any Loan, and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by Borrower and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be; provided that until the earlier of (A) the date which is 60 days after the Closing Date and (B) the date on which Syndication Agent notifies Borrower that the primary syndication of the Loans and Commitments has been completed, as determined by Syndication Agent, the Loans shall be maintained as either (i) Eurodollar Rate Loans having an Interest Period of no longer than one month or (ii) Base Rate Loans.  If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c)   In connection with Eurodollar Rate Loans, no more than five Interest Periods shall be outstanding at any time.  If Borrower fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan, if outstanding as a Eurodollar Rate Loan, will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan or, if outstanding as a Base Rate Loan, will remain as, or if not then outstanding will be made as, a Base Rate Loan.  If Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Borrower shall be deemed to have selected an Interest Period of one month.  As soon as practicable after 10:00 a.m. on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply

NY\1218924.18

ST PAPER9253

to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower and each Lender.

(d)     Interest payable pursuant to Section 2.6(a) shall be computed (i) in the case of Base Rate Loans, on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the following dates shall be included: (A) the date of the making of such Loan, (B) the first day of an Interest Period applicable to such Loan, (C) in the case of a Term Loan, the last Interest Payment Date with respect to such Term Loan, and (D) in the case of a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan; and the following dates shall be excluded: (A) the date of payment of such Loan, (B) the expiration date of an Interest Period applicable to such Loan and (C) with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)     Except as otherwise set forth herein, interest on each Loan shall accrue on a daily basis and shall be payable in arrears on (i) each Interest Payment Date with respect to interest accrued on and to each such Interest Payment Date; (ii) any date of prepayment of such Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, provided, however, that with respect to any voluntary prepayment of a Revolving Loan which is a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date so long as any Loans or Commitments remain outstanding after giving effect to such prepayment; and (iii) the maturity date of such Loan.

**2.7.     Conversion/Continuation.**

(a)     Subject to Section 2.16 and so long as no Default or Event of Default shall have occurred and then be continuing, Borrower shall have the option:

(i)     to convert at any time all or any part of any Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; provided that a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Borrower shall pay all amounts due under Section 2.16 in connection with any such conversion; or

(ii)     upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount as a Eurodollar Rate Loan.

(b)     Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan).

NY\1218924.18

ST PAPER9254

**2.8.    Default Interest.**    To the extent not paid when due hereunder, the principal amount of all overdue Loans and, to the extent permitted by applicable law, any overdue interest payments on the Loans or any overdue fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) from and after the applicable due date therefor, payable on demand, at a rate that is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time when any such increase in interest rate is effective, such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans.    Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.9.    Fees.**

(a)    Borrower agrees to pay to the Revolving Lenders a commitment fee (such fee, the "**Revolving Commitment Fee**") equal to the product of (i) the average of the daily difference between (A) the aggregate Revolving Commitments and (B) the Total Utilization of Revolving Commitments, *multiplied by* (ii) 0.50% per annum.  The Revolving Commitment Fee shall be paid to Administrative Agent at its Principal Office, and upon receipt Administrative Agent shall promptly distribute to each Revolving Lender its Pro Rata Share thereof.  Such Revolving Commitment Fee shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year during the Revolving Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Revolving Commitment Termination Date.

(b)    Borrower agrees to pay to the Agents such other fees in the amounts and at the times separately agreed upon.

**2.10.    Scheduled Payments.**

(a)    Borrower shall repay the outstanding principal amounts of the Term Loans in consecutive annual installments (each, an "**Installment**") as follows:

(i)    On each Principal Payment Date other than the Term Loan Maturity Date Borrower shall pay an amount equal to 1% of the original principal amount of each Term Loan and the balance of each such Term Loan remaining on the Term Loan Maturity Date shall be paid in full on such date.

(ii)    Notwithstanding the foregoing, (A) all Installments shall be reduced, on a *pro rata* basis, in the amount of any voluntary prepayments of the Term Loans made pursuant to Sections 2.11 or any mandatory prepayments of Term Loans made pursuant to

ST PAPER9255

Section 2.12, in each case since the most recent Principal Payment Date (or, in the case of the first Principal Payment Date, since the first Quarterly Waterfall Date); and (B) the Term Loans, together with all other amounts owed hereunder with respect thereto, shall, in any event, be paid in full no later than the Term Loan Maturity Date.

(b)      Revolving Loans.  Borrower shall repay the Revolving Loans in full on the Revolving Commitment Termination Date.

**2.11.  Voluntary Prepayments/Commitment Reductions.**

(a)      Voluntary Prepayments.

(i)      At any time and from time to time, subject to clause (iv) below, Borrower may prepay any Loans on any Business Day in whole or in part in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount; provided that Borrower may not voluntarily prepay Term Loans pursuant to this Section 2.11(a) until after October 16, 2008, except that Borrower may voluntarily prepay Term Loans during such period if all of the Lenders elect to receive such prepayment pursuant to a Permitted Construction Financing and such prepayment is made at 101% of the principal amount prepaid.

(ii)      All such prepayments shall be made:

(A)      upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(B)      upon not less than three Business Days' prior written or telephonic notice in the case of Eurodollar Rate Loans;

in each case given to Administrative Agent by 12:00 p.m. on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice by facsimile or telephone to each applicable Lender).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be applied as specified in Section 2.13(a).

(iii)      Voluntary prepayments of Term Loans may not be reborrowed. Voluntary prepayments of Revolving Loans may be reborrowed subject to the terms and conditions of this Agreement.

(iv)      If Borrower voluntarily prepays any Term Loans pursuant to this Section 2.11(a): (A) after October 16, 2008 and prior to October 16, 2009, such prepayment shall be at 103% of the principal amount prepaid; and (B) on or after October 16, 2009 and prior to October 16, 2010, such prepayment shall be at 101% of the principal amount prepaid; except that in either case such premium shall not apply to any voluntary prepayment of all (but not less than all) Loans then outstanding made with the proceeds received by Borrower or any Affiliate of Borrower from any Permitted Construction Financing.

ST PAPER9256

(b)    <u>Voluntary Commitment Reductions</u>.

(i)    Borrower may, upon not less than three Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by facsimile or telephone to each applicable Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, any Revolving Commitments in an amount up to the amount by which the Revolving Commitments exceed the Total Utilization of Revolving Commitments at the time of such proposed termination or reduction; <u>provided that</u> any partial reduction of the Revolving Commitments shall be in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

(ii)    Borrower's notice to Administrative Agent pursuant to clause (i) above shall designate the date (which shall be a Business Day) of the proposed termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Commitments shall be effective on the date specified in Borrower's notice and shall reduce the Revolving Commitment of each Lender proportionately to its Pro Rata Share thereof.

**2.12.   Mandatory Prepayments.**

(a)    <u>Asset Sales</u>.  No later than the third Business Day following the date of receipt by Borrower or any of its Subsidiaries of any Net Asset Sale Proceeds, Borrower shall prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an aggregate amount equal to 100% of such Net Asset Sale Proceeds; <u>provided</u>, (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $5,000,000, Borrower (or the applicable Subsidiary) shall have the option to invest Net Asset Sale Proceeds within one year of receipt thereof in long-term productive assets of the general type used in the business of Borrower in accordance with the Security Deposit Agreement; <u>provided that</u> if any part of such Net Asset Sale Proceeds are not so reinvested by such date, Borrower shall, on such date, prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an amount equal to the amount of such Net Asset Sale Proceeds that have not been so invested.

(b)    <u>Loss Proceeds</u>.  No later than the first Business Day following the date of receipt by Borrower or any of its Subsidiaries, or Administrative Agent as loss payee, of any Loss Proceeds, Borrower shall prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an aggregate amount equal to 100% of such Loss Proceeds; <u>provided</u>, (i) so long as no Default or Event of Default shall have occurred and be continuing (other than as a result of the Loss Event that caused such Loss Proceeds to be payable), (ii) the applicable Loss Proceeds do not result from a Major Loss and (iii) to the extent that aggregate Loss Proceeds from the Closing Date through the applicable date of determination do not exceed $20,000,000, Borrower (or the applicable Subsidiary) shall have the option to invest such Loss Proceeds within one year of receipt thereof in long-term productive assets of the general type used in the business of Borrower, which investment may include the repair, restoration or replacement of the applicable assets thereof, in accordance with the Security Deposit Agreement; <u>provided that</u> if any part of such Loss Proceeds are not so reinvested by such

38

ST PAPER9257

date, Borrower shall, on such date, prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an amount equal to the amount of such Loss Proceeds that have not been so invested.

(c)    Issuance of Equity Securities.   No later than one Business Day after the date of receipt by Borrower of any Cash proceeds from a capital contribution (other than a capital contribution by Sponsor for the purpose of funding (i) Capital Expenditures, if Borrower shall have given Administrative Agent written notice that such capital contribution is for such purpose, or (ii) any shortfall of funds available in the Revenue Account for application to the payment of amounts referred to in Section 3.2(c) of the Security Deposit Agreement) to, or the issuance of any Equity Interests of, Borrower or Pledgor (other than pursuant to any employee stock or stock option compensation plan), Borrower shall prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an aggregate amount equal to 50% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)    Issuance of Debt.   No later than one Business Day after the date of receipt by Borrower of any Cash proceeds from the incurrence of any Indebtedness of Borrower (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.2), Borrower shall prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an aggregate amount equal to 100% of such Cash proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e)    Excess Cash Flow.   In any Fiscal Quarter in which there shall be Excess Cash Flow (commencing with the Fiscal Quarter ending on June 30, 2007), Borrower shall, no later than one Business Day after the Quarterly Waterfall Date occurring substantially concurrently with the end of such Fiscal Quarter (including the Fiscal Quarter ending on December 31 of any Fiscal Year), prepay outstanding Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an aggregate amount equal to the ECF Prepayment Amount.

(f)    Prepayment Certificate.   Concurrently with any prepayment of the Loans pursuant to Sections 2.12(a) through 2.12(e), Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable Net Asset Sale Proceeds, Loss Proceeds, net proceeds or Excess Cash Flow, as the case may be. In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(g)    Project Improvement Account.   If any funds remain on deposit in the Project Improvement Account after Final Completion of all Project Improvements has been achieved and the final payment due and owing under the EPC Contract has been made, Borrower shall prepay the Loans as set forth in Section 2.13(b) and in accordance with the Security Deposit Agreement in an amount equal to 50% of the amount of such deposited funds.

ST PAPER9258

(h)     Prepayment Premium.  If Borrower makes any prepayment pursuant to the foregoing clauses (a), (c) or (d): (i) after the Closing Date and on or prior to October 16, 2008, such prepayment shall be at 103% of the principal amount prepaid *plus* the amount of interest scheduled to be paid in respect of the prepaid principal on or prior to October 16, 2008; (ii) on or after October 16, 2008 and prior to October 16, 2009, such prepayment shall be at 103% of the principal amount prepaid; and (iii) on or after October 16, 2009 and prior to October 16, 2010, such prepayment shall be at 101% of the principal amount prepaid; except for any prepayment of all (but not less than all) Loans then outstanding made pursuant to the foregoing clause (d) with proceeds received by Borrower or any Affiliate of Borrower from any Permitted Construction Financing.

### 2.13.   Application of Prepayments/Commitment Reductions.

(a)     Application of Voluntary Prepayments by Class of Loans.  Any voluntary prepayment of any Loan pursuant to Section 2.11(a) shall be applied as specified by Borrower in the applicable notice of prepayment; provided that in the event Borrower fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied as follows:

(i)     *first*, to repay outstanding Revolving Loans to the full extent thereof; and

(ii)     *second*, to prepay the Term Loans.

(b)     Application of Mandatory Prepayments by Class of Loans.   Any mandatory prepayment of any Loan pursuant to Section 2.12 shall be applied as follows:

(i)     *first*, to prepay the Term Loans;

(ii)     *second*, to prepay the Revolving Loans to the full extent thereof, it being agreed that the Revolving Commitments shall be permanently reduced by the amount of such prepayment; and

(iii)     *third*, the Revolving Commitments shall be permanently reduced by the amount that remains available to make such Mandatory Prepayment;

provided, however, that notwithstanding the foregoing, any mandatory prepayments pursuant to Section 2.12(b) that result from the receipt of Loss Proceeds shall be applied on a *pro rata* basis to prepay Term Loans (on a *pro rata* basis to reduce the remaining Installments of the Term Loans) and reduce the Revolving Commitments (it being agreed that the Revolving Loans shall be prepaid if, after such reduction in the Revolving Commitments, the aggregate amount of outstanding Revolving Loans exceeds the then reduced Revolving Commitments, by an amount equal to such excess).

(c)     Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans.  Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to

ST PAPER9259

Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrower pursuant to Section 2.16(c).

**2.14.  General Provisions Regarding Payments.**

(a)  All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 1:00 p.m. on the date due at the Principal Office designated by Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b)  All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)  Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)  Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)  Subject to the provisos set forth in the definition of "Interest Period," whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the Revolving Commitment Fee.

(f)  Borrower hereby authorizes Administrative Agent to charge Borrower's accounts with Administrative Agent in order to cause timely payment to be made to Administrative Agent of all principal, interest, fees and expenses due hereunder, subject to sufficient funds being available in its accounts for that purpose.

(g)  Administrative Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 1:00 p.m. to be a non-conforming payment.  Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  Administrative Agent shall give prompt telephonic notice to Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in

41

ST PAPER9260

accordance with the terms of Section 7.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.6 from the date on which such amount was due and payable until the date on which such amount is paid in full.

        (h)    If an Event of Default shall have occurred and not waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 7.1, all payments or proceeds received by Agents hereunder in respect of any of the Obligations shall be applied in accordance with the application arrangements described in Section 7.2 of the Security Agreement.

        **2.15.   Ratable Sharing.**   Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

        **2.16.   Making or Maintaining Eurodollar Rate Loans.**

        (a)    <u>Inability to Determine Applicable Interest Rate</u>. If prior to the first day of any Interest Period: (i) Administrative Agent shall have determined (which determination shall be conclusive and binding upon Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period or (ii) Administrative Agent shall have received notice from Lenders in respect of the relevant Loans that the Eurodollar Rate determined or to be determined for such Interest

42

ST PAPER9261

Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period, Administrative Agent shall give telecopy or telephonic notice thereof to Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given, then (x) any Eurodollar Rate Loans requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Rate Loans shall be continued as Base Rate Loans and (z) any outstanding Eurodollar Rate Loans shall be converted, on the last day of the then-current Interest Period, to Base Rate Loans. Until such notice has been withdrawn by Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall Borrower have the right to, convert Loans to Eurodollar Rate Loans.

      (b)    <u>Illegality or Impracticability of Eurodollar Rate Loans</u>. In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Borrower and Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by facsimile or by telephone confirmed in writing) to Borrower and Administrative Agent of such determination, which notice Administrative Agent shall promptly transmit to each other Lender. Thereafter (A) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (B) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (C) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (D) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, Borrower shall have the option, subject to the provisions of Section 2.16(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by facsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above, which notice of rescission Administrative Agent shall promptly transmit to each other Lender. Except as provided in the immediately preceding sentence, nothing in this Section 2.16(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

NY\1218924.18

ST PAPER9262

(c)  Compensation for Breakage or Non-Commencement of Interest Periods. Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Lender to lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of the Applicable Margin and other anticipated profits) which such Lender may sustain: (i) if for any reason (including the revocation by Borrower of any Funding Notice or Conversion/Continuation Notice, as applicable), other than a default by such Lender, a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrower.

(d)  Booking of Eurodollar Rate Loans.  Any Lender may make, carry or transfer Eurodollar Rate Loans at, to or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)  Assumptions Concerning Funding of Eurodollar Rate Loans.  Calculation of all amounts payable to a Lender under this Section 2.16 and under Section 2.17 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.16 and under Section 2.17.

**2.17.  Increased Costs; Capital Adequacy.**

(a)  Compensation For Increased Costs and Taxes.  Subject to the provisions of Section 2.18 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any Change of Law shall have occurred: (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Tax on the overall net income of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of

NY\1218924.18

ST PAPER9263

funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of Adjusted Eurodollar Rate); or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) with respect to its obligations hereunder or the Eurodollar Loans made by such Lender; and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender deems to be material, of agreeing to make, making or maintaining Eurodollar Rate Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.17(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)      Capital Adequacy Adjustment. In the event that any Change of Law has or would have the effect of reducing the rate of return on the capital of such Lender or any Person controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitments or other obligations hereunder with respect to the Loans or Commitments to a level below that which such Lender or such controlling Person could have achieved but for such Change of Law by an amount deemed by such Lender to be material, then from time to time, within five Business Days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling Person. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.17(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(c)      Compensation by Borrower. Notwithstanding anything to the contrary in this Section 2.17, Borrower shall not be required to compensate a Lender pursuant to this Section 2.17 for any amounts incurred more than nine months prior to the date that such Lender notifies Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect. The obligations of Borrower pursuant to this Section 2.17 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.18.   Taxes; Withholding, etc.**

(a)      Payments to Be Free and Clear. All sums payable by or on behalf of Borrower hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of Administrative Agent or any Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America.

NY\1218924.18

ST PAPER9264

(b)    Withholding of Taxes.  If any Taxes  covered by Section 2.18(a) are required to be deducted or withheld from any sum paid or payable by Borrower to Administrative Agent or any Lender under any of the Credit Documents (other than a Tax on the overall net income of Administrative Agent or any Lender): (i) Borrower shall notify Administrative Agent or cause Administrative Agent to be notified of any such requirement or any change in any such requirement within a reasonable amount of time after Borrower becomes aware of it; (ii) Borrower shall pay or cause to be paid any such Tax on or before the due date of such Tax, such payment to be made (if the liability to pay is imposed on Borrower) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) the sum payable in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required; and (iv) within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, Borrower shall deliver or cause to be delivered to Administrative Agent evidence satisfactory to Administrative Agent of such deduction, withholding or payment and of the remittance thereof to the relevant Governmental Authority; provided that no such additional amount shall be required to be paid to Administrative Agent or any Lender under clause (iii) above to the extent such additional amounts are attributable to Administrative Agent's or such Lender's failure to comply, to the extent it is legally able to comply, with the requirements of paragraph (c) of this Section 2.18 and except to the extent that any change after the date hereof (in the case of Administrative Agent and each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such Assignment Agreement, as the case may be, in respect of payments to Administrative Agent or such Lender.

(c)    Evidence of Exemption from or Reduction in U.S. Withholding Tax.

(i)    Each Lender that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "Non-US Lender") shall deliver to Administrative Agent for transmission to Borrower, on or prior to the Closing Date (in the case of each such Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other such Lender), and at such other times as may be necessary in the determination of and as reasonably requested by Borrower or Administrative Agent (each in the reasonable exercise of its discretion), (A) two original copies of Internal Revenue Service Form W-8BEN, W-8ECI, or W-8IMY, together with any necessary attachments (or any successor forms), properly completed and duly executed by such Non-US Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower to establish that such Lender is not subject to deduction or withholding or is subject to a reduced rate of deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal interest, fees or other amounts payable under

46

ST PAPER9265

any of the Credit Documents, or (B) in the case of a Non-US Lender that is not a "bank" described in Section 881(c)(3)(A) of the Internal Revenue Code and is relying on the "portfolio interest exemption", a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents. Each Non-US Lender hereby agrees, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Borrower two new original copies of Internal Revenue Service Form W-8BEN, W-8ECI, or W-8IMY, together with any necessary attachments, or a new Certificate re Non-Bank Status and two new original copies of Internal Revenue Service Form W-8BEN (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower to confirm or establish that such Lender is not subject to deduction or withholding of, or is subject to a reduced rate of deduction or withholding of, United States federal income tax with respect to payments to such Lender or interest payable under the Credit Documents, or notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence. Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this paragraph that such Lender is not legally able to deliver.

(ii)   Administrative Agent and each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for United States federal income tax purposes (a "**U.S. Lender**") shall deliver to Borrower, in the case of Administrative Agent, and Administrative Agent and Borrower, in the case of each such Lender, on or prior to the Closing Date (or, if later, on or prior to the date on which Administrative Agent or such Lender becomes a party to this Agreement) two original copies of Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by Administrative Agent or such Lender, certifying that such U.S. Lender is entitled to an exemption from United States backup withholding tax, or otherwise prove that it is entitled to such an exemption.

(d)   <u>Other Taxes</u>.   Borrower shall pay (or cause to be paid) any and all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made under any of the Credit Documents or from the execution, delivery or enforcement of, or otherwise with respect to, any of the Credit Documents to the relevant Governmental Authority in accordance with applicable law. Within 30 days after the due date of payment of any such Taxes, Borrower shall deliver to Administrative Agent evidence satisfactory to Administrative Agent of such payment to the relevant Governmental Authority.

(e)   <u>Indemnification</u>.   Borrower shall indemnify or cause to be indemnified Administrative Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Taxes paid by Administrative Agent, or such Lender or any of their respective Affiliates (other than any Taxes on the overall net income of Administrative Agent or such

ST PAPER9266

Lender, as the case may be), on or with respect to any payment by or on account of any obligation of Borrower under any of the Credit Documents (including any Taxes, other than any Taxes on the overall net income of Administrative Agent or such Lender, as the case may be, imposed or asserted on or attributable to amounts payable under this Section 2.18) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, excluding, however, any Tax (or related penalties and interest) that did not give rise to or would not have given rise to an obligation to pay additional amounts as a result of the provisos in Section 2.18(b).   A certificate as to the amount of such payment or liability delivered to Borrower by a Lender or by Administrative Agent on its behalf or on behalf of a Lender shall be conclusive absent manifest error.

(f)   Tax Refunds.   If Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 2.18, it shall pay over such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section 2.18 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that Borrower, upon the request of Administrative Agent or such Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Lender in the event Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.   This paragraph shall not be construed to require Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Borrower or any other Person.

**2.19.   Obligation to Mitigate.**   Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Credit Extensions becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.17 or Section 2.18, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to such Section 2.17 or 2.18 would be avoided or materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Credit Extensions through such other office or in accordance with such other measures, as the case may be, would not otherwise materially adversely affect such Credit Extensions or the interests of such Lender.

**2.20   Defaulting Lenders**.   Anything contained herein to the contrary notwithstanding, in the event that any Revolving Lender, other than at the direction or request of any regulatory agency or authority, defaults (such defaulting Lender, a "**Defaulting Lender**") in its obligation to fund (such default, a "**Funding Default**") any Revolving Loan (in each case, a "**Defaulted**

NY\1218924.18

ST PAPER9267

Loan"), then (a) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; (b) to the extent permitted by applicable law, until such time as the Default Excess with respect to such Defaulting Lender shall have been reduced to zero, any voluntary prepayment or mandatory prepayment of the Revolving Loans shall, if Borrower so directs at the time of making such voluntary prepayment or mandatory prepayment, be applied to the Revolving Loans of other Lenders as if such Defaulting Lender had no Revolving Loans outstanding and the Revolving Exposure of such Defaulting Lender were zero, and in the case of any mandatory prepayments, any portion of any such mandatory prepayment that is not paid to such Defaulting Lender shall be paid *pro rata* to the other Revolving Lenders; (c) such Defaulting Lender's Revolving Commitment and outstanding Revolving Loans shall be excluded for purposes of calculating the Revolving Commitment Fee payable to Lenders in respect of any day during any Default Period with respect to such Defaulting Lender, and such Defaulting Lender shall not be entitled to receive any Revolving Commitment Fee with respect to such Defaulting Lender's Revolving Commitment in respect of any Default Period with respect to such Defaulting Lender; and (d) the Total Utilization of Revolving Commitments as of any date of determination shall be calculated as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender. No Revolving Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in this Section 2.20, performance by Borrower of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section 2.20. The rights and remedies against a Defaulting Lender under this Section 2.20 are in addition to other rights and remedies which Borrower may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

**2.21   Removal or Replacement of a Lender.**   Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "**Increased-Cost Lender**") shall give notice to Borrower that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.17 or Section 2.18, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after Borrower's request for such withdrawal; or (b) (i) any Lender shall become a Defaulting Lender, (ii) the Default Period for such Defaulting Lender shall remain in effect, and (iii) such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five Business Days after Borrower's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 9.5(b), the consent of Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender, Defaulting Lender or Non-Consenting Lender (the "**Terminated Lender**"), Borrower may, by giving written notice to Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and Commitments, if any, in full to one or more Eligible Assignees (each a "**Replacement Lender**") in accordance with the provisions of Section 9.6 and Borrower shall

NY\1218924.18

ST PAPER9268

pay the fees, if any, payable thereunder in connection with any such assignment from an Increased Cost Lender or a Non-Consenting Lender and the Defaulting Lender shall pay the fees, if any, payable thereunder in connection with any such assignment from such Defaulting Lender; provided that (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender, (B) an amount equal to all accrued but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.9; (2) on the date of such assignment, Borrower shall pay any amounts payable to such Terminated Lender pursuant to Section 2.17 or 2.18 or otherwise as if the assignment were a prepayment; and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender.  Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Revolving Commitments, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided that any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

## SECTION 3.  CONDITIONS PRECEDENT

      **3.1.**    **Closing Date.**  The closing under and effectiveness of this Agreement and the obligation of each Lender to make Credit Extensions on the Closing Date are subject to the satisfaction, or waiver in accordance with Section 9.5, of the following conditions (the date on which such conditions precedent are so satisfied or waived, which date is April 16, 2007, the "**Closing Date**"):

      (a)    Credit Documents.  Administrative Agent shall have received sufficient copies of counterparts of each Credit Document originally executed and delivered by an Authorized Officer on behalf of each Credit Party party thereto (or facsimile thereof, followed promptly by originals) for each Lender listed on the signature pages hereof.

      (b)    Equity Contribution.  The Sponsor shall have contributed at least $20,000,000 of common equity to Pledgor in the form of a Cash equity contribution and Pledgor shall have contributed the same amount to Borrower as common equity (the "**Equity Contribution**"), $9,000,000 of which amount shall be deposited by Borrower to the Project Improvement Account on the Closing Date and the remaining $11,000,000 of which shall be applied by Borrower to the payment of a deposit to the EPC Contractor under the EPC Contract.

      (c)    Consummation of Asset Transfer; Project Documents.

      (i)    The Asset Transfer shall have been consummated on terms reasonably satisfactory to Administrative Agent or shall be consummated substantially contemporaneously with the Credit Extensions being made on the Closing Date.

      (ii)    Administrative Agent shall have received a fully executed copy of each Project Document and each Asset Transfer Document listed on Schedule 3.1(c)(ii).  Each Project Document and Asset Transfer Document shall be in full force and effect and no provision

NY\1218924.18

ST PAPER9269

thereof shall have been modified or waived in any material respect without the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed).

(iii)    Borrower shall have delivered evidence (which may include items delivered pursuant to Section 3.1(g)) reasonably satisfactory to Administrative Agent that Borrower has acquired all real estate rights (including appurtenant easements) required for the ownership and operation of the Project.

(iv)    Borrower shall have obtained a Consent from each of its counterparties under each Material Project Document for which a Consent is required as set forth on Schedule 3.1(c) and each such Consent shall be in full force and effect.

(d)    Existing Indebtedness and Liens.   On the Closing Date, Borrower shall have (i) repaid in full all Existing Indebtedness or made arrangements reasonably satisfactory to Administrative Agent for such Existing Indebtedness to be repaid in full with the proceeds of the Equity Contribution or the Term Loans, (ii) terminated any commitments to lend or make other extensions of credit thereunder, (iii) delivered to Administrative Agent all documents and instruments necessary to evidence the release of all existing Liens on the Acquired Assets on the Closing Date, which Liens are listed on Schedule 3.1(d), other than the Existing Liens, and (iv) made arrangements satisfactory to Administrative Agent with respect to the cancellation of any letters of credit outstanding under any Existing Indebtedness.

(e)    Seller Notes.   Oconto Falls Tissue, Inc. shall have entered into the Seller Subordination Agreement with Collateral Agent, pursuant to which the Seller Notes shall be subordinated to the Loans on the terms and conditions provided therein and to the reasonable satisfaction of Administrative Agent.

(f)    Project Improvement Budget and Project Improvement Schedule. Administrative Agent shall have received from Borrower (i) a budget, a copy of which is attached hereto as Exhibit 3.1(f)(i) (the "**Project Improvement Budget**"), for all anticipated Project Improvement Costs and (ii) a schedule, a copy of which is attached hereto as Exhibit 3.1(f)(ii) (the "**Project Improvement Schedule**"), for the Project Improvements through the Completion Date Milestone, in each case in form and substance reasonably satisfactory to Administrative Agent.

(g)    Real Estate Collateral.   Collateral Agent, for the benefit of the Secured Parties, shall have been granted a valid and, subject to any filing and/or recording referred to herein, perfected First Priority Lien in all Real Estate Assets of Borrower.   In connection therewith, and in order to ensure the perfection of such First Priority Lien, Administrative Agent shall have received from Borrower:

(i)    fully executed and notarized Mortgage, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering all Real Estate Assets located in Oconto Falls, Wisconsin;

(ii)    (A) A.L.T.A. mortgagee title insurance policies or unconditional commitments therefor issued by the Title Insurer with respect to the Real Estate Assets (the "**Title Policy**"), in amounts not less than $70,000,000, ensuring that the Mortgage is a First

ST PAPER9270

Priority Lien on the real property which it encumbers, subject only to the Permitted Liens referred to in Section 6.3(g), together with such endorsements and affirmative assurances as Collateral Agent may require, and (B) evidence reasonably satisfactory to Administrative Agent that Borrower has paid to the Title Insurer or to the appropriate governmental authorities all expenses and premiums of the Title Insurer and all other sums required in connection with the issuance of the Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgage in the appropriate real estate records;

(iii)    flood certifications with respect to each Mortgaged Property and evidence of flood insurance with respect to each Flood Hazard Property;

(iv)    A.L.T.A. surveys of all Real Estate Assets, certified to Collateral Agent and dated not more than 30 days prior to the Closing Date;

(v)    any UCC financing statements required to be delivered pursuant to Section 3.1(h)(ii) which relate to the Real Property Assets; and

(vi)    evidence satisfactory to Administrative Agent that the Warehouse Lease has been terminated.

(h)    <u>Personal Property Collateral</u>.    Collateral Agent, for the benefit of the Secured Parties, shall have been granted a valid First Priority Lien on the Collateral.    In connection therewith, and in order to ensure the perfection of such First Priority Lien, Borrower shall have delivered to Administrative Agent:

(i)    a completed Perfection Certificate dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings), tax and judgment liens made with respect to any personal, mixed or real property of any Credit Party in the jurisdictions specified in the Perfection Certificate, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(ii)    UCC financing statements in appropriate form for filing under the UCC, and, where appropriate, fixture filings, filings with the United States Patent and Trademark Office and the United States Copyright Office and such other documents under applicable Legal Requirements in each jurisdiction as may be necessary or appropriate or, in the opinion of Administrative Agent, desirable to perfect the First Priority Liens created, or purported to be created, by the Collateral Documents;

(iii)    evidence reasonably satisfactory to Administrative Agent of the compliance by each Credit Party of its obligations under each of the Collateral Documents to which it is a party (including its obligations to execute and deliver UCC financing statements,

ST PAPER9271

originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein); and

(iv)    evidence reasonably satisfactory to Administrative Agent that Borrower has retained, at its sole cost and expense, Corporation Service Company or another service provider acceptable to Administrative Agent for the tracking of all of UCC financing statements of the Credit Parties (through Corporation Service Company's "FileWatch" service or any similar service).

(i)    Organizational Documents; Incumbency.  Administrative Agent shall have received (i) copies of the Organizational Documents of each Credit Party, certified as of a recent date by the appropriate governmental official to the extent applicable, each dated the Closing Date or a recent date prior thereto, and each certified as of the Closing Date by the secretary or an assistant secretary of each such Credit Party as being in full force and effect without modification or amendment; (ii) signature and incumbency certificates of the Authorized Officers of each Credit Party executing the Operative Documents to which it is a party; (iii) a copy of the resolutions of the management committee or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Operative Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other related documents as Administrative Agent may reasonably request.

(j)    Opinions of Counsel.

(i)    Administrative Agent shall have received originally executed copies of the favorable legal opinions of Simpson Thacher & Bartlett LLP and Godfrey & Kahn S.C., counsel to the Credit Parties, in form and substance reasonably satisfactory to Administrative Agent and its counsel, dated as of the Closing Date and addressed to the Agents and the Lenders.

(ii)    Administrative Agent shall have received originally executed copies of the favorable legal opinion of Godfrey & Kahn S.C., Wisconsin local real estate to the Credit Parties, in form and substance reasonably satisfactory to Administrative Agent and its counsel, dated as of the Closing Date and addressed to the Agents and the Lenders.

(iii)    Administrative Agent shall have received originally executed copies of the favorable legal opinions of counsel to SCA Tissue North America, LLC and the EPC Contractor, in form and substance reasonably satisfactory to Administrative Agent and its counsel, dated as of the Closing Date and addressed to the Agents and the Lenders.

(k)    Governmental Approvals and Consents.  All material Applicable Governmental Approvals required under applicable Governmental Rules to be obtained by the Closing Date (which Applicable Governmental Approvals are identified on Schedule 4.20) and

NY\1218924.18

ST PAPER9272

all applicable consents of other Persons, in each case that are necessary in connection with the transactions contemplated by the Operative Documents and the ownership and operation of the Project and the construction and installation of the Project Improvements (other than those not yet required), shall have been obtained by or on behalf of Borrower, and each of the foregoing shall be in full force and effect with no Unsatisfied Conditions, except Unsatisfied Conditions described on Schedule 4.20, and in form and substance reasonably satisfactory to Administrative Agent.  All applicable waiting periods shall have expired without any action being taken or, to Borrower's knowledge, threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Operative Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.  With respect to material Applicable Government Approvals which are not required to have been obtained under applicable Governmental Rules prior to the Closing Date but for which application, notification or registration was required under applicable Governmental Rules to be submitted by the Closing Date (which Applicable Governmental Approvals are identified on Schedule 4.20), all such applications, notifications or registrations have been submitted by or on behalf of Borrower and in form and substance reasonably satisfactory to Administrative Agent.

(l)      Evidence of Insurance.  Administrative Agent shall have received (i) a certificate from Borrower's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.8 is in full force and effect, together with endorsements naming Collateral Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder to the extent required pursuant to the requirements set forth on Schedule 5.8 and (ii) the Insurance Consultant's certificate substantially in the form of Exhibit I-2, dated as of the Closing Date, together with the Insurance Consultant's report attached thereto.

(m)      Financial Statements; Base Case Projections; Initial Annual Operating Budget.

(i)      *Financial Statements.*  Administrative Agent shall have received from Borrower unaudited financial statements for Fiscal Year 2006 and the balance sheet of Borrower as at the Closing Date, which financial statements and balance sheet shall be in form and substance reasonably satisfactory to Administrative Agent.

(ii)      *Base Case Projections.*  Administrative Agent shall have received from Borrower the base case projections (the "**Base Case Projections**") of projected operating expenses and cash flow for the Project from the Closing Date through Fiscal Year 2014, which Base Case Projections shall be in form and substance reasonably satisfactory to Administrative Agent.

(iii)      *Initial Annual Operating Budget.*  Administrative Agent shall have received from Borrower the initial Annual Operating Budget, which Annual Operating Budget shall be in form and substance reasonably satisfactory to Administrative Agent.

NY\1218924.18

ST PAPER9273

(n)     <u>Independent Engineer's Report and Reliance Letter</u>.    Administrative Agent shall have received a copy of the Independent Engineer's report, dated prior to or as of the Closing Date, in form and substance reasonably satisfactory to Administrative Agent, and the Independent Engineer's reliance letter relating thereto substantially in the form of <u>Exhibit I-1</u>, dated as of the Closing Date.

(o)     <u>Environmental Consultant's Report and Reliance Letter</u>.    Administrative Agent shall have received the Environmental Report, dated prior to or as of the Closing Date, and the corresponding reliance letter, dated as of the Closing Date, in each case in form and substance reasonably satisfactory to Administrative Agent.

(p)     <u>Industrial Revenue Bonds</u>.    All Industrial Revenue Bonds shall have been repaid, redeemed or repurchased and cancelled or defeased, as described on <u>Schedule 3.1(p)</u>, in accordance with the provisions of the indentures governing the Industrial Revenue Bonds and in accordance with Wisconsin Law and all liens on the Acquired Assets securing the Industrial Revenue Bonds shall have been released, all to the satisfaction of Administrative Agent.

(q)     <u>Closing Date Certificate</u>.    Administrative Agent shall have received an originally executed Closing Date Certificate from each Credit Party, dated as of the Closing Date.

(r)     <u>No Litigation</u>.    There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, in the reasonable opinion of Administrative Agent, singly or in the aggregate, materially impairs the Project, the financing thereof or any of the other transactions contemplated by the Credit Documents, or that could have a Material Adverse Effect.

(s)     <u>Solvency Certificates</u>.    Administrative Agent shall have received a Solvency Certificate from each of the Credit Parties, each dated as of the Closing Date.

(t)     <u>Notice to Proceed</u>.    Borrower shall have delivered the Notice to Proceed to EPC Contractor under the EPC Contract and shall have delivered a copy thereof to Administrative Agent.

(u)     <u>Fees</u>.    Borrower shall have paid to the Agents the fees referred to in Section 2.9(b) (or made arrangements reasonably satisfactory to Administrative Agent for such fees to be paid with the proceeds of the Equity Contribution or the Term Loans) which are payable on the Closing Date.

(v)     <u>Transaction Costs</u>.    On or prior to the Closing Date, Borrower shall have paid all accrued and unpaid costs and expenses of the Agents, including the accrued and unpaid fees and disbursements of counsel to the Agents.

(w)     <u>The U.S.A. PATRIOT Act</u>.    Administrative Agent shall have received the documentation and other information listed on <u>Exhibit J</u> as required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. PATRIOT Act.

NY\1218924.18

ST PAPER9274

(x)     Letter of Direction.   Administrative Agent shall have received a duly executed letter of direction from Borrower directing the disbursement on the Closing Date of the proceeds of the Loans made on such date.

**3.2.    Conditions to Each Credit Event.**   The obligation of each Lender to make any Loan or, if applicable, of Administrative Agent to approve any request by Borrower for a release of funds from the Project Improvement Account, on any Credit Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 9.5, of the following conditions precedent:

(a)     Representations and Warranties.   Each representation and warranty of each Credit Party in any of the Credit Documents shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) as if made on such Credit Date, unless such representation or warranty expressly relates solely to an earlier date in which case such representation and warranty shall be true and correct in all material respects as of such earlier date.

(b)     No Default.   No event shall have occurred and be continuing or would result from the consummation of the applicable Credit Event that would constitute an Event of Default or a Default.

(c)     Funding Request Documentation.   Administrative Agent shall have received a fully executed and delivered Funding Notice or Project Improvement Requisition, as the case may be, in accordance with the procedures specified in Section 2.1(b) or 2.2(b) of this Agreement or Section 3.2 of the Security Deposit Agreement, as applicable.

(d)     Revolving Loan Capacity.   To the extent that any of the requested Credit Extensions consist of Revolving Loans, the aggregate principal amount of the requested Revolving Loans shall not exceed the available Revolving Commitments in effect immediately prior to the making of such Revolving Loans.

**3.3.    Conditions Precedent to Each Project Improvement Credit Event.**   The obligation of Administrative Agent to instruct Depositary Bank, or to approve any request made by Borrower to Depositary Bank, to release any portion of the funds in the Project Improvement Account (each such release of funds, a "**Project Improvement Credit Event**") is subject to the prior satisfaction (or written waiver by Administrative Agent with the consent of the Requisite Lenders) of each of the following conditions (other than the disbursements made from the Project Improvement Account on the Closing Date pursuant to Section 3.1(b) of the Security Deposit Agreement):

(a)     Project Improvement Requisition and IE Requisition Certificate.

(i)     At least four Business Days prior to each proposed Project Improvement Credit Event, Borrower shall have provided Administrative Agent and the Independent Engineer with a Project Improvement Requisition, dated the date of delivery thereof, setting forth the date of the proposed Project Improvement Credit Event and completed to the reasonable satisfaction of Administrative Agent (in consultation with the Independent

ST PAPER9275

Engineer), together with (A) in the case of payments to be made under the EPC Contract, copies of all documentation related to such payments required to be provided by the EPC Contractor to Borrower under the EPC Contract, and (B) otherwise, copies of all receipts, invoices and any other appropriate documentation or materials reasonably requested by Administrative Agent to enable it to substantiate the withdrawals and transfers specified in such Project Improvement Requisition and the other matters described therein.   If Administrative Agent reasonably determines that an item or items listed in a Project Improvement Requisition as a Project Improvement Cost is or are not properly included in such Project Improvement Requisition, Administrative Agent may in its reasonable discretion cause Depositary Bank to reduce the requested disbursement from the Project Improvement Account by the amount of such item or items or may cause Depositary Bank to reduce the amount of disbursements made pursuant to any subsequent Project Improvement Requisition by such amount.   In the event that Borrower prevails in any dispute as to whether such Project Improvement Costs were properly included in such Project Improvement Requisition, disbursements in the amount requested but not initially made shall forthwith be made.

    (ii) At least three Business Days prior to each proposed Project Improvement Credit Event, Administrative Agent shall have received an IE Requisition Certificate, dated the date of delivery thereof.

    (b) <u>Title Policy Endorsements</u>.   Borrower shall have provided reasonable evidence, or Administrative Agent shall be reasonably assured, that the Title Insurer is committed at the time of each Project Improvement Credit Event to issue to Collateral Agent a date-down endorsement of the Title Policy dated as of the Credit Date for such Project Improvement Credit Event, insuring the continuing First Priority of the Mortgage (subject only to (i) the exceptions to title contained in the Title Policy, (ii) Permitted Liens and (iii) any other exceptions to title as are reasonably acceptable to Administrative Agent) and otherwise in form and substance reasonably satisfactory to Administrative Agent.

    (c) <u>Lien Releases</u>.   Borrower shall have delivered to Administrative Agent duly executed acknowledgments of payments and releases of mechanics' and materialmen's liens, in form and substance reasonably acceptable to Administrative Agent and the Title Insurer, from the EPC Contractor and its subcontractors for all work, services and materials for which the disbursement of funds from the Project Improvement Account is being requested; <u>provided</u>, <u>however</u>, that such releases may be conditioned upon receipt of payment with respect to work, services and materials to be paid for with the requested funds.

    (d) <u>Available Project Improvement Funds</u>.   After taking into consideration the proposed Project Improvement Credit Event, Administrative Agent (in consultation with the Independent Engineer) shall have reasonably determined that the aggregate, without duplication, of (i) funds on deposit in the Project Improvement Account, (ii) proceeds of insurance claims received or reasonably expected to be received (the amount of those proceeds not yet actually received being noted in the applicable Project Improvement Requisition) by Borrower, the EPC Contractor or Administrative Agent and available (or to be available following receipt thereof) to Borrower in accordance with the terms of the Collateral Documents to pay unpaid construction costs, (iii) liquidated damages received or reasonably expected to be received (the amount of those damages not yet actually received being noted in the applicable Project Improvement

ST PAPER9276

Requisition) pursuant to the Project Documents and available (or to be available following receipt thereof without restriction or limitation and free of any escrow or other adverse interest or claim) to Borrower in accordance with the terms of the Collateral Documents to pay unpaid construction costs, and (iv) other committed sources approved by Administrative Agent, such approval not to be unreasonably withheld or delayed, shall not be less than the aggregate unpaid amount required to cause the Completion Date to occur by the date which is four months after the Completion Date Milestone in accordance with all Legal Requirements, the EPC Contract, each other applicable Project Document and the Credit Documents and to pay or provide for all anticipated non-construction Project Improvement Costs, all as set forth in the then-current Project Improvement Budget.

    **3.4.**    **No Approval of Work.**  The occurrence of any Credit Event shall in no event be deemed an approval or acceptance by Administrative Agent, Collateral Agent, the Lenders or any other Secured Party of any work, labor, supplies, materials or equipment furnished or supplied with respect to the Project.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

    In order to induce the Lenders and the Agents to enter into this Agreement and the Lenders to make each Credit Extension to be made hereby, Borrower hereby represents and warrants to each Lender and each Agent as follows:

    **4.1.**    **Organization; Requisite Power and Authority; Qualification.**  Borrower (a) is duly organized, validly existing and in good standing under the laws of the state of Delaware, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

    **4.2.**    **Equity Interests and Ownership.**  The Equity Interests in Borrower have been duly authorized and validly issued and are fully paid and non-assessable.  There is no existing option, warrant, call, right, commitment or other agreement to which Borrower is a party requiring, and there is no Equity Interest in Borrower outstanding which upon conversion or exchange would require, the issuance by Borrower of any additional Equity Interests in Borrower or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase an Equity Interest in Borrower.  As of the Closing Date, the ownership structure of the Pledgor and Borrower, including the indirect ownership interests of Sponsor in Pledgor, is as set forth on <u>Schedule 4.2</u>.

    **4.3.**    **Single Purpose, Debt, Contracts, Joint Ventures, etc.**  On and as of the Closing Date:

           (a)    Borrower has not engaged in any business other than the ownership and operation of the Project, the execution, delivery and performance of the Asset Transfer

ST PAPER9277

Documents and the Project Documents and the transactions contemplated thereby and any activity incidental thereto;

(b)     Pledgor has not engaged in any business other than the ownership of 100% of the Equity Interests in Borrower;

(c)     Borrower does not have any outstanding Indebtedness or other material liabilities other than the Indebtedness described on Schedule 4.3(c) (the "**Existing Indebtedness**"), and is not a party to or bound by any Contractual Obligation other than the Operative Documents to which it is a party;

(d)     none of Borrower's properties or assets are subject to any Lien other than the Liens described on Schedule 4.3(d) (the "**Existing Liens**") and the Liens created under the Collateral Documents;

(e)     Borrower is not a general partner or a limited partner in any general or limited partnership or a joint venturer in any joint venture;

(f)     Borrower does not have any Subsidiaries or own any Equity Interest in any Person; and

(g)     Borrower has no obligation to any Person in respect of any finder's, broker's or investment banking fee with respect to the Operative Documents or the transactions contemplated thereby or under any other agreement, document or instrument with any Person, other than fees payable under this Agreement.

**4.4.    Separateness.**

(a)     Borrower maintains separate bank accounts and separate books of account from Pledgor, the Sponsor and any other Person.  The separate liabilities of Borrower are readily distinguishable from the liabilities of Pledgor and the Sponsor.

(b)     Borrower conducts its business solely in its own name in a manner not misleading to other Persons as to its identity.  Without limiting the generality of the foregoing, all oral and written communications (if any), including letters, invoices, purchase orders, contracts, statements and applications are made solely in the name of Borrower if related to Borrower.

(c)     Other than pursuant to the Pledge Agreement, the Guaranty and the SCA Contract Guaranty, none of Pledgor or the Sponsor guarantee any of the obligations of Borrower.

**4.5.    Solvency.**  Each Credit Party is and, upon the incurrence of any Obligation by each Credit Party on any date on which this representation and warranty is made, will be, Solvent.

**4.6.    Due Authorization.**  The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

ST PAPER9278

**4.7.    Binding Obligation.**   Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.8.    No Conflict.**   The execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any Legal Requirement applicable to such Credit Party; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of such Credit Party, except any such conflict, breach or default that could not reasonably be expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of such Credit Party (other than Permitted Liens); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of such Credit Party, except for such approvals or consents which will be obtained on or before the Closing Date.

**4.9.    Operative Documents.**

(a)     Set forth on Schedule 4.9 is a list of all material Contractual Obligations to which Borrower is a party or by which it or its properties is bound as of the Closing Date (including all amendments, supplements, waivers, letter agreements, interpretations and other documents amending, supplementing or otherwise modifying or clarifying such documents).

(b)     All Operative Documents currently required for the operation, maintenance, ownership and use of the Project and the sale of Products therefrom and the construction and installation of the Project Improvements are in full force and effect.

(c)     As of the Closing Date, (i) each representation and warranty of Borrower and, to Borrower's knowledge (without inquiry), each other Major Project Participant, in each Major Project Document is true and correct in all material respects, (ii) to Borrower's knowledge (without inquiry), no Major Project Participant is in material default of its obligations under any Major Project Document, and (iii) to Borrower's knowledge (without inquiry), each of the Major Project Documents is enforceable against the Major Project Participants party thereto.

(d)     (i) As of the Closing Date, no "force majeure" or similar event has occurred under any Major Project Document and (ii) as of any other Credit Date, no "force majeure" or similar event which would reasonably be expected to have a Material Adverse Effect has occurred and is continuing under any Major Project Document.

(e)     The duly executed Notice to Proceed given as of the Closing Date was validly issued and is in full force and effect.

(f)     Other than those that can reasonably be expected to be commercially available on reasonable terms when and as required, the services to be performed, the materials

NY\1218924.18

ST PAPER9279

to be supplied and the real property interests and other rights granted, or to be granted, pursuant to the Project Documents currently in effect:

(i)     comprise all of the property interests necessary to secure any right material to the operation, maintenance, ownership and use of the Project and the construction and installation of the Project Improvements in accordance with all Legal Requirements and in accordance with the Project Improvement Budget and Project Improvement Schedule or then-current Annual Operating Budget, as applicable, all without reference to any proprietary information not owned by or available to Borrower;

(ii)     are sufficient to enable the Project to be located, owned, occupied, operated, maintained, improved and used on the Premises and any appurtenant easements; and

(iii)     provide adequate ingress to and egress from the Premises for any reasonable purpose in connection with the improvement and operation of the Project.

**4.10.   No Adverse Proceedings, etc.**     There are no Adverse Proceedings that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Borrower is not subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any Governmental Authority, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**4.11.   No Defaults.**   Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations (including the Project Documents), and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default, except in each case where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.  Borrower's entering into of the Credit Documents and the consummation of the transactions thereunder will not cause a default under or breach of any of the Project Document in effect on the Closing Date.

**4.12.   No Material Adverse Effect.**

(a)     As of the Closing Date, there is no state of facts, change, event, condition or occurrence known to Borrower which has had, or would reasonably be expected to have, a Material Adverse Effect which has not been disclosed in writing to Administrative Agent by or on behalf of Borrower on or prior to the Closing Date in connection with the transactions contemplated hereby.

(b)     Since the Closing Date, no state of facts, change, event, condition or occurrence has occurred that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**4.13.   Compliance with Legal Requirements.**   Borrower is in compliance with all applicable Legal Requirements in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any Governmental Approvals

ST PAPER9280

issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Borrower), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.14.   Disclosure.**   No documents, certificates or other written materials furnished to any Agent or Lender by or on behalf of Borrower for use in connection with the transactions contemplated hereby (including the Information Memorandum and the Base Case Projections) contain, as of the date on which such document, certificate or other written materials are dated, any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made; provided that, with respect to any projections and *pro forma* financial information contained in such materials, including the Base Case Projections, Borrower represents only that such information was based upon good faith estimates and assumptions believed by Borrower to be reasonable at the time made, it being recognized by the Agents and Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that such difference may be material.   There are no facts known (or which should upon the reasonable exercise of diligence be known) to Borrower (other than matters of a general economic nature) that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and written materials furnished to the Agents and Lenders for use in connection with the transactions contemplated hereby.

**4.15.   Properties.**

(a)   Title.   Borrower has (i) good, marketable and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid licensed rights in (in the case of licensed interests in intellectual property) and (iv) good title to (in the case of all other personal property), all of its respective properties and assets reflected in the financial statements delivered pursuant to Section 3.1(m)(i) and in the most recent financial statements delivered pursuant to Section 5.5, in each case except (A) for assets disposed of since the date of such financial statements as permitted under Section 6.5 and (B) in the case of the foregoing clause (iii), where the failure to have such good title could not reasonably be expected to have a Material Adverse Effect.   All such properties and assets are free and clear of Liens other than Permitted Liens.

(b)   Real Estate.   As of the Closing Date, Schedule 4.15 contains an accurate and complete list of (i) all Real Estate Assets and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset, regardless of whether Borrower is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. Each agreement described in clause (ii) of the immediately preceding sentence is in full force and effect and Borrower does not have knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

(c)    <u>Proper Subdivision.</u> The Premises have been properly subdivided in accordance with all applicable Legal Requirements or entitled to exception therefrom, and for all purposes the Premises may be mortgaged, conveyed and otherwise dealt with, respectively, as separate legal lots or parcels.  Each of the Premises are comprised of one or more parcels, each of which constitutes a separate tax lot.

(d)    <u>Flood Zone Disclosure.</u>  Except as disclosed on the A.L.T.A. surveys delivered by Borrower pursuant to Section 3.1(g)(iv), no material portion of the Collateral includes Flood Hazard Property.

(e)    <u>Condemnation</u>.  No Event of Eminent Domain has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Mortgaged Property or for the relocation of any roadways providing access to the Mortgaged Property.

(f)    <u>Occupation and Use</u>.  The occupation and use of a portion of the Premises by a third party as described on <u>Schedule 6.19</u> has not had, and would not reasonably be expected to have, a detrimental effect on the operations of the Project.

**4.16.    Utilities and Other Facilities.**  All utility services, roads and railways necessary for the operation of the Project for its intended purposes and the construction and installation of the Project Improvements are available at the Project or can reasonably be expected to be so available as and when required upon commercially reasonable terms consistent with the Project Improvement Budget, the Project Improvement Schedule, the current Annual Operating Budget and the Base Case Projections, as applicable.

**4.17.    Intellectual Property.**  Borrower owns or has the right to use all patents, trademarks, service marks, trade names, copyrights, licenses and other rights which are necessary for the operation, maintenance, ownership and use of the Project and the construction and installation of the Project Improvements in accordance with the Operative Documents, other than, in each case, as to which the failure of Borrower to so own or have the right to use could not reasonably be expected to have a Material Adverse Effect.  No Product or material product, process, method, substance, part or other material presently contemplated to be employed or sold by Borrower in connection with its business will infringe any patent, trademark, service mark, trade name, copyright, license or other right owned by any other Person, except for such infringements that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.18.    Security Interests.**

(a)    The Collateral Documents are effective to create, in favor of Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Collateral constituting personal property, and (i) when financing statements and other filings in appropriate form are filed in the offices specified on <u>Schedule I</u> to each of the Security Agreement and the Pledge Agreement and (ii) upon the control agreements with respect to any personal property Collateral in which a security interest may be perfected only by control (which control shall be given to  Collateral Agent to the extent control by Collateral Agent is required by

63

ST PAPER9282

the Collateral Documents) being entered into, the Liens created by the Collateral Documents constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the personal property Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction or for which the Collateral Documents do not require control), in each case subject to no Liens other than Permitted Liens. Borrower's collateral assignment to Collateral Agent of the Project Documents in effect on the Closing Date is not prohibited by the terms of such Project Documents.

(b)    The Mortgage is effective to create, in favor of Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable first priority Liens on, and security interests in, all of Borrower's right, title and interest in and to the Mortgaged Properties thereunder and the proceeds thereof, subject only to Liens permitted by the Mortgage, and when the Mortgage is filed in the offices specified thereon the Mortgage shall constitute fully perfected Liens on, and security interests in, all right, title and interest of Borrower in the Mortgaged Properties and the proceeds thereof, in each case prior to and superior in right to any other person, other than Liens permitted by such Mortgage.

**4.19.    Payment of Taxes.**  All material tax returns and reports of Pledgor and Borrower required to be filed by either of them have been timely filed, and all material Taxes due and payable by Borrower or Pledgor have been paid when due and payable, other than those Taxes which are being contested by Borrower or Pledgor in good faith and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.20.    Governmental Approvals.**

(a)    The execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party and the consummation of the transactions contemplated by the Credit Documents do not and will not require any Governmental Approval, except for (i) Governmental Approvals with respect to the Project and the Project Documents as to which the following clauses (b) and (c) apply and (ii) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date.

(b)    There are no Governmental Approvals under existing Legal Requirements with respect to the Project as it is currently designed that are or will become Applicable Governmental Approvals other than the Governmental Approvals listed on Schedule 4.20 hereto (as such Schedule may be supplemented by Borrower to reflect any Change of Law or the issuance or modification of any Governmental Approval after the Closing Date). Except as disclosed on Schedule 4.20 (as supplemented, if applicable), each Governmental Approval listed in Part A of Schedule 4.20 is in full force and effect and is not subject to any current legal proceeding or to any Unsatisfied Condition that would reasonably be expected to have a Material Adverse Effect, and all applicable appeal periods with respect thereto have expired. Each Governmental Approval listed in Part B of Schedule 4.20 is of a type that is routinely granted upon submission of a timely application and demonstration that the Project complies with applicable standards and Legal Requirements. No Governmental Approval listed in Part B of

ST PAPER9283

Schedule 4.20 is required under applicable Legal Requirements or Project Documents to be obtained before the time contemplated to be obtained by Borrower. No fact or circumstance exists, to Borrower's knowledge, which makes it likely that any Governmental Approval identified in Part B of Schedule 4.20 shall not be timely obtainable by Borrower before it becomes an Applicable Governmental Approval without expense in excess of amounts provided therefor in the Project Improvement Budget or the then-current Annual Operating Budget, as applicable, and without delay materially in excess of the time provided therefor in the Project Improvement Schedule (if applicable). Borrower is in compliance in all material respects with all Applicable Governmental Approvals.

(c)     To Borrower's knowledge (without inquiry), (i) there are no Applicable Third Party Governmental Approvals that have not been obtained by the applicable Major Project Participant other than those which if not obtained could not reasonably be expected to have a Material Adverse Effect, (ii) there are no Unsatisfied Conditions with respect to any Applicable Third Party Governmental Approvals that would reasonably be expected to have a Material Adverse Effect, (iii) all applicable appeal periods with respect to all Applicable Third Party Governmental Approvals have expired and (iv) each Major Project Participant is in compliance in all material respects with its respective Applicable Third Party Governmental Approvals. No fact or circumstance exists, to Borrower's knowledge (without inquiry), which makes it reasonably likely that any Governmental Approval which will become an Applicable Third Party Governmental Approval shall not be timely obtainable by the applicable Person other than those which if not obtained would not reasonably be expected to have a Material Adverse Effect.

**4.21.  Government Grants, Loans, Tax Credits, etc.**  Schedule 4.21 sets forth a complete and correct description of all government grants, loans, Tax credits and similar benefits expected, as of the Closing Date, to be received in connection with the Project.

**4.22.  Financial Statements.**  The *pro forma* financial statements delivered to Administrative Agent on the Closing Date pursuant to Section 3.1(m)(i) and each financial statement delivered to Administrative Agent pursuant to Sections 5.5(b) and 5.5(c) have been prepared on a consolidated basis (unless otherwise specified) and in conformity with GAAP after the Closing Date applied on a consistent basis and presents fairly in all material respects the financial condition of Borrower as of the date of delivery thereof. As of the Closing Date, Borrower has no material liabilities, direct or contingent, except as are disclosed in the *pro forma* financial statements delivered pursuant to Section 3.1(m)(i).

**4.23.  Hazardous Materials; Environmental Matters.**

(a)     Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) Borrower, with respect to the Project, Premises, Improvements or other Mortgaged Property, is not or has not in the past been in violation of any Environmental Law which violation could reasonably be expected to (A) result in a liability to, or Environmental Claims against, Borrower or its properties and assets, (B) result in an inability of Borrower to perform its obligations under the Operative Documents, (C) interfere with the continuing operation of the Project, or (D) impair the fair market value of any Mortgaged Property; (ii) neither Borrower nor, to Borrower's knowledge, any other Person has used,

ST PAPER9284

Released, threatened to Release, generated, manufactured, produced or stored in, on, under or about the Premises, Improvements or other Mortgaged Property, or transported thereto or therefrom, any Hazardous Materials that could reasonably be expected to subject any Secured Party to liability, or Borrower to liability, under any Environmental Law; (iii) there are no underground storage tanks, whether operative or temporarily or permanently closed, located on the Project, Premises, Improvements or other Mortgaged Property that could reasonably be expected to subject any Secured Party to liability, or Borrower to liability, under any Environmental Law; (iv) there are no Hazardous Materials used, stored or present at or on the Project, Premises, Improvements or other Mortgaged Property in violation of, or reasonably likely to subject any Secured Party to liability or Borrower to liability under, Environmental Laws and other Legal Requirements, except as disclosed in the Environmental Report; (v) to Borrower's knowledge, there are no Hazardous Materials that could reasonably be expected to migrate onto the Project, Premises, Improvements or other Mortgaged Property that could reasonably be expected to impose on Borrower a liability, except as disclosed in the Environmental Report; and (vi) to Borrower's knowledge, there neither is nor has been any condition, circumstance, action, activity or event that could reasonably be expected to be, or result in, a violation by Borrower of any Environmental Law, or to result in liability to any Secured Party or liability to Borrower under any Environmental Law or any other Environmental Claims against Borrower or any Secured Party.

(b)     (i) There is no pending, or, to Borrower's knowledge, threatened or contemplated, Environmental Claim, action, suit or proceeding under any Environmental Law by any Governmental Authority or any other Person to which Borrower is or will be named as a party or otherwise with respect to the Project, Premises, Improvements or other Mortgaged Property, and (ii) there is, to Borrower's knowledge, no threatened or contemplated Environmental Claim, action, suit or proceeding by any Governmental Authority or any other Person under any Environmental Law that, in the case of each of the foregoing in clauses (i) and (ii), individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(c)     With respect to Borrower or otherwise with respect to the Project, Premises, Improvements or other Mortgaged Property, (i) there is no consent or other decree, consent order, administrative or other order, or other administrative or judicial requirements outstanding under any Environmental Law, and (ii) Borrower has not received and is not aware of any other Environmental Claim or notice of violation, alleged violation, non-compliance, liability or potential liability with respect to any Environmental Law, nor does Borrower have knowledge or reason to believe that any such action is being contemplated, considered or threatened that, in the case of each of the foregoing in clauses (i) and (ii), individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(d)     Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) to Borrower's knowledge, there are no past violations that have not been finally resolved or existing violations of any Environmental Laws by any Person affecting the Project, Premises, Improvements or other Mortgaged Property, which violations could reasonably be expected to result in a liability to Borrower, (ii) neither Borrower nor Pledgor has received any letter or request for information under Section 104 of

NY\1218924.18

ST PAPER9285

CERCLA or any comparable state law that either alleges liability of Borrower, and (iii) Borrower has not assumed any material liability of any Person under any Environmental Law.

(e)     As of the Closing Date, all material environmental reports, investigations, studies, audits, reviews or other analyses which are in the possession or control of Borrower in relation to the Project have been delivered to or made available to Administrative Agent.

**4.24.   Governmental Regulation.**   Neither Pledgor nor Borrower is subject to regulation under the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Pledgor nor Borrower is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.25.   Margin Stock**.  Neither Pledgor nor Borrower is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to Borrower will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors.

**4.26.   The PATRIOT Act, Etc.**   To the extent applicable, Borrower is in compliance with the U.S.A. PATRIOT Act in all material respects.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.27.   Employee Matters.**   Borrower is not engaged in any unfair labor practice.  There is (a) no unfair labor practice complaint pending against Borrower, or to Borrower's knowledge, threatened against it before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against Borrower or to Borrower's knowledge, threatened against it, (b) no strike or work stoppage in existence or threatened involving Borrower or the Project, and (c) to Borrower's knowledge, no union representation question existing with respect to the employees at the Project and, to Borrower's knowledge, no union organization activity that is taking place at the Project.

**4.28.   Employee Benefit Plans.**   Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect: (i) Borrower is in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan; (ii) each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received or has made proper filing for a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of or application for such determination letter which would cause

67

ST PAPER9286

such Employee Benefit Plan to lose its qualified status; (iii) no liability to the PBGC (other than the required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by Borrower or any of its ERISA Affiliates; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Borrower or any of its respective ERISA Affiliates except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws; (vi) the present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Borrower or any of its ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan; (vii) as of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, neither Borrower nor any of its ERISA Affiliates has any potential liability for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA, is zero; and (viii) Borrower and each of its ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

     **4.29    Associated Party Transactions.**  As of the Closing Date, Borrower has not, directly or indirectly, entered into or permitted to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Person that is or was at the time such transaction was consummated an Associated Party with respect to Borrower on terms that were less favorable to Borrower than those that would have been obtained in an arm's-length transaction with a Person that was not an Associated Party with respect to Borrower at such time, other than as set forth on <u>Schedule 4.29</u>.

     **4.30    No Restricted Payments.**  As of the Closing Date, Borrower has not paid any Distributions and has not made any payments of principal, interest or other amounts in respect of any Subordinated Indebtedness.

## SECTION 5. AFFIRMATIVE COVENANTS

     Borrower covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations, Borrower shall comply with all covenants in this Section 5.

     **5.1.    Existence.**  Borrower shall at all times preserve and keep in full force and effect its existence and all rights, franchises, licenses and permits material to its business.

     **5.2.    Project Improvements.**

     (a)    Borrower shall cause the Project Improvements to be completed in a good and workmanlike manner that is prudent and commercially reasonable, with due diligence and in all material respects in accordance with (i) the EPC Contract, (ii) the then-current Project

ST PAPER9287

Improvement Budget, (iii) the Project Improvement Schedule and (iv) all applicable Legal Requirements and Prudent Operating Practices.

(b)     Borrower shall provide Administrative Agent and the Independent Engineer with five days advance notice of any Performance Test and shall permit each of Administrative Agent and the Independent Engineer to witness the Performance Tests.

(c)     If, upon completion of any Performance Test, Borrower determines that both Borrower and the EPC Contractor have satisfied their respective obligations with respect to such Performance Test (each such notice, a "**Performance Test Report**"), Borrower shall so notify Administrative Agent and the Independent Engineer and shall deliver a copy of all test results supporting such opinion, accompanied by supporting data and calculations.

### 5.3.   Operation and Maintenance of Project; Annual Operating Budget.

(a)     Borrower shall operate and maintain the Project in a good and workmanlike manner that is prudent and commercially reasonable, with due diligence and in all material respects in accordance with the then-current Annual Operating Budget, the Base Case Projections, the Project Documents, all applicable Legal Requirements and Prudent Operating Practices.

(b)     On or before the date that is 45 days prior to the beginning of each Fiscal Year beginning after the Closing Date (or, in the case of the first such delivery, on or prior to the Closing Date), Borrower shall submit to Administrative Agent and the Lenders an operating plan for the Project and a budget, detailed by month, of anticipated revenues and anticipated expenditures from the Accounts in accordance with the Security Deposit Agreement, such budget to include categories for Debt Service, proposed Distributions, Major Maintenance (if any), reserves, miscellaneous unexpected and non-itemized expenses and all anticipated O&M Costs (including reasonable allowance for contingencies) applicable to the Project for the ensuing Fiscal Year (or, in the case of the initial Annual Operating Budget, the partial Fiscal Year 2007) and, in the case of Major Maintenance to the conclusion of the second full Fiscal Year thereafter (each such annual operating plan and budget, including the initial operating plan and budget, an "**Annual Operating Budget**"). Each Annual Operating Budget shall be subject to the approval of the Required Lenders (in consultation with the Independent Engineer), such approval not to be unreasonably withheld or delayed.  Failure by the Required Lenders to approve or disapprove any draft Annual Operating Budget within 20 days after receipt thereof shall be deemed to be an approval by the Required Lenders of such draft as the final Annual Operating Budget.  If the Required Lenders disapprove of any draft Annual Operating Budget within such 20 day time period, Administrative Agent shall advise Borrower in writing of any comments that the Required Lenders may have to such draft Annual Operating Budget.  Upon its receipt from Administrative Agent of such written comments, Borrower shall consider in good faith such comments in preparation of a revised Annual Operating Budget.  Within 10 days of receipt of the written comments provided by Administrative Agent, Borrower shall submit such revised draft Annual Operating Budget to Administrative Agent and the Lenders for approval in accordance with the procedure specified above.  If approval by the Requisite Lenders of the final Annual Operating Budget is not obtained prior to the beginning of the Fiscal Year to which such Annual Operating Budget relates, Borrower shall not be deemed to be in breach of this Section

69

ST PAPER9288

5.3(b) so long as it is in compliance with this Section 5.3(b) and otherwise acting in good faith, and Borrower may continue to operate the Project in accordance with Section 5.3(c). The O&M Costs in each Annual Operating Budget which are subject to escalation limitations in the Project Documents shall not, absent extraordinary circumstances, be increased by more than the amounts provided in such Project Documents.

(c)     Borrower shall operate and maintain the Project within an amount not in excess of 110% (on a year-to-date basis) for all Operating Budget Categories in the aggregate of the amounts budgeted therefor in the then-current Annual Operating Budget as approved or deemed approved by the Required Lenders; provided, however, that (A) if any increased cost is less than the increase in Project Revenues projected to result from such increased cost, as certified by an Authorized Officer of Borrower and confirmed by the Independent Engineer, such increased cost shall be permitted, (B) any increased cost that results from unexpected maintenance and repairs in an amount not greater than $250,000 per Fiscal Year shall be permitted and (C) Borrower may propose an amendment to the Annual Operating Budget for the approval of the Requisite Lenders if at any time Borrower cannot comply with the foregoing requirements (and each of the Lenders, in consultation with the Independent Engineer, shall consider each such amendment in good faith and shall not unreasonably withhold its consent to the approval of any such amendment). Pending approval of any Annual Operating Budget or amendment thereto in accordance with the terms of this Section 5.3, Borrower shall use all reasonable efforts to operate and maintain the Project within the then-current Annual Operating Budget, it being acknowledged that if a particular Fiscal Year's Annual Operating Budget has not been approved by the time periods provided in Section 5.3(b), then, so long as Borrower is in compliance with Section 5.3(b) and otherwise acting in good faith, the then-current Annual Operating Budget shall be deemed to be the Annual Operating Budget in effect prior to the delivery of the proposed final Annual Operating Budget.

**5.4.     Project Documents.** Borrower shall maintain in full force and effect, perform the obligations of Borrower under, preserve, protect and defend the rights of Borrower under and take all reasonable action necessary to prevent termination (except by expiration in accordance with its terms) of each Major Project Document, including (to the extent Borrower in the exercise of its business judgment deems it proper) prosecution of suits to enforce any right of Borrower thereunder and enforcement of any claims with respect thereto, except in each case where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.5.     Information Delivery.** Borrower shall deliver to Administrative Agent:

(a)     <u>Monthly Reports</u>. As soon as available, and in any event within 30 days after the end of each month ending after the Closing Date, commencing with the month in which the Closing Date occurs, any consolidated balance sheet of Borrower and its Subsidiaries as at the end of such month, and any related consolidated statements of income, member's equity and cash flows of Borrower and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, to the extent Borrower shall have provided the same to any of its management committee members or executive officers in respect of any such month, all in reasonable detail, together with a Financial Officer Certification with respect thereto.

NY\1218924.18

ST PAPER9289

(b)    Quarterly Financial Statements.  As soon as available, and in any event within (i) 60 days after the end of the Fiscal Quarter in which the Closing Date occurs and (ii) 60 days after the end of each of the other first three Fiscal Quarters of each Fiscal Year, the balance sheet of Borrower as at the end of such Fiscal Quarter and the related statements of income, member's equity and cash flows of Borrower for such Fiscal Quarter and for the period from the beginning of the then-current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year (if any), all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto.

(c)    Annual Financial Statements.  As soon as available, and in any event within 120 days after the end of each Fiscal Year, (1) the consolidated balance sheet of Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, member's equity and cash flows of Borrower and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year (if any), all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (2) with respect to such financial statements a report thereon of independent certified public accountants of recognized national standing selected by Borrower and reasonably acceptable to Administrative Agent (which report shall be unqualified as to going concern and scope of audit, and shall state that such financial statements fairly present, in all material respects, the financial position of Borrower as at the dates indicated and the results of its operations and cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements), and that the examination by such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards), together with a written statement by such independent certified public accountants stating (x) that their audit examination has included a review of the terms of Section 6.7 of this Agreement, (y) whether, in connection therewith, any condition or event that constitutes a Default or an Event of Default with respect to such Section 6.7 has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof, and (z) that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate with respect to such Section 6.7 is not correct or that the matters set forth in such Compliance Certificate with respect to such Section 6.7 are not stated in accordance with the terms hereof.

(d)    Compliance Certificate.  Together with each delivery of financial statements pursuant to Sections 5.5(b) and 5.5(c), a duly executed and completed Compliance Certificate.

(e)    Notice of Default.  Promptly after (and, in any event, no later than three Business Days after) an Authorized Officer of Borrower obtains knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Borrower with respect thereto; (ii) that any Person has given any notice to Borrower or taken any other action with respect to any event or condition set forth in Section 7.1(f); or (iii) of the occurrence of any event or change that has caused or evidences, either individually or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer of Borrower specifying the nature and period of existence of such condition, event or change, or specifying

71

ST PAPER9290

the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto.

(f)     Notices under Major Project Documents.  Promptly after delivery or receipt thereof, copies of all notices of default, termination, suspension, force majeure and other material notices and documents given or received by Borrower pursuant to any Major Project Document other than routine correspondence given or received in the ordinary course of business relating to routine aspects of operation and maintenance of the Project and the construction and installation of the Project Improvements.

(g)     Notice of Adverse Proceedings.  Promptly after an Authorized Officer of Borrower obtains knowledge of (i) the institution of, or non-frivolous threat of, any material Adverse Proceeding not previously disclosed in writing by Borrower to Administrative Agent (including any material Adverse Proceeding relating to an applicable Governmental Approval), or (ii) any material development in any Adverse Proceeding that, in the case of either clause (i) or (ii), if adversely determined could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Borrower to enable the Lenders and their counsel to evaluate such matters.

(h)     Notice of ERISA Events.  Promptly after (and, in any event, within three Business Days after) Borrower obtains knowledge of the occurrence of or forthcoming occurrence of any ERISA Event that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action Borrower or any of its ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto.

(i)     Change Orders.  Promptly after receipt thereof, any Change Order and any document or written notice from the EPC Contractor requesting or recommending the initiation of a Change Order.

(j)     Project Improvement Progress Report.  On or before the first day of each Fiscal Quarter until the final payment under the EPC.Contract is made, a construction progress report (with a copy to the Independent Engineer), in form and scope reasonably satisfactory to Administrative Agent and the Independent Engineer, detailing (i) Project Improvement Costs expended and a description of the status of design, engineering, procurement and construction progress as compared with the Project Improvement Schedule, (ii) projections of Project Improvement Costs necessary to complete the Project, (iii) the estimated dates for Mechanical Completion, Substantial Completion, Completion and Final Completion, (iv) progress of payments as compared with planned expenditures for such work as provided in the Project Improvement Budget and Project Improvement Schedule, including evidence to support such expenditures, (v) status of Change Orders, (vi) monthly staffing levels and (vii) an identification and evaluation of problem areas.

NY\1218924.18

ST PAPER9291

(k)   Performance Tests.  Within three Business Days after Borrower receives notice pursuant to the EPC Contract of the proposed conduct of any Performance Test, written notice of such proposed Performance Test.

(l)   Operating Report.  Within 45 days after the end of each Fiscal Quarter, a summary operating report with respect to the Project, which shall include, with respect to the period most recently ended, (i) a monthly and year-to-date numerical or narrative assessment, as applicable, of (A) the Project's compliance with the then-current Annual Operating Budget, (B) production and delivery of Products, (C) percentage of production capacity utilized, (D) cash receipts and disbursements and cash balances, including Distributions, Debt Service payments and balances in the Accounts as of the end of such period, (E) maintenance activity, including Major Maintenance if any, (F) replacement of equipment with a value in excess of $2,000,000, and (G) material unresolved disputes with contractors, materialmen, suppliers or others and any related claims against Borrower; and (ii) to the extent applicable, a comparison of year-to-date figures to corresponding figures provided in the prior year.

(m)   Insurance.  (i) Within 30 days after each annual policy renewal date, deliver to Administrative Agent a certificate of an Authorized Officer of Borrower, certifying that (A) the insurance requirements of Schedule 5.8 have been implemented and are being complied with in all material respects, (B) Borrower has paid all insurance premiums then due and payable, and (C) Borrower is in compliance in all material respects with all requirements of Borrower's insurance policies.

(ii)   As soon as practicable and in any event by the last day of each Fiscal Year, a certificate from Borrower's insurance broker(s) in form and substance satisfactory to Administrative Agent describing all material insurance coverage maintained by Borrower as of the date of such certificate.

(iii)   Promptly upon obtaining knowledge thereof, written notice of (A) any cancellation, suspension or material change in the terms, coverage or amounts of any insurance described on Schedule 5.8 and (B) any single loss or event likely to give rise to a claim against an insurer under any insurance policy of Borrower for an amount in excess of $250,000.

(n)   Amendments to Project Documents; Additional Project Documents. Promptly, but in no event later than 10 Business Days after the execution and delivery thereof, (i) a copy of each Additional Project Document and (ii) a copy of each amendment, amendment and restatement, supplement or other modification of, and each waiver and consent under, any Major Project Document.

(o)   Management Letters.  Promptly after the receipt thereof by Borrower, a copy of any "management letter" received by it from its certified public accountants and management's responses thereto.

(p)   Environmental Matters.

(i)   As soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind, whether prepared by personnel of Borrower or by independent consultants, Governmental Authorities or any other

ST PAPER9292

Persons, with respect to environmental matters at the Project, Premises, Improvements or other Mortgaged Property or with respect to any Environmental Claims that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect;

(ii)     promptly upon the occurrence thereof, written notice describing in reasonable detail (A) any Release required to be reported to any federal, state or local Governmental Authority under any applicable Environmental Laws that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, (B) any remedial action taken by Borrower or any other Person in response to (1) any Hazardous Materials Activities the existence of which would reasonably be expected to result in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (2) any Environmental Claims that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, and (C) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Premises that could reasonably be expected to cause the Premises or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws and that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect;

(iii)    as soon as practicable following the sending or receipt thereof by Borrower, a copy of any and all written communications with respect to (A) any Environmental Claims, (B) any Release required to be reported to any Governmental Authority, and (C) any request for information from any Governmental Authority that suggests such Governmental Authority is investigating whether Borrower may be potentially responsible for any Hazardous Materials Activity, that in the case of any of clause (A), (B) or (C) above, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; and

(iv)     prompt written notice describing in reasonable detail any proposed action to be taken by Borrower to modify current operations in a manner that could reasonably be expected to subject Borrower to any additional obligations or requirements under any Environmental Laws that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(q)     Information Regarding Collateral. (a) Borrower will furnish to Collateral Agent prompt written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity, corporate structure or chief executive office location or (iii) in any Credit Party's jurisdiction of organization or (iv) in any Credit Party's Federal Taxpayer Identification Number or state organizational identification number. Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents. Borrower also agrees promptly to notify Collateral Agent if any material portion of the Collateral is damaged or destroyed.

NY\1218924.18

ST PAPER9293

(r)     Annual Collateral Verification.  Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.5(c), Borrower shall deliver to Collateral Agent a certificate of its Authorized Officer (i) either confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes and (ii) certifying that all Uniform Commercial Code financing statements (including fixtures filings, as applicable) and all supplemental intellectual property security agreements or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified pursuant to clause (i) above or in such Perfection Certificate to the extent necessary to effect, protect and perfect the security interests under the Collateral Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

(s)     Actions Involving Officers.  Promptly after any Authorized Officer of Borrower obtains knowledge of any material litigation, proceeding or regulatory action involving such Authorized Officer or any other Authorized Officer, written notice thereof, which notice shall include a description of the nature of such litigation or action and what action has been taken, is being taken or is proposed to be taken by the Authorized Officer which is the subject of such litigation or action.

(t)     Additional Information.  (i)     Promptly upon request, such additional financial and other information as Administrative Agent or any Lender shall reasonably request.

(ii)     Promptly upon their being made available by Pledgor to the applicable recipients, copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by Pledgor to its security holders or by any Subsidiary of Pledgor to its security holders, (B) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Pledgor or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, and (C) all press releases and other statements made available generally by Pledgor or any of its Subsidiaries to the public concerning material developments in the business of Pledgor or any of its Subsidiaries.

(u)     Certification of Public Information.  Concurrently with the delivery of any document or notice to be delivered pursuant to this Section 5.5, Borrower shall indicate in writing whether such document or notice contains Non-Public Information.  Borrower and each Lender acknowledge that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material Non-Public Information with respect to Borrower) and, if documents or notices required to be delivered by Borrower pursuant to this Section 5.5 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the "**Platform**"), no such document or notice that Borrower has indicated contains Non-Public Information shall be posted on that portion of the Platform designated for such public-side Lenders.  If Borrower has not indicated whether a document or notice delivered pursuant to this Section 5.5 contains Non-Public Information, Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to Borrower.

ST PAPER9294

**5.6.    Governmental Approvals.**  Borrower shall take, or cause to be taken, all actions necessary to obtain, maintain and comply with all Applicable Governmental Approvals required for the operation, maintenance, ownership and use of the Project and the sale of Products therefrom and the construction and installation of the Project Improvements, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.7.    Compliance with Legal Requirements.**  Borrower shall comply, and shall cause all other Persons, if any, on or occupying any portion of the Premises to comply, with the requirements of all applicable Legal Requirements (including all Environmental Laws), noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.8.    Insurance.**  Borrower shall, without cost to the Secured Parties, maintain or cause to be maintained on its behalf in effect at all times the types of insurance set forth on Schedule 5.8, in the amounts and on the terms and conditions specified therein, from the quality of insurers specified in such Schedule or other insurance companies of recognized responsibility reasonably satisfactory to Administrative Agent.  Borrower shall apply all proceeds of insurance in accordance with the applicable provisions of the Security Deposit Agreement.

**5.9.    Payment of Taxes and Claims.**  Borrower shall pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises on or before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any interest, penalty or fine shall be incurred with respect thereto; provided that no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserves or other appropriate provisions, as shall be required in conformity with GAAP, shall have been made therefor, and (b) in the case of a Tax or claim which has, or is reasonably expected to, become a Lien against any Collateral, such contest proceedings operate to stay the sale of any portion of such Collateral to satisfy such Tax or claim.

**5.10.   Books and Records; Inspections.**  Borrower shall keep proper books of record and accounts in which correct and complete entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities. Borrower will permit any authorized representatives designated by any Lender to visit and inspect any of the properties of Borrower, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its affairs, finances and accounts with its officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.

**5.11.   Lenders Meetings.**  Borrower shall, upon the request of Administrative Agent or the Requisite Lenders, participate in a meeting of Administrative Agent and the Lenders once during each Fiscal Year to be held at Borrower's corporate offices (or at such other location as may be agreed to by Borrower and Administrative Agent) at such time as may be agreed to by Borrower and Administrative Agent.

NY\1218924.18

ST PAPER9295

**5.12.   Independent Consultants.**   Borrower shall (a) cooperate in all reasonable respects with the Independent Consultants and (b) provide each Independent Consultant with all information reasonably requested or required by such Independent Consultant with respect to the operation and use of the Project and the financing, construction and installation of the Project Improvements.

**5.13.   Maintenance of Collateral; Title.**

(a)   Borrower shall maintain, or cause to be maintained, in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of Borrower or the operation of the Project and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.

(b)   Borrower shall maintain (i) good, marketable and legal title to the Premises and easement interest in the related appurtenant easements and (ii) good title to all of its other material properties and assets (other than properties and assets disposed of in the ordinary course of business or otherwise disposed of in accordance with Section 6.5), in each case free and clear of all Liens other than Permitted Liens.

(c)   Borrower shall execute, acknowledge or deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded in an appropriate governmental office, all such notices, statements, instruments and other documents (including any memorandum of lease or other agreement, financing statement, continuation statement or certificate of title) supplemental or otherwise related to or confirmatory of the Collateral Documents, and take such other steps as may be necessary or advisable or otherwise reasonably requested by Administrative Agent or Collateral Agent to render fully valid and enforceable under all applicable laws the Liens, rights, and priorities of the Secured Parties with respect to all Collateral and other security from time to time furnished under the Credit Documents or intended to be so furnished, or for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Security Document, in each case in such form and at such times as shall be reasonably requested by Administrative Agent or Collateral Agent, and pay all reasonable fees and expenses (including reasonable attorneys' fees) incident to compliance with this Section 5.13, and shall perform such other reasonable acts as may be necessary to carry out the intent of this Agreement and the other Credit Documents.

**5.14.   Environmental Matters.**   Borrower shall (a) comply with, and ensure compliance by all contractors and subcontractors (if any) with, all applicable Environmental Laws and obtain, maintain and comply with, and take reasonable actions to ensure that all contractors and subcontractors (if any) obtain, maintain and comply with, in all material respects, all Governmental Approvals required by applicable Environmental Laws; (b) conduct and complete, or cause to be conducted and completed, all investigations, studies, sampling and testing, and all clean-up, remedial, removal, recovery and other actions to the extent required pursuant to Environmental Laws or otherwise as necessary to prevent itself, Pledgor or any Secured Party from incurring any material liability; (c) promptly comply with all orders and directives of all Governmental Authorities in respect of Environmental Laws, except to the extent that the same are being contested in good faith by appropriate proceedings; (d) exercise

77

ST PAPER9296

care, custody and control over the Premises and the Project in such manner as not to pose a material or unreasonable hazard to the environment, health or safety in general; (e) give (and shall use its reasonable best efforts to cause the EPC Contractor, to the extent applicable, to give) due attention to the protection and conservation of the environment in the implementation of each aspect of the Premises or the Project, all in accordance with applicable Environmental Laws, Legal Requirements and Prudent Operating Practices; and (f) make an appropriate response to any Environmental Claim against Borrower and discharge any obligations it may have to any Person thereunder except to the extent that, in the case of each of the foregoing in clauses (a) through and including (f), failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.15.   Intellectual Property.**  Borrower shall retain its ownership of or other rights to use all patents, trademarks, service marks, trade names, copyrights, licenses and other rights which are necessary for the development, construction, operation, maintenance, ownership and use of the Project in accordance with the Operative Documents, other than, in each case, as to which the failure of Borrower to so own or have the right to use could not reasonably be expected to have a Material Adverse Effect.

**5.16.   Cooperation; Further Assurances.**

(a)    <u>Cooperation</u>.   Upon the exercise by Administrative Agent, Collateral Agent or any Lender of any power, right, privilege or remedy pursuant to any Credit Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, Borrower shall execute and deliver all applications, certifications, instruments and other documents that Administrative Agent, Collateral Agent or such Lender may reasonably require in connection therewith.  If Administrative Agent, Collateral Agent or the Requisite Lenders determine that they are required by law or regulation to have appraisals prepared in respect of any Real Estate Asset constituting Collateral, Borrower shall provide to Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of the Federal Institutions Reform, Recovery and Enforcement Act of 1989, and are otherwise in form and substance reasonably satisfactory to Administrative Agent and Collateral Agent.

(b)    <u>Additional Real Property Collateral</u>.  If Borrower shall at any time acquire any real property or leasehold or other interest in real property with a value in excess of $100,000 not covered by the Mortgage, then promptly upon such acquisition, Borrower shall (i) execute, deliver and record a supplement to the applicable Mortgage, in form and substance reasonably satisfactory to Administrative Agent and Collateral Agent, subjecting the real property or leasehold or other interests to the Lien and security interest created by such Mortgage, and (ii) in the case of any such leasehold interest in real property, use all commercially reasonable efforts to deliver a Landlord Waiver and Consent Agreement with respect thereto.  If reasonably requested by Administrative Agent, Borrower shall obtain an appropriate endorsement or supplement to, as applicable, the Title Policy insuring the Lien of the Secured Parties in such additional property, subject only to Permitted Liens and other exceptions to title approved by Administrative Agent.

**5.17.   Use of Proceeds.**

NY\1218924.18

ST PAPER9297

     (a)    <u>Term Loan Proceeds</u>.  The proceeds of the Term Loans shall be applied by Borrower for the purposes specified in Section 2.4.

     (b)    <u>Revolving Loan Proceeds</u>.  The proceeds of any Revolving Loans shall be applied by Borrower to pay permitted working capital expenses in accordance with the terms of the Security Deposit Agreement.

     (c)    <u>Securities Regulations</u>.   No portion of the proceeds of any Credit Extension shall be used in any manner that causes or would reasonably be expected to cause such Credit Extension or the application of such proceeds to violate Regulation T, U or X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

**5.18.   Interest Rate Protection.**  No later than 60 days following the Closing Date, Borrower shall obtain and cause to be maintained protection against fluctuations in interest rates pursuant to one or more Interest Rate Hedging Agreements for a term of not less than three years and otherwise in form and substance reasonably satisfactory to Administrative Agent with respect to an aggregate notional principal amount of not less than 50% of the aggregate principal amount of the Term Loans outstanding from time to time.

**5.19.   Separateness.**  Borrower shall:

     (a)    act solely in its name and through its duly authorized officers or agents in the conduct of its business;

     (b)    conduct its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, all oral and written communications (if any), including letters, invoices, purchase orders, contracts, statements and applications shall made solely in the name of Borrower, if related to Borrower);

     (c)    provide for the payment of its own operating expenses and liabilities from its own funds; and

     (d)    obtain all authorizations required by its Organizational Documents for all its limited liability company actions.

**5.20.   Application of Revenues, Etc.**  Borrower shall transfer and deposit, and shall use all reasonable efforts to cause third parties making payments to Borrower to transfer and deposit, all Project Revenues, all proceeds of Revolving Loans and all other payments, revenues, income and other amounts of every nature and kind received by, or on behalf of, Borrower from whatever sources to the relevant Accounts in accordance with this Agreement and the Security Deposit Agreement.  Unless otherwise applied by Administrative Agent or Collateral Agent pursuant to any Credit Document, Borrower shall apply any and all Project Revenues, payments it receives under any Interest Rate Agreement, equity contributions, Loan proceeds, Loss Proceeds, and damage payments solely for the purpose, and in the order and manner, provided for in the Security Deposit Agreement.

**5.21.   Independent Committee Members.**  Borrower shall establish and maintain (i) a management committee which shall consist of at least three Independent Members; and (ii) an

79

ST PAPER9298

audit committee which shall consist exclusively of Independent Members, in each case in accordance with Borrower's Organizational Documents.

**5.22.   Major Loss Event.**  If an event of Major Loss shall occur with respect to all or any material portion of any Premises or the Improvements thereon, Borrower shall (a) compromise or settle any claim relating to such Major Loss against any Governmental Authority or any other Person only with the written consent of Administrative Agent (which consent shall not be unreasonably withheld or delayed), and (b) pay or apply all Loss Proceeds in accordance with Section 3.10 of the Security Deposit Agreement.  If an Event of Default shall have occurred and be continuing, Borrower consents to, and agrees not to object to or otherwise impede or impair, the participation of Administrative Agent and/or Collateral Agent in any eminent domain proceedings, and Borrower shall deliver to Administrative Agent and Collateral Agent all documents and instruments requested by it to permit such participation.

**5.23.   Borrower Subsidiaries**.  In the event Borrower shall create or acquire any Subsidiary following a waiver by the Requisite Lenders of the restrictions pertaining to such creation or acquisition set forth in Section 6.10, Borrower shall, concurrently with such creation or acquisition, (a) cause such Subsidiary to enter into guaranty and security agreements, each in form and substance satisfactory to Administrative Agent, in favor of Collateral Agent (for the benefit of each Agent, Lender and Lender Counterparty), pursuant to which such Subsidiary shall guarantee the Obligations of each Credit Party and grant Collateral Agent a security interest in its assets to secure its obligations under such guaranty and the Obligations of each Credit Party, as applicable, and (b) enter into such amendments to this Agreement and the other Credit Documents as Administrative Agent and/or Collateral Agent shall deem appropriate.

## SECTION 6. NEGATIVE COVENANTS

Borrower covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations, Borrower shall comply with all covenants in this Section 6.

**6.1.   Conduct of Business.**  Borrower shall not engage in any business other than the financing, operation, maintenance, ownership, improvement and use of the Project, the sale of Products therefrom, the construction and installation of the Project Improvements, the execution, delivery and performance of the Project Documents and the transactions contemplated thereby and any activity incidental thereto.

**6.2.   Indebtedness.**

Borrower shall not, directly or indirectly, create, incur, assume or guaranty or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)      the Obligations;

(b)      Indebtedness with respect to any Interest Rate Hedging Agreement entered into to satisfy the requirements of Section 5.18 or otherwise in the ordinary course of business and not for speculative purposes;

80

ST PAPER9299

(c)      Indebtedness (including any extension, renewal or refinancing thereof) in respect of equipment purchases up to but not exceeding $3,000,000 in the aggregate at any one time outstanding; provided that any such Indebtedness (A) shall be secured only by the asset acquired in connection with the incurrence of such Indebtedness, and (B) shall constitute not more than 90% of the aggregate consideration to be paid with respect to such asset;

(d)      Indebtedness (including any extension, renewal or refinancing thereof) under any Capital Leases in connection with equipment related to the Project, with an aggregate value not to exceed $1,000,000 and  with a term not to exceed five years;

(e)      Indebtedness in respect of netting services, overdraft protections and similar obligations in connection with Deposit Accounts;

(f)      unsecured Indebtedness which may be deemed to exist pursuant to any statutory obligations incurred in the ordinary course of business; and

(g)      other unsecured Indebtedness in an aggregate amount not to exceed $3,000,000 at any one time outstanding.

(h)      Indebtedness existing on the date hereof that is described on Schedule 4.3(c).

**6.3.    Liens.**  Borrower shall not, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of its property or assets, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except:

(a)      Liens in favor of Collateral Agent for the benefit of the Secured Parties granted pursuant to any Collateral Document;

(b)      Liens for Taxes not yet delinquent (to the extent imposed by law) and other Liens for Taxes if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted in accordance with Section 5.9;

(c)      statutory Liens of landlords, banks (including rights of set-off), carriers, warehousemen, mechanics, repairmen, workmen and materialmen and other similar Liens arising by operation of law (but excluding any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business or incidental to the operation or maintenance of the Project or the construction or installation of the Project Improvements (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of 15 days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

81

ST PAPER9300

(d)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)     easements, rights-of-way, restrictions, encroachments and other minor defects or irregularities in, and other encumbrances on, title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Borrower;

(f)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property;

(g)     Liens listed as exceptions to title in the Title Policy;

(h)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     licenses of patents, trademarks and other intellectual property rights granted by Borrower in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of Borrower;

(k)     Liens securing Indebtedness permitted pursuant to Section 6.2(c); provided that any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

(l)     Liens securing Indebtedness incurred pursuant to Section 6.2(d); provided that any such Lien shall encumber only the asset subject to the applicable Capital Lease;

(m)     the replacement, extension or renewal of any Lien permitted by the foregoing clauses (k) and (l) to the extent that the replacement, extended or renewed Lien encumbers the same property that is subject to the Lien being replaced, extended or renewed;

(n)     judgment Liens arising in connection with court proceedings that do not constitute a Default or an Event of Default, provided that (i) such Liens are being contested in good faith and by appropriate proceedings diligently pursued and available to Borrower, (ii) adequate reserves or other appropriate provisions, if any, as are required by GAAP have been made therefor and (iii) a stay of enforcement of any such Liens is in effect; and

(o)     other Liens so long as the aggregate principal or face amount of the obligations secured thereby does not exceed $1,000,000.

NY\1218924.18

ST PAPER9301

**6.4.   Equity Interest.**  Borrower shall not issue any additional Equity Interests or grant any warrants, options or other rights to acquire any of its Equity Interests.

**6.5.   Asset Disposition.**  Borrower shall not sell, lease, assign, transfer or otherwise dispose of any of its property or assets, whether now owned or hereafter acquired, except:

(a)   (i) sales of Products in the ordinary course of its business for fair market value in accordance with the Project Documents and (ii) sales of assets as required or expressly contemplated in the then-current Annual Operating Budget approved by Administrative Agent;

(b)   to the extent that such assets are worn out, obsolete or no longer useful or usable in connection with the operation, use or maintenance of the Project or the construction and installation of the Project Improvements;

(c)   the replacement of property or assets with like property or assets that have an improved technology or design, not to exceed an aggregate fair market value of $1,000,000 unless approved by Administrative Agent (in consultation with the Independent Engineer);

(d)   the disposition of Cash Equivalents prior to the maturity thereof;

(e)   disbursements made in accordance with the Security Deposit Agreement; and

(f)   other dispositions of property or assets not to exceed an aggregate fair market value of $3,000,000.

**6.6.   Distributions.**  Borrower shall not make any Distributions except in accordance with Section 3 of the Security Deposit Agreement and only if each of the Distribution Conditions has been satisfied as of the date of the proposed Distribution.

**6.7.   Financial Covenants.**

(a)   <u>Interest Coverage Ratio</u>.  Borrower shall not permit the Interest Coverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2008, to be less than the correlative ratio indicated in the following table:

| Fiscal Quarter | Interest Coverage Ratio |
|---|---|
| First Fiscal Quarter 2008 | 1.10:1.00 |
| Second Fiscal Quarter 2008 | 1.25:1.00 |
| Third Fiscal Quarter 2008 | 1.45:1.00 |
| Fourth Fiscal Quarter 2008 | 1.65:1.00 |
| First Fiscal Quarter 2009 | 1.90:1.00 |

NY\1218924.18

ST PAPER9302

| Fiscal Quarter | Interest Coverage Ratio |
|---|---|
| Second Fiscal Quarter 2009 and each Fiscal Quarter thereafter through first Fiscal Quarter 2010 | 2.10:1.00 |
| Second Fiscal Quarter 2010 and each Fiscal Quarter thereafter through first Fiscal Quarter 2011 | 2.35:1.00 |
| Second Fiscal Quarter 2011 and each Fiscal Quarter thereafter through first Fiscal Quarter 2012 | 2.60:1.00 |
| Second Fiscal Quarter 2012 and each Fiscal Quarter thereafter through first Fiscal Quarter 2013 | 3.25:1.00 |

(b)      Leverage Ratio.  Borrower shall not permit the Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending March 31, 2008, to exceed the correlative ratio indicated in the following table:

| Fiscal Quarter | Leverage Ratio |
|---|---|
| First Fiscal Quarter 2008 | 7.50:1.00 |
| Second Fiscal Quarter 2008 | 6.50:1.00 |
| Third Fiscal Quarter 2008 | 5.55:1.00 |
| Fourth Fiscal Quarter 2008 | 4.75:1.00 |
| First Fiscal Quarter 2009 | 4.00:1.00 |
| Second Fiscal Quarter 2009 and each Fiscal Quarter thereafter through first Fiscal Quarter 2010 | 3.35:1.00 |
| Second Fiscal Quarter 2010 and each Fiscal Quarter thereafter through first Fiscal Quarter 2011 | 2.90:1.00 |
| Second Fiscal Quarter 2011 and each Fiscal Quarter thereafter through first Fiscal Quarter 2012 | 2.25:1.00 |
| Second Fiscal Quarter 2012 and each Fiscal Quarter thereafter through first Fiscal Quarter 2013 | 1.50:100 |

84

ST PAPER9303

(c)   Maximum Capital Expenditures.   Borrower shall not make or incur Capital Expenditures (other than the Project Improvements), in any period indicated below, in an aggregate amount in excess of the corresponding amount set forth in the table below opposite such period; provided, such amount for any such period shall be increased by an amount equal to the excess, if any of such amount for the previous period over the actual amount of Capital Expenditures for such previous period, so long as the Capital Expenditures made in any period shall be deemed made first, in respect of the amounts permitted for such period as set forth below, and second, in respect of any such excess amounts carried over from the previous period:

| Period | Capital Expenditures |
|---|---|
| Closing Date through March 31, 2008 | $1,000,000 |
| April 1, 2008 through March 31, 2009 | $1,250,000 |
| April 1, 2009 through March 31, 2010 | $1,500,000 |
| April 1, 2010 through March 31, 2011 | $2,000,000 |
| April 1, 2011 through March 31, 2012 | $2,000,000 |
| April 1, 2012 through March 31, 2013 | $2,000,000 |

(d)   Minimum Cumulative Adjusted EBITDA.   Borrower shall not permit the Cumulative Adjusted EBITDA as at the end of the third Fiscal Quarter of 2007 and the fourth Fiscal Quarter of 2007 to be less than the correlative amount indicated in the following table:

| Fiscal Quarter | Minimum Cumulative EBITDA |
|---|---|
| Third Fiscal Quarter 2007 | $3,800,000 |
| Fourth Fiscal Quarter 2007 | $5,950,000 |

(e)   Certain Calculations.   With respect to any period during which an Asset Sale has occurred (each, a "Subject Transaction"), for purposes of determining compliance with the financial covenants set forth in this Section 6.7, Adjusted EBITDA and the components of Fixed Charges shall be calculated with respect to such period on a pro forma basis (including

NY\1218924.18

ST PAPER9304

pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which would include cost savings resulting from head count reduction, closure of facilities and similar restructuring charges, which pro forma adjustments shall be certified by the chief financial officer of Borrower) using the historical audited financial statements of any business to be sold and the financial statements of Borrower which shall be reformulated as if such Subject Transaction had been consummated at the beginning of such period.

**6.8.    Fundamental Changes.**    Borrower shall not liquidate, wind-up, dissolve, combine, merge or consolidate with or into any other entity, change its legal form or purchase or otherwise acquire all or substantially all of the assets of any Person.

**6.9.    Accounts; Permitted Investments; Expenditures.**

(a)    Borrower shall not establish or maintain any account other than (i) the Accounts established and maintained pursuant to the Security Deposit Agreement and (ii) a bank account at a commercial bank reasonably acceptable to Administrative Agent (the "**Local O&M Account**") into which amounts from the Revenue Account and the proceeds of Revolving Loans made pursuant to Section 2.2(b)(iv) may from time to time be deposited by Depositary Bank in accordance with the terms of the Security Deposit Agreement for the sole purpose of paying O&M Costs pursuant to the terms of the Security Deposit Agreement; provided that (A) prior to depositing any funds into the Local O&M Account, Borrower, Collateral Agent and the applicable commercial bank maintaining such Local O&M Account shall have entered into an account control agreement in form and substance reasonably satisfactory to Administrative Agent (each such agreement, an "**Account Control Agreement**") with respect to such account and (B) the aggregate amount on deposit in the Local O&M Account at any time shall not exceed the aggregate amount (without duplication) of budgeted and outstanding O&M Costs at such time as set forth in the then-current Annual Operating Budget *plus* any amount in excess of such budgeted amount to the extent permitted under Section 5.3(c).

(b)    Borrower shall not make any Investments except Permitted Investments.

(c)    Borrower shall not make any Capital Expenditure or other material expenditure other than (i) in accordance with the Project Improvement Budget or the then-current Annual Operating Budget, as applicable, or (ii) with funds on deposit in the Distribution Suspense Account and/or Liquidity Reserve Account.

**6.10.    Subsidiaries.**    Borrower shall not create or acquire any Subsidiary, enter into any joint venture or otherwise acquire any interest in any Person.

**6.11.    Project Improvement Budget Amendments.**    Without the prior consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), Borrower shall not amend, allocate, re-allocate or modify the Project Improvement Budget to increase the aggregate amount payable thereunder, unless such amendment, allocation, re-allocation or modification is a necessary conforming change related to a Change Order or an amendment to a

ST PAPER9305

Project Document permitted by Section 6.12 or Section 6.14, as applicable, or is otherwise funded by funds contributed directly or indirectly by Sponsor to Borrower as common equity concurrently with such increase; provided that the foregoing shall not prevent Borrower from applying (i) identified cost savings in a budget category other than the "contingency" category (after completing each of the items to which such category relates) and (ii) any available amounts in the "contingency" category, in each case to cost overruns in another budget category so long as such application does not increase the aggregate amount payable under the Project Improvement Budget; provided, however, that Borrower shall not apply identified cost savings in any budget category to cost overruns in any budget category relating to management expenses or development fees payable to any Person or any other fees and expenses payable to Sponsor or any Affiliate or Associated Party of Sponsor.

### 6.12.   Change Orders.

(a)     Borrower shall not enter into or approve any Change Order, other than (i) any Change Order the net cost of which does not exceed $250,000 individually or in the aggregate with all prior Change Orders entered into or approved by Borrower since the Closing Date pursuant to this clause (i) (after deducting therefrom, without duplication, any actual cost savings to Borrower arising from any Change Order theretofore made, as confirmed by the Independent Engineer), and (ii) any Change Order approved by Administrative Agent, such approval not to be unreasonably withheld or delayed, the net cost of which does not exceed $500,000 individually or in the aggregate with all prior Change Orders entered into or approved by Borrower pursuant to this clause (ii) or clause (i) above (after deducting therefrom, without duplication, any actual cost savings to Borrower arising from any Change Order theretofore made, as confirmed by the Independent Engineer).

(b)     Notwithstanding clause (a) above, Borrower shall not enter into or approve any Change Order if:

(i)     such Change Order would reasonably be expected to materially delay the Completion Date unless (A) (x) available contingency funds remaining in the Project Improvement Budget (which are not reasonably expected to be applied to other Project Improvement Costs) *plus* liquidated damages and insurance proceeds payable in connection with such delay exceed (y) the amount of net revenues expected to be lost as a result of such delay and (B) all such contingency funds, liquidated damages and insurance proceeds are deposited in the Project Improvement Account;

(ii)     such Change Order will alter in any material adverse respect any liquidated damages provision in the EPC Contract;

(iii)     such Change Order will alter in any material adverse respect any warranty under the EPC Contract; or

(iv)     such Change Order would reasonably be expected to have a Material Adverse Effect.

ST PAPER9306

(c)     Borrower shall give Administrative Agent at least three Business Days prior written notice before it enters into or approves any Change Order, and Borrower shall not enter into or approve any Change Order except as permitted under this Section 6.12.

**6.13.  Completion, Etc.**

(a)     Borrower shall not order any material suspension of work under the EPC Contract without the prior written approval of Administrative Agent (in consultation with the Independent Engineer), such approval not to be unreasonably withheld or delayed; provided that if Borrower shall have delivered a request for approval to Administrative Agent and shall not have received a written response to such request within 10 Business Days of the date of such request (or, if Administrative Agent has requested any additional information related to such request within such 10 Business Day period, then within 10 Business Days of Administrative Agent's receipt of such additional information), then the approval of Administrative Agent shall be deemed to have been given.

(b)     Borrower shall not:

(i)     declare or accept Mechanical Completion, Substantial Completion, Final Completion, Preliminary Acceptance or Final Acceptance;

(ii)    agree to modify or amend the definitions of Mechanical Completion, Substantial Completion, Final Completion, Preliminary Acceptance or Final Acceptance under the EPC Contract;

(iii)   approve the successful completion of any Performance Test; or

(iv)    approve, materially modify or amend the testing protocols under the EPC Contract;

in each case, without the approval of the Independent Engineer (such approval not to be unreasonably withheld or delayed) and without providing written notification of such approval to Administrative Agent.

(c)     Borrower shall not agree on any material remediation, recovery or mitigation plan with respect to any Project Improvement work under the EPC Contract without the approval of Administrative Agent (in consultation with the Independent Engineer), such approval not be unreasonably withheld or delayed; provided that if Borrower shall have delivered a request for approval to Administrative Agent and shall not have received a written response to such request within 10 Business Days of the date of such request (or, if Administrative Agent has requested any additional information related to such request within such 10 Business Day period, then within 10 Business Days of Administrative Agent's receipt of such additional information), then the approval of Administrative Agent shall be deemed to have been given.

(d)     Borrower shall not construct or install, or permit the construction or installation of, shared or joint facilities between the Project and any plants, facilities or other improvements which are not located on the Premises or any appurtenant easements.

88

ST PAPER9307

(e)     Borrower shall not accept any letter of credit, bond or other form of credit support in lieu of retainage under the EPC Contract without the prior approval of Administrative Agent, such approval not to be unreasonably withheld or delayed; provided that if Borrower shall have delivered a request for approval to Administrative Agent and shall not have received a written response to such request within 10 Business Days of the date of such request (or, if Administrative Agent has requested any additional information related to such request within such 10 Business Day period, then within 10 Business Days of Administrative Agent's receipt of such additional information), then the approval of Administrative Agent shall be deemed to have been given.

**6.14.    Modification of Project Documents.**

(a)     Borrower shall not enter into or consent to any amendment, amendment and restatement, supplement, termination or other modification of, grant any waiver or consent under, or assign any of its rights or obligations under, any Major Project Document, other than (i) immaterial administrative-type modifications, (ii) purchase orders (for the purpose specified in and permitted under the applicable Major Project Document) and automatic term extensions or renewals, the methodology for which are set forth in such Major Project Document and (iii) those that are approved by the Requisite Lenders (in consultation with the applicable Independent Consultant), such approval not to be unreasonably withheld or delayed, provided that Change Orders shall be governed exclusively by Section 6.12.

(b)     Borrower shall not enter into or consent to any amendment, amendment and restatement, supplement, termination or other modification of, grant any waiver or consent under, or assign any of its rights or obligations under, any Other Project Document, other than as could not reasonably be expected to have a Material Adverse Effect.

**6.15.    Modification of Organizational Documents.**  Borrower shall not permit any material amendment, material amendment and restatement, material supplement or other material modification to, or material waiver of, any of its Organizational Documents.

**6.16.    Assignment.**  Borrower shall not assign its rights hereunder or under the other Credit Documents, except as specifically permitted in this Agreement and the other Credit Documents.

**6.17.    Additional Project Documents.**

(a)     Borrower shall not enter into any Additional Project Document unless:

(i)     if such Additional Project Document is an Additional Major Project Document, either (A) (1) Administrative Agent has approved such Additional Major Project Document (in consultation with the applicable Independent Consultants), such approval not to be unreasonably withheld or delayed, (2) unless waived by Administrative Agent, Borrower has entered into a Consent for such Additional Major Project Document, and (3) such Additional Major Project Document could not reasonably be expected to have a Material Adverse Effect or (B) (1) such Additional Major Project Document is replacing a Major Project Document that is expiring by its terms and the terms of such Additional Major Project Document (including the creditworthiness of the counterparty) are substantially similar to the Major Project

89

ST PAPER9308

Document being replaced and (2) unless waived by Administrative Agent, Borrower has entered into a Consent for such Additional Major Project Document; or

> (ii)   if such Additional Project Document is an Additional Other Project Document, such Additional Other Project Document could not reasonably be expected to have a Material Adverse Effect.

> (b)   Borrower shall not enter into any material Contractual Obligation other than the Operative Documents and other liabilities and obligations expressly permitted under this Agreement.

**6.18.   Transactions with Associated Parties.**  Borrower shall not, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with Sponsor or any party that is an Affiliate or Associated Party with respect to Sponsor or Borrower on terms that are less favorable to Borrower than those that would be obtained in an arm's-length transaction with a Person which is not an Affiliate or Associated Party of Sponsor or Borrower, other than as set forth on Schedule 4.29.

**6.19.   Use of Premises.**  Except as set forth on Schedule 6.19, Borrower shall not use, maintain, operate or occupy, or allow the use, maintenance, operation or occupancy of, any portion of the Project or the Premises for any purpose (a) which may (i) constitute a public or private nuisance or (ii) make void, voidable or cancelable, or materially increase the premium of, any insurance policies then in force with respect to all or a portion of the Project, or (b) other than for the operation, maintenance and use of the Project and the construction and installation of the Project Improvements as contemplated by the Operative Documents.

**6.20.   Hazardous Materials.**  Borrower shall not Release into the environment any Hazardous Materials in violation of any Environmental Law or that could lead to liability under any Environmental Law, except for any Release that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, including: (a) temporary unplanned exceedences allowed under the Applicable Governmental Approvals, which temporary unplanned exceedences would not reasonably be expected to have a Material Adverse Effect and which Borrower is diligently and in good faith attempting to correct and (b) unintentional violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**6.21.   Acquisition of Real Property.**  Borrower shall not acquire or lease any real property or other interest in real property (excluding the acquisition of any easements necessary or desirable to construct or operate the Project) other than the Premises, the Mortgaged Property, any appurtenant easements and other interests in real property acquired on or prior to the Closing Date, unless (a) such acquisition is necessary or desirable to operate, maintain or use the Project or construct and install the Project Improvements and is within the Project Improvement Budget, as confirmed by Administrative Agent (in consultation with the Independent Engineer), (b) if applicable, Borrower shall have complied with the requirements of Section 5.16(b), and (c) Borrower shall have delivered to Administrative Agent (i) a "Phase I" environmental report with respect to such real property, (ii) if a "Phase II" environmental review is warranted (as

ST PAPER9309

reasonably determined by Administrative Agent upon its review of such "Phase I" environmental report, giving due weight to the recommendation of the consultant that prepared such "Phase I" report), a "Phase II" environmental report that concludes, in form and substance reasonably satisfactory to Administrative Agent, either that (A) no Hazardous Materials were found in, on or under such real property of a nature or concentration that could reasonably be expected to impose on Borrower, any of its Affiliates or any Secured Party a material environmental liability or (B) if any such Hazardous Materials are found, the conditions and risks associated with such Hazardous Materials were otherwise being addressed in a manner reasonably satisfactory to Administrative Agent and (iii) a reliance letter from the consultant(s) issuing such report(s) to the effect that Administrative Agent and the Lenders are entitled to rely on the report(s) to the same extent as Borrower.

**6.22.    Fiscal Year.**  Borrower shall not change its Fiscal Year-end from December 31.

**6.23.    Subordinated Indebtedness.**  Borrower shall not, through any manner or means or through any other Person, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any amounts for principal, interest or any other amounts in respect of any Subordinated Indebtedness, except that Borrower may use any amounts deposited in the Distribution Suspense Account that are then available and permitted to be used for Distributions under this Agreement and the Security Deposit Agreement to make payments in respect of Subordinated Indebtedness rather than to make Distributions.  Borrower shall not agree to any amendments to or modifications of, or waive any of its rights under, the Seller Notes, the Seller Subordination Agreement or the SCA Contracts Guaranty without the written consent of the Requisite Lenders.

**6.24.    Sales and Lease-Backs.**  Borrower shall not directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which Borrower (a) has sold or transferred or is to sell or to transfer to any other Person, or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by Borrower to any Person in connection with such lease.

## SECTION 7.  EVENTS OF DEFAULT

**7.1.    Events of Default.**  Each of the following conditions or events shall constitute an "**Event of Default**":

(a)    <u>Failure to Make Payments When Due</u>.  Borrower shall fail to pay (i) when due, any installment of principal of any Loan or any premium, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) within three Business Days after the due date therefor, any interest on any Loan or any fee due hereunder; or (iii) within five Business Days after the date due therefor, any other amount due hereunder or under any other Credit Document.

(b)    <u>Breach of Representations, etc.</u>  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party in writing pursuant hereto or

ST PAPER9310

thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made and the condition that renders such representation, warranty, certification or other statement false or misleading in any material respect either (i) is incapable of being remedied or (ii) continues unremedied for a period of 30 days after the earlier of (A) Borrower becoming aware of such condition and (B) receipt by Borrower of notice from Administrative Agent or any Lender of such condition.

        (c)   <u>Breach of Certain Covenants</u>.  Borrower shall fail to perform or comply with any term or condition contained in:

        (i)   Section 5.1 (*Existence*), Section 5.5(e) (*Notice of Default*), Section 5.5(g) (*Notice of Adverse Proceedings*), Section 5.13(b) or (c) (*Maintenance of Collateral; Title*), Section 5.17 (*Use of Proceeds*), Section 5.19 (*Separateness*), Section 5.20 (*Application of Revenues*), Section 5.23 (*Borrower Subsidiaries*) or Section 6 (*Negative Covenants*); and

        (ii)   Section 5.5(a) (*Monthly Reports*), Section 5.5(b) (*Quarterly Financial Statements*), Section 5.5(c) (*Annual Financial Statements*), Section 5.5(d) (*Compliance Certificate*), Section 5.8 (*Insurance*), Section 5.10 (*Books and Records; Inspections*), Section 5.18 (*Interest Rate Protection*) or Section 5.21 (*Independent Committee Members*) and any such failure described in this clause (ii) shall not have been remedied or waived within 10 Business Days after the earlier of (A) Borrower becoming aware of such failure, (B) receipt by Borrower of notice from Administrative Agent or any Lender of such failure and (C) in the case of any failure to comply with a specific time requirement, the first day on which Borrower shall be in non-compliance with such time requirement.

        (d)   <u>Other Defaults Under Credit Documents</u>.  Any Credit Party shall default in the performance of or compliance with any term contained herein or in any of the other Credit Documents, other than any such term referred to in any other clause of this Section 7.1, and such default shall not have been remedied or waived within 30 days after the earlier of (i) Borrower becoming aware of such default, (ii) receipt by Borrower of notice from Administrative Agent or any Lender of such default and (iii) in the case of any failure to comply with a specific time requirement, the first day on which Borrower shall be in non-compliance with such time requirement; <u>provided</u> that if (A) such breach does not involve the payment of money and such failure cannot be cured within such 30-day period, (B) such failure is susceptible of cure within 60 days, (C) Borrower is proceeding with diligence and in good faith to cure such failure, (D) the existence of such failure has not had and could not, after considering the nature of the cure, be reasonably expected to have a Material Adverse Effect, and (E) Administrative Agent shall have received an officer's certificate signed by an Authorized Officer to the effect of clauses (A) – (D) above and stating what action Borrower is taking to cure such failure, then such 30-day cure period shall be extended to such date, not to exceed a total of 60 days, as shall be necessary for Borrower diligently to cure such failure, except that such extended grace period shall not apply to the breach of any covenant contained in Section 5.3(b) (*Operation and Maintenance of Project; Annual Operating Budget*), Section 5.5(f) or (h) – (u) (*Information Delivery*), Section 5.9 (*Payment of Taxes and Claims*), Section 5.11 (*Lenders Meetings*), Section 5.12 (*Independent Consultants*) and Section 5.16 (*Cooperation; Further Assurances*).

ST PAPER9311

(e)   Default on Other Indebtedness.  (i) Borrower shall fail to pay when due any principal of, interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 7.1(a) or in clause (iii) below) with an aggregate principal amount (or termination or liquidation value or analogous calculation) of $2,000,000 or more, in each case beyond the grace period, if any, provided therefor; (ii) a breach or default by Borrower with respect to any other term of such Indebtedness or any loan agreement, mortgage, indenture or other agreement relating to such Indebtedness shall occur, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or (iii) an "Event of Default," "Termination Event" or similar event shall occur under any Interest Rate Hedging Agreement.

(f)   Project Document Default; Termination.

(i)   Borrower shall be in breach of or otherwise be in default under any Major Project Document and such breach or default (A) has continued beyond any applicable grace period expressly provided for in such Major Project Document and (B) has had, or would reasonably be expected to have, a Material Adverse Effect; or

(ii)   Any Person other than Borrower shall be in breach of or otherwise be in default under any Major Project Document and such breach or default (A) has continued beyond any applicable grace period expressly provided for in such Major Project Document and (B) has had, or would reasonably be expected to have, a Material Adverse Effect; provided that such breach or default shall not be deemed an Event of Default if Borrower enters into a replacement Major Project Document in accordance with Section 6.17 within 60 days of such breach or default; or

(iii)   Any Major Project Document shall cease to be in full force and effect prior to its scheduled expiration; provided that such failure to be in full force and effect shall not be deemed an Event of Default if Borrower enters into a replacement Major Project Document in accordance with Section 6.17 within 60 days of such failure.

(g)   Involuntary Bankruptcy, Appointment of Receiver, etc.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of any Credit Party in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against any Credit Party under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any Credit Party, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any Credit Party for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any Credit

NY\1218924.18

ST PAPER9312

Party, and any such event described in this clause (ii) shall continue for 60 days without having been dismissed, bonded or discharged.

(h)     Voluntary Bankruptcy, Appointment of Receiver, etc.     (i) Any Credit Party shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or any Credit Party shall make any assignment for the benefit of creditors; or (ii) any Credit Party shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors or similar governing body of any Credit Party (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 7.1(i).

(i)     Judgments and Attachments.     Any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $1,000,000 or (ii) in the aggregate at any time an amount in excess of $2,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Credit Party or any of its assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days (or in any event later than five days prior to the date of any proposed sale thereunder).

(j)     Dissolution.     Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of 30 days.

(k)     Employee Benefit Plans.     There shall occur one or more ERISA Events which individually or in the aggregate results in or would reasonably be expected to result in a Material Adverse Effect.

(l)     Collateral Documents and other Credit Documents.     At any time after the execution and delivery thereof, (i) this Agreement or any other Credit Document shall cease to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any material portion of Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent to hold any Collateral the perfection of the security interest in which is subject to possession by Collateral Agent, (ii) any Credit Party shall contest the validity, enforceability or applicability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents,

ST PAPER9313

(iii) the Seller Subordination Agreement shall terminate prior to the Term Loan Maturity Date or the Revolving Loan Maturity Date.

(m)     Event of Abandonment; Major Loss.  An Event of Abandonment or Major Loss shall occur.

(n)     Project Improvement Completion.  The Project Improvements shall fail to achieve Completion within four months of the Completion Date Milestone.

(o)     Change of Control.  A Change of Control shall occur.

(p)     SCA Contracts Guaranty.  An event shall occur which, upon the expiration of any applicable cure periods, shall cause SCA Tissue North America, LLC to make a claim, or give rise to the right of SCA Tissue North America, LLC to make a claim, under the SCA Contracts Guaranty.

7.2     **Remedies.**  (a) upon the occurrence of any Event of Default described in Section 7.1(g) or 7.1(h), automatically, and (b) upon the occurrence of any other Event of Default, at the request of (or with the consent of) the Requisite Lenders, upon notice to Borrower by Administrative Agent, (i) the Commitments shall terminate; (ii) all of the Obligations shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower; and (iii) Collateral Agent shall, at the direction of the Requisite Lenders, exercise the rights and remedies of the Secured Parties under the Collateral Documents on behalf of the Secured Parties.

## SECTION 8.  AGENTS

**8.1.     Appointment of Agents.**  GSCP is hereby appointed Administrative Agent, Collateral Agent, Arranger and Syndication Agent hereunder, and each Lender hereby authorizes GSCP to act in such capacities in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents.  The provisions of this Section 8 are solely for the benefit of the Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions of this Section 8.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Credit Party.  Each of Arranger and Syndication Agent without consent of or notice to any party hereto, may assign any and all of its rights (in such respective capacities) hereunder to any of its Affiliates.  As of the Closing Date, GSCP, in its capacities as Arranger and Syndication Agent shall not have any obligations hereunder but shall be entitled to all benefits of this Section 8.

**8.2.     Powers and Duties.**  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights

ST PAPER9314

and remedies and perform such duties by or through its agents or employees, and may consult with the applicable Independent Consultants in the exercise of such powers, rights and remedies and the performance of such duties.  No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender, and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents, except as expressly set forth herein or therein.

### 8.3.   General Immunity.

(a)    No Responsibility for Certain Matters.  No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or of any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to the Lenders or by or on behalf of any Credit Party, any Lender or any person or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)    Exculpatory Provisions.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 9.5) and, upon receipt of such instructions from the Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Credit Parties), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 9.5).

NY\1218924.18

ST PAPER9315

(c)     Delegation of Duties. Any Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by such Agent. Any Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 8.3 and of Section 8.6 shall apply to any of the Affiliates of such Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as of such Agent. All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of this Section 8.3 and of Section 8.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by any Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**8.4.    Agents Entitled to Act as Lenders.**  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender if any such Agent becomes a Lender hereunder. With respect to the participation by any Agent in the Loans as a Lender, each such Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender, if applicable. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection herewith and otherwise without having to account for the same to the Lenders.

**8.5.    Lenders' Representations, Warranties and Acknowledgment.**

(a)     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrower in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrower. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and

ST PAPER9316

no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)     Each Lender, by delivering its signature page to this Agreement, and any Lender Counterparty, by entering into a Joinder Agreement, on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, the Requisite Lenders or the Lenders, as applicable, on the Closing Date.

**8.6.    Right to Indemnity.**  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.  To the extent required by applicable Legal Requirements, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any Governmental Authority asserts a claim that Administrative Agent did not properly withhold tax from amounts paid to or on account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstances which rendered exemption from or reduction of withholding tax ineffective or for any other reason, such Lender shall indemnify Administrative Agent fully for amounts paid, directly or indirectly, by Administrative Agent as tax or otherwise, including any penalties and interest and together with any expenses incurred with respect thereto.

**8.7.    Successor Administrative Agent and Collateral Agent.**  (i)  Administrative Agent may resign at any time by giving 10 days' prior written notice thereof to the Lenders and Borrower, and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Borrower and Administrative Agent and signed by Requisite Lenders.  Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to Borrower, to appoint a successor Administrative Agent with, so long as no Event of Default shall have occurred and be continuing, the consent of Borrower (such consent not be unreasonably withheld or delayed).

ST PAPER9317

Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent.  If the Requisite Lenders have not appointed a successor Administrative Agent, Administrative Agent shall have the right to appoint a financial institution to act as Administrative Agent hereunder and in any case, Administrative Agent's resignation shall become effective on the thirtieth day after such notice of resignation.  If neither the Requisite Lenders nor Administrative Agent have appointed a successor Administrative Agent, the Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent; provided that, until a successor Administrative Agent is so appointed by the Requisite Lenders or Administrative Agent, Administrative Agent, by notice to the Borrower and the Requisite Lenders, may retain its role as Collateral Agent under any Collateral Document.  Except as provided in the immediately preceding sentence, any resignation or removal of GSCP or its successor as Administrative Agent pursuant to this Section shall also constitute the resignation or removal of GSCP or its successor as Collateral Agent.  After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.  Any successor Administrative Agent appointed pursuant to this Section shall, upon its acceptance of such appointment, become the successor Collateral Agent for all purposes hereunder.  If GSCP or its successor as Administrative Agent pursuant to this Section has resigned as Administrative Agent but retained its role as Collateral Agent and no successor Collateral Agent has become Collateral Agent pursuant to the immediately preceding sentence, GSCP or its successor may resign as Collateral Agent upon notice to the Borrower and the Requisite Lenders at any time.

(ii)   Collateral Agent may resign at any time by giving 10 days' prior written notice thereof to the Lenders and Borrower, and Collateral Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Borrower and Collateral Agent and signed by Requisite Lenders.  Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to Borrower, to appoint a successor Collateral Agent with, so long as no Event of Default shall have occurred and be continuing, the consent of Borrower (such consent not be unreasonably withheld or delayed).  Upon the acceptance of any appointment as Collateral Agent hereunder by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Collateral Agent.  A retiring or removed Collateral Agent which also acts as Administrative Agent may retain its capacity as Administrative Agent so long as such Collateral Agent has not been removed as Administrative Agent pursuant to this Section 8.7.  After any retiring or removed Collateral Agent's resignation or removal hereunder as Collateral Agent, the provisions of this Section 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent hereunder.  Any Collateral Agent which retires or is removed pursuant to this Section 8.7 shall promptly (i) transfer to the successor Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Collateral Agent under the Credit Documents, and (ii) execute and deliver to the successor Collateral Agent such amendments to financing statements, and take such other

ST PAPER9318

actions, as may be necessary or appropriate in connection with the assignment to the successor Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring or removed Collateral Agent shall be discharged from its duties and obligations hereunder.

**8.8.    Collateral Documents.**

(a)    <u>Authorization under Collateral Documents</u>.  Each Secured Party hereby further authorizes Collateral Agent on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Collateral Documents; <u>provided</u> <u>that</u> neither Administrative Agent nor Collateral Agent shall owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure or any other obligation whatsoever to any holder of Obligations with respect to any Interest Rate Hedging Agreement. Subject to Section 9.5, without further written consent or authorization from any Secured Party, Collateral Agent may execute any documents or instruments necessary to, in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which the Requisite Lenders (or such other Lenders as may be required to give such consent under Section 9.5) have otherwise consented.

(b)    <u>Right to Realize on Collateral</u>.  Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrower, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof, and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale or other disposition.

(c)    <u>Rights under Interest Rate Hedging Agreements</u>.  No Interest Rate Hedging Agreement will create (or be deemed to create) in favor of any Lender Counterparty that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Credit Documents except as expressly provided in Section 9.5(c)(iv) of this Agreement and Section 7.2 of the Security Agreement.

ST PAPER9319

## SECTION 9.  MISCELLANEOUS

### 9.1.  Notices.

(a)     Notices Generally.  Any notice or other communication herein required or permitted to be given to Borrower, Pledgor, Syndication Agent, Collateral Agent or Administrative Agent shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Documents, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing.  Except as otherwise specified herein or as set forth in paragraph (b) below, each notice hereunder shall be in writing and may be personally served or sent by facsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided that no notice to any Agent shall be effective until received by such Agent; and provided further, that any such notice or other communication shall at the request of Administrative Agent be provided to any sub-agent appointed pursuant to Section 8.3(c) hereto as designated by Administrative Agent from time to time.  Any party hereto may change its information for notices and other communications hereunder by providing notice of such change to each other party hereto in accordance with this Section 9.1(a).

(b)     Electronic Communications.  (i) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Section 2 if such Lender has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(ii)    Each of the Credit Parties understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent.

NY\1218924.18

ST PAPER9320

(iii)     The Platform and any Approved Electronic Communications are provided "as is" and "as available."  None of the Agents or any of their respective officers, directors, employees, agents, advisors or representatives (the "**Agent Affiliates**") warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with the Platform or the Approved Electronic Communications.

(iv)     Each of the Credit Parties, the Lenders and the Agents agree that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

**9.2.     Expenses.**  Borrower agrees to pay promptly (a) the actual and reasonable costs and expenses incurred by the Agents in the preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) the costs of furnishing all opinions of counsel for the Credit Parties; (c) the reasonable fees, expenses and disbursements of counsel to Agents (in each case including reasonably allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower; (d) the actual costs and reasonable expenses of creating, perfecting and recording Liens in favor of Collateral Agent, for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or the Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all costs and expenses, including attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent or any Lender in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

**9.3.     Indemnity.**

NY\1218924.18

ST PAPER9321

(a)     In addition to the payment of expenses pursuant to Section 9.2, Borrower agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless each Agent and each Lender and the officers, partners, members, directors, trustees, employees, agents, sub-agents and Affiliates of each Agent and each Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; <u>provided</u> <u>that</u> Borrower shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 9.3 may be unenforceable in whole or in part because they are violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.

(b)     To the extent permitted by applicable law, Borrower shall not assert, and Borrower hereby waives, any claim against each Agent, each Lender and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages  (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof, or any act or omission or event occurring in connection therewith, and Borrower hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**9.4.     Set-Off.**  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuation of any Event of Default, each Lender is hereby authorized by Borrower at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to Borrower or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of Borrower against and on account of the obligations and liabilities of Borrower to such Lender hereunder and participations therein and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto or with any Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured.

**9.5.     Amendments and Waivers.**

(a)     <u>Requisite Lenders' Consent</u>.  Subject to the additional requirements of Sections 9.5(b) and 9.5(c), no amendment, modification, termination or waiver of any provision

ST PAPER9322

of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders; provided that Administrative Agent may, with the consent of Borrower only, amend, modify or supplement this Agreement to cure any ambiguity, omission, defect or inconsistency, so long as such amendment, modification or supplement does not adversely affect the rights of any Lender.

(b)    Affected Lenders' Consent.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification or termination of or consent with respect to any Credit Document shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan or Note;

(ii)    waive, reduce or postpone any scheduled repayment (but not any prepayment);

(iii)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.8) or any fee or any premium payable hereunder;

(iv)    extend the time for payment of any such interest or fees;

(v)    reduce the principal amount of any Loan;

(vi)    amend, modify, terminate or waive any provision of Section 9.5(a), this Section 9.5(b), Section 9.5(c) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(vii)    amend the definition of "Requisite Lenders" or "Pro Rata Share";

(viii)    release all or substantially all of the Collateral;

(ix)    consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document; or

(x)    provide for the consent referred to in clause (i) of the definition of "Event of Abandonment".

(c)    Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)    increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided that no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

104

NY\1218924.18

ST PAPER9323

eg

(ii)      subject to Section 9.5(b)(ii), alter the required application of any repayments or prepayments as between Classes of Loans pursuant to Section 2.13 without the consent of Lenders holding more than 50% of the aggregate Term Loan Exposure of all Lenders if the Term Loans are allocated a lesser repayment or prepayment as a result thereof, or holding more than 50% of the aggregate Revolving Exposure of all Lenders if the Revolving Loans are allocated a lesser repayment or prepayment as a result thereof; provided that, subject to Section 9.5(b)(ii), the Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes of Loans, of any portion of such prepayment which is still required to be made is not altered;

(iii)      amend, modify, terminate or waive any provision of Section 8 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent; or

(iv)      amend, modify or waive this Agreement or the Security Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents and Obligations arising under Interest Rate Hedging Agreements or the definition of "**Lender Counterparty**," "**Interest Rate Hedging Agreement**," "**Obligations**," or "**Secured Obligations**," in each case in a manner adverse to any Lender Counterparty with Obligations then outstanding without the written consent of any such Lender Counterparty.

(d)      <u>Execution of Amendments, etc.</u>  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 9.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by Borrower, on Borrower.

**9.6.      Successors and Assigns; Participations.**

(a)      <u>Generally</u>.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  None of Borrower's rights or obligations hereunder nor any interest therein may be assigned or delegated by Borrower without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders and Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      <u>Register</u>.  Borrower, Administrative Agent and the Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer

ST PAPER9324

thereof, in each case, as provided in Section 9.6(d). Each assignment shall be recorded in the Register on the Business Day the Assignment Agreement is received by Administrative Agent, if received by 12:00 p.m., and on the following Business Day if received after such time, prompt notice thereof shall be provided to Borrower and a copy of such Assignment Agreement shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date**". Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)    <u>Right to Assign</u>.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (<u>provided</u>, <u>however</u>, that *pro rata* assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

(i)    to any Person meeting the criteria of clause (i) of the definition of the term of "Eligible Assignee" upon the giving of notice to Borrower and Administrative Agent; and

(ii)    to any Person meeting the criteria of clause (ii) of the definition of the term of "Eligible Assignee" upon giving of notice to Borrower and Administrative Agent and in the case of assignments of Revolving Loans or Revolving Commitments to any such Person (except in the case of assignments made by or to GSCP), consented to (such consent not to be unreasonably withheld or delayed) by Administrative Agent; <u>provided</u> <u>that</u> each such assignment pursuant to this Section 9.6(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Administrative Agent or as shall constitute the aggregate amount of the applicable Commitments and Loans of the assigning Lender.

(d)    <u>Mechanics</u>.  Assignments and assumptions of Loans and Commitments shall only be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement.  Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date.  In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.18(c).

(e)    <u>Representations and Warranties of Assignee</u>.  Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the applicable Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments and Loans for its own account in the ordinary course of its business and without a view to distribution of such Commitments and Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the

ST PAPER9325

provisions of this Section 9.6, the disposition of such Commitments and Loans or any interests therein shall at all times remain within its exclusive control).

(f)   Effect of Assignment.  Subject to the terms and conditions of this Section 9.6, as of the Assignment Effective Date (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Commitments and Loans as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 9.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided that anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(g)   Participations.

(i)   Each Lender shall have the right at any time to sell one or more participations to any Person (other than Pledgor, Borrower or any of their respective Affiliates) in all or any part of its Commitments or Loans or in any other Obligation.

(ii)   The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan or any Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral.

(iii)   Borrower agrees that each participant shall be entitled to the benefits of Section 2.16(c), Section 2.17 and Section 2.18 to the same extent as if it were a Lender and had

ST PAPER9326

acquired its interest by assignment pursuant to clause (c) of this Section 9.6; provided that (A) a participant shall not be entitled to receive any greater payment under Section 2.16(c), Section 2.17 or Section 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with Borrower's prior written consent and (B) a participant shall not be entitled to the benefits of Section 2.18 unless Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of Borrower, to comply with Section 2.18 as though it were a Lender; provided further, that except as specifically set forth in clauses (A) and (B) of this sentence, nothing herein shall require any notice to Borrower in connection with the sale of any participation.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 9.4 as though it were a Lender, provided such participant agrees to be subject to Section 2.15 as though it were a Lender.

(h)     Certain Other Assignments and Participations.  In addition to any other assignment permitted pursuant to this Section 9.6, any Lender may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender, including to any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided that no Lender, as between Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge; and provided further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**9.7.     Independence of Covenants.**     Each covenant hereunder shall be given independent effect so that if a particular action or condition is not permitted by such covenant, a breach of such covenant shall not be excused by the fact that such action or condition would be permitted by an exception to, or would otherwise be within the limitations of, another covenant.

**9.8.     Survival of Representations, Warranties and Agreements.**     All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Section 2.16(c) (*Compensation for Breakage or Non-Commencement of Interest Periods*), Section 2.17 (*Increased Costs; Capital Adequacy*) and Section 2.18 (*Tax; Withholding, etc.*), Section 9.2 (*Expenses*), Section 9.3 (*Indemnity*) and Section 9.4 (*Set-Off*) and the agreements of Lenders set forth in Section 2.15 (*Ratable Sharing*), Section 8.3(b) (*Exculpatory Provisions*) and Section 8.6 (*Right to Indemnity*) shall survive the payment of the Loans, and the termination hereof.

**9.9.     No Waiver; Remedies Cumulative.**  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of

ST PAPER9327

the Interest Rate Hedging Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**9.10.   Marshalling; Payments Set Aside.**   Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of Borrower or any other Person or against or in payment of any or all of the Obligations.   To the extent that any Credit Party makes a payment or payments to Administrative Agent or the Lenders (or to Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11.   Severability.**   In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12.   Obligations Several; Independent Nature of Lenders' Rights.**   The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.   Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**9.13.   Headings.**   Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**9.14.   APPLICABLE LAW.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**9.15.   CONSENT TO JURISDICTION.   ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.   BY**

NY\1218924.18

ST PAPER9328

EXECUTING AND DELIVERING THIS AGREEMENT, BORROWER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO BORROWER AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 9.1; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER BORROWER IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.

9.16.   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.   EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.16 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

9.17.   **Confidentiality.**   Each Agent and Lender shall hold all non-public information regarding Borrower, Pledgor, the Sponsor and their respective businesses identified as such in

ST PAPER9329

writing by Borrower and obtained by such Agent or Lender, as applicable, pursuant to the requirements hereof (the "**Confidential Information**") in accordance with such Agent's or Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by Borrower that, in any event, an Agent or a Lender may make (i) disclosures of such Confidential Information to Affiliates of such Agent or Lender, as applicable, and to their respective agents and advisors (and to other Persons authorized by such Agent or Lender to organize, present or disseminate such Confidential Information in connection with disclosures otherwise made in accordance with this Section 9.17), (ii) disclosures of such Confidential Information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Loans, Commitments or participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to Borrower and its Obligations (provided that such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 9.17 or other provisions at least as restrictive as this Section 9.17), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any such Confidential Information received by it from any Agent or any Lender, and (iv) disclosures required or requested by any governmental agency or representative thereof or by The National Association of Insurance Commissions (or any successor thereto) or pursuant to legal or judicial process; provided that unless specifically prohibited by Governmental Rule or court order, each Lender and each Agent shall make reasonable efforts to notify Borrower of any request by any Governmental Authority or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such Governmental Authority) for disclosure of any such Confidential Information prior to the disclosure thereof.  In addition, each Agent and each Lender may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Credit Documents.

**9.18.   Usury Savings Clause.**   Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Obligations shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Obligations are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of the Lenders and Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges or

NY\1218924.18

ST PAPER9330

receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Obligations or be refunded to Borrower.

**9.19.   Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**9.20.   Effectiveness.**  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**9.21.   The PATRIOT Act.**  Each Lender and Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender or Agent, as applicable, to identify Borrower in accordance with the Act.

**9.22.   Electronic Execution of Assignments.**  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

*[Signature page follows.]*

NY\1218924.18

ST PAPER9331

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**ST PAPER, LLC,**
as Borrower

By: _____

    Name:  Sharad Tak
    Title:  President

ST PAPER9332

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Administrative Agent, Collateral Agent,
Syndication Agent, Sole Lead Arranger,
Sole Bookrunner and Lender

By: _____
       Authorized Signatory

BRUCE H. MENDELSOHN
AUTHORIZED SIGNATORY

ST PAPER9333

**APPENDIX A-1**
**to Credit Agreement**

**Term Loan Commitments**

| Lender | Term Loan Commitment | Pro Rata Share |
|---|---|---|
| Goldman Sachs Credit Partners L.P. | $65,000,000 | 100% |
| **Total** | **$65,000,000** | **100%** |

ST PAPER9334

<u>**APPENDIX A-2**</u>
**to Credit Agreement**

<u>**Revolving Commitments**</u>

| Lender | Revolving Commitment | Pro Rata Share |
|---|---|---|
| Goldman Sachs Credit Partners L.P. | $5,000,000 | 100% |
| **Total** | **$5,000,000** | **100%** |

ST PAPER9335

**APPENDIX B**
to Credit Agreement

### Notice Addresses

Borrower

ST Paper, LLC
1555 Glory Road
Green Bay, Wisconsin 54304
Attention: Sharad Tak
Telecopier: (301) 840-0749

Administrative Agent and Lenders

Goldman Sachs Credit Partners L.P.,
    as Administrative Agent
c/o Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004
Attention: Rob Schatzman
Telelphone: (212) 902-1000
Telecopier: (212) 902-3000

Collateral Agent

Goldman, Sachs & Co.,
    as Collateral Agent
30 Hudson Street, 17th Floor
Jersey City, NJ 07302
Attention: Pedro Ramirez
Telecopier: (212) 428-1622

NY\1218924.18

**EXHIBIT A-1**
**to Credit Agreement**

## FUNDING NOTICE

Goldman Sachs Credit Partners L.P.,
    as Administrative Agent
85 Broad Street
New York, NY 10004

      Re:   ST Paper, LLC – Funding Notice

      Reference is made to the Credit Agreement, dated as of April 16, 2007 (as it may be amended, supplemented or otherwise modified, the **"Credit Agreement"**; capitalized terms used herein but not otherwise defined have the respective meanings set forth in the Credit Agreement), by and among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time.

      Pursuant to Sections 2.1 and 2.2 of the Credit Agreement, Borrower desires that Lenders make the following Loans to Borrower in accordance with the applicable terms and conditions of the Credit Agreement on _____ \_\_, 2007 (the **"Credit Date"**):

    ☐ Term Loans

        ☐ Base Rate Loans:                    $_____

        ☐ Eurodollar Rate Loans, with an initial Interest Period of _____ month(s):
                                            $_____

    ☐ Revolving Loans

        ☐ Base Rate Loans:                    $_____

        ☐ Eurodollar Rate Loans, with an initial Interest Period of _____ month(s):
                                            $_____

EXHIBIT A-1-1

ST PAPER9337

Borrower hereby certifies that:

     (i)     after making the Revolving Loans requested on the Credit Date, the Total Utilization of Revolving Commitments shall not exceed the Revolving Commitments then in effect;

     (ii)     as of the Credit Date, the representations and warranties contained in each of the Credit Documents are true, correct and complete in all material respects on and as of such Credit Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true, correct and complete in all material respects on and as of such earlier date; and

     (iii)     as of the Credit Date, no event has occurred and is continuing or would result from the consummation of the borrowing contemplated hereby that would constitute an Event of Default or a Default.

Date: _____ __, 20__

**ST PAPER, LLC**

By: _____
     Name:
     Title:

EXHIBIT A-1-2

ST PAPER9338

**EXHIBIT A-2**
**to Credit Agreement**

## CONVERSION/CONTINUATION NOTICE

Goldman Sachs Credit Partners L.P.,
    as Administrative Agent
85 Broad Street
New York, NY 10004

     Re:    ST Paper, LLC – Conversion/Continuation Notice

     Reference is made to the Credit Agreement, dated as of April 16, 2007 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; capitalized terms used herein but not otherwise defined have the respective meanings set forth in the Credit Agreement), by and among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time.

     Pursuant to Section 2.7 of the Credit Agreement, Borrower desires to convert or to continue the following Loans, each such conversion and/or continuation to be effective as of _____ __, 20__:

    ☐ **Term Loans:**

        $_____        Eurodollar Rate Loans to be continued with an Interest Period of ___ month(s)

        $_____        Base Rate Loans to be converted to Eurodollar Rate Loans with an Interest Period of ___ month(s)

        $_____        Eurodollar Rate Loans to be converted to Base Rate Loans

    ☐ **Revolving Loans:**

        $_____        Eurodollar Rate Loans to be continued with Interest Period of ___ month(s)

        $_____        Base Rate Loans to be converted to Eurodollar Rate Loans with an Interest Period of ___ month(s)

        $_____        Eurodollar Rate Loans to be converted to Base Rate Loans

ST PAPER9339

Borrower hereby certifies that as of the date hereof, no event has occurred and is continuing or would result from the consummation of the conversion and/or continuation contemplated hereby that would constitute an Event of Default or a Default.

Date: _____ __, 20__

                                **ST PAPER, LLC**

                                By:_____
                                     Name:
                                     Title:

EXHIBIT A-2-2

ST PAPER9340

**EXHIBIT B-1**
**to Credit Agreement**

**TERM LOAN NOTE**

$_____
_____ \_\_, 20\_\_                                                            New York, New York

**FOR VALUE RECEIVED, ST PAPER, LLC**, a Delaware limited liability company ("**Borrower**"), promises to pay **[NAME OF LENDER]** ("Payee") or its registered assigns the principal amount of [_____] Dollars ($[_____]) in the installments referred to below.

Borrower also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times which shall be determined in accordance with the provisions of that certain Credit Agreement, dated as of April 16, 2007 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"), by and among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time. Capitalized terms used in this Note but not otherwise defined have the respective meanings set forth in the Credit Agreement.

Borrower shall make scheduled principal payments on this Note as set forth in Section 2.12 of the Credit Agreement.

This Note is one of the "Term Loan Notes" under the Credit Agreement and is issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loan evidenced hereby was made and is to be repaid.

All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the Principal Office of Administrative Agent or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Credit Agreement. Unless and until an Assignment Agreement or Settlement Confirmation effecting the assignment or transfer of the obligations evidenced hereby shall have been accepted by Administrative Agent and recorded in the Register, Borrower, each Agent and Lenders shall be entitled to deem and treat Payee as the owner and holder of this Note and the obligations evidenced hereby. Payee hereby agrees, by its acceptance hereof, that before disposing of this Note or any part hereof it will make a notation hereon of all principal payments previously made hereunder and of the date to which interest hereon has been paid; provided, the failure to make a notation of any payment made on this Note shall not limit or otherwise affect the obligations of Borrower hereunder with respect to payments of principal of or interest on this Note.

This Note is subject to mandatory prepayment and to prepayment at the option of Borrower, each as provided in the Credit Agreement.

THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND

NY\1230447.3

ST PAPER9341

ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable attorneys' fees, all as provided in the Credit Agreement, incurred in the collection and enforcement of this Note. Borrower and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

*[Remainder of Page Intentionally Left Blank]*

EXHIBIT B-1-2

ST PAPER9342

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**ST PAPER, LLC**

By:_____
    Name:
    Title:

NY\1230447.3

ST PAPER9343

EXHIBIT B-2
Credit Agreement

## REVOLVING LOAN NOTE

$_____

_____ \_\_, 20\_\_                                                   New York, New York

 **FOR VALUE RECEIVED, ST PAPER, LLC,** a Delaware limited liability company
("**Borrower**"), promises to pay **[NAME OF LENDER]** ("**Payee**") or its registered assigns, on
or before **[mm/dd/yy]**, the lesser of (a) five million dollars ($5,000,000) and (b) the unpaid
principal amount of all advances made by Payee to Borrower as Revolving Loans under the
Credit Agreement referred to below.

 Borrower also promises to pay interest on the unpaid principal amount hereof, from the
date hereof until paid in full, at the rates and at the times which shall be determined in
accordance with the provisions of that certain Credit Agreement, dated as of April 16, 2007 (as
it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"), by and
among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and
Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time.
Capitalized terms used in this Note but not otherwise defined have the respective meanings set
forth in the Credit Agreement.

 This Note is one of the "Revolving Loan Notes" under the Credit Agreement and is
issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is
hereby made for a more complete statement of the terms and conditions under which the Loans
evidenced hereby were made and are to be repaid.

 All payments of principal and interest in respect of this Note shall be made in lawful
money of the United States of America in same day funds at the Principal Office of
Administrative Agent or at such other place as shall be designated in writing for such purpose in
accordance with the terms of the Credit Agreement. Unless and until an Assignment Agreement
effecting the assignment or transfer of the obligations evidenced hereby shall have been accepted
by Administrative Agent and recorded in the Register, Borrower, each Agent and Lenders shall
be entitled to deem and treat Payee as the owner and holder of this Note and the obligations
evidenced hereby. Payee hereby agrees, by its acceptance hereof, that before disposing of this
Note or any part hereof it will make a notation hereon of all principal payments previously made
hereunder and of the date to which interest hereon has been paid; provided, the failure to make a
notation of any payment made on this Note shall not limit or otherwise affect the obligations of
Borrower hereunder with respect to payments of principal of or interest on this Note.

 This Note is subject to mandatory prepayment and to prepayment at the option of
Borrower, each as provided in the Credit Agreement.

 THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND
PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND
ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW
YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF.

NY\1230447.3

ST PAPER9344

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable attorneys' fees, all as provided in the Credit Agreement, incurred in the collection and enforcement of this Note. Borrower and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

*[Remainder of Page Intentionally Left Blank]*

EXHIBIT B-2-2

ST PAPER9345

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**ST PAPER, LLC**

By: _____
    Name:
    Title:

NY\1230447.3

ST PAPER9346

## TRANSACTIONS ON
## REVOLVING LOAN NOTE

| Date | Amount of Loan Made This Date | Amount of Principal Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|------|------|------|------|
| | | | | |

NY\1230447.3

ST PAPER9347

**EXHIBIT C**
**to Credit Agreement**

## ST PAPER, LLC

## COMPLIANCE CERTIFICATE

_____ __, 20__

The undersigned, [_____], Chief Financial Officer of ST Paper, LLC, a Delaware limited liability company ("**Borrower**"), hereby certifies on behalf of Borrower pursuant to Section 5.5(d) of the Credit Agreement, dated as of April 16, 2007 (the "**Credit Agreement**") (capitalized terms used herein but not otherwise defined have the respective meanings set forth in the Credit Agreement), among Borrower, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time, that:

     1.     I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Borrower and its Subsidiaries during the accounting period covered by the attached financial statements.

     2.     The examination described in paragraph 1 above did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes an Event of Default or Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth in a separate attachment, if any, to this Certificate, describing in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event.

The foregoing certifications, together with the computations set forth in the Annex A hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered as of the date first set forth above.

**ST PAPER, LLC**

By: _____
     Name:
     Title:

EXHIBIT C-1

NY\1230447.3

ST PAPER9348

ANNEX A TO
COMPLIANCE CERTIFICATE

## FOR THE FISCAL [QUARTER] [YEAR] ENDING [mm/dd/yy].

| | | | |
|---|---|---|---|
| 1. | Adjusted EBITDA: **(i) - (ii) =** | | $_____ |
| | (i) | (a) Net Income: | $_____ |
| | | (b) Interest Expense: | $_____ |
| | | (c) provisions for taxes based on income: | $_____ |
| | | (d) total depreciation expense: | $_____ |
| | | (d) total amortization expense: | $_____ |
| | | (f) other non-cash items reducing Net Income:[1] | $_____ |
| | (ii) | other non-cash items increasing Net Income:[2] | $_____ |
| 2. | Capital Expenditures: | | $_____ |
| 3. | Interest Expense: | | $_____ |
| 4. | Current Assets: | | $_____ |
| 5. | Current Liabilities: | | $_____ |
| 6. | Excess Cash Flow: **(i) - (ii) =** | | $_____ |
| | (i) | Adjusted EBITDA: | $_____ |
| | (ii) | (a) Capital Expenditures:[3] | $_____ |
| | | (b) Interest Expense: | $_____ |
| | | (c) the provision for current taxes based on income of Borrower and payable in cash with respect to such period: | $_____ |

1 Excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period.
2 Excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash items in any prior period.
3 Net of any proceeds of (y) any related financings with respect to such expenditures and (z) any sales of assets used to finance such expenditures.

EXHIBIT C-A-1

ST PAPER9349

7. <u>Fixed Charges</u>: **(i)** + **(ii)** + **(iii)** + **(iv)** =                    $_____

    (i)      Interest Expense:                                              $_____

    (ii)     Scheduled payments of principal on Total Debt:           $_____

    (iii)    Capital Expenditures:                                      $_____

    (iv)    The portion of taxes based on income actually paid in cash
            and provisions for cash income taxes:                    $_____

8. <u>Interest Expense</u>:                                                   $_____

9. <u>Net Income</u>: **(i)** - **(ii)** =                                         $_____

    (i)      the net income (or loss) of Borrower and its
            Subsidiaries on a consolidated basis for such period
            taken as a single accounting period determined in
            conformity with GAAP:                                   $_____

    (ii)    (a)    the income (or loss) of any Person (other than a
                     Subsidiary of Borrower) in which any other
                     Person (other than Borrower or any of its
                     Subsidiaries) has a joint interest, except to the
                     extent of the amount of dividends or other
                     distributions actually paid to Borrower or any
                     of its Subsidiaries by such Person:               $_____

            (b)    the income (or loss) of any Person accrued
                     prior to the date it becomes a Subsidiary of
                     Borrower or is merged into or consolidated
                     with Borrower or any of its Subsidiaries or that
                     Person's assets are acquired by Borrower or
                     any of its Subsidiaries:                          $_____

            (c)    the income of any Subsidiary of Borrower to
                     the extent that the declaration or payment of
                     dividends or similar distributions by that
                     Subsidiary of that income is not at the time
                     permitted by operation of the terms of its
                     charter or any agreement, instrument,
                     judgment, decree, order, statute, rule or
                     governmental regulation applicable to that
                     Subsidiary:                                       $_____

EXHIBIT C-A-2

ST PAPER9350

(d)    any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan:        $_____

(e)    to the extent not included in clauses (ii)(a) through (d) above, any net extraordinary gains or net extraordinary losses:        $_____

10. <u>Total Debt</u>:        $_____

11. <u>Interest Coverage Ratio</u>: **(i)/(ii) =**

    (i)    Adjusted EBITDA for the four-Fiscal Quarter Period then ended:        $_____

    (ii)    Interest Expense for such four-Fiscal Quarter Period:        $_____

                Actual:    _.__:1.00
                Required:    _.__:1.00

12. <u>Leverage Ratio</u>: **(i)/(ii) =**

    (i)    Total Debt        $_____

    (ii)    Adjusted EBITDA for the four-Fiscal Quarter Period then ended:        $_____

                Actual:    _.__:1.00
                Required:    _.__:1.00

13. <u>Cumulative Adjusted EBITDA</u>

    Actual:        $_____

    Required:        $_____

14. <u>Maximum Capital Expenditures</u>

    Actual:        $_____

    Required:        $_____

EXHIBIT C-A-3

ST PAPER9351

<u>plus</u>, the excess, if any, of such amount for the previous Fiscal Year over the actual amount of Consolidated Capital Expenditures for such previous Fiscal Year:                    $_____

EXHIBIT C-A-4

NY\1230447.3

ST PAPER9352

**EXHIBIT D**
**to Credit Agreement**

## ASSIGNMENT AGREEMENT

This Assignment Agreement (the "**Assignment**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in <u>Annex 1</u> attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters or credit and swingline loans) (the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1.     Assignor:             _____

2.     Assignee:             _____ [and is an Affiliate/Approved Fund[1]]

3.     Borrower(s):         ST Paper, LLC

4.     Administrative Agent:     _____, as Administrative Agent under the Credit Agreement

5.     Credit Agreement:        The $70,000,000 Credit Agreement dated as of April 16, 2007 among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time

6.     Assigned Interest:

---

1 Select as applicable

ST PAPER9353

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[2] |
|---|---|---|---|
| _____ [3] | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE  AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

7.      Notice and Wire Instructions:


**[NAME OF ASSIGNOR]**                          **[NAME OF ASSIGNEE]**

Notices:                                        Notices:

    _____                             _____
    _____                             _____
    _____                             _____
    Attention:                                      Attention:
    Telecopier:                                     Telecopier:

with a copy to:                                 with a copy to:

    _____                             _____
    _____                             _____
    Attention:                                      Attention:
    Telecopier:                                     Telecopier:


Wire Instructions:                              Wire Instructions:

---

2 Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.
3 Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Revolving Loan Commitment", "Term Loan Commitment", etc.)

EXHIBIT D-2

ST PAPER9354

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:

**[NAME OF ASSIGNOR]**

By:_____
Title:

ASSIGNEE:

**[NAME OF ASSIGNEE]**

By:_____
Title:

[Consented to and]⁴ Accepted:

**GOLDMAN SACHS CREDIT PARTNERS L.P.,**
  as Administrative Agent

By:_____
  Name:
  Title:

---

4 To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

EXHIBIT D-3

ST PAPER9355

ANNEX 1

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
## AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other  instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non-US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows: from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

EXHIBIT D-4

ST PAPER9356

3.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

*[Remainder of Page Intentionally Left Blank]*

EXHIBIT D-5

ST PAPER9357

<u>**EXHIBIT E**</u>
**to Credit Agreement**

**<u>CERTIFICATE RE NON-BANK STATUS</u>**

Reference is made to the Credit Agreement, dated as of April 16, 2007 (as it may be amended, supplemented or otherwise modified, the **"Credit Agreement"**; capitalized terms used herein but not otherwise defined have the respective meanings set forth in the Credit Agreement), by and among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time.  Pursuant to Section 2.18(c) of the Credit Agreement, the undersigned hereby certifies that it is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code of 1986, as amended.

**[NAME OF LENDER]**

By: _____
      Name:
      Title:

EXHIBIT E-1

ST PAPER9358

**ST PAPER, LLC**
**ST PAPER HOLDINGS, LLC**

**CLOSING DATE CERTIFICATE**

**April 16, 2007**

The undersigned, Sharad Tak, President of ST Paper, LLC, a Delaware limited liability company ("**Borrower**"), and Manager of ST Paper Holdings, LLC, a Delaware limited liability company ("**Pledgor**"), hereby certifies on behalf of Borrower and Pledgor pursuant to Section 3.1(q) of the Credit Agreement, dated as of April 16, 2007 (the "**Credit Agreement**") (capitalized terms used herein but not otherwise defined have the respective meanings set forth in the Credit Agreement), among Borrower, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time, that:

> (i)    the representations and warranties contained in each of the Credit Documents are true, correct and complete in all respects on and as of the Closing Date to the same extent as though made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true, correct and complete in all respects on and as of such earlier date;

> (ii)    no injunction or other restraining order shall have been issued and no hearing to cause an injunction or other restraining order to be issued shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the borrowing contemplated hereby; and

> (iii)    no event has occurred and is continuing or would result from the consummation of the borrowing contemplated hereby that would constitute an Event of Default or a Default.

Attached hereto as Annexes I, II, III, and IV, respectively, are true, complete and correct copies of (a) unaudited financial statements for Fiscal Year 2006, (b) the balance sheet of Borrower as at the Closing Date, (c) the Base Case Projections of projected operating expenses and cash flow for the Project from the Closing Date through Fiscal Year 2013, and (d) the initial Annual Operating Budget.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Certificate has been duly executed by the undersigned on behalf of Borrower and Pledgor as of the date first written above.

**ST PAPER, LLC**

By: _____
    Name:
    Title:

**ST PAPER HOLDINGS, LLC**

By: _____
    Name:
    Title:

NY\1230447.3

ST PAPER9360

Annex I

Unaudited Financial Statements for Fiscal Year 2006

(*See Attached*)

EXHIBIT F-3

ST PAPER9361

# TISSUE PRODUCTS TECHNOLOGY CORPORATION
## OCONTO FALLS TISSUE, INC
### EBITDA -COMBINED INCOME/ EXPENSE REPORT
#### 12/31/06

|  | Year to Date | |
|---|---|---|
| Tons Sold | | 53,344.09 |
| Tons Produced | | 53,345.51 |
|  | $$ | $ Per Ton |
| **Sales/ Revenue** | | |
| **Total Gross Sales** | 35,327,547.19 | 662.26 |
| **Other Revenue/ Patent** | - | - |
| Commissions | - | - |
| Discounts | (14,199.13) | (0.27) |
| Outbound Freight | - | - |
| **Net Sales** | 35,313,348.06 | 661.99 |
| | | |
| **Cost of Goods Sold** | | |
| Cost of Goods Parent Rolls | 1,351,456.09 | 25.33 |
| **Manufacturing Costs** | | |
| Waste Paper | - | - |
| Pulp | 1,997,978.52 | 37.45 |
| Broke | (3,861.76) | (0.07) |
| Chemicals | 2,307,457.25 | 43.25 |
| Other Materials | 392,829.25 | 7.36 |
| Freight | | |
| Disposal | 1,030,481.82 | 19.32 |
| Electricity | 3,810,816.70 | 71.44 |
| Natural Gas/ Fuel | 6,787,571.71 | 127.24 |
| Water | 59,658.36 | 1.12 |
| Waste Water Treatment | - | - |
| Labor and Benefits | 4,421,851.99 | 82.89 |
| Temp. Services - Contracted | 187,303.26 | 3.51 |
| Repair and Maintenance | 455,756.56 | 8.54 |
| Maintenance - Mill Upgrades | 12,824.01 | 0.24 |
| Repair and Maint. - Wages | 224,465.12 | 4.21 |
| Operating Supplies - Clothing | 368,976.77 | 6.92 |
| Operating Supplies | 145,211.00 | 2.72 |
| **Total Manufacturing Costs** | 22,199,320.56 | 416.14 |
| | | |
| **GROSS MARGIN** | 11,762,571.41 | 220.51 |
| | | |
| **Expenses** | | |
| **Other Manufacturing Costs** | | |
| Environmental Testing | 139,422.21 | 2.61 |
| Other Manufacturing Costs | 476,290.36 | 8.93 |
| Marketing Fee | 719.97 | 0.01 |
| Professional Services | 412,611.04 | 7.73 |
| Property Tax | 148,826.57 | 2.79 |
| Insurance | 479,356.40 | 8.99 |
| Bad Debts | - | - |
| Other Administrative Costs | 210,569.66 | 3.95 |
| **Total Other Manufacturing Costs** | 1,867,796.21 | 35.01 |
| | | |
| **Other Expenses** | | |
| Other (Income)/Expense | (17,539.41) | (0.33) |
| | | |
| **Total Expenses** | 1,850,256.80 | 34.68 |
| | | |
| **EBITDA** | 9,912,314.61 | 185.83 |
| | | |
| **Senior Debt** | | |
| Interest- Bonds | 2,258,089.39 | 42.33 |
| Interest - IFC/Fortress | 2,167,914.14 | 40.64 |
| | | |
| **Income Avail for Subdebt/Equity** | 5,486,311.08 | 102.86 |
| | | |
| **Depreciation/Amortization** | 3,865,994.07 | 72.47 |
| **Sub Debt** | | |
| Sales and Management Fees | 269,944.30 | 5.06 |
| Interest | 2,128,827.60 | 39.91 |
| Income Tax | (1,447.85) | (0.03) |
| | | |
| **Net Income** | (777,007.04) | (14.55) |

ST PAPER9362

# Tissue Products Technology Corp.
## Consolidated Balance Sheet
### December 2006

| Assets | Oconto Falls Tissue, Inc. | TPTC | Eliminations | Consolidated |
|---|---|---|---|---|
| **Current Assets** | | | | |
| Cash | 6,249.69 | 1,146.33 | | 7,396.02 |
| Trade and Other Receivables | 3,421,350.81 | 2,970,254.02 | | 6,391,604.83 |
| Inventories | 126,231.25 | (0.00) | | 126,231.25 |
| Inventories - Supplies/ Spare Parts | 1,939,377.63 | | | 1,939,377.63 |
| Prepaid Expenses | 235,666.10 | (2,208.77) | | 233,457.33 |
| **Total Current Assets** | $ 5,728,875.48 | $ 2,969,191.58 | | $ 8,698,067.06 |
| | | | | |
| **Property and Equipment** | 106,956,826.64 | 1,965,000.00 | | 108,921,826.64 |
| Leased Equipment | - | 5,473,351.21 | | 5,473,351.21 |
| Less Accumulated Depreciation | (24,874,955.10) | (573,364.50) | | (25,448,319.60) |
| **Net Property and Equipment** | $ 82,081,871.54 | $ 6,864,986.71 | | $ 88,946,858.25 |
| **Other Assets** | | | | |
| Restricted Cash | | | | |
| 1999A Bonds | 6.86 | | | 6.86 |
| Debt Service Reserve Fund | 8,221.02 | | | 8,221.02 |
| Interest Earnings Fund | 1.08 | | | 1.08 |
| Escrow- Fortress/IFC | | 1,155,000.00 | | 1,155,000.00 |
| Security Deposit | | 410,000.00 | | 410,000.00 |
| Bond/Finance Fees | $ 2,500,005.04 | 592,123.64 | | 3,092,128.68 |
| Less Amortization | (1,255,561.97) | (661,334.27) | | (1,916,896.24) |
| Patents | | 1,900,000.00 | | 1,900,000.00 |
| A/ R -TPTC | 18,917,725.21 | | (18,917,725.21) | |
| Notes/Accounts Receivable- Related Party | 8,395,279.34 | 14,797,081.91 | | 23,192,361.25 |
| Investment in Subsidiary | | 32,645,023.81 | (32,645,023.81) | - |
| **Total Other Current Assets** | $ 28,565,676.58 | $ 50,837,895.09 | | $ 27,840,822.65 |
| | | | | |
| **TOTAL ASSETS** | $ 116,376,423.60 | $ 60,672,073.38 | (51,562,749.02) | $ 125,485,747.96 |

**Note to Financial Statements:**

*The original property and equipment  purchased from Kimberly Clark in 1997 is reported on the Financial Statements at an estimated fair market value of $38,946,218.*

*Kimberly Clark paid off $41,000,000 of debt on the mill at closing.*

*With the removal of cradle to grave environmental issues for Kimberly Clark which were subequentialy laid off and property titled to Oconto Falls and the County of Oconto, WI.  The purchase price included the power plant three boilers, solid waste disposal system, waste water treatment system, de-ink pulp processing system (only 6 years old at time of sale), water intake, mill permits, 84 acres of land and 270,000 sq feet of buildings.  The appraised fair market value of these assets is $38,946,218.*

*Assets are depreciated based on the actual purchase price.*
*The Company expensed start-up costs as incurred.  Research and development costs are expensed as incurred.*

*Production is 100% sold out, cost paid at 100% of all manufacturing costs plus $800,000 per month facility use charge.  This is sold out until February, 2010 to SCA Tissue.*

ST PAPER9363

# Tissue Products Technology Corp.
## Consolidated Balance Sheet
### December 2006

**LIABILITIES**

**Current Liabilities**

| | | | |
|---|---:|---:|---:|
| Accounts Payable | 6,449,675.73 | 84,834.97 | 6,534,510.70 |
| Accrued Expenses | 955,553.21 | 239,207.14 | 1,194,760.35 |
| Deferred Revenue | 1,227,399.90 | | 1,227,399.90 |
| **Total Current Liabilities** | $ 8,632,628.84 | $ 324,042.11 | $ 8,956,670.95 |

**Short - Term Debt**

| | | | |
|---|---:|---:|---:|
| Notes Payable- Stonehill Financial | 2,500,000.00 | | 2,500,000.00 |
| Notes Payable - Associated Bank | 2,225,814.06 | 58,647.56 | 2,284,461.62 |
| Notes Payable- Nicolet Bank | 1,000,000.00 | | 1,000,000.00 |
| Member Subscription - Payable | | 21,931.78 | 21,931.78 |
| **Total Short Term Debt** | $ 5,725,814.06 | $ 80,579.34 | $ 5,806,393.40 |

**Long- Term Debt**

| | | | |
|---|---:|---:|---:|
| 1997 Development Revenue Bonds | 20,100,000.00 | | 20,100,000.00 |
| 1999 Development Revenue Bonds Payable | 3,435,000.00 | | 3,435,000.00 |
| Lease Revenue Bonds- WW Treatment | - | 4,000,000.00 | 4,000,000.00 |
| Lease Revenue Bonds- Warehouse | | 1,720,000.00 | 1,720,000.00 |
| Lease Obligations - Fortress | - | 13,255,795.59 | 13,255,795.59 |
| **Total Long Term Debt** | $ 23,535,000.00 | $ 18,975,795.59 | $ 42,510,795.59 |

| | | | |
|---|---:|---:|---:|
| Unearned Profit on Sale - Leaseback | 1,987,200.00 | | 1,987,200.00 |
| Deposit | 1,200,000.00 | | 1,200,000.00 |
| Deferred Gain on Asset | | 618,512.86 | 618,512.86 |
| **TOTAL LIABILITIES** | $ 41,080,642.90 | $ 19,998,929.90 | $ 61,079,572.80 |

**STOCK HOLDERS' EQUITY**

| | | | | |
|---|---:|---:|---:|---:|
| Common Stock | 4,000,000.00 | | (4,000,000.00) | - |
| Stock Holders Equity | 53,791,378.25 | 9,961,886.19 | (17,145,160.25) | 46,608,104.19 |
| Accounts Payable - OFTI | | 18,917,725.21 | (18,917,725.21) | |
| Notes/A.P.  Related Party Subdebt | 6,004,538.89 | 32,496,649.99 | | 38,501,188.88 |
| Retained Earnings - Prior | 7,977,763.95 | (19,926,110.87) | (7,977,763.95) | (19,926,110.87) |
| Retained Earnings - Current Year | 3,522,099.61 | (777,007.04) | (3,522,099.61) | (777,007.04) |
| **TOTAL STOCKHOLDERS' EQUITY** | $ 75,295,780.70 | $ 40,673,143.48 | | $ 64,406,175.16 |

| | | | | |
|---|---:|---:|---:|---:|
| **TOTAL LIABILITIES AND EQUITY** | 116,376,423.60 | 60,672,073.38 | (51,562,749.02) | 125,485,747.96 |

ST PAPER9364

Annex II

<u>Closing Date Balance Sheet</u>

(*See Attached*)

NY\1230447.3

ST PAPER9365

## ST Paper, LLC
Opening Balance Sheet - April 2007

| Assets | |
|---|---:|
| Cash | $840,000 |
| Cash-Restricted | $20,000,000 |
| Oconto Falls Assets | $93,649,000 |
| Inventory Acquired | $4,000,000 |
| **Total Assets** | **$118,489,000** |

| Liabilities & Equity | |
|---|---:|
| Term Loan | $65,000,000 |
| Revolver | $2,900,000 |
| Seller Financing | $30,589,000 |
| Equity | $20,000,000 |
| **Total Liabilities & Equity** | **$118,489,000** |

ST PAPER9366

Annex III

Base Case Projections

(*See Attached*)

ST PAPER9367

New York\2007\ST Tissue March 08\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Assumptions 5/21/2007 1:38 PM

Oconto Falls, Existing

**ST Paper, LLC**
**Key financial model assumptions**

21-May-07
Page 2 of 22

| Existing machines rehabilitation program | |
|---|---|
| Cost ($'000's) | 20,000 |
| Schedule (months) | 12 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Equity | 20,000 | Machine efficiency |
| | | | | | | | Machine #1 85.0% |
| SCA Exercises Option to Purchase | 1 | (1 = Yes; 2 = No) | | | Existing balance sheet ($000's) | | Machine #2 85.0% |
| Additional Volumes | | | | | Working capital | 4,000 | |
| | | | | | Inventories | - | |
| | 0.0 | 0.0 | 0.0 | 0.0 | PP&E | 86,400 | |
| | | | | | Total assets | 90,400 | |
| EPC new machines ($'000's) | | | | | Working capital line | - | |
| EPC Price | - | - | - | - | LTD | - | |
| Retention | 0.00% | 0.00% | 0.00% | 0.00% | Seller financing | - | |
| | | | | | Contributed equity | - | |
| Non-EPC cost | | | | | Total liabilities | - | |
| Land | - | - | - | - | | | |
| Start-up cost | - | - | - | - | | | |
| Sub-total | - | - | - | - | Loss carried forward | - | |
| | | | | | | | |
| Development cost | 1,400 | | | | Financing reserves | | |
| Other closing costs | 6,600 | | | | Cash | - | |
| | | | | | Operating losses | - | |
| Existing facility debt | IRB's | Bank | | | Months before stup | 1 | |
| Amount ($000's) | | | | | | | Depreciation (financial reporting) |
| Interest rate | | | | | Minimum cash balance | - | Buildings (S-L) 39 |
| Repayment (years) | | | | | | | Machinery & equipment (S-L) 20 |
| Note: no principal on bonds | | | | | Taxrate | 40.00% | |
| Monthly interest payment | | | | | | | Depreciation (tax purposes) |
| | | | | | Interest on reserves | 3.00% | Buildings (S-L) 39 |
| Financing terms | Bonds | 1st Lien | 2nd Lien | | Residual Value | 30.00% | Machinery & equipment (S-L) 7 |
| Advisory fee | | 0.25% | | | | | |
| GS placement fee | | 2.50% | | | Marketing fee | | |
| Management fee | | 0.00% | | | TTL | 4.00% | |
| Commitment fee | | 0.50% | | | | | |
| Grace period (years) | | | | | Key input prices | | |
| Repayment period | | Cash sweep | Cash sweep | | SOP 37, $/ton (add $25 freight) | 108.0 | |
| Interest rate | | 11.36% | 15.36% | | OCC, $/ton (including freight) | 100.0 | |
| Interest Income | | | | | Natural Gas, $/DT | 6.82 | |
| Percent Bond/Term B | | 100.00% | | | Transportation ($/DT) | 0.84 | |
| Amount | | TBD | TBD | | Escalation Indices | | |
| Mandatory Prepayment | | 1.00% | None | | Sales revenue | 0.00% | |
| Drawdown schedule | Bond | 1st Lien | 2nd Lien | | CPI growth | 0.00% | |
| Financing reserves | | As needed | As needed | | Capex ($'000s/year) | | |
| Balance up-front | | 100% | 100% | | Initial capex | 20,000 | |
| Next draw (# months) | | - | - | | Years 2 - 6 | 700 | |
| Next draw (percentage) | | 0% | 0% | | Years 7 - 11 | 1,400 | |
| | | | | | Years 12 onwards | 3,000 | |
| Seller Financing & W/C line | Vendor sub-debt | Seller financing | W/C line | Revolver | | | |
| Amount | | 30,589 | | 2,811 | | | |
| Interest rate | | 7.50% | | 11.36% | Depreciation (book & tax) | 5 | |
| Grace period | | 10 | | | | | |

Development Capital & Financing, LLC

Oconto Falls, Existing

## ST Paper LLC
### Construction financing ($'000s)

| | Jan-00 | Feb-00 | Mar-00 | Apr-00 | May-00 | Jun-00 | Jul-00 | Aug-00 | Sep-00 | Oct-00 | Nov-00 | Dec-00 | Jan-01 | Feb-01 | Mar-01 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase of RonCo | 86,400 | | | | | | | | | | | | | | | 86,400 |
| Working capital | 4,000 | | | | | | | | | | | | | | | 4,000 |
| Capital cost | | | | | | | | | | | | | | | | |
| Maintenance and growth capex | 20,000 | | | | | | | | | | | | | | | 20,000 |
| Retention payment | | | | | | | | | | | | | | | | |
| Land | | | | | | | | | | | | | | | | |
| Start-up cost | | | | | | | | | | | | | | | | |
| Sub-total | 20,000 | | | | | | | | | | | | | | | 20,000 |
| Development & financing costs | | | | | | | | | | | | | | | | |
| Advisory fee | | | | | | | | | | | | | | | | |
| Management fee | | | | | | | | | | | | | | | | |
| Placement fee | | | | | | | | | | | | | | | | |
| Development cost | 1,400 | | | | | | | | | | | | | | | 1,400 |
| Other closing costs | 6,600 | | | | | | | | | | | | | | | 6,600 |
| Commitment Fee | | | | | | | | | | | | | | | | |
| Interest capitalized | | | | | | | | | | | | | | | | |
| Interest income | | | | | | | | | | | | | | | | |
| Sub-total | 8,000 | | | | | | | | | | | | | | | 8,000 |
| Operating reserves | | | | | | | | | | | | | | | | |
| Cash | | | | | | | | | | | | | | | | |
| Start-up losses reserve | | | | | | | | | | | | | | | | |
| Sub-total | | | | | | | | | | | | | | | | |
| Increase/(decrease) in construction fund | | | | | | | | | | | | | | | | |
| Total uses of funds | 118,400 | | | | | | | | | | | | | | | 118,400 |
| | | | | | | | | | | | | | | | | |
| Working capital line | | | | | | | | | | | | | | | | |
| Senior debt | | | | | | | | | | | | | | | | |
| Revolver | 2,811 | | | | | | | | | | | | | | | |
| Bond | | | | | | | | | | | | | | | | |
| Term 'B' loan | 65,000 | | | | | | | | | | | | | | | 65,000 |
| RonCo IRB's | | | | | | | | | | | | | | | | |
| Total senior debt | 67,811 | | | | | | | | | | | | | | | 65,000 |
| Equity | | | | | | | | | | | | | | | | |
| Cash | 20,000 | | | | | | | | | | | | | | | 20,000 |
| Vendor sub-debt | | | | | | | | | | | | | | | | |
| Seller financing | 30,589 | | | | | | | | | | | | | | | 30,589 |
| Total equity | 50,589 | | | | | | | | | | | | | | | 50,589 |
| Total sources of funds | 118,400 | | | | | | | | | | | | | | | 115,589 |

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3.23.xls Construction Financing 5/24/2007 1:36 PM

Development Capital & Financing, LLC

ST PAPER9369

21-May-07
Page 4 of 22

**ST Paper, LLC**
**Financing Summary**
**($'000s)**

| | 2007 | 2008 | 2009 | TOTAL |
|---|---|---|---|---|
| PP&E: | | | | |
| Acquisition of RonCo | 94,400 | - | - | 94,400 |
| Capital cost | 20,000 | - | - | 20,000 |
| Sub-total | 114,400 | - | - | 114,400 |
| | | | | |
| Working capital | 4,000 | - | - | 4,000 |
| | | | | |
| Reserves: | | | | |
| Minimum cash balance | - | - | - | - |
| Operating losses reserve | - | - | - | - |
| Increase/(decrease) in construction fund | - | - | - | - |
| Sub-total | - | - | - | - |
| | | | | |
| Total uses | 118,400 | - | - | 118,400 |
| | | | | |
| Working capital line | 2,811 | - | - | 2,811 |
| | | | | |
| Senior debt | | | | |
| Bond offering | - | - | - | - |
| 1st Lien | 65,000 | - | - | 65,000 |
| 2nd Lien | - | - | - | - |
| RonCo IRB's | - | - | - | - |
| Total senior debt | 65,000 | - | - | 65,000 |
| | | | | |
| Equity | | | | |
| Cash | 20,000 | - | - | 20,000 |
| Vendor subordinated debt | - | - | - | - |
| Subordinated seller financing | 30,589 | - | - | 30,589 |
| Total equity | 50,589 | - | - | 50,589 |
| | | | | |
| Total sources | 118,400 | - | - | 118,400 |

Development Capital & Financing, LLC

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Financing Summary 5/21/2007 1:38 PM

ST PAPER9370

Oconto Falls, Existing

**ST Paper LLC**

**Depreciation schedules ($'000s)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BOOK DEPRECIATION (new investment)** | | | | | | | | | | | | | | | | | | | |
| Land | | | | | | | | | | | | | | | | | | | |
| Buildings | | | | | | | | | | | | | | | | | | | |
| Machinery & equipment | | | | | | | | | | | | | | | | | | | |
| Capex | 4,000 | 4,140 | 4,280 | 4,420 | 4,560 | 700 | 840 | 980 | 1,120 | 1,260 | 1,400 | 1,720 | 2,040 | 2,360 | 2,680 | 3,000 | 3,000 | 3,000 | 45,500 |
| Total Book Depreciation | 4,000 | 4,140 | 4,280 | 4,420 | 4,560 | 700 | 840 | 980 | 1,120 | 1,260 | 1,400 | 1,720 | 2,040 | 2,360 | 2,680 | 3,000 | 3,000 | 3,000 | 45,500 |
| | | | | | | | | | | | | | | | | | | | |
| Gross PP&E | 20,000 | 20,700 | 21,400 | 22,100 | 22,800 | 23,500 | 24,900 | 26,300 | 27,700 | 29,100 | 30,500 | 33,500 | 36,500 | 39,500 | 42,500 | 45,500 | 48,500 | 51,500 | |
| Accumulated Depreciation | 4,000 | 8,140 | 12,420 | 16,840 | 21,400 | 22,100 | 22,940 | 23,920 | 25,040 | 26,300 | 27,700 | 29,420 | 31,460 | 33,820 | 36,500 | 39,500 | 42,500 | 45,500 | |
| Net PP&E | 16,000 | 12,560 | 8,980 | 5,260 | 1,400 | 1,400 | 1,960 | 2,380 | 2,660 | 2,800 | 2,800 | 4,080 | 5,040 | 5,680 | 6,000 | 6,000 | 6,000 | 6,000 | |
| | | | | | | | | | | | | | | | | | | | |
| **TAX DEPRECIATION (new mills)** | | | | | | | | | | | | | | | | | | | |
| Land | | | | | | | | | | | | | | | | | | | |
| Buildings | | | | | | | | | | | | | | | | | | | |
| Machinery & equipment | | | | | | | | | | | | | | | | | | | |
| Capex | 4,000 | 4,140 | 4,280 | 4,420 | 4,560 | 700 | 840 | 980 | 1,120 | 1,260 | 1,400 | 1,720 | 2,040 | 2,360 | 2,680 | 3,000 | 3,000 | 3,000 | 45,500 |
| Total Tax Depreciation | 4,000 | 4,140 | 4,280 | 4,420 | 4,560 | 700 | 840 | 980 | 1,120 | 1,260 | 1,400 | 1,720 | 2,040 | 2,360 | 2,680 | 3,000 | 3,000 | 3,000 | 45,500 |
| | | | | | | | | | | | | | | | | | | | |
| Gross PP&E | 20,000 | 20,700 | 21,400 | 22,100 | 22,800 | 23,500 | 24,900 | 26,300 | 27,700 | 29,100 | 30,500 | 33,500 | 36,500 | 39,500 | 42,500 | 45,500 | 48,500 | 51,500 | |
| Accumulated Depreciation | 4,000 | 8,140 | 12,420 | 16,840 | 21,400 | 22,100 | 22,940 | 23,920 | 25,040 | 26,300 | 27,700 | 29,420 | 31,460 | 33,820 | 36,500 | 39,500 | 42,500 | 45,500 | |
| Net PP&E | 16,000 | 12,560 | 8,980 | 5,260 | 1,400 | 1,400 | 1,960 | 2,380 | 2,660 | 2,800 | 2,800 | 4,080 | 5,040 | 5,680 | 6,000 | 6,000 | 6,000 | 6,000 | |
| | | | | | | | | | | | | | | | | | | | |
| **BOOK DEPRECIATION (existing facility)** | | | | | | | | | | | | | | | | | | | |
| Land | | | | | | | | | | | | | | | | | | | |
| Buildings | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 4,357 |
| Machinery & equipment | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 4,248 | 76,464 |
| Total Book Depreciation | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 4,490 | 80,821 |
| | | | | | | | | | | | | | | | | | | | |
| Gross PP&E | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | |
| Accumulated Depreciation | 4,490 | 8,980 | 13,470 | 17,960 | 22,450 | 26,940 | 31,431 | 35,921 | 40,411 | 44,901 | 49,391 | 53,881 | 58,371 | 62,861 | 67,351 | 71,841 | 76,331 | 80,821 | |
| Net PP&E | 89,910 | 85,420 | 80,930 | 76,440 | 71,950 | 67,460 | 62,970 | 58,480 | 53,990 | 49,500 | 45,010 | 40,520 | 36,030 | 31,539 | 27,049 | 22,559 | 18,069 | 13,579 | |
| | | | | | | | | | | | | | | | | | | | |
| **TAX DEPRECIATION (existing facility)** | | | | | | | | | | | | | | | | | | | |
| Land | | | | | | | | | | | | | | | | | | | |
| Buildings | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 4,357 |
| Machinery & equipment | 12,137 | 12,137 | 12,137 | 12,137 | 12,137 | 12,137 | 12,137 | | | | | | | | | | | | 84,960 |
| Total Tax Depreciation | 12,379 | 12,379 | 12,379 | 12,379 | 12,379 | 12,379 | 12,379 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 242 | 89,317 |
| | | | | | | | | | | | | | | | | | | | |
| Gross PP&E | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | 94,400 | |
| Accumulated Depreciation | 12,379 | 24,759 | 37,138 | 49,517 | 61,896 | 74,276 | 86,655 | 86,897 | 87,139 | 87,381 | 87,623 | 87,865 | 88,107 | 88,349 | 88,591 | 88,833 | 89,075 | 89,317 | |
| Net PP&E | 82,021 | 69,642 | 57,263 | 44,883 | 32,504 | 20,125 | 7,746 | 7,504 | 7,262 | 7,020 | 6,777 | 6,535 | 6,293 | 6,051 | 5,809 | 5,567 | 5,325 | 5,083 | |

New York\2007\ST Tissue March 06\Covenant\Covenant Model - FINAL VERSION - 3-23.xls Depreciation 5/21/2007 1:39 PM

Providence Capital & Financing, LLC

ST PAPER9371

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Yields 5/21/2007 1:39 PM

| Oconto Falls, Existing | | | | | | | | | | | 21-May-07 |
| | | | | | | | | | | | Page 6 of 22 |

**ST Paper LLC**
**Pre-rehabilitation product yields**
**and utility consumption**

| Machine # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IRR (tons/day) | 108 | 108 | | | | | | | | | |
| Efficiency | 88.0% | 88.0% | | | | | | | | | |
| Production days in Year | 360 | 360 | 360 | 360 | 360 | 360.0 | 360 | 360.0 | 360.0 | 360.0 | |
| Freight ($/ton) | 0.0 | 0.0 | 0.0 | 0.0 | 45.0 | 0.0 | 45.0 | 0.0 | 0.0 | 0.0 | |
| Total tons/year | 34,187 | 34,286 | - | - | - | - | - | - | - | - | 68,473 |

| #1 Oconto Falls (dry crepe, SCA) | Machine specifications and product yields | | | | | | Utility consumption | | | |
| (Present Operation) | % Time | Basis Wt. | IRR TPD | Yankee Speed | Crepe (%) | Trim (in.) | Tons/year | Gas DT/ton | Power kWh/ton | Chemicals $/ton | Steam 000 lb/ton |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.8# BATH 78 BRITE 14 STRETCH | 67.0% | 8.80 | 108.73 | 5,200 | 12.0% | 135.0 | 23,078 | 14.50 | 1,300 | 40.00 | - |
| 8.8# FACIAL80 BRITE 20 STRETCH | 15.0% | 8.80 | 95.36 | 5,000 | 14.0% | 126.0 | 4,531 | 14.50 | 1,300 | 45.00 | - |
| 10.3# NAPKIN 78 BRITE 9 STRETCH | 10.0% | 10.30 | 113.85 | 4,600 | 11.0% | 135.0 | 3,607 | 13.00 | 1,200 | 55.00 | - |
| 12.2# IVORY NAPKIN 7 STRETCH | 8.0% | 12.20 | 117.24 | 4,400 | 9.0% | 120.0 | 2,971 | 13.00 | 1,150 | 55.00 | - |
| | | | | | | | 34,187 | 14.21 | 1,276 | 43.55 | |
| #2 Oconto Falls (swing SCA) | | | | | | | | | | | |
| (Present Operation) | | | | | | | | | | | |
| 13# YELLOW 5 STRETCH NAPKIN | 20.0% | 13.00 | 99.82 | 4,300 | 7.0% | 96.0 | 6,324 | 11.50 | 1,300 | 45.00 | - |
| 28# TOWEL 78 BRITE 6.5 STRETCH | 60.0% | 28.00 | 113.74 | 2,100 | 7.0% | 104.0 | 21,620 | 10.00 | 1,100 | 40.00 | - |
| 12.9# TOWEL 7 STRETCH | 20.0% | 12.90 | 100.09 | 4,350 | 9.0% | 98.0 | 6,341 | 11.50 | 1,150 | 50.00 | - |
| | | | | | | | 34,286 | 10.55 | 1,146 | 42.77 | |

Development Capital
& Financing, LLC

ST PAPER9372

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Yields 5/21/2007 1:39 PM

Oconto Falls, Existing

0.0
0.0
0.0
0.0

21-May-07
Page 7 of 22

**ST Paper LLC**
**Post-rehabilitation product yields**
**and utility consumption**

| Machine # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IRR (tons/day) | 115 | 141 | | | | | | | | | |
| Efficiency | 85.0% | 85.0% | | | | | | | | | |
| Production days in Year | 360 | 360 | 360 | 360 | 360 | 360.0 | 360 | 360.0 | 360.0 | 360.0 | |
| Freight ($/ton) | 0.0 | 0.0 | 0.0 | 0.0 | 45.0 | 0.0 | 45.0 | 0.0 | 0.0 | 0.0 | |
| Total tons/year | 35,281 | 43,271 | - | | | | | | | | 78,552 |

| #1 Oconto Falls (dry crepe, SCA) (Post-rehabilitation) | Machine specifications and product yields | | | | | | | Utility consumption | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | % Time | Basis Wt. | IRR TPD | Yankee Speed | Crepe (%) | Trim (in.) | Tons/year | Gas DT/ton | Power kWh/ton | Chemicals $/ton | Steam 000 lb/ton |
| 8.8# BATH 78 BRITE 14 STRETCH | 67.0% | 8.80 | 117.09 | 5,600 | 12.0% | 135.0 | 24,006 | 13.50 | 1,300 | 40.00 | |
| 8.8# FACIAL80 BRITE 20 STRETCH | 15.0% | 8.80 | 101.08 | 5,300 | 14.0% | 126.0 | 4,639 | 13.50 | 1,300 | 45.00 | |
| 10.3# NAPKIN 78 BRITE 9 STRETCH | 10.0% | 10.30 | 118.80 | 4,800 | 11.0% | 135.0 | 3,635 | 12.25 | 1,200 | 55.00 | |
| 12.2# IVORY NAPKIN 7 STRETCH | 8.0% | 12.20 | 122.57 | 4,600 | 9.0% | 120.0 | 3,000 | 12.25 | 1,150 | 55.00 | |
| #2 Oconto Falls (swing SCA) (Post-rehabilitation) | | | | | | | 35,281 | 13.26 | 1,276.94 | 43.48 | |
| 13# YELLOW 5 STRETCH NAPKIN | 20.0% | 13.00 | 113.74 | 4,900 | 7.0% | 96.0 | 6,961 | 10.50 | 1,300 | 45.00 | |
| 28# TOWEL 78 BRITE 6.5 STRETCH | 60.0% | 28.00 | 162.49 | 3,000 | 7.0% | 104.0 | 29,833 | 9.50 | 1,100 | 40.00 | |
| 12.9# TOWEL 7 STRETCH | 20.0% | 12.90 | 105.84 | 4,600 | 9.0% | 98.0 | 6,477 | 10.50 | 1,150 | 50.00 | |
| | | | | | | | 43,271 | 9.81 | 1,139.66 | 42.30 | - |

78,552.4          78,552.4


Development Capital
& Financing, LLC

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Wastepaper - OF & TAD 5/21/2007 1:39 PM

Oconto Falls, Existing

| | | | 21-May-07 |
|---|---|---|---|
| | **ST Paper LLC** | | Page 8 of 22 |
| | **Wastepaper cost -- Oconto Falls** | | |
| | **Pre-rehabilitation** | | |

### Existing Tissue Machines

| | Production (tons/year) by grade of tissue | | | | |
|---|---|---|---|---|---|
| Existing Tissue Machines | 8.8# Bath 70 | 8.8# Facial | 10.3# Napkin | 12.2# Napkin | Total |
| #1 Oconto Falls (Dry Crepe, SCA) | 23,078 | 4,531 | 3,607 | 2,971 | 34,187 |
| | 12# Napkin | 28# Towel | 12.9# Towel | Total | |
| #2 Oconto Falls (Swing Tissue, SCA) | 6,324 | 21,620 | 6,341 | 34,286 | |

| | Wastepaper usage by grade | | | | |
|---|---|---|---|---|---|
| Dry Crepe Grades | SOP | MWL | MCL/HPB | CBS | Total |
| 8.8# BATH 78 BRITE 14 STRETCH | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| 8.8# FACIAL80 BRITE 20 STRETCH | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| 10.3# NAPKIN 78 BRITE 9 STRETCH | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| 12.2# IVORY NAPKIN 7 STRETCH | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| Shrinkage | 42.00% | 35.00% | 42.00% | 42.00% | |
| Swing Tissue Grades | | | | | |
| 13# YELLOW 5 STRETCH NAPKIN | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| 28# TOWEL 78 BRITE 6.5 STRETCH | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| 12.9# TOWEL 7 STRETCH | 35.00% | 25.00% | 20.00% | 20.00% | 100.00% |
| Shrinkage | 42.00% | 35.00% | 42.00% | 42.00% | |
| #1 Oconto Falls (Dry Crepe, SCA) | | | | | |
| Wastepaper actual (tons/year) | 16,991 | 11,538 | 9,709 | 9,709 | 47,948 |
| Wastepaper mix | 35.44% | 24.06% | 20.25% | 20.25% | 100.00% |
| Wastepaper price ($/ton) | 133 | 223 | 183 | 143 | 167 |
| Wastepaper cost ($/year) | 2,259,809 | 2,573,015 | 1,776,778 | 1,388,411 | 7,998,012 |
| #2 Oconto Falls (Swing Tissue, SCA) | | | | | |
| Wastepaper actual (tons/year) | 17,040 | 11,572 | 9,737 | 9,737 | 48,086 |
| Wastepaper mix | 35.44% | 24.06% | 20.25% | 20.25% | 100.00% |
| Wastepaper price ($/ton) | 133 | 223 | 183 | 143 | 167 |
| Wastepaper cost ($/year) | 2,266,338 | 2,580,449 | 1,781,912 | 1,392,423 | 8,021,122 |

Development Capital
& Financing, LLC.

ST PAPER9374

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Wastepaper - OF & TAD 5/21/2007 1:39 PM

| Oconto Falls, Existing | | | | | 21-May-07 |
| --- | --- | --- | --- | --- | --- |
| | **ST Paper LLC**<br>**Wastepaper cost – Oconto Falls**<br>**Post-rehabilitation** | | | | Page 9 of 22 |

| **Existing Tissue Machines** | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Production (tons/year) by grade of tissue | | | | |
| Existing Tissue Machines | 8.8# Bath 70 | 8.8# Facial | 10.3# Napkin | 12.2# Napkin | Total |
| #1 Oconto Falls (Dry Crepe, SCA) | 24,006 | 4,639 | 3,635 | 3,000 | 35,281 |
| | 12# Napkin | 28# Towel | 12.9# Towel | Total | |
| #2 Oconto Falls (Swing Tissue, SCA) | 6,961 | 29,833 | 6,477 | 43,271 | |
| | Wastepaper usage by grade | | | | |
| Dry Crepe Grades | SOP | MWL | MCL/HPB | CBS | Total |
| 8.8# BATH 78 BRITE 14 STRETCH | 60.00% | 20.00% | 10.00% | 10.00% | 100.00% |
| 8.8# FACIAL80 BRITE 20 STRETCH | 50.00% | 30.00% | 10.00% | 10.00% | 100.00% |
| 10.3# NAPKIN 78 BRITE 9 STRETCH | 60.00% | 20.00% | 10.00% | 10.00% | 100.00% |
| 12.2# IVORY NAPKIN 7 STRETCH | 60.00% | 20.00% | 10.00% | 10.00% | 100.00% |
| Shrinkage | 42.00% | 35.00% | 42.00% | 42.00% | |
| Swing Tissue Grades | | | | | |
| 13# YELLOW 5 STRETCH NAPKIN | 60.00% | 20.00% | 10.00% | 10.00% | 100.00% |
| 28# TOWEL 78 BRITE 6.5 STRETCH | 70.00% | 20.00% | 5.00% | 5.00% | 100.00% |
| 12.9# TOWEL 7 STRETCH | 60.00% | 20.00% | 10.00% | 10.00% | 100.00% |
| Shrinkage | 42.00% | 35.00% | 42.00% | 42.00% | |
| #1 Oconto Falls (Dry Crepe, SCA) | | | | | |
| Wastepaper actual (tons/year) | 29,401 | 10,152 | 5,010 | 5,010 | 49,573 |
| Wastepaper mix | 59.31% | 20.48% | 10.11% | 10.11% | 100.00% |
| Wastepaper price ($/ton) | 133 | 223 | 183 | 143 | 157 |
| Wastepaper cost ($/year) | 3,910,276 | 2,263,939 | 916,811 | 716,415 | 7,807,441 |
| #2 Oconto Falls (Swing Tissue, SCA) | | | | | |
| Wastepaper actual (tons/year) | 41,104 | 11,683 | 4,026 | 4,026 | 60,840 |
| Wastepaper mix | 67.56% | 19.20% | 6.62% | 6.62% | 100.00% |
| Wastepaper price ($/ton) | 133 | 223 | 183 | 143 | 154 |
| Wastepaper cost ($/year) | 5,466,779 | 2,605,376 | 736,831 | 575,775 | 9,384,761 |

Development Capital
& Financing, LLC

ST PAPER9375

New York\2007\ST Tissue March 06\Covenants\Covenant Model - FINAL VERSION - 3-23.xls Operating Cost 5/21/2007 1:39 PM

| Oconto Falls, Existing | | | | 21-May-07 |
|---|---|---|---|---|
| | | | | Page 10 of 22 |

### ST Paper LLC
### Operating Cost

| | Oconto Falls - existing machines | | | |
|---|---|---|---|---|
| | Pre-rehabilitation | | Post-rehabilitation | |
| **Production** | #1 SCA | #2 SCA | #1 SCA | #2 SCA |
| Annual production (tons/year) | 34,187 | 34,286 | 35,281 | 43,271 |

| **Fixed Cost ($/year)** | | | | |
|---|---|---|---|---|
| Salaries & wages | 2,391,842 | 2,391,842 | 2,391,842 | 2,391,842 |
| Maintenance supplies | 293,205 | 293,205 | 302,586 | 370,047 |
| Insurance | 160,000 | 160,000 | 160,000 | 160,000 |
| Workman's Comp. Ins. | 52,646 | 52,646 | 52,646 | 52,646 |
| Property Taxes | 81,630 | 81,630 | 81,630 | 81,630 |
| Training | 156,950 | 156,950 | 156,950 | 156,950 |
| Miscellaneous fixed cost | 343,650 | 343,650 | 354,644 | 434,965 |
| Total fixed cost | 3,479,923 | 3,479,923 | 3,500,298 | 3,648,080 |

| **Variable Cost ($/year)** | | | | |
|---|---|---|---|---|
| Wastepaper | 7,998,012 | 8,021,122 | 7,807,441 | 9,384,761 |
| Steam | - | - | - | - |
| Power | 2,618,219 | 2,357,791 | 2,703,099 | 2,958,882 |
| Natural gas | 3,721,104 | 2,771,475 | 2,723,132 | 2,470,131 |
| Water | 49,821 | 52,053 | 51,415 | 65,695 |
| Sewer | | | | |
| Mill heating costs | - | - | - | - |
| Sub-total utilities | 6,389,145 | 5,181,319 | 5,477,646 | 5,494,708 |
| Machine clothing | 243,636 | 244,340 | 251,430 | 308,375 |
| Chemicals | 1,488,817 | 1,466,476 | 1,533,973 | 1,830,438 |
| Miscellaneous supplies | 409,961 | 411,146 | 423,077 | 518,896 |
| Waste disposal | 828,493 | 835,207 | 854,999 | 1,054,093 |
| Sub-total other | 2,970,907 | 2,957,168 | 3,063,480 | 3,711,802 |
| Total variable cost | 17,358,063 | 16,159,609 | 16,348,567 | 18,591,272 |

Development Capital
& Financing, LLC

ST PAPER9376

New York/2007/ST Tissue March 08/Covenants/Covenant Model - FINAL VERSION - 3-23.xls Prices - #1 5/21/2007 1:39 PM

21-May-07
Page 11 of 22

Oconto Falls, Existing
Existing machine #1

**ST Paper LLC**
**Product pricing**
**Oconto Falls - Machine #1**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COMMON COSTS ($/ton)** | | | | | | | | | | | | | | | | | | |
| Fiber cost | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 |
| Electricity cost | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 |
| Natural gas cost | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 |
| Other production cost | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 |
| Sub-total common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| **8.5# BATH 70 BRITE 14 STRETCH** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 172.79 | 172.79 | 165.59 | 141.22 | 131.81 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 | 128.48 |
| Variable consideration | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 | 144.51 |
| Dye cost | | | | | | | | | | | | | | | | | | |
| Wet strength resin cost | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 839.58 | 839.58 | 832.38 | 808.02 | 798.60 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 |
| Price (external sales) | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 |
| **8.5# FACIAL/60 BRITE 20 STRETCH** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 196.97 | 196.97 | 188.76 | 160.99 | 150.25 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 | 146.47 |
| Variable consideration | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 | 164.73 |
| Dye cost | | | | | | | | | | | | | | | | | | |
| Wet strength resin cost | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 883.99 | 883.99 | 875.78 | 848.00 | 837.27 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 |
| Price (external sales) | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 |
| **10.3# NAPKIN 78 BRITE 9 STRETCH** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 172.59 | 172.59 | 165.40 | 141.06 | 131.65 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 | 128.33 |
| Variable consideration | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 | 144.34 |
| Dye cost | | | | | | | | | | | | | | | | | | |
| Wet strength resin cost | | | | | | | | | | | | | | | | | | |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 834.21 | 834.21 | 827.02 | 802.68 | 793.28 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 |
| Price (external sales) | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 |
| **12.2# IVORY NAPKIN 7 STRETCH** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 193.57 | 193.57 | 185.51 | 158.21 | 147.66 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 | 143.94 |
| Variable consideration | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 | 161.89 |
| Dye cost | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 |
| Wet strength resin cost | | | | | | | | | | | | | | | | | | |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 882.75 | 882.75 | 874.68 | 847.38 | 836.84 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 |
| Price (external sales) | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 |

Development Capital & Financing, LLC

ST PAPER9377

Oconto Falls, Existing
Existing machine #2

21-May-07
Page 12 of 22

**ST Paper LLC**
**Product pricing**
**Oconto Falls - Machine #2**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COMMON COSTS ($/ton)** | | | | | | | | | | | | | | | | | | |
| Fiber cost | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 | 238.14 |
| Electricity cost | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 | 76.82 |
| Natural gas cost | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 | 96.35 |
| Other production cost | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 | 105.97 |
| Sub-total common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| **13# YELLOW 5 STRETCH NAPKIN** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 135.97 | 135.97 | 130.30 | 111.13 | 103.72 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 | 101.10 |
| Variable consideration | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 | 113.71 |
| Dye cost | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 | 10.00 |
| Wet strength resin cost | | | | | | | | | | | | | | | | | | |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 776.96 | 776.86 | 771.30 | 752.12 | 744.71 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 | 742.10 |
| Price (external sales) | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 |
| **29# TOWEL 78 BRITE 6.5 STRETCH** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 107.96 | 107.96 | 103.46 | 88.23 | 82.35 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 | 80.28 |
| Variable consideration | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 90.29 | 116.08 |
| Dye cost | | | | | | | | | | | | | | | | | | |
| Wet strength resin cost | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 740.53 | 740.53 | 736.03 | 720.81 | 714.92 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 712.85 | 738.64 |
| Price (external sales) | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 | 955.00 |
| **12.9# TOWEL 7 STRETCH** | | | | | | | | | | | | | | | | | | |
| Fixed consideration | 133.37 | 133.37 | 127.82 | 109.01 | 101.74 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 | 99.18 |
| Variable consideration | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 | 111.54 |
| Dye cost | | | | | | | | | | | | | | | | | | |
| Wet strength resin cost | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| Common costs | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 | 517.28 |
| Purchase price | 787.20 | 787.20 | 781.64 | 762.84 | 755.57 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 | 753.00 |
| Price (external sales) | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 |

New York\2007\ST Tissue March 06\Covenants\Covenant Model – FINAL VERSION – 3.23.xls Prices – #2 5/21/2007 1:39 PM

Development Capital & Financing, LLC

ST PAPER9378

Oconto Falls, Existing
Machine #1

21-May-07
Page 13 of 22

**ST Paper LLC**
**Sales Revenue**
**Oconto Falls – Machine #1**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Machine #1 SCA sales (tons/year)** | | | | | | | | | | | | | | | | | | | |
| 8.8# BATH 78 BRITE 14 STRETCH | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 22,684 | 408,305 |
| 8.8# FACIAL80 BRITE 20 STRETCH | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 4,455 | 80,189 |
| 10.2# NAPKIN 78 BRITE 9 STRETCH | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 3,390 | 61,013 |
| 12.2# IVORY NAPKIN 7 STRETCH | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 2,418 | 43,518 |
| Sub-total SCA sales | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 32,946 | 593,025 |
| **SCA price ($/ton)** | | | | | | | | | | | | | | | | | | | |
| 8.8# BATH 78 BRITE 14 STRETCH | 839.58 | 839.58 | 832.38 | 809.02 | 799.80 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | 795.28 | |
| 8.8# FACIAL80 BRITE 20 STRETCH | 883.99 | 883.99 | 875.76 | 848.00 | 837.27 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | 833.48 | |
| 10.2# NAPKIN 78 BRITE 9 STRETCH | 834.21 | 834.21 | 827.02 | 802.68 | 793.28 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | 789.96 | |
| 12.2# IVORY NAPKIN 7 STRETCH | 882.75 | 882.75 | 874.68 | 847.38 | 836.84 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | 833.11 | |
| SCA sales revenue | 27,945 | 27,945 | 27,701 | 26,876 | 26,557 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 26,445 | 480,805 |
| **External sales (tons/year)** | | | | | | | | | | | | | | | | | | | |
| 8.8# BATH 78 BRITE 14 STRETCH | 394 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 1,322 | 22,669 |
| 8.8# FACIAL80 BRITE 20 STRETCH | 76 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 3,396 |
| 10.2# NAPKIN 78 BRITE 9 STRETCH | 217 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 246 | 4,396 |
| 12.2# IVORY NAPKIN 7 STRETCH | 554 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 583 | 10,460 |
| Sub-total | 1,241 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 2,335 | 40,939 |
| **External pricing (tons/year)** | | | | | | | | | | | | | | | | | | | |
| 8.8# BATH 78 BRITE 14 STRETCH | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | 950.00 | |
| 8.8# FACIAL80 BRITE 20 STRETCH | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | |
| 10.2# NAPKIN 78 BRITE 9 STRETCH | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | 925.00 | |
| 12.2# IVORY NAPKIN 7 STRETCH | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | 958.00 | |
| External sales revenue | 1,181 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 2,222 | 38,962 |
| **Sales revenue machine #1** | 29,125 | 50,167 | 29,923 | 29,098 | 28,780 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 519,768 |

Development Capital
& Funding, LLC

ST PAPER9379

New York\2007\ST Tissue March Diff\Coverage\Covenant Model - FINAL VERSION - 3-23.xls EBITDA #1 5/21/2007 1:39 PM

Oconto Falls, Existing
Machine #1

21-May-07
Page 15 of 22

35,100.0
11,700.0

**ST Paper LLC**
**EBITDA**
**Oconto Falls -- Existing #1**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | 29,125 | 30,167 | 29,923 | 29,098 | 28,760 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 28,667 | 519,768 |
| TTL Marketing Fee | (1,165) | (1,207) | (1,197) | (1,164) | (1,151) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (1,147) | (20,791) |
| Net Sales Revenue | 27,960 | 28,961 | 28,727 | 27,935 | 27,629 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 27,521 | 498,977 |
| Wastepaper | (7,998) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (7,807) | (140,725) |
| Steam | | | | | | | | | | | | | | | | | | | |
| Power | (2,616) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (2,703) | (48,571) |
| Natural gas | (3,721) | (2,891) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (2,723) | (50,183) |
| Water | | | | | | | | | | | | | | | | | | | |
| Sewer | (50) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (51) | (904) |
| Mill heating costs | | | | | | | | | | | | | | | | | | | |
| Machine clothing | (244) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (251) | (4,518) |
| Chemicals | (1,469) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (1,534) | (27,566) |
| Miscellaneous supplies | (410) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (423) | (7,602) |
| Waste disposal | (828) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (855) | (15,363) |
| Variable cost | (17,356) | (16,517) | (16,349) | (16,349) | (16,348) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (16,349) | (285,452) |
| Salaries & wages | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (43,053) |
| Maintenance supplies | (293) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (303) | (5,437) |
| Insurance | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (2,880) |
| Workman's Comp. Ins. | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (946) |
| Property Taxes | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (1,469) |
| Training | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (2,826) |
| Miscellaneous fixed cost | (344) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (355) | (6,373) |
| Fixed Cost | (3,480) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (62,985) |
| EBITDA | 7,122 | 8,943 | 8,878 | 8,086 | 7,780 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 7,672 | 161,331 |

an Investment Capital
& Advisory, LLC

ST PAPER9380

Oconto Falls, Existing
Machine #1

21-May-07
Page 15A of 22

**ST Paper LLC**
**EBITDA ($/ton)**
**Oconto Falls – Existing #1**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | 851.94 | 855.06 | 848.15 | 824.76 | 815.73 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 | 812.54 |
| TTL Marketing Fee | (34.08) | (34.20) | (33.93) | (32.99) | (32.63) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) | (32.50) |
| Net Sales Revenue | 817.86 | 820.85 | 814.22 | 791.77 | 783.10 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 | 780.04 |
| Wastepaper | (233.95) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) | (221.29) |
| Steam | | | | | | | | | | | | | | | | | | |
| Power | (76.58) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) | (76.62) |
| Natural gas | (108.84) | (81.96) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) | (77.18) |
| Water | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) | (1.46) |
| Sewer | | | | | | | | | | | | | | | | | | |
| Mill heating costs | | | | | | | | | | | | | | | | | | |
| Machine clothing | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) |
| Chemicals | (43.55) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) | (43.48) |
| Miscellaneous supplies | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) |
| Waste disposal | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) | (24.23) |
| Variable cost | (507.74) | (468.15) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) | (463.38) |
| Salaries & wages | (69.96) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) | (67.79) |
| Maintenance supplies | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) | (8.58) |
| Insurance | (4.68) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) | (4.54) |
| Workmen's Comp. Ins. | (1.54) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) | (1.49) |
| Property Taxes | (2.39) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) | (2.31) |
| Training | (4.59) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) | (4.45) |
| Miscellaneous fixed cost | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) |
| Fixed Cost | (101.79) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) | (99.21) |
| EBITDA | 208.33 | 253.49 | 251.63 | 229.18 | 220.51 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 | 217.44 |

▲ Development Capital & Financing, LLC

ST PAPER9381

Oconto Falls, Existing
Machine #2

**ST Paper LLC**
**EBITDA**
**Oconto Falls -- Existing #2**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | 25,916 | 33,621 | 33,433 | 32,798 | 32,563 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 32,466 | 33,116 | 581,033 |
| TTL Marketing Fee | (1,037) | (1,345) | (1,337) | (1,312) | (1,302) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,299) | (1,325) | (23,241) |
| Net Sales Revenue | 24,880 | 32,276 | 32,096 | 31,486 | 31,251 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,167 | 31,794 | 557,791 |
| Wastepaper | (8,021) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (9,385) | (167,562) |
| Steam | | | | | | | | | | | | | | | | | | | |
| Power | (2,358) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (2,959) | (52,659) |
| Natural gas | (2,771) | (2,627) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (2,470) | (44,920) |
| Water | (52) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (66) | (1,168) |
| Sewer | | | | | | | | | | | | | | | | | | | |
| Mill heating costs | | | | | | | | | | | | | | | | | | | |
| Machine clothing | (244) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (308) | (5,487) |
| Chemicals | (1,466) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (1,830) | (32,584) |
| Miscellaneous supplies | (411) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (519) | (9,232) |
| Waste disposal | (695) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (1,054) | (18,755) |
| Variable cost | (16,160) | (18,740) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (18,591) | (330,366) |
| Salaries & wages | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (2,392) | (43,053) |
| Maintenance supplies | (293) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (370) | (6,564) |
| Insurance | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (2,880) |
| Workman's Comp. Ins. | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (53) | (948) |
| Property Taxes | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (82) | (1,469) |
| Training | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (157) | (2,825) |
| Miscellaneous fixed cost | (344) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (435) | (7,738) |
| Fixed Cost | (3,480) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (3,648) | (65,497) |
| EBITDA | 5,240 | 9,880 | 9,857 | 9,247 | 9,011 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 8,928 | 9,554 | 183,168 |

New York/2007/ST Tissue March 06/Covenant/Covenant Model - FINAL VERSION - 3-23.xls EBITDA #2 5/21/2007 1:39 PM

Development Capital & Financing, LLC

ST PAPER9382

| | | | | |
|---|---|---|---|---|
| sca tons | 67,231.8 | | 71,403.8 | |
| mkt tons | 1,241.4 | | 7,148.6 | |
| total | 68,473.2 | | 78,552.4 | |

| | **2007** | | **2008** | |
|---|---|---|---|---|
| SCA sales | **53861** | 801.1 | **56970** | 797.9 |
| Mkt sales | **1181** | 951.0 | **6818** | 953.7 |
| Sales Revenue | 55,041.5 | | 63,788.1 | |
| TTL Marketing Fee | (2,201.7) | | (2,551.5) | |
|   Net Sales Revenue | 52,839.9 | | 61,236.6 | |
| | | | | |
| Wastepaper | (16,019.1) | | (17,192.2) | |
| Steam | | | | |
| Power | (4,976.0) | | (5,662.0) | |
| Natural gas | (6,492.6) | | (5,518.1) | |
| Water | (101.9) | | (117.1) | |
| Sewer | | | | |
| Mill heating costs | | | | |
| Machine clothing | (488.0) | | (559.8) | |
| Chemicals | (2,955.3) | | (3,364.4) | |
| Miscellaneous supplies | (821.1) | | (942.0) | |
| Waste disposal | (1,663.7) | | (1,909.1) | |
|   Variable cost | (33,517.7) | | (35,264.7) | |
| | | | | |
| Corp SG&A | (1,776.0) | | (1,776.0) | |
| Salaries & wages | (4,783.7) | | (4,783.7) | |
| Maintenance supplies | (586.4) | | (672.6) | |
| Insurance | (320.0) | | (320.0) | |
| Workman's Comp. Ins. | (105.3) | | (105.3) | |
| Property Taxes | (163.3) | | (163.3) | |
| Training | (313.9) | | (313.9) | |
| Miscellaneous fixed cost | (687.3) | | (789.6) | |
|   Fixed Cost | (8,735.8) | | (8,924.4) | |
| | | | | |
| EBITDA | 10,586.3 | | 17,047.6 | |

ST PAPER9383

New York2007/ST Tissue March 06/Covenants/Covenant Model - FINAL VERSION - 3-23.xls EBITDA #2 (per ton) 5/21/2007 1:39 PM

21-May-07
Page 16A of 22

Oconto Falls, Existing
Machine #2

**ST Paper LLC**
**EBITDA ($/ton)**
**Oconto Falls – Existing #2**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | 755.88 | 776.98 | 772.64 | 757.96 | 752.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 750.29 | 765.36 |
| TTL Marketing Fee | (30.24) | (31.08) | (30.91) | (30.32) | (30.09) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.01) | (30.61) |
| Net Sales Revenue | 725.65 | 745.90 | 741.73 | 727.64 | 722.20 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 720.28 | 734.75 |
| Wastepaper | (233.95) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) | (216.88) |
| Steam | | | | | | | | | | | | | | | | | | |
| Power | (68.77) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) | (68.38) |
| Natural gas | (80.83) | (60.70) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) | (57.08) |
| Water | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) | (1.52) |
| Sewer | | | | | | | | | | | | | | | | | | |
| Mill heating costs | | | | | | | | | | | | | | | | | | |
| Machine clothing | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) | (7.13) |
| Chemicals | (42.77) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) | (42.30) |
| Miscellaneous supplies | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) | (11.99) |
| Waste disposal | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) | (24.36) |
| Variable cost | (471.32) | (433.06) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) | (429.64) |
| Salaries & wages | (69.76) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) | (55.28) |
| Maintenance supplies | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) | (8.55) |
| Insurance | (4.67) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) | (3.70) |
| Workman's Comp. Ins. | (1.54) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) | (1.22) |
| Property Taxes | (2.13) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) | (1.89) |
| Training | (4.58) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) | (3.63) |
| Miscellaneous fixed cost | (10.09) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) | (10.05) |
| Fixed Cost | (101.50) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) | (84.31) |
| EBITDA | 152.83 | 228.33 | 227.78 | 213.69 | 208.25 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 206.33 | 220.80 |

Development Capital & Financing, LLC

ST PAPER9384

Eco Fiber

**ST Paper LLC**
**EBITDA**
**Eco Fiber -- Existing**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | | | | | | | | | | | | | | | | | | | |
| TTL Marketing Fee | | | | | | | | | | | | | | | | | | | |
| Net Sales Revenue | | | | | | | | | | | | | | | | | | | |
| Fiber | | | | | | | | | | | | | | | | | | | |
| Additives | | | | | | | | | | | | | | | | | | | |
| Disposal | | | | | | | | | | | | | | | | | | | |
| Power | | | | | | | | | | | | | | | | | | | |
| Natural gas | | | | | | | | | | | | | | | | | | | |
| Water | | | | | | | | | | | | | | | | | | | |
| Sewer/waste treatment | | | | | | | | | | | | | | | | | | | |
| Operating supplies | | | | | | | | | | | | | | | | | | | |
| Variable cost | | | | | | | | | | | | | | | | | | | |
| Labor and benefits | | | | | | | | | | | | | | | | | | | |
| Contracted services | | | | | | | | | | | | | | | | | | | |
| Rent - warehouse & buildings | | | | | | | | | | | | | | | | | | | |
| Repairs & maintenance | | | | | | | | | | | | | | | | | | | |
| Other fixed costs | | | | | | | | | | | | | | | | | | | |
| Fixed Cost | | | | | | | | | | | | | | | | | | | |
| EBITDA | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| Cost inflation factor | 1.00 | 1.00 | ~1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Operating months/year | | | | | | | | | | | | | | | | | | | |
| Production (tons/month) | 4,350 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | |
| Product price ($/ton) | 446.00 | | | | | | | | | | | | | | | | | | |
| Variable costs ($/ton) | | | | | | | | | | | | | | | | | | | |
| Fiber | 250.70 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | 231.00 | |
| Additives | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | 19.35 | |
| Disposal | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | 17.66 | |
| Power | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | 18.61 | |
| Natural gas | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | 22.00 | |
| Water | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | 6.02 | |
| Sewer/waste treatment | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | 8.30 | |
| Operating supplies | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | 1.15 | |
| Fixed cost ($/month) | | | | | | | | | | | | | | | | | | | |
| Labor and benefits | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | |
| Contracted services | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | 11,270 | |
| Rent - warehouse & buildings | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | 4,320 | |
| Repairs & maintenance | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | |
| Other fixed costs | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | 36,982 | |
| Sales volume | | | | | | | | | | | | | | | | | | | |

Development Capital
& Financing, LLC

ST PAPER9385

New York/2040/7/ST Tissue March 06/Covenant/Covenant Model - FINAL VERSION - 3-23.xls EBITDA Eco Fiber (per ton) 5/21/2007 1:40 PM

Eco Fiber

21-May-07
Page 17A of 22

**ST Paper LLC**
**EBITDA ($/ton)**
**Eco Fiber – Existing**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| TTL Marketing Fee | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Net Sales Revenue | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Fiber | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Additives | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Disposal | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Power | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Natural gas | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Water | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Sewer/waste treatment | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Operating supplies | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Variable cost | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Labor and benefits | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Contracted services | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Rent - warehouse & buildings | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Repairs & maintenance | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Other fixed costs | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| Fixed Cost | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |
| EBITDA | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |

Provictorianos Capital
& Banking, LLC

ST PAPER9386

New York2007/ST Tissue March 06/Covenants/Covenant Model - FINAL VERSION - 3-23.xls Quarterly 5/21/2007 1:40 PM

## ST Paper - Covenant Proposal

| | Q2 2007<br>$ in 000's | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 | Q1 2009 | Full Yr 2009-10 | Full Yr 2010-11 | Full Yr 2011-12 | Full Yr 2012-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Revenue | 11,920.7 | 13,502.0 | 13,593.3 | 13,823.8 | 14,594.3 | 15,261.9 | 15,404.3 | 15,956.2 | 60,822 | 59,421 | 58,879 | 58,688 |
| EBITDA | 2,053.7 | 2,643.7 | 2,685.4 | 3,203.6 | 3,418.5 | 4,352.7 | 4,408.5 | 4,867.8 | 16,958 | 15,556 | 15,015 | 14,824 |
| LTM EBITDA | 8,214.8 (1,2) | 9,394.7 (1,3) | 9,843.7 (2,3) | 10,566.3 | 11,951.2 | 13,660.2 | 15,383.3 | 17,047.6 | 16,958 | 15,556 | 15,015 | 14,824 |
| Cumulative EBITDA | NA | 4,697.4 | 7,382.8 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Min. Cumm. EBITDA Covenant | NA | 3,600.0 | 5,950.0 | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Cushion | NA | (19.1%) | (19.4%) | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Ending Debt Balance | 67,683.1 | 66,961.7 | 66,178.0 | 64,853.9 | 63,482.2 | 61,076.5 | 58,577.6 | 55,548.4 | 45,600.4 | 35,924.2 | 25,690.3 | 14,484.9 |
| Total Debt / EBITDA | 8.24x | 7.13x | 6.72x | 6.13x | 5.31x | 4.47x | 3.81x | 3.26x | 2.69x | 2.31x | 1.71x | 0.98x |
| Covenant Level | NA | NA | NA | 7.50x | 6.50x | 5.55x | 4.78x | 4.00x | 3.35x | 2.90x | 2.25x | 1.50x |
| Implied Min EBITDA | NA | NA | NA | 8,647.2 | 9,761.9 | 11,004.8 | 12,332.1 | 13,887.1 | 13,612.1 | 12,387.6 | 11,417.9 | 9,656.6 |
| Cushion | NA | NA | NA | (18.3%) | (18.3%) | (19.4%) | (19.8%) | (18.5%) | (19.7%) | (20.4%) | (24.0%) | (34.9%) |
| Interest Expense | (7,703.3) (1,4) | (7,696.1) (1,4) | (7,666.3) (1,4) | (7,629.2) | (7,545.2) | (7,425.1) | (7,257.9) | (7,042.1) | (6,310.3) | (5,180.2) | (4,081.0) | (2,918.4) |
| EBITDA / Interest | 1.07x | 1.22x | 1.28x | 1.39x | 1.58x | 1.84x | 2.12x | 2.42x | 2.69x | 3.00x | 3.68x | 5.08x |
| Covenant Level | NA | NA | NA | 1.10x | 1.25x | 1.45x | 1.65x | 1.90x | 2.10x | 2.35x | 2.60x | 3.25x |
| Implied Min EBITDA | NA | NA | NA | 8,392.1 | 9,431.5 | 10,766.3 | 11,975.6 | 13,379.9 | 13,251.6 | 12,173.5 | 10,610.6 | 9,484.8 |
| Cushion | NA | NA | NA | (20.7%) | (21.1%) | (21.2%) | (22.2%) | (21.5%) | (21.9%) | (21.7%) | (29.3%) | (36.0%) |
| Maximum Capex Covenant (annual, with carryover) | | | | 1.00 | | | | 1.25 | 1.50 | 2.00 | 2.00 | 2.00 |

(1) Annualized (Quarterly EBITDA * 4)
(2) Annualized (First two Quarters of EBITDA * 2)
(3) Annualized (First three Quarters of EBITDA * 3)

ST PAPER9387

New York/2007/ST Tissue March 06/Covenant/Covenant Model - FINAL VERSION - 3-23.xls Income Statement 5/21/2007 1:40 PM

**Oconto Falls, Existing**
**Eco Fiber**

21-May-07
Page 18 of 22

## ST Paper LLC
### Income Statement ($'000s)

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Revenue | 55,042 | 63,788 | 63,357 | 61,897 | 61,332 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,133 | 61,786 | 1,100,800 |
| TTL marketing fee | (2,202) | (2,552) | (2,534) | (2,476) | (2,453) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,445) | (2,471) | (44,032) |
| IFP sales commision | | | | | | | | | | | | | | | | | | | |
| Other Marketing Fee | | | | | | | | | | | | | | | | | | | |
| Net Sales Revenue | 52,840 | 61,237 | 60,822 | 59,421 | 58,879 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 58,688 | 59,314 | 1,056,768 |
| | | | | | | | | | | | | | | | | | | | |
| Operating Cost | | | | | | | | | | | | | | | | | | | |
| Variable | (33,518) | (35,265) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (34,940) | (627,820) |
| Fixed | (6,960) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (7,148) | (128,482) |
| Corporate SG&A | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (1,776) | (31,968) |
| Sub-total | (42,254) | (44,189) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (43,864) | (788,270) |
| | | | | | | | | | | | | | | | | | | | |
| EBITDA | 10,586 | 17,048 | 16,958 | 15,556 | 15,015 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 15,450 | 268,498 |
| | | | | | | | | | | | | | | | | | | | |
| Net Interest Expense: | | | | | | | | | | | | | | | | | | | |
| Revolver | (919) | (66) | | | | | | | | | | | | | | | | | (385) |
| 1st Lien | (7,384) | (7,310) | (6,357) | (5,232) | (4,139) | (2,882) | (1,717) | (387) | | | | | | | | | | | (35,508) |
| 2nd Lien | | | | | | | | | | | | | | | | | | | |
| Seller Note | (2,294) | (2,466) | (2,651) | (2,860) | (3,064) | (3,294) | (3,541) | (3,806) | (4,092) | (4,398) | (4,728) | (4,076) | (3,495) | (2,871) | (2,286) | (1,859) | (1,403) | (927) | (54,101) |
| Bond | | | | | | | | | | | | | | | | | | | |
| Industrial Revenue Bonds | | | | | | | | | | | | | | | | | | | |
| Working capital | | | | | | | | | | | | | | | | | | | |
| interest income | | | | | | | | | | | | | | | | | | | |
| Sub-total | (9,998) | (9,842) | (9,008) | (8,082) | (7,202) | (6,276) | (5,257) | (4,193) | (4,092) | (4,398) | (4,728) | (4,076) | (3,495) | (2,871) | (2,286) | (1,859) | (1,403) | (927) | (89,993) |
| | | | | | | | | | | | | | | | | | | | |
| Book Depreciation | (8,490) | (8,630) | (8,770) | (8,910) | (9,050) | (5,190) | (5,330) | (5,470) | (5,610) | (5,750) | (5,880) | (6,210) | (6,530) | (6,850) | (7,170) | (7,490) | (7,490) | (7,490) | (126,321) |
| Gain/(loss) on sale | | | | | | | | | | | | | | | | | | 24,191 | 24,191 |
| | | | | | | | | | | | | | | | | | | | |
| Pretax Income | (7,901) | (1,425) | (820) | (1,436) | (1,238) | 3,358 | 4,236 | 5,161 | 5,122 | 4,675 | 4,205 | 4,537 | 4,799 | 5,103 | 5,368 | 5,475 | 5,931 | 31,224 | 76,375 |
| | | | | | | | | | | | | | | | | | | | |
| Tax Provision | | | | | | | | | | | | | | | | | | | |
| Current Portion | | | | | | | | | (2,023) | (1,870) | (1,682) | (1,815) | (1,919) | (1,156) | (3,846) | (3,889) | (4,071) | (17,587) | (30,550) |
| Deferred Portion | | | | | | | | | | | | | | (886) | 1,699 | 1,699 | 1,699 | 5,098 | 5,098 |
| Total Provision | | | | | | | | | (2,023) | (1,870) | (1,682) | (1,815) | (1,919) | (2,041) | (2,147) | (2,190) | (2,372) | (12,490) | (30,550) |
| | | | | | | | | | | | | | | | | | | | |
| Net Income | (7,901) | (1,425) | (820) | (1,436) | (1,238) | 3,358 | 4,236 | 5,161 | 3,099 | 2,805 | 2,523 | 2,722 | 2,879 | 3,062 | 3,221 | 3,285 | 3,558 | 18,734 | 45,825 |

Oconto Falls, Existing
Eco Fiber

## ST Paper LLC
### Debt Repayment ($'000s)

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning cash balance | | | | | | | | | | | | | | | | | | | |
| Operating cash flow | 2,863 | 8,972 | 9,902 | 9,625 | 10,176 | 11,141 | 11,707 | 13,037 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| Cumulative cash available | 2,863 | 8,972 | 9,902 | 9,625 | 10,176 | 11,141 | 11,707 | 13,037 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| Mandatory Prepayment | (650) | (644) | (560) | (461) | (364) | (263) | (151) | (34) | | | | | | | | | | | |
| Cumulative Cash after mand prepay | 2,233 | 8,328 | 9,342 | 9,164 | 9,812 | 10,879 | 11,556 | 13,003 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| **Revolver** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | 2,811 | 579 | | | | | | | | | | | | | | | | | |
| Less: repayment | (2,233) | (579) | | | | | | | | | | | | | | | | | |
| Ending balance | 579 | | | | | | | | | | | | | | | | | | |
| Cumulative Cash after Revolver | | 7,750 | 9,342 | 9,164 | 9,812 | 10,879 | 11,556 | 13,003 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| **1st Lien** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | 65,000 | 64,350 | 55,957 | 46,055 | 36,431 | 26,254 | 15,113 | 3,406 | | | | | | | | | | | |
| Balance after mandatory prepay | 64,350 | 63,707 | 55,397 | 45,595 | 36,066 | 25,992 | 14,962 | 3,372 | | | | | | | | | | | |
| Less: cash sweep paydown | | (7,750) | (9,342) | (9,164) | (9,812) | (10,879) | (11,556) | (3,372) | | | | | | | | | | | (61,874) |
| Ending balance | 64,350 | 55,957 | 46,055 | 36,431 | 26,254 | 15,113 | 3,406 | - | | | | | | | | | | | |
| Cumulative cash after 1st Lien | | | | | | | | 9,631 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| **2nd Lien** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | | | | | | | | | | | | | | | | | | | |
| Less: repayment | | | | | | | | | | | | | | | | | | | |
| Ending balance | | | | | | | | | | | | | | | | | | | |
| Cumulative cash after 2nd Lien | | | | | | | | 9,631 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| **Bond** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | | | | | | | | | | | | | | | | | | | |
| Less: repayment | | | | | | | | | | | | | | | | | | | |
| Ending balance | | | | | | | | | | | | | | | | | | | |
| Cumulative cash after bond | | | | | | | | 9,631 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| **Vendor subordinated debt** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | | | | | | | | | | | | | | | | | | | |
| Capitalized interest | | | | | | | | | | | | | | | | | | | |
| Less: repayment | | | | | | | | | | | | | | | | | | | |
| Ending balance | | | | | | | | | | | | | | | | | | | |
| Cumulative cash after vendor sub-debt | | | | | | | | 9,631 | 13,424 | 13,424 | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 42,633 | |
| **Seller financing** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | 30,589 | 32,883 | 35,349 | 38,001 | 40,851 | 43,914 | 47,208 | 50,749 | 54,555 | 58,646 | 63,045 | 54,350 | 46,602 | 38,273 | 30,476 | 24,784 | 18,708 | 12,359 | |
| Capitalized interest | 2,294 | 2,466 | 2,651 | 2,850 | 3,064 | 3,294 | 3,541 | 3,806 | 4,092 | 4,398 | 4,728 | 4,076 | 3,495 | 2,871 | 2,286 | 1,859 | 1,403 | 927 | |
| Less: repayment | | | | | | | | | | | (13,424) | (11,824) | (11,824) | (10,668) | (7,977) | (7,935) | (7,752) | (13,286) | (84,690) |
| Ending balance | 32,883 | 35,349 | 38,001 | 40,851 | 43,914 | 47,208 | 50,749 | 54,555 | 58,646 | 63,045 | 54,350 | 46,602 | 38,273 | 30,476 | 24,784 | 18,708 | 12,359 | 29,347 | |
| Cash after seller financing | | | | | | | | 9,631 | 13,424 | 13,424 | | | | | | | 12,359 | 29,347 | |
| **Industrial Revenue Bond** | | | | | | | | | | | | | | | | | | | |
| Beginning balance | | | | | | | | | | | | | | | | | | | |
| Less: repayment | | | | | | | | | | | | | | | | | | | |
| Ending balance | | | | | | | | | | | | | | | | | | | |
| Cash after subordinated debt | | | | | | | | 9,631 | 13,424 | 13,424 | | | | | | | | 28,347 | |

ST PAPER9389

Oconto Falls, Existing
Eco Fiber

21-May-07
Page 20 of 22

## ST Paper LLC
### Sources and Uses of Cash ($'000s)

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning cash balance** | | | | | | | | | | | | | | | | | | | |
| **Plus sources of cash:** | | | | | | | | | | | | | | | | | | | |
| Net Income | (7,901) | (1,425) | (820) | (1,436) | (1,238) | 3,356 | 4,236 | 5,161 | 3,099 | 2,805 | 2,523 | 2,722 | 2,879 | 3,062 | 3,221 | 3,285 | 3,558 | 18,734 | 45,825 |
| Depreciation | 8,490 | 8,630 | 8,770 | 8,910 | 9,050 | 5,190 | 5,330 | 5,470 | 5,610 | 5,750 | 5,890 | 6,210 | 6,530 | 6,850 | 7,170 | 7,490 | 7,490 | 7,490 | 126,321 |
| Deferred Taxes | | | | | | | | | 2,023 | 1,870 | 1,682 | 1,815 | 1,919 | 886 | (1,699) | (1,699) | (1,699) | (5,098) | (0) |
| Sale of Assets at Book Value | | | | | | | | | | | | | | | | | | | |
| Working Capital Line | | | | | | | | | | | | | | | | | | 19,579 | 19,579 |
| Revolver | 2,811 | | | | | | | | | | | | | | | | | | |
| 1st Lien | 65,000 | | | | | | | | | | | | | | | | | | 65,000 |
| 2nd Lien | | | | | | | | | | | | | | | | | | | |
| Bond | | | | | | | | | | | | | | | | | | | |
| Industrial Revenue Bond | 20,000 | | | | | | | | | | | | | | | | | | 20,000 |
| Equity | | | | | | | | | | | | | | | | | | | |
| Vendor subordinated debt | | | | | | | | | | | | | | | | | | | |
| Seller financing | 32,883 | 2,466 | 2,651 | 2,850 | 3,064 | 3,294 | 3,541 | 3,806 | 4,092 | 4,398 | 4,728 | 4,076 | 3,495 | 2,871 | 2,286 | 1,859 | 1,403 | 927 | 84,690 |
| Sub-total | 121,283 | 9,672 | 10,602 | 10,325 | 10,876 | 11,841 | 13,107 | 14,437 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 13,668 | 10,977 | 10,935 | 10,752 | 41,633 | 361,415 |
| **Less uses of cash:** | | | | | | | | | | | | | | | | | | | |
| Property Plant & Equipment | 114,400 | 700 | 700 | 700 | 700 | 700 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 146,900 |
| Increase in financing reserves | | | | | | | | | | | | | | | | | | | |
| Operating losses reserve buildup | | | | | | | | | | | | | | | | | | | |
| Working Capital | 4,000 | | | | | | | | | | | | | | | | | (4,000) | |
| Revolver Payment | 2,233 | 579 | | | | | | | | | | | | | | | | | |
| Principal - 1st Lien | | 7,750 | 9,342 | 9,164 | 9,812 | 10,879 | 11,556 | 3,372 | | | | | | | | | | | 61,874 |
| Principal - 1st Lien Mandatory Prepay | 650 | 644 | 560 | 461 | 364 | 263 | 151 | 34 | | | | | | | | | | | 3,128 |
| Principal - 2nd Lien | | | | | | | | | | | | | | | | | | | |
| Principal - Bond | | | | | | | | | | | | | | | | | | | |
| Principal - Industrial Revenue Bond | | | | | | | | | | | | | | | | | | | |
| Repayment of vendor sub-debt | | | | | | | | | | | | | | | | | | | |
| Repayment of seller financing | | | | | | | | | | | 13,424 | 11,824 | 11,824 | 10,668 | 7,977 | 7,935 | 7,752 | 13,286 | 84,690 |
| Return of Capital | | | | | | | | | | | | | | | | | | 20,000 | 20,000 |
| Dividends | | | | | | | | 9,631 | 13,424 | 13,424 | | | | | | | | 9,347 | 45,825 |
| Sub-total | 121,283 | 9,672 | 10,602 | 10,325 | 10,876 | 11,841 | 13,107 | 14,437 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 13,668 | 10,977 | 10,935 | 10,752 | 41,633 | 361,415 |
| **Ending cash balance** | | | | | | | | | | | | | | | | | | | |

Development Capital & Financing, LLC

ST PAPER9390

New York/2007/ST Tissue March 06/Covenant/Covenant Model - FINAL VERSION - 3-23.xls Balance Sheet 5/21/2007 1:40 PM

Oconto Falls, Existing
Eco Fiber

21-May-07
Page 21 of 22

## ST Paper LLC
## Balance Sheet ($'000s)

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Working Capital | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Operating Losses Reserve | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Financing Reserve Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Property Plant & Equipment | | | | | | | | | | | | | | | | | | |
| Gross PP&E | 114,400 | 115,100 | 115,800 | 116,500 | 117,200 | 117,900 | 119,300 | 120,700 | 122,100 | 123,500 | 124,900 | 127,900 | 130,900 | 133,900 | 136,900 | 139,900 | 142,900 | 145,900 |
| Accumulated Depreciation | (8,490) | (17,120) | (25,890) | (34,800) | (43,850) | (49,040) | (54,371) | (59,841) | (65,451) | (71,201) | (77,091) | (83,301) | (89,831) | (96,681) | (103,861) | (111,341) | (118,831) | (126,321) |
| Sale at Book Value | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (19,579) |
| Net PP&E | 105,910 | 97,980 | 89,910 | 81,700 | 73,350 | 68,860 | 64,900 | 60,860 | 56,650 | 52,300 | 47,810 | 44,600 | 41,070 | 37,219 | 33,049 | 28,559 | 24,069 | - |
| Total Assets | 109,910 | 101,980 | 93,910 | 85,700 | 77,350 | 72,860 | 68,930 | 64,860 | 60,650 | 56,300 | 51,810 | 48,600 | 45,070 | 41,219 | 37,049 | 32,559 | 28,069 | (0) |
| Working Capital Line | | | | | | | | | | | | | | | | | | |
| Deferred Taxes | 579 | - | - | - | - | - | - | - | 2,023 | 3,883 | 5,575 | 7,390 | 9,310 | 10,195 | 8,496 | 6,797 | 5,098 | (0) |
| Revolver | 64,350 | 55,957 | 46,055 | 36,431 | 26,254 | 15,113 | 3,406 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (0) |
| 1st Lien | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2nd Lien | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bond | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Industrial Revenue Bond | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vendor subordinated debt | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Seller Note | 32,883 | 35,349 | 38,001 | 40,851 | 43,914 | 47,208 | 50,749 | 54,555 | 58,646 | 63,045 | 54,350 | 46,602 | 38,273 | 30,476 | 24,784 | 18,708 | 12,359 | - |
| Equity | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Retained Earnings | (7,901) | (9,326) | (10,146) | (11,581) | (12,819) | (9,461) | (5,225) | (9,695) | (20,029) | (30,638) | (28,115) | (25,393) | (22,314) | (19,452) | (16,231) | (12,946) | (9,388) | - |
| Total Liabilities | 109,910 | 101,980 | 93,910 | 85,700 | 77,350 | 72,860 | 68,930 | 64,860 | 60,650 | 56,300 | 51,810 | 48,600 | 45,070 | 41,219 | 37,049 | 32,559 | 28,069 | (0) |

Development Capital
& Financing, LLC

ST PAPER9391

Oconto Falls, Existing
Eco Fiber

21-May-07
Page 22 of 22

**ST Paper LLC**
**Tax Reporting ($'000s)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | 10,586 | 17,048 | 16,958 | 15,556 | 15,015 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 14,824 | 15,450 | 268,498 |
| Net Interest Expense: | | | | | | | | | | | | | | | | | | | |
| Revolver | (319) | (86) | | | | | | | | | | | | | | | | | (385) |
| 1st Lien | (7,364) | (7,310) | (6,357) | (5,232) | (4,139) | (2,982) | (1,717) | (387) | | | | | | | | | | | (35,508) |
| 2nd Lien | | | | | | | | | | | | | | | | | | | |
| Seller Note | (2,294) | (2,466) | (2,651) | (2,850) | (3,064) | (3,294) | (3,541) | (3,806) | (4,092) | (4,398) | (4,728) | (4,076) | (3,495) | (2,871) | (2,266) | (1,859) | (1,403) | (927) | (54,101) |
| Bond | | | | | | | | | | | | | | | | | | | |
| Industrial Revenue Bonds | | | | | | | | | | | | | | | | | | | |
| Working capital | | | | | | | | | | | | | | | | | | | |
| Interest income | | | | | | | | | | | | | | | | | | | |
| Sub-total | (9,998) | (9,842) | (9,008) | (8,082) | (7,202) | (6,276) | (5,257) | (4,193) | (4,092) | (4,398) | (4,728) | (4,076) | (3,495) | (2,871) | (2,266) | (1,859) | (1,403) | (927) | (89,993) |
| Tax Depreciation | (16,379) | (16,519) | (16,659) | (16,799) | (16,939) | (13,079) | (13,219) | (1,222) | (1,362) | (1,502) | (1,642) | (1,962) | (2,282) | (2,602) | (2,922) | (3,242) | (3,242) | (3,242) | (134,817) |
| Gain/(loss) on sale for tax purposes | | | | | | | | | | | | | | | | | | 32,687 | 32,687 |
| Income Before Taxes | (15,790) | (9,314) | (8,709) | (9,325) | (9,127) | (4,532) | (3,653) | 9,409 | 9,370 | 8,923 | 8,453 | 8,785 | 9,047 | 9,351 | 9,616 | 9,723 | 10,179 | 43,968 | 76,375 |
| Current tax | | | | | | | | | | | | | | (1,156) | (3,846) | (3,889) | (4,071) | (17,597) | (30,550) |
| Income After Taxes | (15,790) | (9,314) | (8,709) | (9,325) | (9,127) | (4,532) | (3,653) | 9,409 | 9,370 | 8,923 | 8,453 | 8,785 | 9,047 | 8,196 | 5,770 | 5,834 | 6,107 | 26,381 | 45,825 |

DevelopSpace Capital
& Financing, LLC

New York/2007/ST Tissue March 06/Covenant/Covenant Model - FINAL VERSION - 3-23.xls Tax Reporting 5/21/2007 1:40 PM

ST PAPER9392

Annex IV

<u>Initial Annual Operating Budget</u>

(*See Attached*)

EXHIBIT F-6

ST PAPER9393

Annex IV

Initial Annual Operating Budget

(*See Attached*)

NY\1265878.1

ST PAPER9394

**ST Paper-Oconto Falls**
**2007 Annual Budget**

| | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 |
|---|---|---|---|---|---|
| Sales net of Commissions | $4,382 | $4,376 | $4,382 | $4,714 | $4,714 |
| Waste Paper | $1,504 | $1,502 | $1,504 | $1,606 | $1,606 |
| **Sales Net Wastepaper** | **$2,878** | **$2,875** | **$2,878** | **$3,109** | **$3,109** |
| **Variable Costs** | | | | | |
| Chemicals | $232 | $231 | $232 | $248 | $248 |
| Other Materials | $64 | $64 | $64 | $69 | $69 |
| Disposal | $130 | $130 | $130 | $139 | $139 |
| Electricity | $390 | $390 | $390 | $417 | $417 |
| Natural Gas/ Fuel | $537 | $483 | $483 | $487 | $459 |
| Water | $8 | $8 | $8 | $9 | $9 |
| Operating Supplies - Clothing | $38 | $38 | $38 | $41 | $41 |
| Allowance for Contingencies | $50 | $50 | $50 | $100 | $100 |
| **Total Variable Costs** | $1,450 | $1,395 | $1,396 | $1,509 | $1,481 |
| **Fixed Costs** | | | | | |
| Corp SG&A | $145 | $145 | $145 | $145 | $145 |
| Labor and Benefits | $393 | $406 | $393 | $406 | $406 |
| Repair and Maintenance | $48 | $50 | $48 | $50 | $50 |
| Insurance | $26 | $27 | $26 | $27 | $27 |
| Insurance- Workers Compensation | $9 | $9 | $9 | $9 | $9 |
| Property Taxes | $13 | $14 | $13 | $14 | $14 |
| Training | $26 | $27 | $26 | $27 | $27 |
| Other Fixed Costs | $56 | $58 | $56 | $58 | $58 |
| Miscellaneous Exp. | $50 | $50 | $50 | $50 | $50 |
| **Total Fixed Costs** | $767 | $786 | $767 | $786 | $786 |
| **Total O&M Costs** | $2,217 | $2,180 | $2,163 | $2,295 | $2,266 |
| **EBITDA** | **$662** | **$694** | **$715** | **$814** | **$842** |
| *Debt Service* | *$650* | *$650* | *$650* | *$650* | *$650* |

ST PAPER9395

| Sep-07 | Oct-07 | Nov-07 | Dec-07 | Total |
|---|---|---|---|---|
| $4,546 | $4,856 | $4,682 | $4,856 | $41,508 |
| $1,554 | $1,649 | $1,596 | $1,649 | $14,169 |
| **$2,992** | **$3,206** | **$3,086** | **$3,206** | **$27,339** |
| | | | | |
| $240 | $254 | $246 | $254 | $2,184 |
| $67 | $71 | $68 | $71 | $607 |
| $135 | $143 | $138 | $143 | $1,229 |
| $403 | $430 | $414 | $428 | $3,679 |
| $472 | $530 | $570 | $648 | $4,669 |
| $8 | $9 | $8 | $9 | $75 |
| $40 | $42 | $41 | $42 | $361 |
| $100 | $100 | $100 | $100 | $750 |
| $1,464 | $1,579 | $1,586 | $1,695 | $13,554 |
| | | | | |
| $145 | $145 | $145 | $145 | $1,301 |
| $393 | $406 | $393 | $406 | $3,604 |
| $48 | $50 | $48 | $50 | $442 |
| $26 | $27 | $26 | $27 | $241 |
| $9 | $9 | $9 | $9 | $80 |
| $13 | $14 | $13 | $14 | $124 |
| $26 | $27 | $26 | $27 | $237 |
| $56 | $58 | $56 | $58 | $517 |
| $50 | $50 | $50 | $50 | $450 |
| $767 | $786 | $767 | $786 | $6,994 |
| | | | | |
| $2,230 | $2,364 | $2,353 | $2,480 | $20,548 |
| | | | | |
| **$761** | **$842** | **$734** | **$726** | **$6,791** |
| | | | | |
| *$650* | *$650* | *$650* | *$650* | *$5,850* |

ST PAPER9396

ST PAPER9397

need to make it 360 days prod.

ST PAPER9398

**EXHIBIT G**
**to Credit Agreement**

**ST PAPER, LLC**
**ST PAPER HOLDINGS, LLC**

**SOLVENCY CERTIFICATE**

**April 16, 2007**

I hereby certify that I am the duly elected and qualified Chief Financial Officer of ST Paper, LLC, a Delaware limited liability company ("**Borrower**"), and ST Paper Holdings, LLC, a Delaware limited liability company ("**Pledgor**"), and that, as such, I am authorized to execute this Solvency Certificate on behalf of Borrower and Pledgor. This Certificate is being delivered pursuant to Section 3.1(s) of the Credit Agreement, dated as of April 16, 2007 (the "**Credit Agreement**"), by and among Borrower, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereto and the Lenders party thereto from time to time. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in the Credit Agreement.

I have reviewed the Credit Agreement and, in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein.

Based upon my review and examination described in the paragraph above, I hereby certify that, as of the date hereof, each of Borrower and Pledgor is Solvent.

**ST PAPER HOLDINGS, LLC**

_____
Name:
Title:

**ST PAPER, LLC**

_____
Name:
Title:

NY\1230447.3

ST PAPER9399

## CONSENT AND AGREEMENT

This CONSENT AND AGREEMENT, dated as of [_____ __], 20[__] (this "**Consent**"), is entered into by and among [*NAME OF CONSENTING PARTY*], a Delaware [*identify type of entity*] (together with its permitted successors and assigns, "**Contracting Party**"), GOLDMAN SACHS CREDIT PARTNERS L.P., as collateral agent ("**Collateral Agent**"), and ST PAPER, LLC, a Delaware limited liability company ("**Borrower**").

### RECITALS

A.     In order to, among other things, finance the acquisition of a paper production facility in Oconto Falls, Wisconsin and certain other assets related thereto and the development of certain capital improvements in connection therewith (collectively, the "**Project**"), Borrower is entering into a Credit Agreement, dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), with Goldman Sachs Credit Partners L. P., as administrative agent, Collateral Agent, the other agents party thereto and the lenders party thereto from time to time. Borrower and Collateral Agent are also entering into a security agreement (the "**Security Agreement**") pursuant to which Borrower has agreed to assign its interest under the Assigned Agreement (as defined below) to Collateral Agent as collateral for the secured obligations under the Credit Agreement and the transaction documents related thereto.

B.     Contracting Party and Borrower have entered into that certain [*insert name of Assigned Agreement*], dated as of [*insert date*] (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Assigned Agreement**").

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the parties hereto hereby agree, notwithstanding anything in the Assigned Agreement to the contrary, as follows:

1.     Assignment and Agreement.

1.1     Consent to Assignment.     Contracting Party consents to the collateral assignment under the Security Agreement of all of Borrower's right, title and interest in, to and under the Assigned Agreement (collectively, the "**Assigned Interests**").     Contracting Party acknowledges the right of Collateral Agent, in the exercise of Collateral Agent's rights and remedies pursuant to the Security Agreement, to make all demands, give all notices, take all actions and exercise all rights of Borrower under the Assigned Agreement.

1.2     Subsequent Owner.

(a)     Contracting Party agrees that, if Collateral Agent notifies Contracting Party in writing that, pursuant to the Security Agreement, it has assigned, foreclosed

EXHIBIT H-1

ST PAPER9400

or sold the Assigned Interests, then, upon the giving of such notice, (i) Collateral Agent or its successor, assignee and/or designee (a "**Subsequent Owner**") shall be substituted for Borrower under the Assigned Agreement and (ii) Contracting Party shall (1) recognize Collateral Agent or the Subsequent Owner, as the case may be, as its counterparty under the Assigned Agreement and (2) continue to perform its obligations under the Assigned Agreement in favor of Collateral Agent or the Subsequent Owner, as the case may be; provided that Collateral Agent or such Subsequent Owner, as the case may be, has assumed in writing all of Borrower's rights under the Assigned Agreement, whether arising before or after the date of such notice, and has assumed all of Borrower's obligations under the Assumed Agreement from the date of such notice.

(b)     Without limiting anything herein, the warranties provided by Contracting Party under the Assigned Agreement shall continue in full force and effect (until the expiration of the applicable warranty periods set forth in the Assigned Agreement) in the event that Collateral Agent or a Subsequent Owner succeeds to Borrower's right, title and interest in the Assigned Agreement.

1.3     Right to Cure.  If Borrower defaults in the performance of any of its obligations under the Assigned Agreement, or upon the occurrence or non-occurrence of any event or condition under the Assigned Agreement which would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable Contracting Party to terminate or suspend its performance under the Assigned Agreement (each hereinafter a "**default**"), Contracting Party shall not terminate or suspend its performance under the Assigned Agreement until it first gives written notice of such default to Collateral Agent and affords Collateral Agent a period of at least 60 days (or if such default is a nonmonetary default, such longer period, not to exceed 90 days as may be required so long as Collateral Agent has commenced and is diligently pursuing appropriate action to cure such default) from receipt of such notice to cure such default; provided, however, that (a) if possession of the Project is necessary to cure such nonmonetary default and Collateral Agent has commenced foreclosure proceedings, Collateral Agent shall be allowed a reasonable time to complete such proceedings, and (b) if Collateral Agent is prohibited from curing any such nonmonetary default by any process, stay or injunction issued by any governmental authority or pursuant to any bankruptcy or insolvency proceeding or other similar proceeding involving Borrower, then the time periods specified herein for curing such nonmonetary default shall be extended for the period of such prohibition.

1.4     Replacement Agreements.  In the event the Assigned Agreement is rejected or terminated as a result of any bankruptcy, insolvency, reorganization or similar proceeding affecting Borrower, Contracting Party shall, at the option of Collateral Agent exercised within 45 days after such rejection or termination, enter into a new agreement with Collateral Agent or its designee having identical terms as the Assigned Agreement (subject to any conforming changes necessitated by the substitution of parties and other changes as the parties may mutually agree), provided that the term under such new agreement shall be no longer than the remaining balance of the term specified in the Assigned Agreement. Collateral Agent shall have the right to assign all or a pro rata interest in such new agreement to a Subsequent Owner; provided that the Subsequent Owner assumes in writing the obligations of Collateral Agent under such new agreement. Upon such assignment, Collateral Agent shall be released from any further liability under such new agreement to the extent of the interest assigned.

NY\1230447.3

ST PAPER9401

1.5 <u>Limitations on Liability</u>. Contracting Party acknowledges and agrees that Collateral Agent shall not have any liability or obligation under the Assigned Agreement as a result of this Consent, the Security Agreement or otherwise, nor shall Collateral Agent be obligated or required to (a) perform any of Borrower's obligations under the Assigned Agreement, except during any period in which Collateral Agent has assumed Borrower's rights and obligations under the Assigned Agreement pursuant to Section 1.2(a) or has entered into a new agreement pursuant to Section 1.4, or (b) take any action to collect or enforce any claim for payment assigned under the Security Agreement. If Collateral Agent has assumed Borrower's rights and obligations under the Assigned Agreement pursuant to Section 1.2(a) or has entered into a new agreement pursuant to Section 1.4, Collateral Agent's liability to Contracting Party under the Assigned Agreement or such new agreement, and the sole recourse of Contracting Party in seeking enforcement of the obligations under such agreements, shall be limited to the interest of Collateral Agent in the Project.

1.6 <u>Delivery of Notices</u>. Contracting Party shall deliver to Collateral Agent, concurrently with the delivery thereof to Borrower, a copy of each notice, request or demand given by Contracting Party to Borrower pursuant to the Assigned Agreement relating to a default by Borrower under the Assigned Agreement.

2. <u>Payments under the Assigned Agreement</u>.

2.1 <u>Payments</u>. Contracting Party shall pay all amounts (if any) payable by it under the Assigned Agreement to Borrower in the manner and as and when required by the Assigned Agreement directly into the account specified from time to time by Collateral Agent to Contracting Party in writing. Notwithstanding the foregoing, if any entity or person has become a Subsequent Owner pursuant to the terms hereof, then Contracting Party shall pay all such amounts directly to an account designated by Subsequent Owner.

2.2 <u>No Offset, Etc.</u> All payments required to be made by Contracting Party under the Assigned Agreement shall be made without any offset, recoupment, abatement, withholding, reduction or defense whatsoever, other than those allowed by the terms of the Assigned Agreement.

3. <u>Representations and Warranties of Contracting Party</u>. Contracting Party hereby represents and warrants, in favor of Collateral Agent, as of the date hereof, that:

(a) Contracting Party (i) is a Delaware duly organized and validly existing under the laws of the State of Delaware, (ii) is duly qualified, authorized to do business and in good standing in every jurisdiction necessary to perform its obligations under the Assigned Agreement and this Consent, and (iii) has all requisite power and authority to enter into and to perform its obligations hereunder and under the Assigned Agreement, and to carry out the terms hereof and thereof and the transactions contemplated hereby and thereby.

(b) The execution, delivery and performance by Contracting Party of this Consent and the Assigned Agreement have been duly authorized by all necessary corporate or other action on the part of Contracting Party and do not require any approvals, filings with, or consents of any entity or person which have not previously been obtained or made.

EXHIBIT H-3

ST PAPER9402

(c)     Each of this Consent and the Assigned Agreement is in full force and effect, has been duly executed and delivered on behalf of Contracting Party by the appropriate officers of Contracting Party.

4.     <u>Miscellaneous</u>.

4.1     <u>Notices</u>.  Any communications between the parties hereto or notices provided herein to be given may be given to the following addresses:

| If to Contracting Party: | If to Collateral Agent: |
|---|---|
| *[Name and address of Contracting Party]*<br>Facsimile:<br>Telephone:<br>Attention: | Goldman, Sachs & Co.<br>30 Hudson Street, 17th Floor<br>Jersey City, NJ 07302<br>Attention: Pedro Ramirez<br>Facsimile: (212) 428-1622<br>Telephone: (917) 343-8319<br>E-mail: pedro.ramirez@gs.com |

If to Borrower:

ST Paper, LLC
1555 Glory Road
Green Bay, WI 54304
Facsimile: (301) 840-0749
Attention: Sharad Tak

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service (including Federal Express, UPS, DHL and other similar overnight delivery services), (c) in the event overnight delivery services are not readily available, if mailed by first class United States Mail, postage prepaid, registered or certified with return receipt requested, (d) if sent by prepaid telegram or by facsimile or (e) if sent by other electronic means (including electronic mail) confirmed by facsimile or telephone.  Any party may change its address for notice hereunder by giving of 30 days' notice to the other parties in the manner set forth hereinabove.

4.2     <u>Counterparts</u>.  This Consent may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

4.3     <u>Amendment, Waiver</u>.  Neither this Consent nor any of the terms hereof may be terminated, amended, supplemented, waived or modified except by an instrument in writing signed by Contracting Party and Collateral Agent.

EXHIBIT H-4

ST PAPER9403

4.4    Successors and Assigns.  This Consent shall bind and benefit Contracting Party, Collateral Agent, and their respective successors and assigns.

4.5    Headings Descriptive.  The headings of the several sections and subsections of this Consent are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Consent.

4.6    Severability.  In case any provision in or obligation under this Consent shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

4.7    Entire Agreement.    This Consent and any agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings between the parties hereto in respect of the subject matter hereof.  In the event of any conflict between the terms, conditions and provisions of this Consent and any such agreement, document or instrument (including, without limitation, the Assigned Agreement), the terms, conditions and provisions of this Consent shall prevail.

4.8    Governing Law; Submission to Jurisdiction.  **THIS CONSENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH, AND BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK.**

4.9    WAIVER OF TRIAL BY JURY.  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTING PARTY, BORROWER AND COLLATERAL AGENT HEREBY IRREVOCABLY WAIVE ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS CONSENT OR ANY MATTER ARISING HEREUNDER.**

*[Signature Page Follows]*

ST PAPER9404

IN WITNESS WHEREOF, the parties hereto, by their officers duly authorized, intending to be legally bound, have caused this Consent and Agreement to be duly executed and delivered as of the date first above written.

[*NAME OF CONSENTING PARTY*],
a Delaware corporation,
as Contracting Party

By:_____
    Name:
    Title:

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Collateral Agent

By:_____
    Name:
    Title:

ST PAPER, LLC,
a Delaware limited liability company,
as Borrower

By:_____
    Name:
    Title:

EXHIBIT I-1-6

ST PAPER9405

**EXHIBIT I-1**
**to Credit Agreement**

## INDEPENDENT ENGINEER'S RELIANCE LETTER

Goldman Sachs Credit Parties L.P.,
as Administrative Agent and Collateral Agent
85 Broad Street
New York, New York 10004

April 16, 2007

Dear Goldman Sachs Credit Partners L.P.,

On behalf of our client, ST Paper, LLC (the "Client"), we, Poyry Forest Industry Consulting Inc. (the "Independent Engineer"), have prepared a report titled "ST Paper Independent Engineer Report, Phase I – Acquisition of TPTC and Rebuild of Existing Assets," dated December 19, 2006 (the "Report"), in connection with a proposed acquisition by the Client of certain paper mill assets and certain upgrades related thereto (the "Transaction"). The Client has requested that we provide you this letter in your capacity as the administrative agent and collateral agent (collectively in such capacities, the "Agent") under the Credit Agreement being entered into among the Client, you and certain other agents and lenders in connection with the Transaction.

The Independent Engineer hereby authorizes the Agent to rely upon the Report to the extent permitted by this letter and, subject to the condition that the Agent acknowledges its agreement to the following terms and conditions of this letter by signing this letter in the appropriate space below.

The Agent acknowledges and agrees that:

1.     The Agent's reliance on the Report is subject to the limitations, qualifications and disclaimers of the Independent Engineer set forth in the Report.

2.     The conclusions in the Report represent the Independent Engineer's professional judgment based upon the information available and received from different parties (including the Client and the Agent) and conditions existing on the date of the Report.

3.     The Independent Engineer's liability to the Agent in connection with the Agent's reliance on the Report shall be subject to the limitations on liability set forth in the Revised Agreement entered into between the Independent Engineer and the Client, dated October 11, 2006 (the "Revised Agreement"). The Independent Engineer's maximum aggregate liability to the Agent and the Client shall not under any circumstances exceed in the aggregate the limitations on liability set forth in the Revised Agreement.

EXHIBIT I-1-1

NY\1230447.3

ST PAPER9406

4.     The Report is dated December 19, 2006 and the Agent is aware and acknowledges that the Report has not been updated since that date.  The Independent Engineer has not been requested to, nor does the Independent Engineer have any duty to update or supplement the Report pursuant to this letter.

5.     The Report has been prepared for the Client and submitted to the Client and the Agent only.  The Independent Engineer is aware that the Agent intends to provide a copy of the Report to certain lenders and potential lenders (and their authorized representatives) involved in the Transaction.  For the avoidance of doubt, the reliance authorized by this letter may not be extended, and the Independent Engineer shall have no liability or responsibility under this letter, the Report or otherwise in connection with the Transaction, to any such lender or potential lender or any other party.  The Agent agrees that it will inform any party (by providing such party a copy of this letter or otherwise informing such party in writing), including any lenders or potential lenders, to whom the Agent provides a copy of the Report that the Independent Engineer has not authorized such party to rely on the Report and that the Independent Engineer disclaims any and all liability for any actions or lack thereof taken by any such party as a result of relying on or in any way using the Report.


Yours truly,

Poyry Forest Industry Consulting Inc.


By:_____
      Name:
      Title:


EXHIBIT I-1-2

ST PAPER9407

The undersigned hereby acknowledges and agrees to the terms and conditions set forth in this letter.

Date: April ___, 2007

Goldman Sachs Credit Partners L.P.,
as Administrative Agent and Collateral Agent

By:_____
         Authorized Signatory

The undersigned hereby executes this letter for the purpose of acknowledging and agreeing to the terms and conditions set forth in this letter. All terms and conditions of the Revised Agreement remain unchanged and valid between the Independent Engineer and the Client. For the avoidance of doubt, the Client acknowledges the application of Section 7 of the Revised Agreement and that the Independent Engineer has relied upon the limitations, rights and protections and Client's obligations contained therein in granting this letter and agreeing to permit reliance by the Agent upon the Report as set forth in this letter. Such limitations, rights and protections will also apply for the benefit of the Independent Engineer in the event the Report is provided to certain lenders or potential lenders (and their authorized representatives) or other parties involved in the Transaction in accordance with paragraph 5 of this letter.

Date: April ___, 2007

ST Paper, LLC

By:_____
         Name:
         Title:

EXHIBIT I-1-3

ST PAPER9408

**EXHIBIT I-2**
**to Credit Agreement**

## INSURANCE CONSULTANT'S CERTIFICATE

April 16, 2007

Goldman Sachs Credit Partners L.P.,
    as Administrative Agent and Collateral Agent
85 Broad Street
New York, New York 10004

      Re:    ST Paper, LLC – Insurance Consultant's Certificate

Ladies and Gentlemen:

The undersigned, a duly authorized representative of Aon Corporation, a Delaware corporation (the "**Insurance Consultant**"), hereby delivers this Insurance Consultant's Certificate to you in accordance with Section 3.1(l) of the Credit Agreement, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among ST Paper, LLC, a Delaware limited liability company ("**Borrower**"), Goldman Sachs Credit Partners L.P., as administrative agent (in such capacity, "**Administrative Agent**"), collateral agent, lead arranger, book runner and syndication agent (collectively in such capacities, the "**Agents**"), and the financial institutions from time to time parties thereto as lenders (the "**Lenders**," and collectively with the Agents and the other Secured Parties referred to in the Credit Agreement and each of their respective successors, transferees and assigns, the "**Secured Parties**").

The Insurance Consultant hereby makes the following statements in favor of the Secured Parties with respect to Borrower and the Project (as defined below) as of the date hereof:

      1.    The Insurance Consultant acknowledges that pursuant to the Credit Agreement, the Lenders are providing financing to Borrower for, among other things, the acquisition of a paper production facility and certain other assets related thereto and the development of certain improvements in connection therewith (collectively, the "**Project**"), and in so doing are relying on this Insurance Consultant's Certificate and the Insurance Consultant's report dated _____, 2007 (the "**Insurance Consultant's Report**"), with respect to the Project.

      2.    Attached hereto as Annex I is an accurate and complete copy of the Insurance Consultant's Report.

      3.    The Insurance Consultant's Report was prepared in good faith by the Insurance Consultant pursuant to the scope of services in accordance with generally accepted consulting practices.

EXHIBIT I-2-1

ST PAPER9409

4.     The Insurance Consultant hereby confirms, as of the date hereof, that the evaluation, conclusions and recommendations contained in the Insurance Consultant's Report are accurate and complete in all material respects.

5.     Nothing has come to the attention of the Insurance Consultant that causes the Insurance Consultant to believe that the Insurance Consultant's Report, as of the date hereof, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

6.     Attached hereto as Annex II is an accurate and complete list of the coverages which have been proposed to Borrower in connection with the Project as evidenced by draft certificates of insurance and other materials supplied by Borrower.

7.     Upon delivery to Administrative Agent of the certificates of insurance evidencing its insurance coverages, copies of which are attached hereto as Annex III, Borrower will have provided satisfactory evidence of compliance with the terms and conditions of Section 3.1(l) of the Credit Agreement and Section 5.8 of the Credit Agreement as of the date hereof.

The Secured Parties shall be permitted to rely on the Insurance Consultant's Report as if the Insurance Consultant's Report was specifically addressed to each of them.

*[Signature Page Follows]*

EXHIBIT I-2-2

ST PAPER9410

IN WITNESS WHEREOF, the Insurance Consultant has caused this Insurance Consultant's Certificate to be duly executed and delivered by an authorized officer of the Insurance Consultant as of the date first above written.

AON CORPORATION

By:_____
    Name:
    Title:

EXHIBIT I-2-3

ST PAPER9411

Annex I

<u>Insurance Consultant's Report</u>

(*Copy Attached*)

EXHIBIT I-2-4

ST PAPER9412

Annex II

Insurance Coverages

(*Copy Attached*)

EXHIBIT I-2-5

ST PAPER9413

Annex III

<u>Insurance Certificates</u>

(*Copies Attached*)

EXHIBIT I-2-6

NY\1230447.3

ST PAPER9414

**EXHIBIT J**
**to Credit Agreement**

## <u>PATRIOT ACT AND OTHER REQUIRED INFORMATION</u>

Borrower's duly completed and executed Patriot Act information letter, containing the following information:

(1) Name of each Credit Party;

(2) Address of each Credit Party's principal place of business;

(3) Each Credit Party's taxpayer identification number;

(4) Name of the manager or managing member of each Credit Party;

(5) Country of domicile of the manager or managing member of each Credit Party;

(6) Borrower's certificate of formation, as an attachment;

(7) Borrower's operating agreement, as an attachment; and

(8) Borrower's executed confirmation of authority, as an attachment.

NY\1230447.3

ST PAPER9415

<u>**EXHIBIT K**</u>
**to Credit Agreement**

<u>**CREDIT AGREEMENT JOINDER**</u>

Date: _____, 20__

Goldman Sachs Credit Partners L.P.,
    as Administrative Agent and Collateral Agent
85 Broad Street
New York, New York 10004

ST Paper, LLC
    as Borrower
1555 Glory Road
Green Bay, Wisconsin 54304

    Re:   <u>ST Paper, LLC – Credit Agreement Joinder</u>

Ladies and Gentlemen:

    This Credit Agreement Joinder is delivered to you pursuant to Section 8.5(b) of the Credit Agreement, dated as of April 16, 2007 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among ST Paper, LLC, a Delaware limited liability company, as borrower ("**Borrower**"), Goldman Sachs Credit Partners L.P., as administrative agent (in such capacity, "**Administrative Agent**"), collateral agent (in such capacity, "**Collateral Agent**"), syndication agent, lead arranger and book runner, and the financial institutions from time to time party thereto as lenders (collectively, the "**Lenders**"). Unless otherwise defined herein, capitalized terms used herein have the meanings provided in the Credit Agreement.

    [***Insert name of Joining Party***] ("**Joining Party**") is entering into this Credit Agreement Joinder in order to become a Secured Party under the Credit Documents.

    Joining Party hereby requests to be joined as a Secured Party under the Credit Documents, and by its signature and the acknowledgement of Administrative Agent and Collateral Agent below, shall become a Secured Party under the Credit Documents.

    Joining Party agrees to be, and hereby is, bound by the terms and conditions of Section 8.8 and Section 9.5(c)(iv) of the Credit Agreement, and agrees to be, and hereby is, entitled to all of the rights and benefits, and bound by all of the obligations, provided under such Sections.

*[Signature Page Follows]*

EXHIBIT K-1

ST PAPER9416

IN WITNESS WHEREOF, the undersigned has duly executed this Credit Agreement Joinder as of the date first written above.

*[INSERT NAME OF JOINING PARTY]*

By:_____
    Name:
    Title:


Accepted and Agreed to:

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Administrative Agent and Collateral Agent


By:_____
    Name:
    Title:

NY\1230447.3

ST PAPER9417

**EXHIBIT L**
**to Credit Agreement**

**RECORDING REQUESTED BY:**
Latham & Watkins LLP

**AND WHEN RECORDED MAIL TO:**

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn: [*Name of Attorney*], Esq.

**Re:  ST PAPER, LLC**

_____

Space above this line for recorder's use only

**LANDLORD WAIVER AND CONSENT AGREEMENT**

This **LANDLORD WAIVER AND CONSENT AGREEMENT** (this "**Agreement**") is dated as of _____ __, 20__ and entered into by [*NAME OF LANDLORD*] ("**Landlord**"), to and for the benefit of **GOLDMAN SACHS CREDIT PARTNERS L.P.**, as collateral agent for Lenders and Lender Counterparties (in such capacity "**Collateral Agent**").

**RECITALS:**

**WHEREAS**, **ST PAPER, LLC**, a Delaware limited liability company ("**Tenant**"), has possession of and occupies all or a portion of the property described on Exhibit A annexed hereto (the "**Premises**");

**WHEREAS**, Tenant's interest in the Premises arises under the lease agreement (the "**Lease**") more particularly described on Exhibit B annexed hereto, pursuant to which Landlord has rights, upon the terms and conditions set forth therein, to take possession of, and otherwise assert control over, the Premises;

**WHEREAS**, reference is made to that certain Credit Agreement, dated as of April 16, 2007 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; capitalized terms used herein but not otherwise defined have the respective meanings set forth in the Credit Agreement), by and among ST Paper, LLC, Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, the other agents party thereo and the Lenders party thereto from time to time, pursuant to which Tenant has executed a security agreement, mortgages, deeds of trust, deeds to secure debt and assignments of rents and leases, and other collateral documents in relation to the Credit Agreement;

ST PAPER9418

WHEREAS, Tenant's repayment of the extensions of credit made by Lenders under the Credit Agreement will be secured, in part, by equipment and all other personal property now or hereafter located at the Premises (together, the "**Collateral**"); and

WHEREAS, Collateral Agent has requested that Landlord execute this Agreement as a condition to the extension of credit to Tenant under the Credit Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby represents and warrants to, and covenants and agrees with, Collateral Agent as follows:

1.      Landlord hereby (a) waives and releases unto Collateral Agent and its successors and assigns any and all rights granted by or under any present or future laws to levy or distraint for rent or any other charges which may be due to Landlord against the Collateral, and any and all other claims, liens and demands of every kind which it now has or may hereafter have against the Collateral, and (b) agrees that any rights it may have in or to the Collateral, no matter how arising (to the extent not effectively waived pursuant to clause (a) of this paragraph 1), shall be second and subordinate to the rights of Collateral Agent in respect thereof.    Landlord acknowledges that the Collateral is and will remain personal property and not fixtures even though it may be affixed to or placed on the Premises.

2.      Landlord certifies that (a) Landlord is the landlord under the Lease, (b) the Lease is in full force and effect and has not been amended, modified, or supplemented except as set forth on <u>Exhibit B</u> annexed hereto, (c) to the knowledge of Landlord, there is no defense, offset, claim or counterclaim by or in favor of Landlord against Tenant under the Lease or against the obligations of Landlord under the Lease, (d) no notice of default has been given under or in connection with the Lease which has not been cured, and Landlord has no knowledge of the occurrence of any other default under or in connection with the Lease, and (e) except as disclosed to Collateral Agent, no portion of the Premises is encumbered in any way by any deed of trust or mortgage lien or ground or superior lease.

3.      Landlord consents to the installation or placement of the Collateral on the Premises, and Landlord grants to Collateral Agent a license to enter upon and into the Premises to do any or all of the following with respect to the Collateral:    assemble, have appraised, display, remove, maintain, prepare for sale or lease, repair, transfer, or sell (at public or private sale).    In entering upon or into the Premises, Collateral Agent hereby agrees to indemnify, defend and hold Landlord harmless from and against any and all claims, judgments, liabilities, costs and expenses incurred by Landlord caused solely by Collateral Agent's entering upon or into the Premises and taking any of the foregoing actions with respect to the Collateral.    Such costs shall include any damage to the Premises made by Collateral Agent in severing and/or removing the Collateral therefrom.

4.      Landlord agrees that it will not prevent Collateral Agent or its designee from entering upon the Premises at all reasonable times to inspect or remove the Collateral.    In the event that Landlord has the right to, and desires to, obtain possession of the Premises (either through expiration of the Lease or termination thereof due to the default of Tenant thereunder),

EXHIBIT L-2

NY\1230447.3

ST PAPER9419

Landlord will deliver notice (the "**Landlord's Notice**") to Collateral Agent to that effect. Within the 45 day period after Collateral Agent receives the Landlord's Notice, Collateral Agent shall have the right, but not the obligation, to cause the Collateral to be removed from the Premises. During such 45 day period, Landlord will not remove the Collateral from the Premises nor interfere with Collateral Agent's actions in removing the Collateral from the Premises or Collateral Agent's actions in otherwise enforcing its security interest in the Collateral. Notwithstanding anything to the contrary in this paragraph, Collateral Agent shall at no time have any obligation to remove the Collateral from the Premises.

5.      Landlord shall send to Collateral Agent a copy of any notice of default under the Lease sent by Landlord to Tenant. In addition, Landlord shall send to Collateral Agent a copy of any notice received by Landlord of a breach or default under any other lease, mortgage, deed of trust, security agreement or other instrument to which Landlord is a party which may affect Landlord's rights in, or possession of, the Premises.

6.      All notices to Collateral Agent under this Agreement shall be in writing and sent to Collateral Agent at its address set forth on the signature page hereof by telefacsimile, by United States mail, or by overnight delivery service.

7.      The provisions of this Agreement shall continue in effect until Landlord shall have received Collateral Agent's written certification that all amounts advanced under the Credit Agreement have been paid in full.

8.      This Agreement and the rights and obligations of the parties hereunder shall be governed by, and shall be construed and enforced in accordance with, the internal laws of the State of New York, without regard to conflicts of laws principles.

*[Signature Page Follows]*

**EXHIBIT L-3**

ST PAPER9420

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be duly executed and delivered as of the day and year first set forth above.

**[NAME OF LANDLORD]**

By: _____
    Name:
    Title:

_____
_____
_____

Attention:
Telecopier:

By its acceptance hereof, as of the day and year first set forth above, Collateral Agent agrees to be bound by the provisions hereof.

**GOLDMAN SACHS CREDIT PARTNERS L.P.,**
as Collateral Agent

By: _____
    Name:
    Title:

_____
_____
_____

Attention:
Telecopier:

**[APPROPRIATE NOTARY BLOCKS]**

**EXHIBIT L-4**

ST PAPER9421

EXHIBIT A to
Landlord Waiver and Consent

Legal Description of Premises:

EXHIBIT L-A-1

NY\1230447.3

ST PAPER9422

EXHIBIT B to
Landlord Waiver and Consent

Description of Lease:

EXHIBIT L-B-1

ST PAPER9423

## SCHEDULE 3.1(c)

## CLOSING DATE CONSENTS

None.

mw1258062_8

ST PAPER9424

## SCHEDULE 3.1(c)(ii)

## ASSET TRANSFER DOCUMENTS

1.  Second Amended and Restated Asset Purchase Agreement, dated April 16, 2007, by and among Borrower, Oconto Falls Tissue, Inc., Tissue Products Technology Corp. and Partners Concepts Development, Inc., including all warranty bills of sale, general and specific assignments, warranty deeds, certificates of title and other instruments of conveyance and any assignment and assumption agreement executed in connection therewith.

2.  Warranty Bill of Sale, dated April 16, 2007, executed by Oconto Falls Tissue, Inc., in favor of Borrower.

3.  Assignment and Assumption Agreement, dated April 16, 2007, by and between Oconto Falls Tissue, Inc. and Borrower.

4.  Warranty Deed, dated April 16, 2007, executed by Oconto Falls Tissue, Inc. in favor of Borrower.

5.  Subordinated Promissory Note, dated April 16, 2007, by Borrower in favor of Oconto Falls Tissue, Inc.

6.  Amended and Restated Sales and Marketing Agreement, dated September 20, 2006, by and between Borrower and Tissue Technology, LLC, as further amended on April 16, 2007.

7.  Noncompetition Agreement, dated April 16, 2007, by and among Borrower, Tissue Products Technology Corp. and Partners Concepts Development, Inc.

mw1258062_8

ST PAPER9425

# SCHEDULE 3.1(d)

# RELEASED LIENS

See attached.

mw1258062_8

ST PAPER9426

## RELEASED LIENS

| | DEBTOR NAME | FILE NUMBER | DATE FILED | SECURED PARTY | COLLATERAL |
|---|---|---|---|---|---|
| 1. | Oconto Falls Tissue, Inc. | 060011970523 | 08/08/2006 | Nicolet National Bank<br>P.O. Box 23900<br>Green Bay, WI 54305-3900 | Blanket, including Parent Roll Toll Supply Agreement and Warehouse Lease |
| 2. | Oconto Falls Tissue, Inc.<br>106 E. Central Ave.<br>Oconto Falls, WI 54154<br>(Lessee)<br>**AND**<br>PCDI Oconto Falls Tissue, LLC<br>2079-A Lawrence Dr.<br>De Pere, WI 54115<br>(Lessee) | 060001291215 | 1/24/06 | IFC Credit Corporation<br>8700 Waukegan Rd.<br>Morton Grove, IL 60053<br>(Lessor) | Blanket Security Interest including specific equipment. Dryer Inventory located at: W.O.W. Glory Road |
| | Oconto Falls Tissue, Inc. | Amendment No. 060006614724 to original filing No. 060001291215 | 5/2/06 | IFC Credit Corporation | Restated Collateral Description |
| 3. | Oconto Falls Tissue, Inc.<br>1555 Glory Road<br>Green Bay, WI 54304<br>**AND**<br>Tissue Products Technology Corp.<br>1555 Glory Road<br>Green Bay, WI 54304 | 050015508928 | 10/26/05 | SHF XII, LLC<br>150 S. 150th Street<br>Minneapolis, MN 55402 | Blanket Security Interest |
| | Oconto Falls Tissue, Inc.<br>And<br>Tissue Products Technology Corp. | Amendment No. 050016448932 to original filing No. 050015508928 | 11/15/05 | SHF XII, LLC<br>150 S. 150th Street<br>Minneapolis, MN 55402 | Restated Collateral Description |

mw1298840_2

ST PAPER9427

| # | Lessee | Number | Date | Secured Party | Blanket Security Interest |
|---|---|---|---|---|---|
| 4. | Oconto Falls Tissue, Inc. 1555 Glory Road Green Bay, WI 54304 | 05001358I826 | 9/16/05 | SHF XII, LLC 150 S. 5th Street Minneapolis, MN 55402 | |
| 5. | Oconto Falls Tissue, Inc. 106 E. Central Ave. Oconto Falls, WI 54154 (Lessee) | 050012732318 | 8/29/05 | Fortress Credit Corp. 1251 Avenue of the Americas New York, NY 10020 (Lessor) (Immediately assigned by: IFC Credit Corporation) | Blanket Security Interest including filed General Business Security Agreement |
| 6. | Oconto Falls Tissue, Inc. 106 E. Central Ave. Oconto Falls, WI 54154 (Lessee) | 050012562925 | 8/25/05 | Fortress Credit Corp. 1251 Avenue of the Americas New York, NY 10020 (Lessor) | All equipment covered under Lease Schedule No. 1 to Master Lease Agreement No. 801056 dated June 10, 2005 between Oconto Falls Tissue, Inc., and Fortress Credit Corp. Filed to give notice of the true lease. |
| 7. | Oconto Falls Tissue, Inc. 106 E. Central Ave. Oconto Falls, WI 54154 (Lessee) AND PCDI Oconto Falls Tissue, LLC 2079-A Lawrence Dr. De Pere, WI 54115 (Lessee) | 050001971220 | 2/8/05 | IFC Credit Corporation 8700 Waukegan Rd. Morton Grove, IL 60053 (Lessor) | All equipment covered under Lease Schedule No. 12 to Master Lease Agreement No. 99-1003 between Oconto Falls Tissue, Inc. And PCDI Oconto Falls Tissue, LLC and IFC Credit Corporation. Filed to give notice of the true lease. |

mw1298840_2

ST PAPER9428

| | | | | |
|---|---|---|---|---|
| 8. | Oconto Falls Tissue, Inc. 106 E. Central Ave. Oconto Falls, WI 54154 (Bailee) AND Tissue Products Technology Corp. 1555 Glory Road Green Bay, WI 54304 (Bailee) AND Partner's Concepts Development, Inc. 1555 Glory Road Green Bay, WI 54304 (Bailee) | 050001782826 | 2/3/05 | SCA Tissue North America, LLC 1451 McMahon Drive Neenah, WI 54956 (Bailor) | Described Specific equipment. Stated that this UCC was filed for informational purposes and shall not grant Oconto Falls Tissue, Inc., Tissue Products Technology Corp., and Partner's Concepts Development, Inc. any interest in any of the Personal Property that is the subject of the Tolling Agreement or any other agreements. |
| 9. | Oconto Falls Tissue, Inc. 2079-A Lawrence Drive De Pere, WI 54115 AND Tissue Products Technology Corp. 2079-A Lawrence Dr. De Pere, WI 54115 | 020015907628 | 8/30/02 | First Northern Savings Bank PO Box 23100 201 N Monroe Ave Green Bay, WI 54305-3100 | Blanket Security Interest |
| | Oconto Falls Tissue, Inc. AND Tissue Products Technology Corp. | Amendment No. 050012846829 to original filing No. 020015907628 | 9/1/05 | First Northern Savings Bank | Re-stated Collateral: Inventory and accounts receivable per GAAP |
| | Oconto Falls Tissue, Inc. AND Tissue Products Technology Corp. | Assignment No. 050012893427 to original filing No. 020015907628 | 9/1/05 | VHC, Inc. 3080 Holmgren Way Green Bay, WI 54304 | Assigned from First Northern Savings Bank To VHC, Inc. |
| 10. | Oconto Falls Tissue, Inc. 2079A Lawrence Drive De Pere, WI 54115 | 020014242922 | 7/31/02 | Associated Bank, N.A. 200 N. Adams St. PO Box 19006 Green Bay, WI 54307-9006 | Blanket Security Interest |

mw1298840_2

ST PAPER9429

| | | | Associated Bank | Deleted Following Collateral: Working Capital assets, inventory and accounts receivable per GAAP |
|---|---|---|---|---|
| | Oconto Falls Tissue, Inc. | Amendment No. 050014318219 to original filing No. 02001424292 | 10/3/05 | |
| | Oconto Falls Tissue, Inc. | Amendment No. 050015022818 to original filing No. 02001424292 | 10/17/05 | Associated Bank, N.A. | All of debtor's right, title and interest in and to the equipment set forth on Exhibit A attached to the filing, deleted with this filing statement |
| | Oconto Falls Tissue, Inc. | Continuation No. 070001574522 to original filing No. 060011970523 | 02/01/2007 | Associated Bank, N.A. | Continuation of original filing |
| | Oconto Falls Tissue, Inc. | Continuation No. 070001574522 to original filing No. 060011970523 | 02/01/2007 | Associated Bank, N.A. | Amendment of original filing changing Debtor's mailing address |
| 11. | Oconto Falls Tissue, Inc. 2079A Lawrence Drive De Pere, WI 54115 | 01986321 | 8/25/00 | PCDI Oconto Falls Tissue, LLC. 2079A Lawrence Drive De Pere, WI 54115 | Specific Equipment (The interest of PCDI Oconto Falls Tissue, LLC in the collateral is subordinate to the interests of F & M Bank-Wisconsin and Associated Trust Co. N.A., as Trustee) |
| | Oconto Falls Tissue, Inc. | Continuation No. 050012512213 to original filing No. 1986321 | 8/24/05 | PCDI Oconto Falls Tissue, LLC. 2079A Lawrence Drive De Pere, WI 54115 | Continuation of original filing |

12.   Mortgage and Security Agreement, according to the terms and provisions thereof, from Oconto Falls Tissue, Inc. to Associated Trust Company, Inc.
Trustee Community Development Authority for the City of Oconto Falls, Wisconsin "Issuer", to secure the originally stated indebtedness of
$24,000,000.00 (and any other amount payable under the terms thereof), dated December 1, 1997 and recorded on December 4, 1997, in Volume 722
Records, Page 780, as Document Number 453466.  As amended by an amendment to Mortgage and Security Agreement, dated November 19, 1999 and
recorded on November 30, 1999, in Volume 790 Records, Page 463, as Document Number 483681.

13.   Mortgage, according to the terms and provisions thereof, from Oconto Falls Tissue, Inc. to Associated Trust Co. NA, Trustee, to secure the originally
stated indebtedness of $28,000,000.00 (and any other amount payable under the terms thereof), dated August 14, 2000 and recorded on August 23,
2000, in Volume 812 Records, Page 120, as Document Number 492215.

mw1298840_2

ST PAPER9430

14.  Security interest of SHFXII, LLC, Secured Party, as disclosed by Financing Statement filed October 16, 2000, executed by IFC Credit Corporation (Debtor) to Marine Bank (Secured Party) Document Number 300127; continued by a Continuation Statement filed May 12, 2005 by Marine Bank, Document Number 573903; and subsequently assigned by Marine Bank to SHFXII, LLC by an Assignment filed October 19, 2005, Document Number 580862.

15.  Security interest of Associated Bank, N.A. secured party, as disclosed by Financing Statement recorded on August 26, 2002, as Document Number 523529 executed by Oconto Falls Tissue, Inc, debtor, in certain chattels on the subject premises.

16.  Security interest of Associated Bank, N.A., secured party, as disclosed by Financing Statement recorded on December 20, 2002, as Document Number 530750 executed by Oconto Falls Tissue, Inc, debtor, in certain chattels on the subject premises.

17.  Security interest of Associated Trust Co. Inc., secured party, as disclosed by Financing Statement recorded on December 20, 2002, as Document Number 530751 executed by Community Development Authority, debtor, in certain chattels on the subject premises.

18.  Security interest of Fortress Credit Corp, secured party, as disclosed by Financing Statement recorded on August 25, 2005, as Document Number 578485 executed by Oconto Falls Tissue, Inc, debtor, in certain chattels on the subject premises.

19.  Security interest of Fortress Credit Corp, secured party, as disclosed by Financing Statement recorded on August 25, 2005, as Document Number 578486 executed by Partner's Concepts Development, Inc., debtor, in certain chattels on the subject premises.

20.  Security interest of Fortress Credit Corp, secured party, as disclosed by Financing Statement recorded on August 25, 2005, as Document Number 578487 executed by Partner's Concepts Development, Inc., debtor, in certain chattels on the subject premises.

21.  Security interest of Fortress Credit Corp, secured party, as disclosed by Financing Statement recorded on August 25, 2005, as Document Number 578488 executed by Tissue Products Technology Corp., debtor, in certain chattels on the subject premises.

22.  Security interest of Fortress Credit Corp, secured party, as disclosed by Financing Statement recorded on August 25, 2005, as Document Number 578489 executed by Oconto Falls Tissue, Inc., debtor, in certain chattels on the subject premises.

23.  Security interest of Fortress Credit Corp, secured party, as disclosed by Financing Statement recorded on August 25, 2005, as Document Number

24.  Mortgage, according to the terms and provisions thereof, from Community Development Authority of the City of Oconto Falls to US Bank, to secure the originally stated indebtedness of $1,965,000.00 (and any other amount payable under the terms thereof), dated July 1, 2002 and recorded on July 31, 2002, in Volume 924 Records, Page 194, as Document Number 522208.

25.  Mortgage, according to the terms and provisions thereof, from Community Development Authority of the City of Oconto Falls to Associated Bank, to secure the originally stated indebtedness of $5,143,836.00 (and any other amount payable under the terms thereof), dated November 1, 2001 and recorded on December 10, 2002, in Volume 960 Records, Page 227, as Document Number 529906.

mw1298840_2

Note: All references to Volume, Records, and Document Number in items 12 through 25 shall have the meaning given to those terms by the Register of Deeds for Oconto County, Wisconsin.

mw1298840_2

ST PAPER9432

## SCHEDULE 3.1(f)(i)

## PROJECT IMPROVEMENT BUDGET

See attached – all reference to sections/articles shall be to the relevant sections/articles of the EPC Contract.

mw1258062_8

**ARTICLE 6 - PRICE AND METHOD OF PAYMENT**

A. <u>FIXED PRICE.</u>  OWNER shall pay in accordance with the Milestone Payment Schedule set forth in this ARTICLE, and CONTRACTOR shall accept in full consideration for the Work, the FIXED PRICE of twenty million U.S. Dollars ($20,000,000).

B. <u>PRICE BREAKOUT BY MAJOR COMPONENT:</u>

| | <u>AMOUNT</u> |
|---|---|
| Upgrade Tissue Machine #1 | $  1,305,000 |
| Upgrade Tissue Machine #2 | $  3,986,000 |
| Upgrade De-ink plant | $  5,238,000 |
| General Upgrades to Oconto Falls Mill | $  4,280,000 |
| <u>Wood Boiler</u> | <u>$   5,191,000</u> |
| TOTAL | $ 20,000,000 |

C. <u>CHANGES</u>
Change order or extra Work shall be as described in Article 11.

D. <u>MONTHLY MILESTONE PAYMENT SCHEDULE AND PAYMENT TERMS.</u>
Invoices will be submitted by CONTRACTOR no later than the 5th of each month.  Terms will be Net 20 from date of invoice.  In the event that any milestones described in this payment schedule are completed early, CONTRACTOR may submit invoices for the payment as milestones are completed.

| <u>MONTH</u> | <u>DESCRIPTION</u> | <u>AMOUNT of TOTAL CONTRACT</u> |
|---|---|---|
| 0 | Contract signing and down payment of: | 55.0% |
| | Specifications for  #1 TM equipment upgrades | |
| | Specifications for #1 TM approach flow equipment upgrades | |
| | Specifications for #1 TM winder upgrades | |
| | Specifications for #2 TM equipment upgrades | |
| | Specifications for #2 TM approach flow equipment upgrades | |
| | Specifications for OFTI de-ink plant (DIP) equipment upgrades | |
| | Specifications for drive system upgrades for both tissue machines | |
| | Specifications for wastewater treatment (WWT) equipment upgrades | |
| | Specifications for wood and sludge burning boiler | |
| | Specifications for material handling and storage for boiler fuel | |
| | Specifications for OFTI electrical equipment upgrades | |
| | As specifications for above items are complete, place purchase orders | |
| 1 | Sign subcontractor agreements/contracts | 10% |
| | Specifications for #1 and #2 TM equipment installation procedures | |
| | Specifications for DIP equipment installation and integration | |
| | Specifications for WWT equipment installation and piping | |
| | Specifications for boiler installation and integration | |
| | As specifications for above items are complete, place purchase orders | |
| 2 | Provide project schedule | 8% |
| | Order TM, DIP, WWT upgrade equipment | |
| | Provide process and building drawings for OWNER review | |
| | Issue purchase order for roof repairs at OFTI | |

| MONTH | DESCRIPTION | AMOUNT of TOTAL CONTRACT |
|---|---|---|
| 3 | Obtain Building Permit –<br>Order for boiler equipment and building materials<br>Start equipment foundations & site work<br>Begin equipment foundation work | 5% |
| 4 | Specifications for pipe fabrication<br>Specifications for electrical and instrumentation equipment<br>Begin installation of electrical and piping<br>Begin WWT system modifications | 4% |
| 5 | Start work on disperger<br>Continue WWT modifications<br>Begin Boiler Room Construction<br>Issue training manuals – draft<br>Begin Conventional TM #1 & #2 Rebuild | 3% |
| 6 | Continue equipment foundation work<br>Begin DIP system modifications | 1% |
| 7 | Continue boiler construction<br>Continue equipment, electrical and piping install<br>Continue DIP equipment install | 1% |
| 8 | Continue DIP process piping modifications<br>Begin general upgrades of roads, parking lots, fences | 1% |
| 9 | Continue DIP construction and TM rebuilds<br>Continue install of DIP equipment and upgrades | 1% |
| 10 | Continue install steam piping and boiler installation<br>Continue TM rebuilds and DIP modifications | 1% |
| 11 | Start Waste Water punch list and check out<br>Start DIP punch list and check out<br>Start TM punch list and check out | 1% |
| 12 | TM #1 capable of operating at 6,000 fpm<br>TM #2 capable of operating at 4,800 fpm<br>DIP systems capable of producing 210 tpd<br>Waste water treatment capable of 210 tpd pulp production | 5% |
| 13 | Start Boiler punch list and check out | 2% |
| 14 | Start Boiler burning wood and sludge<br>Performance Tests successfully completed | 2% |

EPC TOTAL                                  $ 20,000,000

ST   SVOH

ST Paper        Spirit                    {Page 12 of 53}

ST Paper OFTI Upgrades<br>EPC-2/20/07

ST PAPER9435

## SCHEDULE 3.1(f)(ii)

## PROJECT IMPROVEMENT SCHEDULE

See attached – all reference to sections/articles shall be to the relevant sections/articles of the EPC Contract.

mw1258062_8

ST PAPER9436

**Exhibit A:    Milestone Schedule**

The following table of milestones, start month and completion month are a succession of activities needed to complete the Work required to build the Project.  Numerous milestones are connected to other milestones and must be completed sequentially.  Month zero (0) represents the signing of this Agreement and OWNER's first payment to CONTRACTOR defined in month 0 of Article 6 Section D, and Notice to Proceed described in Article 6.E.

| Key Milestone | Start Month | Completion Month |
|---|---|---|
| Environmental & Building Permits | 0 | 1 |
| Project Procedure Manuals | 0 | 1 |
| Detailed Project Schedule (200+ lines) | 1 | 2 |
| Purchase Tissue Machine and De-ink Equipment | 1 | 3 |
| Project Design Engineering, Owner Approvals | 1 | 8 |
| Construct Buildings | 2 | 11 |
| Order elect/instr/pipe/HVAC materials | 2 | 4 |
| Deliver De-ink & Boiler equipment | 6 | 10 |
| Modify De-ink plant | 8 | 11 |
| Deliver Tissue Machine Equipment | 6 | 8 |
| Install Tissue Machine Equipment | 7 | 12 |
| Install Tissue Machine civil/piping/elect/HVAC | 6 | 13 |
| Deliver vendor and operating manuals, approved | 4 | 8 |
| Train O&M personnel | 11 | 13 |
| Start up boiler, de-ink & waste water facilities | 11 | 14 |
| Start up Tissue Machines | 11 | 14 |
| Final Completion of EPC | | 14 |

ST        Spirit
ST Paper      Spirit

{Page 36 Of 53}

ST Paper OFTI Upgrades
EPC-2/20/07

ST PAPER9437

**#1 Dry Crepe Tissue Machine**
**Rebuild OFTI**
S = START  F = FINISH

| | Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Project Permits | NA | | | | | | | | | | | | | | | | | |
| 2 | Process Engineering | S | X | X | X | X | X | X | X | F | | | | | | | | | |
| 3 | P&ID Drawing | | S | X | X | X | F | | | | | | | | | | | | |
| 4 | Piping Engineering | | | | S | X | X | X | F | | | | | | | | | | |
| 5 | Civil Engineering | NA | | | | | | | | | | | | | | | | | |
| 6 | Structural Engineering | NA | | | | | | | | | | | | | | | | | |
| 7 | Process Controls Design | | | S | X | X | X | X | X | F | | | | | | | | | |
| 8 | Controls Check-Out | | | | | S | X | X | X | X | X | F | | | | | | | |
| 9 | Electrical Design | | S | X | X | X | X | X | F | | | | | | | | | | |
| 10 | HVAC Design | | S | X | X | X | X | X | F | | | | | | | | | | |
| 11 | Order Paper Machine | S/F | | | | | | | | | | | | | | | | | |
| 12 | Boiler Installed | NA | | | | | | | | | | | | | | | | | |
| 13 | Stock Prep Equipment | | | | | | | S | X | X | X | F | | | | | | | |
| 14 | Building Construct | NA | | | | | | | | | | | | | | | | | |
| 15 | Paper Machine Installation | S | X | X | X | X | X | X | X | X | X | F | | | | | | | |
| 16 | Power Distribution | NA | | | | | | | | | | | | | | | | | |
| 17 | Stock Prep Start-Up | | | | | | S | X | X | X | X | F | | | | | | | |
| 18 | Vacuum System | NA | | | | | | | | | | | | | | | | | |
| 19 | Stock Approach Start-Up | | | | | | | | S | X | X | F | | | | | | | |
| 20 | Paper Machine Start-Up | | | | | | S | X | X | X | X | F | | | | | | | |

# #2 Swing Tissue Machine Rebuild OFTI

S = START  F = FINISH

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  Project Permits | NA | | | | | | | | | | | | | | | | | |
| 2  Process Engineering | S | X | X | X | X | X | X | X | F | | | | | | | | | |
| 3  P&ID Drawing | | S | X | X | X | F | | | | | | | | | | | | |
| 4  Piping Engineering | | | | S | X | X | X | F | | | | | | | | | | |
| 5  Civil Engineering | NA | | | | | | | | | | | | | | | | | |
| 6  Structural Engineering | NA | | | | | | | | | | | | | | | | | |
| 7  Process Controls Design | | | S | X | X | X | X | X | F | | | | | | | | | |
| 8  Controls Check-Out | | | | | S | X | X | X | X | X | F | | | | | | | |
| 9  Electrical Design | | S | X | X | X | X | X | F | | | | | | | | | | |
| 10  HVAC Design | | S | X | X | X | X | X | F | | | | | | | | | | |
| 11  Order Paper Machine | S/F | | | | | | | | | | | | | | | | | |
| 12  Boiler Installed | NA | | | | | | | | | | | | | | | | | |
| 13  Stock Prep Equipment | | | | | | | S | X | X | X | F | | | | | | | |
| 14  Building Construct | NA | | | | | | | | | | | | | | | | | |
| 15  Paper Machine Installation | S | X | X | X | X | X | X | X | X | X | F | | | | | | | |
| 16  Power Distribution | NA | | | | | | | | | | | | | | | | | |
| 17  Stock Prep Start-Up | | | | | | S | X | X | X | X | F | | | | | | | |
| 18  Vacuum System | NA | | | | | | | | | | | | | | | | | |
| 19  Stock Approach Start-Up | | | | | | | | S | X | X | F | | | | | | | |
| 20  Paper Machine Start-Up | | | | | | S | X | X | X | X | F | | | | | | | |

ST Paper   Spirit

{Page 38 Of 53}

ST Paper OFTI Upgrades
EPC-2/20/07

ST PAPER9439

**SCHEDULE 3.1(p)**

**INDUSTRIAL REVENUE BONDS**

1.  The $24,000,000 Bond Agreement, dated as of December 1, 1997, among Community Development Authority of the City of Oconto Falls, Wisconsin, as issuer, Oconto Falls Tissue, Inc., as borrower, and Associated Trust Company, Inc. (now known as Associated Trust Company, National Association), as trustee; and the $4,000,000 Bond Agreement, dated as of June 1, 1999, as supplemented October 1, 1999, among Community Development Authority of the City of Oconto Falls, Wisconsin, as issuer, Oconto Falls Tissue, Inc., as borrower, and Associated Trust Company, National Association, as trustee (the "Tax Exempt Bonds"):

    The holders of the Tax Exempt Bonds will sell the Tax Exempt Bonds to Mesirow Financial Inc. ("Mesirow") at a price equal to 102% of the outstanding principal amount plus accrued interest.  Immediately upon its acquisition of the Tax Exempt Bonds, Mesirow will waive all redemption lock-out periods and notice provisions and tender the Tax Exempt Bonds to Oconto Falls Tissue, Inc. for redemption at a price equal to 102% of the outstanding principal amount plus accrued interest and a $50,000 fee.  Upon redemption, (i) Associated Trust Company, National Association, as trustee, will execute and deliver a Satisfaction of Bond Agreement whereby the Tax Exempt Bonds will be deemed paid in full and terminated, all liens relating theretowill be deemed discharged, satisfied and terminated; and (ii) Associated Trust Company, National Association, as trustee, will execute and deliver a Satisfaction of Mortgage and UCC Termination Statements relating to all liens filed against Oconto Falls Tissue, Inc. in connection with the issuance of the Tax Exempt Bonds.

2.  The $5,000,000 Indenture of Trust, dated as of November 1, 2001, between Community Development Authority of the City of Oconto Falls, Wisconsin and Bank One Trust Company, National Association, as trustee (the "2001 Taxable Bonds").

    The Community Development Authority of the City of Oconto Falls, Wisconsin and Oconto Falls Tissue, Inc. will provide an irrevocable direction to Bank One Trust Company, National Association, as trustee, to call the 2001 Taxable Bonds for redemption.  The redemption will occur 30 days thereafter.  Simultaneous with such direction, (i) an amount will be deposited with Bank One Trust Company, National Association, as trustee, sufficient to pay the 2001 Taxable Bonds at the time of redemption, (ii) the letter of credit issued by Associated Bank to support the repayment of the 2001 Taxable Bonds will be released, (iii) Associated Bank will execute and deliver a Satisfaction of Mortgage and UCC Termination Statements relating to all liens filed against Oconto Falls Tissue, Inc. in connection with the issuance of the 2001 Taxable Bonds, and (iv) the Community Development Authority of the City of Oconto Falls, Wisconsin will quitclaim the underlying real estate (referred to as the wastewater treatment facility) to Oconto Falls Tissue, Inc., and the related lease and sublease will be terminated.

mw1258062_8

ST PAPER9440

3.  The $1,965,000 Indenture of Trust, dated as of July 1, 2002, between Community Development Authority of the City of Oconto Falls, Wisconsin and U.S. Bank National Association, Milwaukee, Wisconsin, as trustee (the "2002 Taxable Bonds").

U.S. Bank National Association, Milwaukee, Wisconsin, as trustee, and Oconto Falls Tissue, Inc. will enter into an escrow agreement whereby Oconto Falls Tissue, Inc. will deposit an amount sufficient to redeem the 2002 Taxable Bonds upon their first applicable call date. Simultaneous with such deposit, (i) the letter of credit issued by U.S. Bank to support the repayment of the 2002 Taxable Bonds will be released, (ii) U.S. Bank will execute and deliver a Satisfaction of Mortgage and UCC Termination Statements relating to all liens filed against Oconto Falls Tissue, Inc. in connection with the issuance of the 2002 Taxable Bonds, and (iii) the Community Development Authority of the City of Oconto Falls, Wisconsin will quitclaim the underlying real estate (referred to as the warehouse) to the parent corporation of Oconto Falls Tissue, Inc. (Tissue Products Technology Corporation), and the related lease and sublease will be terminated.

mw1258062_8

**SCHEDULE 4.2**

**OWNERSHIP STRUCTURE**

| Loan Party | Jurisdiction of Organization | Direct Equity Holder(s) | Ownership by Each Equity Holder |
|---|---|---|---|
| Borrower | Delaware | Pledgor | 1,000 Units (100%) |
| Pledgor | Delaware | Tak Investments, Inc.<br>Tak Investments, LLC<br>K.G. Rajan<br>Alok Mathur<br>Barry Reisig<br>Mike Schneider<br>Dan Platkowski<br>Steve Peters<br>ST Trust #1<br>ST Trust #2<br>ST Trust #3 | 1,000 Class A Units<br>5,200 Class B Units<br>600 Class B Units<br>50 Class B Units<br>50 Class B Units<br>200 Class B Units<br>200 Class B Units<br>50 Class B Units<br>800 Class B Units<br>800 Class B Units<br>1,400 Class B Units |
| Tak Investments, LLC | Delaware | Mahinder Tak<br>Tak Investments, Inc. | 1 Class B Unit<br>99 Class A Units |
| Tak Investments, Inc. | Delaware | Sponsor | 1,000 Shares of Common Stock (100%) |

ST PAPER9442

**SCHEDULE 4.3(c)**

**EXISTING INDEBTEDNESS**

1.   Subordinated Promissory Note, dated April 16, 2007, by Borrower in favor of Oconto Falls Tissue, Inc. in the original principal balance of $8,000,000.00.

2.   Subordinated Promissory Note, dated April 16, 2007, by Borrower in favor of Oconto Falls Tissue, Inc. in the original principal balance of $8,000,000.00.

3.   Subordinated Promissory Note, dated April 16, 2007, by Borrower in favor of Oconto Falls Tissue, Inc. in the original principal balance of $8,000,000.00.

4.   Subordinated Promissory Note, dated April 16, 2007, by Borrower in favor of Oconto Falls Tissue, Inc. in the original principal balance of $6,589,000.00.

mw1258062_8

ST PAPER9443

**SCHEDULE 4.3(d)**

**EXISTING LIENS**

| | Debtor | Secured Party | Filing Office | Filing No. | Filing Date | Collateral Description |
|---|---|---|---|---|---|---|
| 1. | Oconto Falls Tissue, Inc. (Lessee) | General Electric Capital Corporation | Wisconsin Department of Financial Institutions ("DFI") | 050013242416 | 9/9/05 | All equipment described herein or under Lease Agreement 4379217-001 including all accessories, accessions, replacements, additions, substitutions, add-ons and upgrades thereto. |
| 2. | Oconto Falls Tissue, Inc. | Yale Materials Handling | DFI | 030009023822 | 5/30/03 | Specific Equipment |
| 3. | Oconto Falls Tissue, Inc. | Yale Materials Handling | DFI | 020010047214 | 5/22/02 | Specific Equipment |
| 4. | Oconto Falls Tissue, Inc. | Yale Materials Handling | DFI | 010006168021 | 11/16/01 | Specific Equipment |

mw1258062_8

ST PAPER9444

**SCHEDULE 4.9**

**OPERATIVE DOCUMENTS**

**Part A.1.      Credit Documents**

    1.   Account Control Agreement.

    2.   Consent and Agreement dated April 16, 2007, by and among Borrower, Spirit Construction Services, Inc. and Collateral Agent.

    3.   Confirmation and Consent dated April 16, 2007, by and among Borrower, SCA Tissue North America, LLC and Collateral Agent.

**Part A.2.      Asset Transfer Documents – See Schedule 3.1(c)(ii)**

**Part A.3.      Major Project Documents**

    1.   Parent Roll Supply agreement dated as of November 6, 2006, between ST Paper, LLC and SCA Tissue North America LLC, as amended.

    2.   Amended and Restated Wastepaper Fiber Supply Agreement dated as of April 16, 2007, between SCA Tissue North America LLC and ST Paper, LLC.

    3.   Environmental Compliance and Indemnification Agreement dated as of November 6, 2006 by ST Paper, LLC in favor of SCA Tissue North America LLC.

    4.   Warehouse Agreement dated as of November 6, 2006 by and between SCA Tissue North America LLC and ST Paper, LLC.

    5.   EPC Contract.

**Part A.4.      Other Project Documents**

    1.   Service Agreement - Non-Hazardous Wastes, dated as of April 16, 2007, by and between ST Paper, LLC and Waste Management Inc.

    2.   Gas Sales Agreement, dated as of April 16, 2007, by and between ST Paper, LLC and Enbridge Gas Services (U.S.) Inc.

    3.   Electric Service Agreements, dated as of April 9, 2007, by and between ST Paper, LLC and Wisconsin Electric Power Company, d/b/a We Energies.

ST PAPER9445

## SCHEDULE 4.15

## REAL ESTATE ASSETS

**1. Leased Real Property**

None.

**2. Fee Interests in Real Property Assets**

See attached.

mw1258062_8

ST PAPER9446

**PARCEL I:**

A parcel of land located in part of Outlot 2 of Government Lot 2 of Section 26, part of Outlots 1, 2, and 8 of Government Lot 1 of Section 25, Part of Outlots 1 and 2 of Government Lot 2 of Section 25, and part of Outlots 2, 3, and 4 of Government Lot 3 of Section 25, all of the Assessors Plats of said Government Lots in Township 28 North, Range 19 East, and all of Lot 11 of Block 2 of John H. Volk, George W. Volk and Annie A. Elliot's Plat all in the City of Oconto Falls, Oconto County, Wisconsin, described as follows:

Commencing at the West quarter corner of said Section 25; Thence North 00 degrees 23 minutes 48 seconds East along the West line of said Section 25, a distance of 318.95 ft.; Thence South 89 degrees 36 minutes 12 seconds East, a distance of 48.83 ft. to a 1" iron pipe at the corner of Maple and Central Avenues and the POINT OF BEGINNING;

THENCE North 00 degrees 42 minutes 05 seconds West for a distance of 97.67 feet along the east line of Maple Ave. to a 1" iron pipe;
THENCE along a curve to the left having a radius of 195.78 feet and an arc length of 164.54 feet, being subtended by a chord of North 24 degrees 46 minutes 41 seconds West for a distance of 159.74 feet along said east line to a 1" iron pipe;
THENCE North 50 degrees 24 minutes 49 seconds West for a distance of 135.48 feet along said east line to a 1" iron pipe;
THENCE along a curve to the right having a radius of 261.56 feet and an arc length of 263.38 feet, being subtended by a chord of North 18 degrees 57 minutes 03 seconds West for a distance of 252.39 feet along said east line to a 1 " iron pipe;
THENCE North 38 degrees 32 minutes 03 seconds East for a distance of 68.71 feet to a 1" iron pipe on a meander line of the Oconto River;
THENCE South 39 degrees 35 minutes 14 seconds East for a distance of 416.45 feet along said meander line to a 1" iron pipe;
THENCE South 32 degrees 37 minutes 27 seconds East for a distance of 235.10 feet along said meander line to a 1" iron pipe on the north line of Central Avenue;
THENCE South 60 degrees 23 minutes 18 seconds West for a distance of 207.52 feet along said north line to a 1" iron pipe;
THENCE South 56 degrees 41 minutes 11 seconds East across Central Avenue for a distance of 73.88 feet to a 3" iron pipe at the northeast corner of lands described in Volume 515 Records, Page 845 of the Oconto County Registry;
THENCE North 60 degrees 23 minutes 48 seconds East for a distance of 501.93 feet along the southerly line of Central Avenue to a 1" iron pipe on a meander line of the Oconto River;
THENCE North 35 degrees 21 minutes 56 seconds West for a distance of 635.58 feet along said meander line to a 1" iron pipe on the southwesterly line of Scott Drive;
THENCE North 30 degrees 57 minutes 27 seconds West for a distance of 288.44 feet along said meander line to a 1" iron pipe on the Easterly line of Maple Avenue;

(continued)

THENCE North 04 degrees 08 minutes 49 seconds East for a distance of 20.82 feet along said line to a 1" iron pipe on the Westerly line of Scott Drive;

THENCE along a curve to the right having a radius of 201.11 feet and an arc length of 64.83 feet, being subtended by a chord of South 35 degrees 10 minutes 00 seconds East for a distance of 64.55 feet along said westerly line to a 1" iron pipe;

THENCE South 25 degrees 56 minutes 06 seconds East for a distance of 187.55 feet along said line to a 1"iron pipe;

THENCE along a curve to the left having a radius of 329.96 feet and an arc length of 54.38 feet, being subtended by a chord of South 30 degrees 38 minutes 55 seconds East for a distance of 54.27 feet along said line to a 1" iron pipe;

THENCE South 35 degrees 21 minutes 50 seconds East for a distance of 266.38 feet along said line to a 1" iron pipe at the westerly terminus point of the Scott Drive vacation;

THENCE North 60 degrees 23 minutes 48 seconds East for a distance of 60.30 feet along said line to a 1" iron pipe on the easterly line of Scott Drive;

THENCE North 35 degrees 21 minutes 50 seconds West for a distance of 272.43 feet along said line to a 1" iron pipe;

THENCE along a curve to the right having a radius of 269.96 feet and an arc length of 44.45 feet, being subtended by a chord of North 30 degrees 38 minutes 55 seconds West for a distance of 44.40 feet along said line to a 1" iron pipe;

THENCE North 25 degrees 56 minutes 06 seconds West for a distance of 187.55 feet along said line to a 1" iron pipe;

THENCE along a curve to the left having a radius of 261.11 feet and an arc length of 35.08 feet, being subtended by a chord of North 29 degrees 46 minutes 49 seconds West for a distance of 35.06 feet along said line to a 1" iron pipe on the north line of Government Lot 2 of Section 25 as monumented;

THENCE South 89 degrees 28 minutes 25 seconds East for a distance of 97.78 feet along said north line to a 1" iron pipe on the westerly line of River Street;

THENCE South 40 degrees 24 minutes 14 seconds East for a distance of 699.14 feet along said line to a 1" iron pipe at the northeast corner of Lot 11 Block 2 of John H. Volk, Geo. W. Volk and Annie A. Elliot's Plat;

THENCE South 58 degrees 59 minutes 21 seconds West for a distance of 14.00 feet along the northwesterly line of Lot 11 of said Block 2 to a 1" iron pipe;

THENCE South 28 degrees 36 minutes 16 seconds East for a distance of 100.00 feet along the westerly line of said Lot 11 to a 1" iron pipe on the west line of Central Avenue;

THENCE North 60 degrees 23 minutes 48 seconds East for a distance of 35.50 feet along the west line thereof to a 1" iron pipe at the northerly vacation of Central Avenue;

THENCE South 29 degrees 36 minutes 12 seconds East for a distance of 68.84 feet along said northerly vacation line to a 1" iron pipe on the east line of Central Avenue;

THENCE North 60 degrees 23 minutes 48 seconds East for a distance of 104.40 feet along said east line to a 1" iron pipe at the northwesterly corner of Lot 1 of Block 1 of Volk's Plat;

THENCE South 33 degrees 49 minutes 18 seconds East for a distance of 467.20 feet along the westerly line of said Block 1 to a 2" iron pipe at the northwesterly corner of Lot 1 of Riverview Plat;

(continued)

THENCE South 33 degrees 37 minutes 45 seconds East for a distance of 57.02 feet along the westerly line of said Lot 1 of Riverview Plat to a 1" iron pipe;

THENCE North 54 degrees 19 minutes 45 seconds East for a distance of 10.00 feet along the southeasterly line of said Lot 1 to a 1" iron pipe; ,

THENCE South 33 degrees 41 minutes 01 seconds East for a distance of 103.82 feet along the westerly line of Lot 2 of said Plat to a 2" iron pipe;

THENCE South 56 degrees 13 minutes 50 seconds West for a distance of 9.94 feet along the northwesterly line of Lot 3 of said Plat to a 2" iron pipe;

THENCE South 33 degrees 36 minutes 16 seconds East for a distance of 184.50 feet along the westerly line of Lots 3, 4, and 5 of said plat to a 1" iron pipe;

THENCE North 56 degrees 47 minutes 36 seconds East for a distance of 160.37 feet along the southeasterly line of said Lot 5 to a 1" iron pipe on the westerly line of South Main Street;

THENCE South 33 degrees 43 minutes 05 seconds East for a distance of 17.12 feet along said line to a 1" iron pipe;

THENCE South 56 degrees 47 minutes 36 seconds West for a distance of 194.34 feet along the northwesterly line of Lot 6 of said Plat to a 1" iron pipe at the northwesterly corner of lands described in Volume 566 Records, Page 875 of the O.C.R.;

THENCE South 33 degrees 39 minutes 56 seconds East for a distance of 110.72 feet along the westerly line thereof to a 1" iron pipe on the westerly line of Lot 7 of said Plat;

THENCE South 00 degrees 34 minutes 02 seconds West for a distance of 23.20 feet along said westerly line to a 1" iron pipe on the northwesterly line of Lot 8 of said Plat;

THENCE South 56 degrees 47 minutes 09 seconds West for a distance of 105.91 feet along said line to a 1" iron pipe;

THENCE South 16 degrees 43 minutes 40 seconds East for a distance of 330.00 feet along the westerly line of said Lot 8 to a 1" iron pipe;

THENCE South 56 degrees 47 minutes 09 seconds West for a distance of 30.00 feet to a 1" iron pipe on a meander line of the Oconto River;

THENCE South 39 degrees 19 minutes 57 seconds West for a distance of 424.15 feet across said River to a 1" iron pipe at the northeast corner of lands described in Volume 205 Deeds, Page 513 of the O.C.R.;

THENCE North 84 degrees 08 minutes 40 seconds West for a distance of 213.43 feet along the north line thereof to a 1" iron pipe;

THENCE South 04 degrees 29 minutes 40 seconds East for a distance of 162.70 feet along the west line thereof to a 1" iron pipe;

THENCE South 26 degrees 26 minutes 20 seconds West for a distance of 48.89 feet along the west line thereof to a  1" iron pipe;

THENCE South 60 degrees 51 minutes 22 seconds West for a distance of 152.11 feet along said west line to a 1" iron pipe on the south line thereof,

THENCE North 89 degrees 27 minutes 58 seconds East for a distance of 209.56 feet along said south line to a 1" iron pipe on a meander line of the Oconto River;

THENCE South 20 degrees 38 minutes 22 seconds West for a distance of 80.85 feet along said meander line to a 1" iron pipe;

(continued)

ST PAPER9449

THENCE South 08 degrees 48 minutes 08 seconds East for a distance of 140.93 feet along said meander line to a 1" iron pipe;

THENCE South 04 degrees 50 minutes 20 seconds East for a distance of 71.25 feet along said meander line to a 1" iron pipe;

THENCE South 27 degrees 45 minutes 40 seconds West for a distance of 163.63 feet along said meander line to a 1" iron pipe;

THENCE South 45 degrees 06 minutes 28 seconds West for a distance of 237.15 feet along said meander line to a 1" iron pipe on the north line of lands described in Volume 717 Records, Page 223 of the O.C.R.;

THENCE North 77 degrees 00 minutes 39 seconds West for a distance of 165.87 feet along said north line to a 1" iron pipe;

THENCE North 00 degrees 05 minutes 50 seconds East for a distance of 449.24 feet along said north line to a 1" iron pipe;

THENCE South 60 degrees 37 minutes 51 seconds West for a distance of 49.82 feet along said north line to a 1" iron pipe;

THENCE South 33 degrees 14 minutes 41 seconds West for a distance of 166.45 feet along said north line to a 1" iron pipe;

THENCE South 14 degrees 28 minutes 41 seconds West for a distance of 123.87 feet along said north line to a 1" iron pipe;

THENCE South 63 degrees 04 minutes 41 seconds West for a distance of 42.64 feet along said north line to a 1" iron pipe;

THENCE South 65 degrees 56 minutes 20 seconds West for a distance of 263.61 feet along said north line to a 2" iron pipe on the east line of Maple Avenue;

THENCE North 00 degrees 18 minutes 14 seconds West for a distance of 241.00 feet along said east line to a 2" iron pipe;

THENCE South 89 degrees 41 minutes 46 seconds West for a distance of 20.00 feet along said east line to a 2" iron pipe;

THENCE North 00 degrees 33 minutes 52 seconds West for a distance of 238.24 feet along said east line to a 2" iron pipe at the southwest corner of Lot 1 of the Falls Manufacturing Cos. First Addition;

THENCE North 89 degrees 37 minutes 25 seconds East for a distance of 139.86 feet along the south line thereof to a 2" iron pipe at the southeast corner of said Lot 1;

THENCE North 00 degrees 27 minutes 00 seconds West for a distance of 836.78 feet along the east line of said Addition to a 3" iron pipe at the northeast corner of Lot 14 of the Falls Manufacturing Cos. Second Addition;

THENCE North 44 degrees 14 minutes 16 seconds West for a distance of 38.59 feet along the easterly line of Lot 15 of said Addition to a 3" iron pipe;

THENCE North 55 degrees 03 minutes 42 seconds East for a distance of 271.99 feet along the southerly line of the Falls Manufacturing Cos. Third Addition to a 2" iron pipe at the southeast corner of Lot 20 of said Addition;

THENCE North 26 degrees 47 minutes 09 seconds West for a distance of 69.00 feet along the east line of said Lot 20 to a 2" iron pipe;

(continued)

ST PAPER9450

THENCE North 32 degrees 05 minutes 44 seconds West for a distance of 117.65 feet along the east line thereof to a 2" iron pipe at the northeast corner of Green Bay Avenue;

THENCE South 55 degrees 32 minutes 06 seconds West for a distance of 11.01 feet along the northeasterly line of Green Bay Avenue to a 2" iron pipe;

THENCE North 34 degrees 38 minutes 54 seconds West for a distance of 119.89 feet along the east line of Outlot 6 of said Assessor Plat of Government Lot 2 to a 2" iron pipe;

THENCE North 36 degrees 14 minutes 46 seconds West for a distance of 61.70 feet along the east line of lands described in Volume 650 Records, Page 150 of the O.C.R. to a 2" iron pipe;

THENCE North 25 degrees 46 minutes 20 seconds West for a distance of 108.30 feet along the east line of lands described in Volume 515 Records, Page 845 aforesaid and the POINT OF TERMINATION of this description ... Including all those lands lying between the above described meander lines and the respective banks of the Oconto River; EXCEPTING THEREFROM: Lot l of Oconto County Certified Survey Map Number 1212; EXCEPTING THEREFROM: Lands of N.E.W. Hydro Inc. described in Volume 660 Records, Page 746 of the O.C.R.; EXCEPTING THEREFFROM: Lands of the Escanaba and Lake Superior Railroad, their heirs and assigns, and EXCEPTING THEREFROM: Parcels 1,2,3,4, and 5 as set forth below.

## PARCEL 1: CLARIFIER LANDS

A parcel of land located in part of Government Lot 1 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin described as follows:

Commencing at the southwest corner of said Section 25; Thence North 00 degrees 21 minutes 44 seconds West along the west line of said Section 25, a distance of 999.46 ft.; Thence North 65 degrees 56 minutes 20 seconds East along with north line of lands described in Volume 717 Records, Page 223 of the Oconto County Registry, a distance of 319.55 ft. to a 1" iron pipe; Thence North 63 degrees 04 minutes 41 seconds East for a distance of 42.64 ft. along said north line to a 1" iron pipe; Thence North 14 degrees 28 minutes 41 seconds East for a distance of 123.87 ft. along said north line to a 1" iron pipe; Thence North 33 degrees 14 minutes 41 seconds East for a distance of 166.45 ft. along said north line to a 1" iron pipe; Thence North 60 degrees 37 minutes 51 seconds East for a distance of 49.82 ft. along said north line to a 1" iron pipe at the POINT OF BEGINNING;

THENCE North 60 degrees 50 minutes 20 seconds East for a distance of 224.97 feet to the southwest corner of lands described in Volume 205 Records, Page 513 of the O.C.R.;

THENCE North 89 degrees 27 minutes 58 seconds East for a distance of 209.56 feet along the south line thereof to a 1" iron pipe on a meander line of the Oconto River;

THENCE South 20 degrees 38 minutes 22 seconds West for a distance of 80.85 feet along said meander line to a 1" iron pipe;

THENCE South 08 degrees 48 minutes 08 seconds East for a distance of 140.93 feet along said meander line to a 1" iron pipe;

THENCE South 04 degrees 50 minutes 20 seconds East for a distance of 71.25 feet along said meander line to a 1" iron pipe;

(continued)

ST PAPER9451

THENCE South 27 degrees 45 minutes 40 seconds West for a distance of 163.63 feet along said meander line to a 1" iron pipe;

THENCE South 45 degrees 06 minutes 28 seconds West for a distance of 237.15 feet along said meander line to a 1" iron pipe;

THENCE North 77 degrees 00 minutes 39 seconds West for a distance of 165.87 feet along the north line of lands described in, Volume 717 Records, Page 223 aforesaid to a 1" iron pipe;

THENCE North 00 degrees 05 minutes 50 seconds East for a distance of 449.24 feet along said north line to the POINT OF BEGINNING ... Including all those lands lying between the above described meander line and the west bank of the Oconto River, bounded on the north and south by the above described property lines extended easterly to said west bank.


## PARCEL 2: BLOCK BARN LANDS

Part of Outlot 2 of the Assessor Plat of Government Lot 1 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin, described as follows:

COMMENCING at the Southeast corner of Block 2 of the Falls Manufacturing Company's Third Addition to Oconto Falls;

THENCE South 00 degrees 27 minutes 00 seconds East for a distance of 847.87 feet on a line parallel with the east line of Falls Manufacturing Company's First and Second Addition;

THENCE South 89 degrees 33 minutes 00 seconds West for a distance of 197.49 feet to the east line The Falls Manufacturing Company's First Addition;

THENCE North 00 degrees 27 minutes 00 seconds West for a distance of 666.00 feet along said east line to a 3" iron pipe at the Southeast corner of Lot 15 of Falls Manufacturing Company's Third Addition;

THENCE North 44 degrees 14 minutes 16 seconds West for a distance of 38.59 feet along the northeasterly line of said Lot 15 to a 3" iron pipe;

THENCE North 55 degrees 03 minutes 42 seconds East for a distance of 271.99 feet along the southeasterly line of said Block 2 of said Plat to the POINT OF COMMENCEMENT, EXCEPTING THEREFROM that part thereof contained in Certified Survey Map #1212 as recorded in Volume 8 Certified Survey Maps, Page 72.


## PARCEL 3: PARK AREA

A parcel of land located in part of Outlot 2 of Government Lot 2 of Section 26, part of Outlots 1,2, and 8 of Government Lot 1 of Section 25, Part of Outlots 1 and 2 of Government Lot 2 of Section 25, and part of Outlots 2, 3 and 4 of Government Lot 3 of Section 25, all of the Assessors Plats of said Government Lots in Township 28 North, Range 19 East, and all of Lot I I of Block 2 of John H. Volk, George W Volk and Annie A Elliot's Plat all in the City of Oconto Falls, Oconto County, Wisconsin, described as follows:

(continued)

ST PAPER9452

Commencing at the West quarter corer of said Section 25; Thence North 00 degrees 23 minutes 48 seconds East along the west line of said Section 25, a distance of 318.95 ft.; Thence South 89 degrees 36 minutes 12 seconds East, a distance of 48.83 ft. to a 1" iron pipe at the corner of Maple and Central Avenues and the POINT OF BEGINNING;

THENCE North 00 degrees 42 minutes 05 seconds West for a distance of 97.67 feet along the east line of Maple Ave. to a 1" iron pipe;

THENCE along a curve to the left having a radius of 195.78 feet and an arc length of 164.54 feet, being subtended by a chord of North 24 degrees 46 minutes 41 seconds West for a distance of 159.74 feet along said east line to a 1" iron pipe;

THENCE North 50 degrees 24 minutes 49 seconds West for a distance of 135.48 feet along said east line to a 1" iron pipe;

THENCE along a curve to the right having a radius of 261.56 feet and an arc length of 263.38 feet, being subtended by a chord of North 18 degrees 57 minutes 03 seconds West for a distance of 252.39 feet along said east line to a 1" iron pipe;

THENCE North 38 degrees 32 minutes 03 seconds East for a distance of 68.71 feet to a 1" iron pipe on a meander line of the Oconto River;

THENCE South 39 degrees 35 minutes 14 seconds East for a distance of 416.45 feet along said meander line to a 1" iron pipe;

THENCE South 32 degrees 37 minutes 27 seconds East for a distance of 235.10 feet along said meander line to a 1" iron pipe on the north line of Central Ave.;

THENCE South 60 degrees 23 minutes 18 seconds West for a distance of 207.52 feet along said north line to a 1" iron pipe at the POINT OF BEGINNING ... Including all those lands lying between the above described meander line and the left bank of the Oconto River, bounded on the north and south by the above described property lines extended easterly to said left bank.

## PARCEL 4: POWER STATION B

Part of Outlot 1 of the Assessor Plat of Government Lot 2 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin described as follows:

Commencing at the Northwest corner of Block 1 of Volk's Plat to the City of Oconto Falls; Thence South 60 degrees 23 minutes 49 seconds West along the Southeasterly line of Central Avenue, a distance of 125.00 ft. to the POINT OF BEGINNING OF AN INGRESS/EGRESS EASEMENT TO A POWERSTATION B:

(continued)

ST PAPER9453

THENCE South 65 degrees 55 minutes 34 seconds East for a distance of 8.31 feet;
THENCE North 59 degrees 41 minutes 39 seconds East for a distance of 3 1.10 feet;
THENCE South 32 degrees 05 minutes 38 seconds East for a distance of 103.64 feet;
THENCE South 49 degrees 21 minutes 50 seconds West for a distance of 5.91 feet to the Power Station Fence line AND THE POINT OF BEGINNING FOR THE POWER STATION LANDS;

THENCE South 32 degrees 33 minutes 42 seconds East for a distance of 48.54 feet along said fence line;
THENCE South 57 degrees 26 minutes 14 seconds West for a distance of 24.35 feet along said fence line;
THENCE North 37 degrees 45 minutes 08 seconds West for a distance of 48.85 feet along said fence line;
THENCE North 57 degrees 39 minutes 23 seconds East for a distance of 28.77 feet along said fence line to the POINT OF BEGINNING OF THE POWER STATION DESCRIPTION;
THENCE South 57 degrees 39 minutes 23 seconds West for a distance of 28.77 feet along said fence line and the southeasterly limit of the easement;
THENCE North 40 degrees 39 minutes 57 seconds West for a distance of 114.49 feet along a retaining wall of the easement to the southeasterly line of Central Avenue;
THENCE North 60 degrees 23 minutes 49 seconds East for a distance of 15.98 feet along Central Avenue to the POINT OF BEGINNING OF THE INGRESS/EGRESS EASEMENT.

## PARCEL 5: BARK AREA

Part of Outlots 2 and 8 of Government Lot 1 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin described as follows:

Commencing at the southwest corner of said Section 25; Thence North 00 degrees 21 minutes 44 seconds West along the west line of said Section 25, a distance of 1501.19 ft.; Thence North 89 degrees 37 minutes 25 seconds East, a distance of 30.62 ft. to a 2" iron pipe at the southwest corner of the Falls Manufacturing Cos. First Addition and the POINT OF BEGINNING;

THENCE North 89 degrees 37 minutes 25 seconds East for a distance of 139.86 feet along the south line thereof to a 2" iron pipe;
THENCE North 00 degrees 27 minutes 00 seconds West for a distance of 170.78 feet along the east line thereof to a 1" iron pipe;
THENCE North 89 degrees 33 minutes 00 seconds East for a distance of 197.49 feet to a 1" iron pipe;
THENCE North 00 degrees 27 minutes 00 seconds West for a distance of 38.64 feet to the northwest line of Lot 1 of Certified Survey Map Number 1212;
THENCE North 47 degrees 09 minutes 10 seconds East for a distance of 96.51 feet along said northwest line to a 1" iron pipe;
THENCE South 42 degrees 59 minutes 15 seconds East for a distance of 100.05 feet along the easterly line thereof to a 1" iron pipe;

(continued)

THENCE North 51 degrees 29 minutes 00 seconds East for a distance of 87.00 feet to a 1" iron pipe;

THENCE North 70 degrees 03 minutes 00 seconds East for a distance of 68.00 feet to a 1" iron pipe;

THENCE North 78 degrees 32 minutes 00 seconds East for a distance of 62.00 feet to a 1" iron pipe;

THENCE North 79 degrees 02 minutes 50 seconds East for a distance of 141.47 feet to a 1" iron pipe at the northwest corner of lands described in Volume 205 Records, Page 513 of the Oconto County Registry;

THENCE South 04 degrees 29 minutes 40 seconds East for a distance of 162.70 feet along the west line thereof to a 1" iron pipe;

THENCE South 26 degrees 26 minutes 20 seconds West for a distance of 48.89 feet along the west line thereof to a 1" iron pipe;

THENCE South 60 degrees 51 minutes 22 seconds West for a distance of 152.11 feet along said west line to a 1" iron pipe;

THENCE South 60 degrees 50 minutes 20 seconds West for a distance of 224.97 feet to a 1" iron pipe on the north line of lands described in Volume 717 Records, Page 223 of the O.C.R.;

THENCE South 60 degrees 37 minutes 51 seconds West for a distance of 49.82 feet along said north line to a 1" iron pipe;

THENCE South 33 degrees 14 minutes 41 seconds West for a distance of 166.45 feet along said north line to a 1" iron pipe;

THENCE South 14 degrees 28 minutes 41 seconds West for a distance of 123.87 feet along said north line to a 1" iron pipe;

THENCE South 63 degrees 04 minutes 41 seconds West for a distance of 42.64 feet along said north line to a 1" iron pipe;

THENCE South 65 degrees 56 minutes 20 seconds West for a distance of 263.61 feet along said north line to a 2" iron pipe on the east line of Maple Avenue;

THENCE North 00 degrees 18 minutes 14 seconds West for a distance of 241.00 feet along said east line to a 2" iron pipe;

THENCE South 89 degrees 41 minutes 46 seconds West for a distance of 20.00 feet along said east line to a 2" iron pipe;

THENCE North 00 degrees 33 minutes 52 seconds West for a distance of 238.24 feet along said east line to the POINT OF BEGINNING. This description includes all those lands described as Lot 1 of Oconto County Certified Survey Map Number 1212 recorded in Volume 8 CSM 72 of the O.C.R.

## PARCEL II:   (WAREHOUSE FACILITY)

Lot 1, Volume 23 Certified Survey Maps, Page 97, Map No. 3457, Document Number 521548, located on part of the Southwest ¼ of the Northwest ¼ of Section 24, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin.

Tax Parcel Number:  266-0202605003
Property Address:    921 Saunders Drive

(continued)

ST PAPER9455

**PARCEL III:   (CLARIFIER LAND)**

A parcel of land located in part of Government Lot 1 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin described as follows:

Commencing at the southwest corner of said Section 25; Thence North 00 degrees 21 minutes 44 seconds West along the west line of said Section 25, a distance of 999.46 ft.; Thence North 65 degrees 56 minutes 20 seconds East along with north line of lands described in Volume 717 Records, Page 223 of the Oconto County Registry, a distance of 319.55 ft. to a 1" iron pipe; Thence North 63 degrees 04 minutes 41 seconds East for a distance of 42.64 ft. along said north line to a 1" iron pipe; Thence North 14 degrees 28 minutes 41 seconds East for a distance of 123.87 ft. along said north line to a 1" iron pipe; Thence North 33 degrees 14 minutes 41 seconds East for a distance of 166.45 ft. along said north line to a 1" iron pipe; Thence North 60 degrees 37 minutes 51 seconds East for a distance of 49.82 ft. along said north line to a 1" iron pipe at the POINT OF BEGINNING;

THENCE North 60 degrees 50 minutes 20 seconds East for a distance of 224.97 feet to the southwest corner of lands described in Volume 205 Records, Page 513 of the O.C.R.;
THENCE North 89 degrees 27 minutes 58 seconds East for a distance of 209.56 feet along the south line thereof to a 1" iron pipe on a meander line of the Oconto River;
THENCE South 20 degrees 38 minutes 22 seconds West for a distance of 80.85 feet along said meander line to a 1" iron pipe;
THENCE South 08 degrees 48 minutes 08 seconds East for a distance of 140.93 feet along said meander line to a 1" iron pipe;
THENCE South 04 degrees 50 minutes 20 seconds East for a distance of 71.25 feet along said meander line to a 1" iron pipe;
THENCE South 27 degrees 45 minutes 40 seconds West for a distance of 163.63 feet along said meander line to a 1" iron pipe;
THENCE South 45 degrees 06 minutes 28 seconds West for a distance of 237.15 feet along said meander line to a 1" iron pipe;
THENCE North 77 degrees 00 minutes 39 seconds West for a distance of 165.87 feet along the north line of lands described in, Volume 717 Records, Page 223 aforesaid to a 1" iron pipe;
THENCE North 00 degrees 05 minutes 50 seconds East for a distance of 449.24 feet along said north line to the POINT OF BEGINNING ... Including all those lands lying between the above described meander line and the west bank of the Oconto River, bounded on the north and south by the above described property lines extended easterly to said west bank.

TOGETHER with an easement for ingress and egress for the benefit of Parcel IV (Clarifier Lands) as contained in an instrument executed between Scott Paper Company and the City of Oconto Falls, a municipal corporation, dated June 15, 1977 and recorded June 21, 1977, in Volume 447 Records, Page 415, as Document Number 303459.

(continued)

ST PAPER9456

## PARCEL IV:  (BLOCK BARN LANDS)

Part of Outlot 2 of the Assessor Plat of Government Lot 1 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin, described as follows:

COMMENCING at the Southeast corner of Block 2 of the Falls Manufacturing Company's Third Addition to Oconto Falls;

THENCE South 00 degrees 27 minutes 00 seconds East for a distance of 847.87 feet on a line parallel with the east line of Falls Manufacturing Company's First and Second Addition;
THENCE South 89 degrees 33 minutes 00 seconds West for a distance of 197.49 feet to the east line The Falls Manufacturing Company's First Addition;
THENCE North 00 degrees 27 minutes 00 seconds West for a distance of 666.00 feet along said east line to a 3" iron pipe at the Southeast corner of Lot 15 of Falls Manufacturing Company's Third Addition;
THENCE North 44 degrees 14 minutes 16 seconds West for a distance of 38.59 feet along the northeasterly line of said Lot 15 to a 3" iron pipe;
THENCE North 55 degrees 03 minutes 42 seconds East for a distance of 271.99 feet along the southeasterly line of said Block 2 of said Plat to the POINT OF COMMENCEMENT, EXCEPTING that part thereof contained in Certified Survey Map #1212, as recorded in Volume 8 Certified Survey Maps, Page 72.

## PARCEL V:  (POWER STATION B)

Part of Outlot 1 of the Assessor Plat of Government Lot 2 of Section 25, Township 28 North, Range 19 East, City of Oconto Falls, Oconto County, Wisconsin described as follows:

Commencing at the Northwest corner of Block 1 of Volk's Plat to the City of Oconto Falls; Thence South 60 degrees 23 minutes 49 seconds West along the Southeasterly line of Central Avenue, a distance of 125.00 ft. to the POINT OF BEGINNING OF AN INGRESS/EGRESS EASEMENT TO A POWERSTATION B:

THENCE South 65 degrees 55 minutes 34 seconds East for a distance of 8.31 feet;
THENCE North 59 degrees 41 minutes 39 seconds East for a distance of 3 1.10 feet;
THENCE South 32 degrees 05 minutes 38 seconds East for a distance of 103.64 feet;
THENCE South 49 degrees 21 minutes 50 seconds West for a distance of 5.91 feet to the Power Station Fence line AND THE POINT OF BEGINNING FOR THE POWER STATION LANDS;
THENCE South 32 degrees 33 minutes 42 seconds East for a distance of 48.54 feet along said fence line;

(continued)

ST PAPER9457

THENCE South 57 degrees 26 minutes 14 seconds West for a distance of 24.35 feet along said fence line;

THENCE North 37 degrees 45 minutes 08 seconds West for a distance of 48.85 feet along said fence line;

THENCE North 57 degrees 39 minutes 23 seconds East for a distance of 28.77 feet along said fence line to the POINT OF BEGINNING OF THE POWER STATION DESCRIPTION;

THENCE South 57 degrees 39 minutes 23 seconds West for a distance of 28.77 feet along said fence line and the southeasterly limit of the easement;

THENCE North 40 degrees 39 minutes 57 seconds West for a distance of 114.49 feet along a retaining wall of the easement to the southeasterly line of Central Avenue;

THENCE North 60 degrees 23 minutes 49 seconds East for a distance of 15.98 feet along Central Avenue to the POINT OF BEGINNING OF THE INGRESS/EGRESS EASEMENT.


Tax Parcel Nos.:    266-0707815510T
                    266-0708015801T
                    266-0707915653
                    266-0707915653B
                    266-0707915759
                    266-0708216208
                    266-0707915652
                    266-14251041157
                    266-18250081480

ST PAPER9458

**SCHEDULE 4.20**

**GOVERNMENTAL APPROVALS**

**PART A – Existing Government Approvals for the Site:**

1.    Wisconsin Department of Natural Resources Air Pollution Control Permit #443044470-P01; 443044470-J02; 00-DMM-422; 00-DMM-422-OP (applied for on October 12, 2006).

2.    Wisconsin Department of Natural Resources, Wisconsin Pollutant Discharge Elimination System ("WPDES") Permit No. WI-0000531-07-0.

3.    Wisconsin Department of Natural Resources, Tier I Industrial Storm Water Permit No. WI-S067849-2.

4.    Wisconsin Department of Natural Resources, Transportation Service License No. 10055.

5.    Wisconsin Department of Natural Resources, Wisconsin Registration under NR 149. Laboratory Id: 443044470.

6.    Wisconsin Department of Commerce, Aboveground Flammable/Combustible/Hazardous Liquid Storage Tank Registration.  Tank Id. Numbers 876387 and 876395.

7.    Federal Communications Commission Wireless Telecommunications Bureau, Radio Station Authorization.  FCC Registration Number 0002699916.  Call Sign WNPK818.  File Number 0001746952.

**PART B –Government Approvals to be transferred/obtained by Borrower at or following the closing of the Asset Transfer:**

1.    Wisconsin Department of Natural Resources, Registration of Water Withdrawal.

mw1258062_8

ST PAPER9459

## SCHEDULE 4.21

## GOVERNMENT GRANTS, ETC.

None.

ST PAPER9460

## SCHEDULE 4.29

## ASSOCIATED PARTY TRANSACTIONS

1.    Limited Liability Company Agreement of ST Paper, LLC dated as of January 10, 2007

ST PAPER9461

## SCHEDULE 5.8

## INSURANCE REQUIREMENTS

See attached.

ST PAPER9462

INSURANCE REQUIREMENTS

Borrower shall maintain insurance with financially sound and reputable insurance companies, and with respect to Borrower's tangible and real personal property ("**Property**") and risks of a character usually maintained by companies engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such companies.   In any event the following insurance coverage shall be maintained.

(A)   Insurance to be Maintained by Borrower.   Borrower will procure at its own expense and maintain in full force and effect, with Acceptable Insurance Carriers (as defined in paragraph (H) below) the following types of insurance:

(i)   Builder's All Risk and Delay in Start-Up Insurance.   On and after the Closing Date, insurance on an "all risks" basis against loss or damage covering all of the Property of every description to be used in the construction of the Work (as defined in the EPC Contract), except tools or equipment owned or rented by the EPC Contractor, by reason of any Peril (as defined in paragraph (A)(ii) below) while being transported to the Site, in temporary storage off-site, and thereafter throughout erection and testing until Completion, in such amounts (subject to such deductibles as shall be satisfactory to Administrative Agent, but in any event, no greater than $100,000) as shall be reasonable and customary and sufficient to avoid the insured named therein from becoming a co-insurer of any losses under such policy but in any event in an amount: (a) in the case of fixed assets and equipment, at least equal to 100% of the actual replacement cost of such assets (including foundation, footings and excavation costs), subject to deductibles as aforesaid; and (b) in the case of the contingent business interruption insurance, covering as a minimum amount all fixed expenses and debt service for a period of 12 months arising from losses insured by clause (a) above.   The maximum deductible in relation to clause (b) shall be no greater than 10 days; provided that in relation to delays resulting from mechanical or electrical failure including explosion, rupture, bursting, cracking, bulging, burning or change of temperature of the yankee dryer roll, such maximum deductible shall be 180 days. There shall be either an "agreed amount" clause or a waiver of coinsurance.

(ii)   Property Insurance.   On and after the Closing Date, insurance on an "all risks" basis (inclusive of flood and earthquake) against loss or damage covering all of the Property by reason of any perils of flood, earth movement, sabotage and terrorism ("**Perils**") in such amounts (subject to such deductibles as shall be satisfactory to Collateral Agent) as shall be reasonable and customary and sufficient to avoid the insured named therein from becoming a co-insurer of any losses under such policy but in any event in an amount: (a) in the case of fixed assets and equipment, at least equal to 100% of the actual replacement cost of such assets (including foundation, footings and excavation costs), subject to deductibles as aforesaid; (b) in the case of inventory, not less than the fair market value thereof, subject to deductibles as aforesaid; and (c) in the case of the business interruption insurance, covering as a minimum amount all fixed expenses and debt service for a period of 12 months arising from losses insured by clauses (a) and (b) above.   The maximum deductible in relation to clause (c) shall be no greater than 30 days; provided that in relation to delays resulting from mechanical or electrical failure including explosion, rupture, bursting, cracking, bulging, burning or change of

ST PAPER9463

temperature of the yankee dryer roll, such maximum deductible shall be 180 days.  There shall be either an "agreed amount" clause or a waiver of coinsurance.

      (iii)    <u>Automobile Liability Insurance for Bodily Injury and Property Damage</u>. On and after the Closing Date, insurance against liability for personal injury (including bodily injury or death) and Property damage, in each case, in respect of all vehicles (whether owned, leased, hired, borrowed or operated by Borrower) at any time located at, or used in connection with, its Properties or operations in such amounts as are then customary for vehicles used in connection with similar Properties and businesses, but in any event to the extent required by applicable law and with not less than a $1,000,000 combined single limit, for any one incident.

      (iv)    <u>Comprehensive General Liability Insurance</u>.  On and after the Closing Date, insurance against claims for personal injury (including bodily injury or death) and Property damage occurring on, in or about the Properties (and adjoining streets, sidewalks and waterways) of Borrower, in such amounts as are then customary for Properties similar in use in the jurisdictions where such Properties are located, including insurance against claims for bodily injury, death or Property damage resulting from the use of products sold by Borrower in such amounts as are then customarily maintained by responsible persons engaged in business similar to that of Borrower; <u>provided</u> that at a minimum such insurance shall be written on an occurrence basis with a combined single limit of liability of $1,000,000 per occurrence and a $2,000,000 annual aggregate limit.

      (v)    <u>Workers' Compensation Insurance</u>.  On and after the Closing Date, workers' compensation insurance including statutory coverage with a minimum employers' liability limit of $500,000 per accident for bodily injury, $500,000 per employee for bodily injury caused by disease and a $500,000 policy limit.  The policy shall include coverage: (a) required by the laws of the State of Wisconsin; and (b) to the extent applicable, pertaining to the U.S. Longshoremen and Harbour Workers Act.

      (vi)    <u>Environmental Liability Insurance</u>.  On and after the Closing Date, environmental liability insurance including first party liability coverage against claims for clean-up costs, and third party liability coverage against claims for bodily injury, property damage and clean-up costs.  Each such policy shall have a minimum limit of $2,000,000 for each occurrence and $2,000,000 in the aggregate.

      (vii)    <u>Director's and Officer's Liability Insurance</u>.  On and after the Closing Date, insurance against liability for actions of Borrower's directors and officers with an aggregate minimum limit of $2,000,000.

      (viii)    <u>Umbrella Coverage</u>.  "Following form" coverage in excess of the underlying comprehensive general liability insurance, workers' compensation insurance and automobile liability insurance described above, with a minimum per occurrence and aggregate limit of no less than $5,000,000.

      (ix)    <u>Other Insurance</u>.  Such other insurance in each case as generally carried by owners of similar Properties in the jurisdictions where such Properties are located, in such amounts and against such risks as are then customary for Properties similar in use.

2

ST PAPER9464

In addition to the insurance coverage otherwise required by this paragraph (A), Borrower shall at all times maintain the insurance coverage required to be maintained by it under the terms of each of the Project Documents.

All policies of insurance to be maintained by Borrower shall provide for waiver of subrogation in favor of the Secured Parties, and Borrower shall waive any right of the insurers to set off or counterclaim or any other deduction.

(B)   Waiver of Subrogation.   Borrower hereby waives any and every claim for recovery from the Secured Parties for any and all loss or damage covered by any of the insurance policies to be maintained under this Schedule 5.8 to the extent that such loss or damage is recovered under any such policy.   Inasmuch as the foregoing waiver will preclude the assignment of any such claim to the extent of such recovery, by subrogation (or otherwise), to an insurance company (or other Person), Borrower shall give written notice of the terms of such waiver to each insurance company which has issued, or which may issue in the future, any such policy of insurance (if such notice is required by the insurance policy) and shall cause each such insurance policy to be properly endorsed by the issuer thereof to, or to otherwise contain one or more provisions that, prevent the invalidation of the insurance coverage provided thereby by reason of such waiver.

(C)   Amendment of Requirements.   In the event any insurance (including the limits or deductibles thereof) required to be maintained under this Schedule 5.8 shall not be reasonably available and commercially feasible in the commercial insurance market, Administrative Agent shall not unreasonably withhold its agreement to waive such requirement to the extent the maintenance thereof is not so available; provided, however, that (i) Borrower shall first request any such waiver in writing, which request shall be accompanied by a written report prepared by Borrower's insurance broker, certifying that such insurance is "not reasonably available and commercially feasible" (and, in any case where the required amount is not so available, certifying as to the maximum amount which is so available) and explaining in detail the basis for such conclusions; (ii) at any time after the granting of any such waiver, but not more often than once a year, Administrative Agent may request, and Borrower shall furnish to Administrative Agent within thirty (30) days after such request, supplemental reports reasonably acceptable to Administrative Agent from Borrower's insurance broker updating its prior report and reaffirming such conclusion; and (iii) any such waiver shall be effective only so long as such insurance shall not be reasonably available and commercially feasible in the commercial insurance market, it being understood that the failure of Borrower to timely furnish any such supplemental report shall be conclusive evidence that such waiver is no longer effective because such condition no longer exists, but that such failure is not the only way to establish such non-existence.   The failure at any time to satisfy the condition to any waiver of an insurance requirement set forth in the proviso to the preceding sentence shall not impair or be construed as a relinquishment of Borrower's ability to obtain a waiver of an insurance requirement pursuant to the preceding sentence at any other time upon satisfaction of such conditions.   For the purposes of this paragraph (C), insurance will be considered "not reasonably available and commercially feasible" if it is obtainable only at excessive costs which are not justified in terms of the risk to be insured and is generally not being carried by or applicable to projects or operations similar to the Project because of such excessive costs.

3

ST PAPER9465

(D)    Conditions.

  (i) Participation in Claims Meetings.  The builder's risk, delay in start-up, property damage and business interruption insurance policies shall provide that the proceeds greater than $500,000 shall be payable directly to Collateral Agent.  For such losses greater than $500,000, Collateral Agent shall have the right, but not the obligation, to participate in claims meetings with the insurer and Borrower.

  (iii) Loss Adjustment and Settlement.  Any loss insured by the builder's risk, delay in start-up, property damage or business interruption insurance policies shall be adjusted with the respective insurance companies, including the filing in a timely manner of appropriate proceedings, by Borrower, subject to the approval of Administrative Agent if such loss is in excess of $1,000,000.  In addition Borrower may in its reasonable judgment consent to the settlement of any loss, provided that in the event that the amount of the loss exceeds $2,000,000 the terms of such settlement is concurred with Administrative Agent.

  (iv) Policy Cancellation and Change.  All policies of insurance required to be maintained pursuant to this Schedule 5.8 by Borrower, other than the insurance in paragraph (vi), shall be endorsed so that if at any time they should be canceled, or coverage be reduced (by any party including the assured), which affects the interests of the Secured Parties, such cancellation or reduction shall not be effective as to the Secured Parties for 30 days, except for non-payment of premium which shall be for 10 days, after receipt by Administrative Agent of written notice from such insurer of such cancellation or reduction.  The insurance policies set forth in paragraph (vi) can only be cancelled for non-payment of premium.

  (v) Miscellaneous Policy Provisions.  The builder's risk, delayed startup, property damage and business interruption insurance policies shall (i) not include any annual or term aggregate limits of liability or clause requiring the payment of additional premium to reinstate the limits after loss except as regards the insurance applicable to the Perils, (ii) include the Secured Parties as additional insureds as their interest may appear, and (iii) include a clause requiring the insurer to make final payment on any claim within 30 days after the submission of proof of loss and its acceptance by the insurer.

  (vi) Separation of Interests.  The builder's risk, delayed startup, property damage and business interruption insurance policies shall insure the interests of the Secured Parties regardless of any breach or violation by Borrower or any other party of warranties, declarations 'or conditions contained in such policies, any action or inaction of Borrowers or others.  This requirement may be satisfied by the attachment of Form 438BFU (or something substantially similar thereto) to the policy.

  (vii) Acceptable Policy Terms and Conditions.  All policies of insurance required to be maintained pursuant to this Schedule 5.8 shall contain terms and conditions reasonably acceptable to Administrative Agent after consultation with the Insurance Consultant.

  (E) Failure to Maintain Insurance.  In the event Borrower fails to take out or maintain the full insurance coverage required by this Schedule 5.8, Administrative Agent, upon 30 days' prior notice (unless the aforementioned insurance would lapse within such period, in which event

4

notice should be given as soon as reasonably possible) to Borrower of any such failure, may (but shall not be obligated to) take out the required policies of insurance and pay the premiums on the same. All amounts so advanced by Administrative Agent shall become an additional obligation of Borrower to Administrative Agent, and Borrower shall forthwith pay such amounts to Administrative Agent together with interest thereon at the Default Rate from the date so advanced.

(F)    No Duty of Administrative Agent or Collateral Agent to Verify or Review.  No provision of this Schedule 5.8 or any provision of the Credit Agreement or any Project Document shall impose on Administrative Agent or Collateral Agent any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by Borrower, nor shall Administrative Agent or Collateral Agent be responsible for any representations or warranties made by or on behalf of Borrower to any insurance company or underwriter. Any failure on the part of Administrative Agent or Collateral Agent to pursue or obtain the evidence of insurance required by this Agreement from Borrower and/or failure of Administrative Agent or Collateral Agent to point out any non-compliance of such evidence of insurance shall not constitute a waiver of any of the insurance requirements in the Credit Agreement, including without limitation this Schedule 5.8.

(G)    Other Insurance.  Borrower shall maintain or cause to be maintained such insurance in addition to or in lieu of that required by the foregoing provisions of this Schedule 5.8 as Administrative Agent may from time to time require, at the direction of the Requisite Lenders, consistent with the coverage maintained for projects of similar scope and size at economically reasonable terms, due to (i) new information coming to the attention of the Requisite Lenders after the Closing Date or (ii) changed circumstances after the Closing Date, which, in the case of either of the foregoing clauses (i) and (ii), is reasonably determined by the Requisite Lenders to render the insurance coverage set forth in this Schedule 5.8 materially inadequate.

(H)    Insurers and Certain Policy Provisions.  The insurance policies required under this Schedule 5.8 shall be written by financially responsible companies selected by Borrower and having an A.M. Best rating of "A-"or better and being in a financial size category of "IX" or larger, or by other companies acceptable to Administrative Agent (collectively, "**Acceptable Insurance Carriers**"), and (other than contractor's equipment) shall name Collateral Agent as loss payee (to the extent covering risk of loss or damage to tangible property and loss of income) and as an additional insured as its interests may appear (to the extent covering any other risk other than workers' compensation).

(I)    Other Requirements.  Each policy referred to in this Schedule 5.8 shall provide that:

(i)    it will not be canceled, reduced, allowed to lapse without renewal or materially changed, except after not less than 60 days' notice to Administrative Agent;

(ii)    the interests of the Secured Parties shall not be invalidated by any act or negligence of Borrower or any Person having an interest in any Property covered by the Mortgage nor by occupancy or use of any such Property for purposes more hazardous

5

ST PAPER9467

than permitted by such policy nor by any foreclosure or other proceedings relating to such Property;

      (iii)    that the insurer shall notify Administrative Agent of any non-payment of premium; and

      (iv)    all policies of liability insurance shall also be provide for the following:

            (a)    to provide a severability of interests or cross liability clause;

            (b)    that the insurance shall be primary and not excess to or contributing with any with any insurance or self-insurance maintained by Borrower or Collateral Agent; and

            (c)    to name Collateral Agent and the other Secured Parties as additional insureds, except in relation to: (1) builder's all risk and contingent business interruption insurance or any similar insurance on which Collateral Agent shall be named as loss payee; and (2) contractor's equipment insurance.

6

ST PAPER9468