# EXHIBIT I

MORTGAGE AND SECURITY AGREEMENT



Tx:40136797

**2654008**
CATHY WILLIQUETTE LINDSAY
BROWN COUNTY RECORDER
GREEN BAY, WI
RECORDED ON
12/13/2013 3:07 PM
REC FEE: 30.00
EXEMPT #
PAGES: 16

---

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

This instrument prepared by
and after recording return to:
Michael L. Helt
Michael L. Helt, P.C.
1609 NW Rust Road
Grain Valley, Missouri 64029
71-91292
Tax Parcel Number: WD-1042

**BAY TITLE**

## MORTGAGE AND SECURITY AGREEMENT

THIS MORTGAGE AND SECURITY AGREEMENT (the "Mortgage"), is made as of the _10th_ day of December, 2013 between GREEN BOX NA GREEN BAY, LLC, a Wisconsin limited liability company, 2077B Lawrence Drive, De Pere, Wisconsin 54115 ("Mortgagor") in favor of MAPLE BRIDGE FUNDING, LLC, a Wyoming limited liability company, 55 N Water Street, Ste. 3, South Norwalk, Connecticut 06854 ("Mortgagee").

WITNESSETH, That Mortgagor, in consideration of the indebtedness herein mentioned, does hereby grant, convey, mortgage and warrant unto Mortgagee forever, with power of sale and right of entry and possession, the following property (herein referred to as the "Property"):

A.    The land in the County of Brown, State of Wisconsin described in Exhibit "A" attached hereto and incorporated herein (the "Land");

B.    All easements, appurtenances, tenements and hereditaments belonging to or benefiting the Land, including, but not limited to, all waters, water rights, water courses, all ways, trees, rights, liberties and privileges;

1

C.     All improvements to the Land, including, but not limited to, all buildings, structures and improvements now existing or hereafter erected on the Land; all fixtures and equipment of every description belonging to Mortgagor which are or may be placed or used upon the Land or attached to the buildings, structures or improvements, including, but not limited to, all engines, boilers, elevators and machinery, all heating apparatus, electrical equipment, air conditioning and ventilating equipment, water and gas fixtures, and all furniture and easily removable equipment, all of which, to the extent permitted by applicable law, shall be deemed an accession to the freehold and part of the realty as between the parties hereto; and

D.     Mortgagor's interest in all articles of personal property of every kind and nature whatsoever, including, but not limited to, all carpeting, draperies, ranges, microwave ovens, refrigerators, dishwashers, dehumidification equipment, now or hereafter located upon the Land or in or on the buildings and improvements and now owned or leased or hereafter acquired or leased by Mortgagor.

Mortgagor agrees not to sell, transfer, assign or remove anything described in paragraphs B, C and D above now or hereafter located on the Land without prior written consent from Mortgagee unless (i) such action does not constitute a sale or removal of any buildings or structures or the sale or transfer of water or water rights and (ii) such action results in the substitution or replacement with similar items of equal value.

Without limiting the foregoing grants, Mortgagor hereby pledges to Mortgagee, and grants to Mortgagee, a security interest in, all of Mortgagor's present and hereafter acquired right, title and interest in and to the Property and any and all

E.     cash and other funds now or at any time hereafter deposited by or for Mortgagor on account of tax, special assessment, replacement or other reserves required to be maintained pursuant to the Loan Documents (as hereinafter defined) with Mortgagee or a third party, or otherwise deposited with, or in the possession of, Mortgagee pursuant to the Loan Documents;

F.     surveys, soils reports, environmental reports, guaranties, warranties, architect's contracts, construction contracts, drawings and specifications, applications, permits, surety bonds and other contracts relating to the acquisition, design, development, construction and operation of the Property;

G.     accounts, chattel paper, deposit accounts, instruments, equipment, inventory, documents, general intangibles, letter-of-credit rights, investment property and all other personal property of Mortgagor, in each case, to the extent associated with or arising from the ownership, development, operation, use or disposition of any portion of the Property; and

2

AIC000092

H.     present and future rights to condemnation awards, insurance proceeds or other proceeds at any time payable to or received by Mortgagor on account of the Property or any of the foregoing personal property.

All personal property hereinabove described is hereinafter referred to as the "Personal Property".

If any of the Property is of a nature that a security interest therein can be perfected under the Uniform Commercial Code, this Mortgage shall constitute a security agreement and financing statement if permitted by applicable law and Mortgagor authorizes Mortgagee to file a financing statement describing such Property and, at Mortgagee's request, agrees to join with Mortgagee in the execution of any financing statements and to execute any other instruments that may be necessary or desirable, in Mortgagee's determination, for the perfection or renewal of such security interest under the Uniform Commercial Code.

TO HAVE AND TO HOLD the same unto Mortgagee for the purpose of securing

A.     Payment to the order of Mortgagee of the indebtedness evidenced by that certain promissory note of even date herewith (and any restatement, extension or renewal thereof and any amendment thereto) executed by Mortgagor to Mortgagee in the principal sum of Seven Million One Hundred Fifty Thousand and 00/100 Dollars ($7,150,000.00) with full maturity no later than June 1, 2015 and with interest as therein expressed (which promissory note, as such instrument may be amended, restated, renewed and extended, is hereafter referred to as the "Note"), it being recognized the funds may not have been fully advanced as of the date hereof, but may be advanced in the future in accordance with the terms of a written contract;

B.     Payment of all sums that may become due Mortgagee under the provisions of, and the performance of each agreement of Mortgagor contained in, the Loan Documents

"Loan Documents" means this Mortgage, the Note, that certain Absolute Assignment of Leases and Rents of even date herewith from Mortgagor to Mortgagee, the Conditional Commitment Letter dated November 10, 2013 from Mortgagor to Mortgagor and accepted by Mortgagor on November 12, 2013, that certain Certification of even date herewith from Mortgagor to Mortgagee and any other supplements and authorizations required by Mortgagee and any other agreement entered into or document executed by Mortgagor and delivered to Mortgagee in conjunction with the transaction contemplated hereby, except for that certain Environmental Indemnity Agreement of even date herewith given by Mortgagor and Ronald H. Van Den Heuvel to Mortgagee, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

3

AIC000093

PROVIDED, HOWEVER, that if and when Mortgagor has paid all of the indebtedness evidenced by the Note and performed and observed all of the agreements, terms, conditions, provisions, and warranties relating to the Loan Documents, this Mortgage and the estate, right, and interest of Mortgagee in and to the Property shall cease and be released at the cost of Mortgagor, but otherwise, shall remain in full force and effect. Mortgagee shall be entitled to charge a reasonable release fee.

TO PROTECT THE SECURITY OF THIS MORTGAGE, MORTGAGOR COVENANTS AND AGREES:

**Payment of Debt**. Mortgagor agrees to pay the indebtedness hereby secured (the "Indebtedness") promptly and in full compliance with the terms of the Loan Documents.

**Ownership**. Mortgagor represents that it owns the Property and has good and lawful right to convey the same and that the Property is free and clear from any and all encumbrances whatsoever, except as appears in the title evidence accepted by Mortgagee. Mortgagor does hereby forever warrant and shall forever defend the title and possession thereof against the lawful claims of any and all persons whomsoever.

**Use of Chlorinated Solvents**. Mortgagor agrees not to allow the use or storage of chlorinated solvents on the Property. Notwithstanding the foregoing, over-the-counter products in household quantities are excepted from this prohibition.

**Business Restriction Representation and Warranty**. Mortgagor represents and warrants Mortgagor, all persons and entities owning (directly or indirectly) an ownership interest in Mortgagor, all guarantors of all or any portion of the Indebtedness, and all persons and entities executing any separate indemnity agreement in favor of Mortgagee in connection with the Indebtedness: (i) is not, and shall not become, a person or entity with whom Mortgagee is restricted from doing business under regulations of the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated Nationals and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action; (ii) is not, and shall not become, a person or entity with whom Mortgagee is restricted from doing business under the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder; and (iii) is not knowingly engaged in, and shall not knowingly engage in, any dealings or transaction or be otherwise associated with such person or entities described in (i) or (ii) above.

**Maintenance of Property and Compliance with Laws**. Mortgagor agrees to keep the buildings and other improvements now or hereafter erected on the Land in good condition and repair; not to commit or suffer any waste; to comply with all laws, rules and regulations affecting the Property; and to permit Mortgagee to enter at all reasonable times for the purpose of inspecting and of conducting, in a reasonable and proper manner, such tests as

4

AIC000094

Mortgagee determines to be necessary in order to monitor Mortgagor's compliance with applicable laws and regulations regarding hazardous materials affecting the Property.

**Insurance**. Mortgagor agrees to keep the Property insured for the protection of Mortgagee in such manner, in such amounts and in such companies as Mortgagee may from time to time approve, and to keep the policies therefor, properly endorsed, on deposit with Mortgagee, or at Mortgagee's option, to keep evidence of insurance acceptable to Mortgagee evidencing all insurance coverages required hereunder on deposit with Mortgagee, which evidence shall reflect at least thirty (30) days' notice of cancellation to Mortgagee and shall list Mortgagee as the certificate holder or as a similar additional interest with Mortgagee's correct mailing address; if Mortgagor requests Mortgagee to accept a different form of evidence of insurance, Mortgagee shall not unreasonably withhold its consent, provided, a copy of a standard mortgagee endorsement in favor of Mortgagee stating the insurer shall provide at least thirty (30) days' notice of cancellation to Mortgagee accompanies such evidence. Mortgagor shall furnish Mortgagee with renewals of all applicable insurance evidence no later than the actual expiration date.

If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, Mortgagor shall give prompt written notice thereof to Mortgagee. Following the occurrence of a casualty, Mortgagor, regardless of whether sufficient insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the improvements on the Property to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law; provided, however, that Mortgagee shall permit Mortgagor to apply all such available insurance loss proceeds (less expenses of collection) to the restoration of the Property unless there is an Event of Default (as hereinafter defined) under the Loan Documents in which case Mortgagee shall not be obligated to permit Mortgagor to apply all such available insurance loss proceeds to the restoration of the Property. All insurance loss proceeds (less expenses of collection) shall, at Mortgagee's option, be applied on the Indebtedness, whether due or not, or to the restoration of the Property, or be released to Mortgagor, but such application or release shall not cure or waive any default under any of the Loan Documents. If Mortgagee elects to apply the insurance loss proceeds on the Indebtedness, no prepayment fee, if any, shall be due thereon.

Notwithstanding the foregoing provision, Mortgagee agrees if the amount necessary to restore the Property to its condition prior to the casualty is less than Four Million Dollars ($4,000,000.00), then the insurance loss proceeds shall be applied to the restoration of the Property, subject to satisfaction of the following conditions:

(i)     There is no existing Event of Default at the time of casualty;

(ii)    The casualty insurer has not denied liability for payment of insurance loss proceeds to Mortgagor as a result of any act, neglect, use or occupancy of the Property by Mortgagor or any tenant of the Property;

(iii)   Mortgagee shall be satisfied all insurance loss proceeds so held, together with supplemental funds to be made available by Mortgagor, shall be

5

AIC000095

sufficient to complete the restoration of the Property (any remaining insurance loss proceeds may, at the option of Mortgagee, be applied on the Indebtedness, whether or not due, or be released to Mortgagor);

(iv)    If required by Mortgagee, Mortgagee shall be furnished a satisfactory report addressed to Mortgagee from an environmental engineer or other qualified professional satisfactory to Mortgagee to the effect no adverse environmental impact to the Property resulted from the casualty;

(v)    Mortgagee shall release insurance loss proceeds as restoration of the Property progresses provided Mortgagee is furnished satisfactory evidence of the costs of restoration and if, at the time of such release, no Event of Default shall then exist with respect to which Mortgagee shall have given Mortgagor notice pursuant to the "**Notice of Default**" provision herein. If an Event of Default shall then exist, Mortgagee shall have no further obligation to release insurance loss proceeds hereunder unless such default is cured within the cure period set forth in the "**Notice of Default**" provision contained herein. If the estimated cost of restoration exceeds Two Hundred Fifty Thousand Dollars ($250,000.00), then (a) the drawings and specifications for the restoration shall be approved by Mortgagee in writing prior to commencement of the restoration, and (b) Mortgagee shall receive an administration fee equal to one-half of one percent (1/2%) of the cost of restoration;

(vi)    Prior to each release of funds, Mortgagor shall obtain for the benefit of Mortgagee an endorsement to Mortgagee's title insurance policy insuring Mortgagee's lien as a first and valid lien on the Property subject only to liens and encumbrances theretofore approved by Mortgagee;

(vii)    Mortgagor shall pay all costs and expenses incurred by Mortgagee, including, but not limited to, outside legal fees, title insurance costs, third-party disbursement fees, third-party engineering reports and inspections deemed necessary by Mortgagee;

(viii)    All reciprocal easement and operating agreements benefiting the Property, if any, shall remain in full force and effect between the parties thereto on and after restoration of the Property; and

(ix)    Mortgagee shall be satisfied, in its sole discretion, the Property can be repaired to its condition immediately prior to the casualty.

**Condemnation**.  Mortgagor hereby assigns to Mortgagee (i) any award and any other proceeds resulting from damage to, or the taking of, all or any portion of the Property in connection with condemnation proceedings or the exercise of a power of eminent domain and (ii) the proceeds from any sale or transfer in lieu thereof.  Any award or any other proceeds (less expenses of collection) received by Mortgagee as a result of such taking shall, at Mortgagee's option, be applied on the Indebtedness, whether due or not, or to the

AIC000096

restoration and rebuilding of the Property, or be released to Mortgagor, but such application or release shall not cure or waive any default under any of the Loan Documents. If Mortgagee elects to apply the award or other proceeds on the Indebtedness, no prepayment privilege fee, if any, shall be due thereon.

<u>Taxes and Special Assessments</u>. Mortgagor agrees to pay before delinquency all taxes and special assessments of any kind that have been or may be levied or assessed against the Property, this Mortgage, the Note or the Indebtedness, or upon the interest of Mortgagee in the Property, this Mortgage, the Note or the Indebtedness, and to procure and deliver to Mortgagee, within thirty (30) days after Mortgagee shall have given a written request therefor to Mortgagor, the official receipt of the proper officer showing timely payment of all such taxes and assessments; provided, however, that Mortgagor shall not be required to pay any such taxes or special assessments if the amount, applicability or validity thereof shall currently be contested in good faith by appropriate proceedings and funds sufficient to satisfy the contested amount have been deposited in an escrow satisfactory to Mortgagee.

<u>Personal Property</u>.

With respect to the Personal Property, Mortgagor hereby represents, warrants and covenants as follows:

A.     Except for the security interest granted hereby, Mortgagor is, and as to portions of the Personal Property to be acquired after the date hereof will be, the sole owner of the Personal Property, free from any lien, security interest, encumbrance or adverse claim thereon of any kind whatsoever. Mortgagor shall notify Mortgagee of, and shall indemnify and defend Mortgagee and the Personal Property against, all claims and demands of all persons at any time claiming the Personal Property or any part thereof or any interest therein.

B.     Except as otherwise provided above, Mortgagor shall not lease, sell, convey or in any manner transfer the Personal Property without the prior consent of Mortgagee.

C.     Mortgagor is a limited liability company organized under the laws of the State of Wisconsin. Until the Indebtedness is paid in full, Mortgagor (i) shall not change its legal name without providing Mortgagee with thirty (30) days' prior written notice; (ii) shall not change its state of organization; and (iii) shall preserve its existence and shall not, in one transaction or a series of transactions, merge into or consolidate with any other entity.

D.     At the request of Mortgagee, Mortgagor shall join Mortgagee in executing one or more financing statements and continuations and amendments thereof pursuant to the Uniform Commercial Code of the jurisdiction in which the Property is located in form satisfactory to Mortgagee, and Mortgagor shall pay the cost of filing the same in all public offices wherever

AIC000097

filing is deemed by Mortgagee to be necessary or desirable. Mortgagor shall also, at Mortgagor's expense, take any and all other action requested by Mortgagee to perfect Mortgagee's security interest under the Uniform Commercial Code with respect to the Personal Property, including, without limitation, exercising Mortgagor's best efforts to obtain any consents, agreements or acknowledgments required of third parties to perfect Mortgagee's security interest in Personal Property consisting of deposit accounts, letter-of-credit rights, investment property and electronic chattel paper.

**Other Liens**. Mortgagor agrees to keep the Property and any Personal Property free from all other liens either prior or subsequent to the lien created by this Mortgage. The (i) creation of any other lien on any portion of the Property or on any Personal Property, whether or not prior to the lien created hereby, (ii) assignment or pledge by Mortgagor of its revocable license to collect, use and enjoy rents and profits from the Property, or (iii) granting or permitting of a security interest in or other encumbrance on the direct or indirect ownership interests in Mortgagor, shall constitute a default under the terms of this Mortgage.

**Indemnification, Duty to Defend and Costs, Fees and Expenses**. In addition to any other indemnities contained in the Loan Documents, Mortgagor shall indemnify, defend and hold Mortgagee harmless from and against any and all losses, liabilities, claims, demands, damages, costs and expenses (including, but not limited to, costs of title evidence and endorsements to Mortgagee's title insurance policy with respect to the Property and reasonable attorneys' fees and other costs of defense) which may be imposed upon, incurred by or asserted against Mortgagee, whether or not any legal proceeding is commenced with regard thereto, in connection with: (i) the enforcement of any of Mortgagee's rights or powers under the Loan Documents; (ii) the interpretation of any of the terms and conditions of the Loan Documents; (iii) the protection of Mortgagee's interest in the Property; or (iv) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on any sidewalk, curb, parking area, space or street located adjacent thereto. If any claim or demand is made or asserted against Mortgagee by reason of any event as to which Mortgagor is obligated to indemnify or defend Mortgagee, then, upon demand by Mortgagee, Mortgagor, at Mortgagor's sole cost and expense, shall defend such claim, action or proceeding in Mortgagee's name, if necessary, by such attorneys as Mortgagee shall approve. Notwithstanding the foregoing, Mortgagee may, in Mortgagee's sole discretion, engage its own attorneys to defend it or assist in its defense and Mortgagor shall pay the reasonable fees and disbursements of such attorneys.

**Failure of Mortgagor to Act**. If Mortgagor fails to make any payment or do any act as herein provided, Mortgagee may, without obligation to do so, without notice to or demand upon Mortgagor and without releasing Mortgagor from any obligation hereof: (i) make or do the same in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof, Mortgagee being authorized to enter upon the Property for such purpose; (ii) to appear in and defend any action or proceeding purporting to affect the

8

AIC000098

security hereof, or the rights or powers of Mortgagee; (iii) pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of Mortgagee appears to be prior or superior hereto; and (iv) in exercising any such powers, pay necessary expenses, employ counsel and pay its reasonable fees. Sums so expended and all losses, liabilities, claims, damages, costs and expenses required to be reimbursed by Mortgagor to Mortgagee hereunder shall be payable by Mortgagor immediately upon demand with interest from the date of expenditure or demand, as the case may be, at the Default Rate (as defined in the Note). All sums so expended by Mortgagee and the interest thereon shall be included in the Indebtedness and secured by the lien of this Mortgage.

**Event of Default**. Any default by Mortgagor in making any required payment of the Indebtedness or any default in any provision, covenant, agreement, warranty or certification contained in any of the Loan Documents shall, except as provided in the two (2) immediately succeeding paragraphs, constitute an "Event of Default".

**Notice of Default**. A default in any payment required in the Note or any other Loan Document, whether or not payable to Mortgagee (a "Monetary Default") shall not constitute an Event of Default unless Mortgagee shall have given a written notice of such Monetary Default to Mortgagor and Mortgagor shall not have cured such Monetary Default by payment of all amounts in default (including payment of interest at the Default Rate, as defined in the Note, from the date of default to the date of cure on amounts owed to Mortgagee) within five (5) business days after the date on which Mortgagee shall have given such notice to Mortgagor.

Any other default under the Note or under any other Loan Document (a "Non-Monetary Default") shall not constitute an Event of Default unless Mortgagee shall have given a written notice of such Non-Monetary Default to Mortgagor and Mortgagor shall not have cured such Non-Monetary Default within thirty (30) days after the date on which Mortgagee shall have given such notice of default to Mortgagor (or if the Non-Monetary Default is not curable within such 30-day period, Mortgagor shall not have diligently undertaken and continued to pursue the curing of such Non-Monetary Default and deposited an amount sufficient to cure such Non-Monetary Default in an escrow account satisfactory to Mortgagee).

In no event shall the notice and cure period provisions recited above constitute a grace period for the purpose of commencing interest at the Default Rate (as defined in the Note).

**Appointment of Receiver**. Upon commencement of any proceeding to enforce any right under this Mortgage, including foreclosure thereof, Mortgagee (without limitation or restriction by any present or future law, without regard to the solvency or insolvency at that time of any party liable for the payment of the Indebtedness, without regard to the then value of the Property, whether or not there exists a threat of imminent harm, waste or loss to the Property and whether the same shall then be occupied by the owner of the equity of redemption as a homestead) shall have the absolute right to the appointment of a receiver of the Property and of the revenues, rents, profits and other income therefrom, and said

AIC000099

receiver shall have (in addition to such other powers as the court making such appointment may confer) full power to collect all such income and, after paying all necessary expenses of such receivership and of the operation, maintenance and repair of said Property, to apply the balance to the payment of any of the Indebtedness then due.

**Foreclosure.**  Upon the occurrence of an Event of Default, the entire unpaid Indebtedness shall, at the option of Mortgagee, become immediately due and payable for all purposes without any notice or demand, except as required by law, (ALL OTHER NOTICE OF THE EXERCISE OF SUCH OPTION, OR THE INTENT TO EXERCISE SUCH OPTION, BEING HEREBY EXPRESSLY WAIVED), and Mortgagee may, in addition to exercising any rights it may have with respect to the Personal Property under the Uniform Commercial Code of the jurisdiction in which the Property is located, institute proceedings in any court of competent jurisdiction to foreclose this Mortgage as a mortgage, or to enforce any of the covenants hereof, or Mortgagee may, to the extent permitted by applicable law, either personally or by agent or attorney in fact, enter upon and take possession of the Property and may manage, rent or lease the Property or any portion thereof upon such terms as Mortgagee may deem expedient, and collect, receive and receipt for all rentals or other income therefrom and apply the sums so received as hereinafter provided in case of sale. Mortgagee is hereby further authorized and empowered to the extent permitted by applicable law, as agent or attorney in fact, either after or without such entry, to sell and dispose of the Property en masse or in separate parcels (as Mortgagee may think best), and all the right, title and interest of Mortgagor therein, by advertisement or in any manner provided by applicable law, (MORTAGOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO A HEARING PRIOR TO SUCH SALE TO THE EXTENT PERMITTED BY APPLICABLE LAW), and to issue, execute and deliver a deed of conveyance, all as then may be provided by applicable law; and Mortgagee, to the extent permitted by applicable law, shall, out of the proceeds or avails of such sale, after first paying and retaining all fees, charges, costs of advertising the Property and of making said sale, and attorneys' fees as herein provided, apply such proceeds to the Indebtedness, including all sums advanced or expended by Mortgagee or the legal holder of the Indebtedness, with interest from the date of advance or expenditure at the Default Rate (as defined in the Note), rendering the excess, if any, as provided by law; such sale or sales and said deed or deeds so made shall be a perpetual bar, both in law and equity, against Mortgagor, the heirs, successors and assigns of Mortgagor, and all persons claiming the Property aforesaid, or any part thereof, by, from, through or under Mortgagor.  The legal holder of the Indebtedness may purchase the Property or any part thereof, and it shall not be obligatory upon any purchaser at any such sale to see to the application of the purchase money.  Mortgagor agrees in the event of the foreclosure of this Mortgage, Mortgagor will be bound by the applicable provisions of Sections 846.101, 846.102 and 846.103 of the Wisconsin Statutes or any similar successor statute.

**Prohibition on Transfer.**  The present ownership and management of the Property is a material consideration to Mortgagee in making the loan secured by this Mortgage, and Mortgagor shall not (i) convey title to all or part of the Property; (ii) enter into any contract to convey (land contract/installment sales contract/contract for deed) title to all or any part of the Property which gives a purchaser possession of, or income from, the Property prior

AIC000100

to a transfer of title to all or any part of the Property ("Contract to Convey"); or (iii) cause or permit a Change in the Proportionate Ownership (as hereinafter defined) of Mortgagor. Any such conveyance, entering into a Contract to Convey or Change in Proportionate Ownership of Mortgagor shall constitute a default under the terms of this Mortgage.

"Change in Proportionate Ownership" means in the case of a limited liability company, a change in, or the existence of a lien on, the direct or indirect ownership of the limited liability company interests of Mortgagor; any transfer of direct or indirect ownership interest of Mortgagor; or any change in the manager of Mortgagor which has not been pre-approved by Mortgagee.

Notwithstanding the foregoing provision, a Change in Proportionate Ownership shall not be deemed to have occurred provided Environmental Advanced Reclamation Technology HQ, LLC, RVDH Development, LLC, Glen Arbor, LLC and/or AKS Green, LLC continue to own a controlling interest in Mortgagor which, for purposes hereof, shall constitute ownership of more than eighty percent (80%) of the membership interests of Mortgagor in the aggregate.

**Financial Statements**.  Mortgagor shall furnish to Mortgagee:

(i)     an unaudited income statement and balance sheet for Mortgagor as of the last day of Mortgagor's most recently closed fiscal year within forty-five (45) days following the close of such fiscal year;

(ii)    an unaudited income statement and balance sheet for Mortgagor as of the last day of Mortgagor's most recently closed fiscal quarter within thirty (30) days following the close of such quarter;

(iii)   a copy of Mortgagor's federal income tax return filed with the Internal Revenue Service within ten (10) days  following the filing of such return;

(iv)    a copy of any extension filed with the Internal Revenue Service for Mortgagor's federal income tax return within ten (10) days following the filing of such extension;

(v)     Mortgagor shall further cause to be provided to Mortgagee a financial statement for any guarantor of the Indebtedness within thirty (30) days following request by Mortgagee; and

(vi)    such other reasonable financial and management information in the possession of, or accessible to, Mortgagor which Mortgagee determines to be useful in Mortgagee's monitoring the value and condition of the Property, Mortgagor or any guarantor.

**Property Management**.  Any management company for the Property shall be satisfactory to Mortgagee.  Any change in the management company without the prior written consent

11

AIC000101

of Mortgagee, which shall not be unreasonably withheld, shall constitute a default under this Mortgage.

**Compliance With Water Regulations**. Mortgagor agrees to abide by all the statutes of the jurisdiction in which the Property is located and the rules and regulations of any and all federal, state and local authority having jurisdiction over the use and distribution of water or water resources, and shall not transfer, sell, assign or relinquish the water rights now held or hereafter acquired covering the Property without the written consent of Mortgagee.

**Deposits by Mortgagor**. To assure the timely payment of real estate taxes and special assessments (including personal property taxes, if appropriate), upon the occurrence of an Event of Default, Mortgagee shall thence forth have the option to require Mortgagor to deposit funds with Mortgagee, in monthly or other periodic installments in amounts estimated by Mortgagee from time to time sufficient to pay real estate taxes and special assessments as they become due. If at any time the funds so held by Mortgagee shall be insufficient to pay any of said expenses, Mortgagor shall, upon receipt of notice thereof, immediately deposit such additional funds as may be necessary to remove the deficiency. All funds so deposited shall be irrevocably appropriated to Mortgagee to be applied to the payment of such real estate taxes and special assessments and, at the option of Mortgagee after an Event of Default, the Indebtedness.

**Modification of Terms**. Without affecting the liability of Mortgagor or any other person (except any person expressly released in writing) for payment of the Indebtedness or the performance of any obligation contained herein and without affecting the rights of Mortgagee with respect to any security not expressly released in writing, Mortgagee may, at any time and from time to time, either before or after the maturity of the Note, without notice or consent: (i) release any person liable for payment of all or any part of the Indebtedness or for performance of any obligation; (ii) make any agreement extending the time or otherwise altering the terms of payment of all or any part of the Indebtedness, or modifying or waiving any obligation, or subordinating, modifying or otherwise dealing with the lien or charge hereof; (iii) exercise or refrain from exercising or waive any right Mortgagee may have; (iv) accept additional security of any kind; (v) release or otherwise deal with any property, real or personal, securing the Indebtedness, including all or any part of the Property.

**Exercise of Option**. Whenever, by the terms of this Mortgage, of the Note or any of the other Loan Documents, Mortgagee is given any option, such option may be exercised when the right accrues or at any time thereafter, and no acceptance by Mortgagee of payment of Indebtedness in default shall constitute a waiver of any default then existing and continuing or thereafter occurring.

**Nature and Succession of Agreement**. Each of the provisions, covenants and agreements contained herein shall inure to the benefit of, and be binding on, the heirs, executors, administrators, successors, grantees, and assigns of the parties hereto, respectively, and the term "Mortgagee" shall include the owner and holder of the Note.

AIC000102

**Legal Enforceability**.  No provision of this Mortgage, the Note or any other Loan Document shall require the payment of interest or other obligation in excess of the maximum permitted by law.  If any applicable state law or applicable United States federal law (to the extent that it permits Mortgagee to contract for, charge, take, reserve or receive a greater amount of interest than under state law) is ever judicially interpreted so as to render usurious any amount called for under this Mortgage, the Note or under any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Indebtedness secured by this Mortgage and evidenced by the Note or any other Loan Document, or if Mortgagee's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Mortgagor results in Mortgagor having paid any interest in excess of that permitted by applicable law, then all excess amounts theretofore collected by Mortgagee shall be credited on the principal balance of the Note (or, if the Note has been or would thereby be paid in full, refunded to Mortgagor), and the provisions of this Mortgage, the Note and the other Loan Documents shall  immediately be deemed reformed and the amounts thereafter collectible reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder.  All sums paid or agreed to be paid to Mortgagee for the use, forbearance and detention of the Indebtedness secured by this Mortgage and evidenced by the Note and the Loan Documents shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such Indebtedness until payment in full so that the rate or amount of interest on account of such Indebtedness does not exceed the maximum rate permitted under applicable law from time to time in effect and applicable to the Indebtedness secured by this Mortgage and evidenced by the Note for so long as such Indebtedness remains outstanding.  Notwithstanding anything to the contrary contained in this Mortgage, the Note or the Loan Documents, it is not the intention of Mortgagee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**Limitation of Liability**.  Notwithstanding any provision contained herein to the contrary, the personal liability of Mortgagor shall be limited as prescribed in the Note.

**Further Assurances**.  Mortgagor will keep the lien of this Mortgage valid and unimpaired.  Mortgagor will promptly (and in no event later than thirty (30) days after written notice from Mortgagee is received) cure any defects in the creation, execution and delivery of this Mortgage and the other Loan Documents.  Mortgagor at its expense will promptly execute and deliver to Mortgagee upon request all such other and further documents, agreements and instruments in compliance with or accomplishment of the covenants and agreements of Mortgagor in this Mortgage and the other Loan Documents or to further evidence and more fully describe the Property or more fully state the security obligations set out herein, or to perfect, protect or preserve any liens created pursuant to this Mortgage, or to make any recordings, to file any notices, or obtain any consents as may be necessary or appropriate in connection with the transactions contemplated by this Mortgage.

13

AIC000103

**Miscellaneous**. Time is of the essence in each of the Loan Documents. The remedies of Mortgagee as provided herein or in any other Loan Document or at law or in equity shall be cumulative and concurrent, and may be pursued singly, successively, or together at the sole discretion of Mortgagee, and may be exercised as often as occasion therefor shall occur; and neither the failure to exercise any such right or remedy nor any acceptance by Mortgagee of payment of Indebtedness in default shall in any event be construed as a waiver or release of any right or remedy. Neither this Mortgage nor any other Loan Document may be modified or terminated orally but only by agreement or discharge in writing and signed by Mortgagor and Mortgagee. If any of the provisions of any Loan Document or the application thereof to any persons or circumstances shall to any extent be invalid or unenforceable, the remainder of such Loan Document and each of the other Loan Documents and the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of each of the Loan Documents shall be valid and enforceable to the fullest extent permitted by law.

**Notice**. Any notice required or provided for herein shall be in writing and shall be delivered personally or sent by certified mail or reputable courier service with charges prepaid, to the address for Mortgagor and Mortgagee set forth on the first page of this Mortgage or at such other address as either Mortgagor or Mortgagee shall designate by written notice as provided in this paragraph. Notice shall be deemed given on the date received. Any notice which is rejected, the acceptance of which is refused or which is incapable of being delivered during normal business hours at the address provided herein or such other address designated pursuant hereto shall be deemed received as of the date of the attempted delivery.

**Waiver of Jury Trial**. Mortgagor hereby waives any right to trial by jury with respect to any action or proceeding (i) brought by Mortgagor, Mortgagee or any other person relating (a) the obligations secured hereby and/or any understandings or prior dealings between the parties hereto or (b) the Loan Documents or the Environmental Indemnity Agreement, or (ii) to which Mortgagee is a party.

**Captions**. The captions contained herein are for convenience and reference only and in no way define, limit or describe the scope or intent of, or in any way affect this Mortgage.

**Governing Law**. This Mortgage, the interpretation hereof and the rights, obligations, duties and liabilities hereunder shall be governed and controlled by the laws of the State of Wisconsin.

[Remainder of this Page Left Intentionally Blank.]

AIC000104

IN WITNESS WHEREOF, this Mortgage has been executed by the Mortgagor as of the day and year first above written.

Signed in the presence of:

*Tami A. Kersten* (signature)

Tami a. Kersten
Typed or Printed Name

*Mark Smolinski* (signature)

Mark Smolinski
Typed or Printed Name

MORTGAGOR:

GREEN BOX NA GREEN BAY, LLC,
a Wisconsin limited liability company
By: ENVIRONMENTAL ADVANCED
RECLAMATION TECHNOLOGY HQ,
LLC, a Wisconsin limited liability company,
its Manager

By: _____ (signature)
Name: Ronald Van Den Heuvel
Title: Chairman

STATE OF WISCONSIN     )
                       )ss.
COUNTY OF   BROWN       )

Be it known, that on this _10th_ day of December, 2013, before me, a Notary Public, in and for said County and State, personally came Ronald Van Den Heuvel acknowledged himself/herself to be the Chairman of Environmental Advanced Reclamation Technology HQ, LLC, a Wisconsin limited liability company, as Manager of GREEN BOX NA GREEN BAY, LLC, a Wisconsin limited liability company, to me personally known to be the person who executed the foregoing instrument, and acknowledged that he/she executed the same freely and voluntarily for the uses and purposes mentioned in it and as the free act and deed of the said limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(Notary seal: NOTARY PUBLIC / DEBRA S STARY / STATE OF WISCONSIN)

*Debra S Stary* (signature)
Debra S Stary , Notary Public

Brown County
My Commission Expires: 2/16/14

15

AIC000105

# EXHIBIT "A"
## LEGAL DESCRIPTION OF PROPERTY

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of Lot One (1), Vol. 24 Certified Survey Maps, Page 84, Map No. 4035, all being in the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

ALSO KNOWN AS

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4); the Northwest Quarter (NW 1/4) of the Southwest Quarter (SW 1/4) and Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Boulevard, De Pere, WI 54115
Tax Parcel Number: WD-1042

16

AIC000106

8 0 2 1 0 9 1 6
Tx:40145281

2663443
CATHY WILLIQUETTE LINDSAY
BROWN COUNTY RECORDER
GREEN BAY, WI
RECORDED ON
04/09/2014 11:16 AM
REC FEE: 30.00
EXEMPT #
PAGES: 3

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A NAME & PHONE OF CONTACT AT FILER (optional)
Michael L. Helt (816) 867-5182

B E-MAIL CONTACT AT FILER (optional)
mhelt@accessus.net

C SEND ACKNOWLEDGMENT TO:   (Name and Address)

Michael L. Helt
Michael L. Helt, P.C.
1609 NW Rust
Grain Valley, MO 64029

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a INITIAL FINANCING STATEMENT FILE NUMBER | 1b ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 2654010 Recorded 12/13/2013 | (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial)  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5 ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes                         AND Check one of these three boxes to
☐ This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address Complete item 6a or 6b, and item 7a or 7b and item 7c   ☐ ADD name Complete item 7a or 7b and item 7c   ☐ DELETE name Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)
6a ORGANIZATION'S NAME

OR | 6b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

7 CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact full name, do not omit, modify, or abbreviate any part of the Debtor's name)
7a ORGANIZATION'S NAME
**Ability Insurance Company**

OR 7b INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
|---|---|---|---|

| 7c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 55 N Water Street, Ste. | South Norwalk | CT | 06854 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes   ☐ ADD collateral   ☐ DELETE collateral   ☑ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR check here ☐ and provide name of authorizing Debtor
9a ORGANIZATION'S NAME
**Maple Bridge Funding, LLC**

OR | 9b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

AIC000107

AIC000108

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

| 11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form |
|---|
| **2654010 Recorded 12/13/2013** |

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 8 on Amendment form

|  | 12a. ORGANIZATION'S NAME |  |
|---|---|---|
|  | **Maple Bridge Funding, LLC** |  |
| OR | 12b. INDIVIDUAL'S SURNAME |  |
|  | FIRST PERSONAL NAME |  |
|  | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

|  | 13a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
|  | **Green Box NA Green Bay, LLC** |  |  |  |
| OR | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

| 15. This FINANCING STATEMENT AMENDMENT:<br>☐ covers timber to be cut  ☐ covers as-extracted collateral  ☑ is filed as a fixture filing | 17. Description of real estate:<br>**Legal description attached as Exhibit "A".** |
|---|---|
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest): |  |

18. MISCELLANEOUS:

International Association of Commercial Administrators (IACA)

AIC000109



AIC000110

## EXHIBIT A

Green Box NA Green Bay, LLC  – Attachment to financing statement.

Item No. 17 UCC Financing Statement Amendment Addendum continued:

### DESCRIPTION OF PROPERTY

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of Lot One (1), Vol. 24 Certified Survey Maps, Page 84, Map No. 4035, all being in the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

ALSO KNOWN AS

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4); the Northwest Quarter (NW 1/4)  of the Southwest Quarter (SW 1/4) and Southeast Quarter (SE 1/4)  of the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Boulevard, De Pere, WI 54115
Tax Parcel Number: WD-1042

AIC000111

ASSIGNMENT OF MORTGAGE



Tx:40136797

**2654011**
CATHY WILLIQUETTE LINDSAY
BROWN COUNTY RECORDER
GREEN BAY, WI
RECORDED ON
12/13/2013 3:07 PM
REC FEE: 30.00
EXEMPT #
PAGES: 4

Document Prepared by and
After Recording Return to:
Michael L. Helt
Michael L. Helt, P.C.
1609 NW Rust Road
Grain Valley, MO 64029
TI- 9./.29.

Tax Parcel Number: WD-1042

**BAY TITLE**

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, on this ___ day of December, 2013, MAPLE BRIDGE FUNDING, LLC, a Wyoming limited liability, 55 N Water Street, Ste. 3, South Norwalk, Connecticut 06854 ("Assignor"), does hereby grant, sell, assign, transfer and convey unto ABILITY INSURANCE COMPANY, a Nebraska insurance company, C/O Monroe Capital, LLC, 55 N Water Street, Ste. 3, South Norwalk, Connecticut 06854 ("Assignee"), that certain Mortgage and Security Agreement dated December _10_, 2013, made and executed by GREEN BOX NA GREEN BAY, LLC, a Wisconsin limited liability company, to and in favor of MAPLE BRIDGE FUNDING, LLC, upon the property described herein. Such Mortgage and Security Agreement having been given to secure payment of $7,150,000.00 and being recorded on December _13_, 2013 as Document No. _2654008_ of the Records of Brown County, Wisconsin, together with the obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under such Mortgage and Security Agreement.

Legal Description:

See Exhibit "A" attached hereto.

1

AIC000112

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns forever, but without recourse.

[Remainder of this page left intentionally blank.]

2

AIC000113

IN WITNESS WHEREOF, this Assignment has been executed as of the day and year first-above written.

ASSIGNOR:

Signed in the presence of:

MAPLE BRIDGE FUNDING, LLC,
a Wyoming limited liability company

_____
SAVRABH VAICHWANAR
Typed or Printed Name

By: _____
Name: Tim O'Shea
Title:  Manager

_____
Russell Mntrgh
Typed or Printed Name

STATE OF CONNECTICUT            )
                               )ss.
COUNTY OF FAIRFIELD            )

Be it known, that on this 11th day of December, 2013, before me, a Notary Public, in and for said County and State, personally came Tim O'Shea, who acknowledged himself to be the Manager of Maple Bridge Funding, LLC, a Wyoming limited liability company, to me personally known to be the person who executed the foregoing instrument, and acknowledged that he executed the same freely and voluntarily for the uses and purposes mentioned in it and as the free act and deed of the said limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Amanda Calabrese              , Notary Public

Fairfield              County
My Commission Expires: 10/31/15

Amanda Calabrese
Notary Public-Connecticut
My Commission Expires
October 31, 2015

3

## EXHIBIT "A"
## LEGAL DESCRIPTION OF PROPERTY

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of Lot One (1), Vol. 24 Certified Survey Maps, Page 84, Map No. 4035, all being in the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

ALSO KNOWN AS

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4); the Northwest Quarter (NW 1/4) of the Southwest Quarter (SW 1/4) and Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Boulevard, De Pere, WI 54115
Tax Parcel Number: WD-1042

4

AIC000115

ASSIGNMENT OF COLLATERAL SECURITY



8 0 1 9 7 6 5 0
Tx:40136797

2654012
CATHY WILLIQUETTE LINDSAY
BROWN COUNTY RECORDER
GREEN BAY, WI
RECORDED ON
12/13/2013 3:07 PM
REC FEE: 30.00
EXEMPT #
PAGES: 4

---

Document Prepared by and
After Recording Return to:
Michael L. Helt
Michael L. Helt, P.C.
1609 NW Rust Road
Grain Valley, MO 64029
TI- 91298
Tax Parcel Number: WD-1042

**BAY TITLE**



## ASSIGNMENT OF COLLATERAL SECURITY

FOR VALUE RECEIVED, on this __th__ day of December, 2013, MAPLE BRIDGE FUNDING, LLC, a Wyoming limited liability, 55 N Water Street, Ste. 3, South Norwalk, Connecticut 06854 ("Assignor"), does hereby grant, sell, assign, transfer and convey unto ABILITY INSURANCE COMPANY, a Nebraska insurance company, C/O Monroe Capital, LLC, 55 N Water Street, Ste. 3, South Norwalk, Connecticut 06854 ("Assignee"), that certain Absolute Assignment of Leases and Rents dated December _10_, 2013, made and executed by GREEN BOX NA GREEN BAY, LLC, a Wisconsin limited liability company, to and in favor of MAPLE BRIDGE FUNDING, LLC, in regard to the property described herein. Such Absolute Assignment of Leases and Rents having been given to secure payment of $7,150,000.00 and being recorded on December _13_, 2013 as Document No. _2654009_ of the Records of Brown County, Wisconsin. together with the obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under such Absolute Assignment of Leases and Rents.

Legal Description:

See Exhibit "A" attached hereto.

1

AIC000116

TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns forever, but without recourse.

[Remainder of page left intentionally blank.]

2

AIC000117

IN WITNESS WHEREOF, this Assignment has been executed as of the day and year first-above written.

Signed in the presence of:

ASSIGNOR:

MAPLE BRIDGE FUNDING, LLC,
a Wyoming limited liability company

SAURABH VAISHWANAR
Typed or Printed Name

By: _____
Name: Tim O'Shea
Title:  Manager

Russell M~tanga
Typed or Printed Name

STATE OF CONNECTICUT    )
                        )ss.
COUNTY OF FAIRFIELD     )

Be it known, that on this ___ day of December, 2013, before me, a Notary Public, in and for said County and State, personally came Tim O'Shea, who acknowledged himself to be the Manager of Maple Bridge Funding, LLC, a Wyoming limited liability company, to me personally known to be the person who executed the foregoing instrument, and acknowledged that he executed the same freely and voluntarily for the uses and purposes mentioned in it and as the free act and deed of the said limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Amanda Calabrese          , Notary Public

Fairfield          County
My Commission Expires: 10/31/15

Amanda Calabrese
Notary Public-Connecticut
My Commission Expires
October 31, 2015

3

AIC000118

# EXHIBIT "A"
## LEGAL DESCRIPTION OF PROPERTY

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of Lot One (1), Vol. 24 Certified Survey Maps, Page 84, Map No. 4035, all being in the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

ALSO KNOWN AS

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4); the Northwest Quarter (NW 1/4) of the Southwest Quarter (SW 1/4) and Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Boulevard, De Pere, WI 54115
Tax Parcel Number: WD-1042

4

AIC000119

ABSOLUTE ASSIGNMENT OF LEASES AND RENTS



2654009
CATHY WILLIQUETTE LINDSAY
BROWN COUNTY RECORDER
GREEN BAY, WI
RECORDED ON
12/13/2013 3:07 PM
REC FEE: 30.00
EXEMPT #
PAGES: 13

This instrument prepared by
and after recording return to:
Michael L. Helt
Michael L. Helt, P.C.
1609 NW Rust Road
Grain Valley, Missouri 64029
*7) – 9/292*
Tax Parcel Number: WD-1042

**BAY TITLE**



## ABSOLUTE ASSIGNMENT OF LEASES AND RENTS
(With License Back)

THIS ABSOLUTE ASSIGNMENT OF LEASES AND RENTS (this "Assignment"), is made as of the /0*th* day of December, 2013 by GREEN BOX NA GREEN BAY, LLC, a Wisconsin limited liability company, 2077B Lawrence Drive, De Pere, Wisconsin 54115 ("Borrower") in favor of MAPLE BRIDGE FUNDING, LLC, a Wyoming limited liability company, 55 N Water Street, Ste. 3, South Norwalk, Connecticut 06854 ("Lender").

WITNESSETH:

FOR AND IN CONSIDERATION of the indebtedness hereinafter described, Borrower has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey, unto Lender, its successors and assigns forever, all and singular the property hereinafter described (collectively, the "Security"), to wit:

    (a)    All rents, issues and profits arising from or related to the land situated in the County of Brown and State of Wisconsin described in **Exhibit "A"** attached hereto and fully incorporated herein by reference for all purposes and all improvements and any other property, whether real, personal or mixed, located thereon (which land, improvements and other property are hereinafter collectively called the "Property");

1

AIC000120

(b)     All of Borrower's rights, titles, interests and privileges, as lessor, in the leases now existing or hereafter made affecting the Property whether or not made by Borrower and as the same may have been, or may from time to time hereafter be, modified, extended and renewed (hereinafter collectively called the "Leases" and individually called a "Lease");

(c)     All tenant security deposits and other amounts due and becoming due under the Leases;

(d)     All guarantees of the Leases, including guarantees of tenant performance;

(e)     All insurance proceeds, including rental loss coverage and business interruption coverage with respect to the Leases; and

(f)     All judgments and settlements of claims in favor of Borrower (including condemnation proceeds, if any) and all rights, claims and causes of action under any court proceeding, including without limitation any bankruptcy, reorganization or insolvency proceeding, or otherwise arising from the Leases.

TO HAVE AND TO HOLD the Security unto Lender, its successors and assigns forever, and Borrower does hereby bind itself, its heirs, legal representatives, successors and assigns, to warrant and forever defend the Security unto Lender, its successors and assigns forever against the claim or claims of all persons whomsoever claiming the same or any part thereof.

ARTICLE I
DEFINITIONS

1.01    **Terms Defined Above**.  As used in this Assignment, the terms "Borrower", "Leases", "Lender", "Property" and "Security" shall have the respective meanings indicated above.

1.02    **Certain Definitions**.    The following terms shall have the meanings assigned to them below whenever they are used in this Assignment, unless the context clearly otherwise requires.  Except where the context otherwise requires, words in the singular form shall include the plural and vice versa.

"Event of Default" shall mean any Event of Default as defined in the Loan Documents.

"Lien Instrument" shall mean that certain Mortgage and Security Agreement of even date herewith, executed by Borrower and granting a lien on the Property to Lender, as such instrument may be amended and restated from time to time.

2

AIC000121

"Loan Commitment" shall mean that certain Conditional Commitment Letter dated November 10, 2013 from Lender to Borrower and accepted by Borrower on November 12, 2013.

"Loan Documents" shall mean the Note, the Lien Instrument, this Assignment, the Loan Commitment, that certain Certification of even date herewith from Borrower to Lender and any other supplements and authorizations required by Lender and all other instruments and documents (as the same may be amended from time to time) executed by Borrower and delivered to Lender in connection with, or as security for, the indebtedness evidenced by the Note, except for that certain Environmental Indemnity Agreement of even date herewith given by Borrower and Ronald H. Van Den Heuvel, to Lender, as any of the foregoing may be amended from time to time.

"Note" shall mean that certain Promissory Note of even date herewith, in the original principal amount of Seven Million One Hundred Fifty Thousand and 00/100 Dollars ($7,150,000.00), executed by Borrower and payable to the order of Lender, as such instrument may be amended, renewed and restated from time to time.

"Obligations" shall mean the following:

      (a)     The indebtedness evidenced by the Note and all interest thereon;

      (b)     The performance of all covenants and agreements of Borrower contained in the Loan Documents;

      (c)     All funds hereafter advanced by Lender to or for the benefit of Borrower as contemplated by any covenant or provision contained in any Loan Document and all interest thereon;

      (d)     All renewals, extensions, rearrangements and modifications of any of the Obligations described hereinabove; and

      (e)     Any and all attorneys' fees and expenses of collection payable under the terms of any Loan Document.

ARTICLE II
ASSIGNMENT

    2.01   **Absolute Assignment**.  This Assignment is, and is intended to be, an absolute and present assignment of the Security from Borrower to Lender with a concurrent license back to Borrower (which license is subject to revocation upon the occurrence of an

3

AIC000122

Event of Default as herein provided) and is not intended as merely the granting of a security interest relating to the Obligations.

2.02   **License**. Borrower is hereby granted the license to manage and control the Security and to collect at the time of, but not prior to, the date provided for the payment thereof, all rents, issues and profits from the Property, and to retain, use and enjoy the same. The license created and granted hereby shall be revocable upon the terms and conditions contained herein.

2.03   **Revocation of License**. Immediately upon the occurrence of an Event of Default and at any time thereafter, Lender may, at its option and without regard to the adequacy of the security for the Obligations, either by an authorized representative or agent, with or without bringing or instituting any judicial or other action or proceeding, or by a receiver appointed by a court, immediately revoke the license granted in Section 2.02, as evidenced by a written notice to said effect given to Borrower, and further, at Lender's option (without any obligation to do so), take possession of the Property and the Security and have, hold, manage, lease and operate the Property and the Security on such terms and for such period of time as Lender may deem proper, and, in addition, either with or without taking possession of the Property, demand, sue for or otherwise collect and receive all rents, issues and profits from the Property, including those past due and unpaid, with full power to make, from time to time, all alterations, renovations, repairs or replacements thereto or thereof as may seem proper to Lender in its sole discretion, and to apply (in such order and priority as Lender shall determine in its sole discretion) such rents, issues and profits to the payment of:

(a)   all expenses of (i) managing the Property, including without implied limitation, the salaries, fees and wages of a managing agent and such other employees as Lender may in its sole discretion deem necessary or desirable, (ii) operating and maintaining the Property, including without implied limitation, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens and premiums for all insurance which Lender may in its sole discretion deem necessary or desirable, (iii) the cost of any and all alterations, renovations, repairs or replacements of or to the Property, and (iv) any and all expenses incident to taking and retaining possession of the Property and the Security; and

(b)   the Obligations.

The exercise by Lender of the rights granted it in this Section 2.03, and the collection and receipt of rents, issues and profits and the application thereof as herein provided, shall not be considered a waiver of any Event of Default.

2.04   **Trust Funds**. All monies or funds covered by this Assignment paid to, or for the benefit of, Borrower after any Event of Default are hereby declared, and shall be deemed to be, trust funds in the hands of Borrower for the sole benefit of Lender, until all

AIC000123

Events of Default have been cured or waived or the Obligations have been paid and performed in full. Borrower, or any officer, director, representative or agent thereof receiving such trust funds or having control or direction of same, is hereby made and shall be construed to be a trustee of such trust funds so received or under its control and direction, and such person shall be under a strict obligation and duty should such persons receive or constructively receive trust funds to (a) remit any and all such trust funds to Lender within twenty-four (24) hours of receipt, upon demand therefor by Lender or (b) to apply such trust funds only to Obligations then due or the operating expenses of the Property.

## ARTICLE III
## COVENANTS, REPRESENTATIONS AND WARRANTIES

3.01    **Liability**.  Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property or the Security after an Event of Default, except for acts constituting gross negligence or willful misconduct.  Lender shall not be obligated to perform or discharge, nor does Lender hereby undertake to perform or discharge, any obligation, duty or liability under any Lease, and Borrower shall and does hereby indemnify Lender for, and save and hold Lender harmless from, any and all liability, loss or damages, except so much thereof as shall result from the gross negligence or willful misconduct of Lender, which may or might be incurred under any Lease or under or by reason of this Assignment and from any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligation or undertaking on its part to perform or discharge any of the terms, covenants or agreements contained in any Lease, including, without implied limitation, any claims by any tenants of credit for rents for any period paid to and received by Borrower but not delivered to Lender.  Should Lender incur any such liability under any Lease in defense of any such claim or demand, the amount thereof, including, without implied limitation, all costs, expenses and attorneys' fees, shall be added to the principal of the Note and Borrower shall reimburse Lender therefore immediately upon demand.  This Assignment shall not operate to place responsibility upon Lender for the control, care, upkeep, management, operation or repair of the Property and the Security or for the carrying out of any of the terms and conditions of any Lease; nor shall this Assignment operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other party, for any dangerous or defective condition of the Property or for any negligence in the control, care, upkeep, operation, management or repair of the Property resulting in loss or injury or death to any tenant, licensee, employee, stranger or other person whatsoever.

3.02    **Termination**.  Upon payment and performance of the Obligations in full, this Assignment shall become null and void and of no further legal force or effect, but the affidavit, certificate, letter or statement of any officer, agent, authorized representative or attorney of Lender showing any part of the Obligations remaining unpaid or unperformed shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment upon which any person may, and is hereby authorized to, rely. Borrower hereby authorizes and directs all tenants under the Leases, all guarantors of Leases, all insurers providing rental loss or business interruption insurance with respect to

5

AIC000124

the Property, all governmental authorities and all other occupants of the Property, upon receipt from Lender of written notice to the effect that Lender is then the holder of the Note and that an Event of Default exists, to pay over to Lender all rents and other amounts due and to become due under the Leases and under guaranties of the Leases and all other issues and profits from the Property and to continue so to do until otherwise notified in writing by Lender. This right may be exercised without Lender taking actual or constructive possession of the Property or any part thereof.

3.03    Security.  Lender may take or release any security for the payment or performance of the Obligations, may release any party primarily or secondarily liable therefor and may apply any security held by it to the satisfaction of all or any portion of the Obligations, without prejudice to any of its rights under this Assignment, the other Loan Documents or otherwise available at law or in equity.

3.04    Covenants.  Borrower covenants with Lender:

(a)    to observe and perform all the obligations imposed upon the lessor under all Leases and not to do or permit to be done anything to impair the same without Lender's prior written consent;

(b)    not to collect any of the rent or other amounts due under any Lease or other issues or profits from the Property in any manner in advance of the time when the same shall become due (save and except only for collecting one month's rent in advance plus the security deposit, if any, at the time of execution of a Lease);

(c)    not to execute any other assignment of rents, issues or profits arising or accruing from the Leases or from the Property;

(d)    not to enter into any lease agreement affecting the Property except in the ordinary course of business with commercially reasonable terms and provisions;

(e)    to execute and deliver, at the request of Lender, all such further assurances and acknowledgments of the assignment contained herein and the other provisions hereof, with respect to specific Leases or otherwise, as Lender shall from time to time require;

(f)    to request, and use commercially reasonable efforts to obtain, from any tenant at the Property, from time to time as requested by Lender, estoppel certificates in form and substance satisfactory to Lender, confirming the terms of such tenant's Lease and the absence of default thereunder;

6

(g)     to provide Lender with a current rent roll and copies of all Leases, not later than fifteen (15) days following Lender's written request therefor;

(h)     to provide prompt written notice to Lender of any notice of Borrower's default received from any tenant and to further provide to Lender a complete copy thereof; and

(i)     not cancel, surrender or terminate any Lease, exercise any option which might lead to such termination or consent to any change, modification, or alteration thereof, to the release of any party liable thereunder or to the assignment of the lessee's interest therein, without the prior written consent of Lender, and any of said acts, if done without the prior written consent of Lender, shall be null and void.

3.05    **Authority to Assign**.  Borrower represents and warrants that:

(a)     Borrower has full right and authority to execute this Assignment and has no knowledge of any existing defaults under any existing Lease;

(b)     all conditions precedent to the effectiveness of any existing Lease have been satisfied;

(c)     Borrower has not executed or granted any modification of any existing Lease, either orally or in writing;

(d)     all existing Leases are in full force and effect according to the terms set forth in the lease instruments heretofore submitted to Lender; and

(e)     Borrower has not executed any other instrument which might prevent Lender from operating under any of the terms and conditions of this Assignment, including any other assignment of the Leases or the rents, issues and profits from the Property.

3.06    **Cross-Default**.    Violation or default under any of the covenants, representations, warranties and provisions contained in this Assignment by Borrower shall be deemed a default hereunder as well as under the terms of the other Loan Documents, and any default thereunder shall likewise be a default under this Assignment.  Any default by Borrower under any of the terms of any Lease shall be deemed a default hereunder and under the terms of the other Loan Documents, and any expenditures made by Lender in curing such default on Borrower's behalf, with interest thereon at the Default Rate (as defined in the Note), shall become part of the Obligations.

3.07    **No Mortgagee in Possession**.    The acceptance by Lender of this Assignment, with all of the rights, powers, privileges and authority created hereby, shall

7

AIC000126

not, prior to entry upon and taking possession of the Property by Lender, be deemed or construed to constitute Lender a "mortgagee in possession", or hereafter or at any time or in any event obligate Lender to appear in or defend any action or proceeding relating to any Lease, the Property or the Security, to take any action hereunder, to expend any money, incur any expense, perform or discharge any obligation, duty or liability under any Lease, or to assume any obligation or responsibility for any security deposits or other deposits delivered to Borrower by any tenant and not actually delivered to Lender. Lender shall not be liable in any way for any injury or damage to any person or property sustained in or about the Property.

3.08   **Representation and Warranty**. Borrower represents and warrants that: (a) no Lease grants the tenant thereunder or any other party (i) the right or option to acquire the Property or any portion of the Property or (ii) any rights with respect to any other property owned by Borrower; (b) Borrower is the sole owner of the lessor's or landlord's interest in the Leases; (c) all existing Leases are in full force and effect, are valid and enforceable and have not been altered, modified or amended in any manner; (d) no portion of the Leases or any interest therein has heretofore been assigned or pledged; (e) all rent due to date under the Leases has been collected and no tenant has been granted a concession in the form of a waiver, release, reduction, discount or other alteration of the rentals due or to become due under the Leases; (f) no rent for any period subsequent to the date of this Assignment has been collected in advance of the time when the same is due under the terms of the existing Leases; (g) neither Borrower or any tenant under the Leases is in default under any of the terms, covenants or conditions in any of the existing Leases; and (h) no tenant has any defense, set-off or counterclaim against Borrower under any of the existing Leases.

## ARTICLE IV
## GENERAL

4.01   **Remedies**. The rights and remedies provided Lender in this Assignment and the other Loan Documents are cumulative. Nothing contained in this Assignment, and no act done or omitted by Lender pursuant hereto, including, without implied limitation, the collection of any rents, shall be deemed to be a waiver by Lender of any of its rights and remedies under the other Loan Documents or applicable law or a waiver of any default under the other Loan Documents, and this Assignment is made and accepted without prejudice to any of the rights and remedies provided Lender by the other Loan Documents. The right of Lender to collect the principal sum and the interest due on the Note and to enforce the other Loan Documents may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

4.02   **Notice**. Any notice required or provided for herein shall be in writing and shall be delivered personally or sent by certified mail or reputable courier service with charges prepaid, to the address for Borrower and Lender set forth on the first page of this Assignment or at such other address as either Borrower or Lender shall designate by written notice as provided in this paragraph. Notice shall be deemed given on the date received. Any notice which is rejected, the acceptance of which is refused or which is incapable of

8

AIC000127

being delivered during normal business hours at the address provided herein or such other address designated pursuant hereto shall be deemed received as of the date of the attempted delivery.

4.03    **Appointment**.  Borrower irrevocably appoints Lender its true and lawful attorney in fact, which appointment is coupled with an interest, to execute any or all of the rights or powers described herein with the same force and effect as if executed by Borrower, and Borrower ratifies and confirms any and all acts done or omitted to be done by Lender, its agents, servants, employees or attorneys in, to or about the Property.

4.04    **Captions**.  The title and headings of the various Articles and Sections hereof are intended solely for reference and are not intended to modify, explain or affect the meaning of the provisions of this Assignment.

4.05    **Severability**.  If any of the provisions of this Assignment or the application thereof to any persons or circumstances shall to any extent be invalid or unenforceable, the remainder of this Assignment, and the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.

4.06    **Attorneys' Fees**.  In the event of any controversy, claim, dispute, or litigation between the parties hereto to enforce any provision of this Assignment or any right of Lender hereunder, Borrower agrees to pay to Lender all costs and expenses, including reasonable attorneys' fees incurred therein by Lender, whether in preparation for or during any trial, as a result of an appeal from a judgment entered in such litigation or otherwise.

4.07    **Amendments**.  This Assignment may not be modified, amended or otherwise changed in any manner unless done so by a writing executed by Borrower and Lender.

4.08    **Benefits**.  This Assignment and all the covenants, terms and provisions contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

4.09    **Assignment**.  Borrower shall have no right to assign or transfer the revocable license granted herein.  Any such assignment or transfer shall constitute a default.

4.10    **Time of Essence**.  Time is of the essence of this Assignment.

AIC000128

4.11   <u>Governing Law</u>. This Assignment, the interpretation hereof and the rights, obligations, duties and liabilities hereunder shall be governed and controlled by the laws of the State of Wisconsin.

4.12   <u>Limitation of Liability</u>. Notwithstanding any provision contained in this Assignment, the personal liability of Borrower shall be limited as provided in the Note.

4.13   <u>Conflicts</u>. This Assignment is intended to be supplementary to, and not in substitution for or in derogation of any assignment of leases and rents contained in any other Loan Document specifically including, but not limited to, the Lien Instrument. If any conflict or inconsistency exists between this Assignment and the assignment of the rents and leases as security in any of the other Loan Documents, the terms of this Assignment shall control.

4.14   **WAIVER OF PUNITIVE OR CONSEQUENTIAL DAMAGES.** NEITHER LENDER (BY ITS ACCEPTANCE HEREOF) NOR BORROWER SHALL BE RESPONSIBLE OR LIABLE TO THE OTHER OR TO ANY OTHER PERSON FOR ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF THIS ASSIGNMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING ANY BREACH OR OTHER DEFAULT BY ANY PARTY HERETO.

4.15   <u>**WAIVER OF JURY TRIAL/SUBMISSION TO JURISDICTION**</u>. TO THE MAXIMUM EXTENT PERMITTED BY LAW, BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THE TRANSACTION CONTEMPLATED BY THIS ASSIGNMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THE LOAN DOCUMENTS OR IN ANY WAY RELATING TO THIS ASSIGNMENT OR THE SECURITY (INCLUDING ANY ACTION TO RESCIND OR CANCEL THIS ASSIGNMENT, AND ANY CLAIM OR DEFENSE ASSERTING THAT THIS ASSIGNMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS ASSIGNMENT. BORROWER AND LENDER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY FEDERAL OR STATE COURT IN THE STATE OF WISCONSIN IN ANY ACTION, SUIT OR PROCEEDING BROUGHT AGAINST IT AND RELATED TO OR IN CONNECTION WITH THIS ASSIGNMENT AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY WAIVE AND AGREE NOT TO ASSERT BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING ANY CLAIM THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH FEDERAL OR STATE COURTS, THAT THE SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT, ACTION OR

10

PROCEEDING IS IMPROPER, OR THAT THIS ASSIGNMENT OR ANY OTHER LOAN DOCUMENT OR ANY OTHER DOCUMENT OR INSTRUMENT REFERRED TO HEREIN OR THEREIN OR THE SUBJECT MATTER HEREOF OR THEREOF MAY NOT BE LITIGATED IN OR BY SUCH FEDERAL OR STATE COURTS.

[Remainder of this Page Left Intentionally Blank.]

11

AIC000130

IN WITNESS WHEREOF, this Assignment has been executed as of the day and year first-above written.

Signed in the presence of:

*Tammi A. Kersten* (signature)

Tami A. Kersten
Typed or Printed Name

*Mark Smolinski* (signature)

Mark Smolinski
Typed or Printed Name

BORROWER:

GREEN BOX NA GREEN BAY, LLC,
a Wisconsin limited liability company
By: ENVIRONMENTAL ADVANCED
RECLAMATION TECHNOLOGY HQ,
LLC, a Wisconsin limited liability company,
its Manager

By: _____
Name: Ronald Van Den Heuvel
Title: Chairman

STATE OF WISCONSIN )
                    )ss.
COUNTY OF  BROWN    )

Be it known, that on this 13th day of December, 2013, before me, a Notary Public, in and for said County and State, personally came Ronald Van Den Heuvel who acknowledged himself/herself to be the Chairman of Environmental Advanced Reclamation Technology HQ, LLC, a Wisconsin limited liability company, as Manager of GREEN BOX NA GREEN BAY, LLC, a Wisconsin limited liability company, to me personally known to be the person who executed the foregoing instrument, and acknowledged that he/she executed the same freely and voluntarily for the uses and purposes mentioned in it and as the free act and deed of the said limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*Debra S Stary* (signature)
Debra S Stary _____, Notary Public

Brown _____ County
My Commission Expires: 2 | 16 | 14

(Notary seal: NOTARY PUBLIC  DEBRA S STARY  STATE OF WISCONSIN)

12

AIC000131

## EXHIBIT "A"
## LEGAL DESCRIPTION OF PROPERTY

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of Lot One (1), Vol. 24 Certified Survey Maps, Page 84, Map No. 4035, all being in the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

ALSO KNOWN AS

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4); the Northwest Quarter (NW 1/4) of the Southwest Quarter (SW 1/4) and Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Boulevard, De Pere, WI 54115
Tax Parcel Number: WD-1042

AIC000132

THIS IS AN
AUTHENTICATED COPY OF
THE ORIGINAL DOCUMENT

State Bar of Wisconsin Form 3-2003
## QUIT CLAIM DEED

Document Number

THIS DEED, made between SHF XII, LLC, a Delaware limited liability company ("Grantor," whether one or more), and Green Box NA Green Bay, LLC a Wisconsin limited liability company ("Grantee," whether one or more).

Grantor quit claims to Grantee the following described real estate, together with the rents, profits, fixtures and other appurtenant interests, in Brown County, State of Wisconsin ("Property") (if more space is needed, please attach addendum):

Lot 2, Volume 41, Certified Survey Maps, page 100, Map No. 6194, said lot being part of Lots 1, 2, and 3, DePere Business Park South Addition and part of the Northeast 1/4 of the Southwest 1/4; the Northwest 1/4 of the Southwest 1/4; and Southeast 1/4 of the Southwest 1/4 , Section 32, Township 23 North, Range 20, in the City of DePere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Blvd.

Recording Area

Name and Return Address

Winthrop & Weinstine, P.A.
225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
Attention: Dean D. Willer

WD-1042
Parcel Identification Number (PIN)

This ____ is not ____ homestead property.
(is) (is not)

Dated December 24th , 2013.

SHF XII, LLC, a Delaware limited liability company

By:                                                           (SEAL)
Name: Jeffrey A. Thusinger
Its: Authorized Officer

### AUTHENTICATION

Signature(s) _____

authenticated on _____

_____

_____

*

TITLE: MEMBER STATE BAR OF WISCONSIN
(If not,
authorized by Wis. Stat. § 706.06)

THIS INSTRUMENT WAS DRAFTED BY:
Ann M. Steingraeber, Winthrop & Weinstine, P.A.
225 South Sixth Street, Ste. 3500
Minneapolis, MN 55402

### ACKNOWLEDGMENT

STATE OF Minnesota   )
                     ) ss.
Hennepin   COUNTY  )

Personally came before me on Dec. 4th , 2013, the above-named Jeffrey A. Thusinger , the Authorized Officer of SHF XII, LLC, a Delaware limited liability company to me known to be the person(s) who executed the foregoing instrument and acknowledged the same.

Carol Racine
Notary Public, State of Minnesota
My Commission (is permanent) (expires: 1-31-2015   )

CAROL L. RACINE
Notary Public-Minnesota
My Commission Expires Jan 31 2015

(Signatures may be authenticated or acknowledged. Both are not necessary.)

## ALLONGE

This Allonge is attached to and made a part of that certain Subordinated Promissory Note, Note No. 1, dated as of April 16, 2007, in the original principal amount of $8,000,000.00 made by ST PAPER, LLC, a Delaware limited liability company, payable to the order of OCONTO FALLS TISSUE, INC., a Wisconsin corporation.

Pay to the order of Green Box NA Green Bay, LLC, a Wisconsin limited liability company, without recourse.

Dated as of December 18, 2013.

PAPER HOLDCO, LLC

Signed: _____
By: _____ Jeffrey A. Thuringer _____
Its: _____ Managing Director _____

7833138v2

AIC000134

## ALLONGE

This Allonge is attached to and made a part of that certain Subordinated Promissory Note, Note No. 1, dated as of April 16, 2007, in the original principal amount of $8,000,000.00 made by ST PAPER, LLC, a Delaware limited liability company, payable to the order of OCONTO FALLS TISSUE, INC., a Wisconsin corporation, as assigned to SHF XII, LLC, a Delaware limited liability company, d/b/a Stonehill Financial Group, pursuant to that certain Allonge dated as of April 16, 2007.

Pay to the order of Paper Holdco, LLC, Delaware limited liability company, without recourse.

Dated as of September 24, 2012.

SHF XII, LLC, a Delaware limited liability company, d/b/a Stonehill Financial Group

By:

Name: Donald C. Swinson

Its: Chairman, CEO

## AGREED AND ACCEPTED:

Stonehill Financial, LLC, a Delaware limited liability company

By:

Name: Donald G. Swinson

Its: Chairman, CEO

13833-1
7269591v1

AIC000135

ENDORSEMENT

For value received, the undersigned hereby endorses to the order of
Stonehill Financial Group _____ the attached Subordinated
Promissory Note No. 1.

Dated: 4-16-07 _____

OCONTO FALLS TISSUE, INC.

By: _____

Name: Ronald H. Van Den Heuvel
Title: President

AIC000136

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS NOTE MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

THIS NOTE AND THE INDEBTEDNESS EVIDENCED HEREBY IS SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH HEREIN AND IN THE SUBORDINATION AGREEMENT, DATED AS OF APRIL 16, 2007 (THE "SUBORDINATION AGREEMENT"), BY AND AMONG ST PAPER, LLC, OCONTO FALLS TISSUE, INC. AND GOLDMAN SACHS CREDIT PARTNERS L.P., AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT, TO THE SENIOR INDEBTEDNESS (AS DEFINED IN THE SUBORDINATION AGREEMENT). THE HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, SHALL BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

## SUBORDINATED PROMISSORY NOTE

$8,000,000.00                                                        April 16, 2007
Note No. 1

FOR VALUE RECEIVED, the undersigned, ST PAPER, LLC, a Delaware limited liability company ("Maker"), hereby promises to pay to the order of OCONTO FALLS TISSUE, INC., a Wisconsin corporation ("Payee"), c/o Tissue Products Technology Corp., 1555 Glory Road, Green Bay, Wisconsin 54304, or such other place as the Payee shall from time to time direct in writing to the Maker, subject to the contingency described herein, the principal sum of Eight Million and 00/100 Dollars ($8,000,000.00). The unpaid principal balance of this Note shall bear interest at a rate per annum equal to seven and one-half percent (7.5%). Interest accrued from and after the date hereof shall be added to the unpaid principal balance of this Note on an annual basis commencing April 16, 2008 and continuing on the subsequent anniversaries of such date until the unpaid principal balance of this Note is paid in full. The unpaid principal balance of this Note, together with accrued and capitalized interest, shall be due and payable on April 16, 2015.

This Note is the Note referred to in Paragraph 2.3 of the Second Amended and Restated Asset Purchase Agreement, dated as of April 16, 2007 (the "Purchase Agreement"), by and between Maker, Payee and others. Reference is made to the Purchase Agreement for relevant terms and provisions that bear upon this Note, including without limitation, Paragraph 9.4 of the Purchase Agreement.

Maker may prepay all or any part of the unpaid balance of this Note at any time, and from time to time, without premium or penalty.

The Purchase Agreement contains provisions for offset against amounts due under this Note. Notwithstanding anything contained herein to the contrary, any offset against amounts due

under this Note in accordance with the Purchase Agreement shall not be considered an Event of Default hereunder.

Payee, by its acceptance hereof, acknowledges that this Note is subordinated and junior in right of payment to all amounts owed to current or future holder of Senior Indebtedness, including, without limitation, interest thereon, whether or not an allowed claim. Payee, by accepting this Note, agrees to execute the Subordination Agreement in the form attached hereto as Exhibit A upon such acceptance and any other documents the Senior Lenders may reasonably request to effect the subordination intended hereunder. For purposes hereof, the term "Senior Indebtedness" has the meaning given in the Subordination Agreement. A "Senior Lender" is any holder of Senior Indebtedness.

The unpaid principal balance of this Note, together with accrued and unpaid interest, shall, at the option of Payee or any subsequent holder hereof, become immediately due and payable upon the occurrence of any of the following events (hereinafter, an "Event of Default"): Maker shall: (i) become insolvent or take or fail to take any action which constitutes an admission of inability to pay its debts as they become due, (ii) make a general assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its assets, (iii) become the subject of an "order for relief" within the meaning of the United States Bankruptcy Code, (iv) file a petition in bankruptcy, or for reorganization, or to effect a plan or other arrangement with creditors, (v) file an answer to a creditor's petition, admitting the material allegations thereof, for an adjudication of bankruptcy or for reorganization or to effect a plan or other arrangement with creditors, (vi) apply to a court for the appointment of a receiver or custodian for any of its assets or properties, (vii) have a receiver or custodian appointed for any of its assets or properties, with or without consent, and such receiver shall not be discharged within sixty (60) days after his appointment, or (viii) take any action for the purpose of effecting any of the foregoing.

No delay or omission on the part of Payee or any holder of this Note in exercising any right or option given to Payee or such holder shall impair such right or option or be considered as a waiver thereof or acquiescence in any default hereunder.

Maker hereby waives presentment, demand, notice of dishonor and protest and consents to any and all extensions and renewals hereof without notice.

Upon payment in full of this Note or upon the adjustment described above, Payee agrees to surrender this Note to Maker for cancellation thereof.

This Note shall be construed in accordance with the internal laws of the State of Wisconsin.

2

AIC000138

MAKER:

ST PAPER, LLC

By: _____

   Name: Sharad Tak
   Title:   President

AIC000139

**EXHIBIT A**

**Subordination Agreement**

*(Copy Attached)*

4

AIC000140

EXECUTION VERSION

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement"), dated as of April 16, 2007, is among ST PAPER, LLC, a Delaware limited liability company ("Borrower"), OCONTO FALL TISSUE, INC., a Wisconsin corporation ("OFTI"), in its capacity as holder of Subordinated Indebtedness (as hereinafter defined) (OFTI, together with any other party from time to time becoming a holder of Subordinated Indebtedness, and their respective successors and assigns, being hereinafter collectively referred to as the "Subordinated Creditors"), and GOLDMAN SACHS CREDIT PARTNERS L.P. ("GSCP"), in its capacity as administrative agent (in such capacity, "Administrative Agent") for the Lenders and as collateral agent (in such capacity, "Collateral Agent") for the Secured Parties under the Credit Agreement referred to below.

## RECITALS

A.     Borrower has entered into a Credit Agreement, dated as of the date hereof (as the same may be amended, restated, supplemented or otherwise modified from time to time as permitted hereunder, the "Credit Agreement" and, collectively with the financing and security documents related thereto, the "Loan Documents"), with Administrative Agent, Collateral Agent, GSCP, as Sole Lead Arranger, Sole Bookrunner and Syndication Agent, and the Lenders from time to time party thereto, pursuant to which, among other things, Lenders have agreed, subject to the terms and conditions set forth in the Credit Agreement, to make certain loans and other financial accommodations to Borrower.

B.     Borrower, OFTI, Tissue Products Technology Corp. and Partners Concepts Development, Inc., a Wisconsin corporation ("PCDI"), have entered into a Second Amended and Restated Asset Purchase Agreement, dated as of the date hereof (as the same may be amended, supplemented, restated or otherwise modified from time to time as permitted hereunder, the "Asset Purchase Agreement"), pursuant to which, among other things, OFTI has extended credit to Borrower as evidenced by four (4) Subordinated Promissory Notes of even date herewith issued by Borrower to OFTI in the original aggregate principal amounts of $8,000,000, $8,000,000, $8,000,000 and   $6,589,000, respectively (as the same may be amended, supplemented, restated or otherwise modified from time to time as permitted hereunder and all notes issued in exchange or substitution of any thereof, the "Subordinated Notes"), and pursuant to which Borrower has incurred and may hereafter incur other obligations and liabilities to OFTI.

C.     As an inducement to and as one of the conditions precedent to the agreement of Administrative Agent, Collateral Agent and Lenders to consummate the transactions contemplated by the Credit Agreement, Administrative Agent, Collateral Agent and Lenders required the execution and delivery of this Agreement by OFTI and Borrower.

NOW, THEREFORE, in order to induce Administrative Agent, Collateral Agent and Lenders to consummate the transactions contemplated by the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

AIC000141

1.     **Definitions**.  All capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement. The following terms shall have the following meanings in this Agreement:

"Administrative Agent" shall have the meaning ascribed to such term in the preamble of this Agreement; provided, however that after the consummation of any Permitted Refinancing, the term "Administrative Agent" shall refer to any party appointed by the holders of the Senior Indebtedness as agent for themselves for the purposes of this Agreement.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Collateral" means all of the collateral securing the obligations of Borrower under the Loan Documents.

"Enforcement Action" is defined in subsection 2.7.

"Lender or Lenders" shall mean any "Lender" or the "Lenders," respectively, as such terms are defined in the Credit Agreement; provided, however that after the consummation of any Permitted Refinancing, such terms shall refer to any holder or all of the holders, respectively, of the Senior Indebtedness.

"Loan Documents" is defined in Recital A.

"Paid in Full" or "Payment in Full" shall mean the indefeasible payment in full in cash of all Senior Indebtedness.

"Permitted Refinancing" shall mean any refinancing of the Senior Indebtedness under the Loan Documents provided that the financing documentation entered into by Borrower in connection with such Permitted Refinancing constitutes Permitted Refinancing Loan Documents.

"Permitted Refinancing Loan Documents" shall mean any financing documentation which replaces the Loan Documents and pursuant to which the Senior Indebtedness under the Loan Documents is refinanced, as such financing documentation may be amended, restated, supplemented or otherwise modified from time to time.

"Proceeding" is defined in subsection 2.3.

"Required Lenders" shall have the meaning ascribed to such term in the Credit Agreement; provided, however that after the consummation of any Permitted Refinancing, the term "Required Lenders" shall mean the holders of Senior Indebtedness having the right and/or ability under the Permitted Refinancing Loan Documents to effectuate the waiver, amendment, granting of consent or other matter in question.

"Senior Indebtedness" shall mean the "Obligations," as such term is defined in the Credit Agreement, including all interest, fees, expenses, indemnities, in each instance, whether before or after the commencement of a Proceeding and without regard to whether or not an allowed claim, and all obligations and liabilities incurred with respect to Permitted Refinancings, together with any amendments, restatements, modifications, renewals or extensions of any thereof permitted hereunder.

2

AIC000142

"Subordinated Creditors" shall mean the Subordinated Creditors who are signatories to this Agreement and any other holders of the Subordinated Notes or any other Subordinated Indebtedness from time to time.

"Subordinated Indebtedness" shall mean all of the obligations of Borrower to Subordinated Creditors evidenced by the Subordinated Notes and all other amounts and other obligations now or hereafter owed by Borrower to Subordinated Creditors pursuant to the Subordinated Note Documents.

"Subordinated Note Documents" shall mean the Subordinated Notes, the Asset Purchase Agreement, any guaranty with respect to the Subordinated Indebtedness and all other documents and instruments evidencing, securing or pertaining to any portion of the Subordinated Indebtedness, as amended, supplemented, restated or otherwise modified from time to time as permitted hereunder.

> 2.    Subordination of Subordinated Indebtedness to Senior Indebtedness.

2.1    **Subordination**.  The payment of any and all of the Subordinated Indebtedness hereby expressly is subordinated, to the extent and in the manner set forth herein, to the Payment in Full of the Senior Indebtedness.  Each holder of Senior Indebtedness, whether now outstanding or hereafter arising, shall be deemed to have acquired Senior Indebtedness in reliance upon the provisions contained herein.

2.2    **Restriction on Payments**.  No payment (whether made in cash, securities or other property or by set-off) of principal, interest or any other amount due with respect to the Subordinated Indebtedness shall be made or received, and no Subordinated Creditor shall exercise any right of set-off or recoupment with respect to any Subordinated Indebtedness, until all of the Senior Indebtedness is Paid in Full.

2.3    **Proceedings**.  In the event of any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, assignment for the benefit of creditors or other proceeding for the liquidation, dissolution or other winding up of Borrower or any of its Subsidiaries or any of their respective properties (a "Proceeding"):

A.    all Senior Indebtedness first shall be Paid in Full before any payment (whether made in cash, securities or other property) of or with respect to the Subordinated Indebtedness shall be made;

B.    any payment which, but for the terms hereof, otherwise would be payable or deliverable in respect of the Subordinated Indebtedness, shall be paid or delivered directly to Administrative Agent (to be held and/or applied by Administrative Agent in accordance with the terms of the Credit Agreement or the Permitted Refinancing Loan Documents) until all Senior Indebtedness is Paid in Full, and each Subordinated Creditor irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, custodians, conservators and others having authority in the premises to effect all such payments and deliveries, and each Subordinated Creditor also irrevocably authorizes, empowers and directs Administrative Agent to demand, sue for, collect and receive every such payment or distribution; and

3

AIC000143

C.     each Subordinated Creditor agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Indebtedness requested by Administrative Agent in connection with any such Proceeding and hereby irrevocably authorizes, empowers and appoints Administrative Agent its agent and attorney-in-fact to execute, verify, deliver and file such proofs of claim upon the failure of such Subordinated Creditor promptly to do so (and in any event prior to 15 days before the expiration of the time to file any such proof); provided Administrative Agent shall have no obligation to execute, verify, deliver, and/or file any such proof of claim.

The Senior Indebtedness shall continue to be treated as Senior Indebtedness and the provisions of this Agreement shall continue to govern the relative rights and priorities of Administrative Agent, Collateral Agent, Lenders and Subordinated Creditors even if all or part of the Senior Indebtedness or the liens securing the Senior Indebtedness are subordinated, set aside, avoided or disallowed in connection with any such Proceeding.  This Agreement shall be reinstated if at any time any payment of any of the Senior Indebtedness is rescinded or must otherwise be returned by any holder of the Senior Indebtedness or any representative of such holder and the Senior Indebtedness, or portion thereof, intended to have been satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.

2.4     **Incorrect Payments**.  If any payment (whether made in cash, securities or other property) not permitted under this Agreement is received by any Subordinated Creditor on account of the Subordinated Indebtedness before all Senior Indebtedness is Paid in Full, such payment shall not be commingled with any asset of such Subordinated Creditor, shall be held in trust by such Subordinated Creditor for the benefit of Lenders and shall be paid over to Administrative Agent, or its designated representative, for application (in accordance with the Credit Agreement or the Permitted Refinancing Loan Documents) to the payment of the Senior Indebtedness then remaining unpaid, until all of the Senior Indebtedness is Paid in Full.

2.5     **Sale, Transfer**.  (a) No Subordinated Creditor shall sell, assign, dispose of or otherwise transfer all or any portion of the Subordinated Indebtedness (1) unless prior to the consummation of any such action, the transferor and transferee thereof shall execute and deliver to Administrative Agent a joinder to this Agreement, or an agreement substantially identical to this Agreement, in either case providing for the continued subordination and forbearance of the Subordinated Indebtedness to the Senior Indebtedness as provided herein and for the continued effectiveness of all of the rights of Administrative Agent, Collateral Agent and Lenders arising under this Agreement and (2) unless following such sale, assignment, disposition or other transfer, there shall be no more than five (5) holders who shall have rights in and to the Subordinated Indebtedness.

(b)     Notwithstanding the failure to execute or deliver any such agreement or appoint any such agent, the subordination effected hereby shall survive any sale, assignment, disposition or other transfer of all or any portion of the Subordinated Indebtedness, and the terms of this Agreement shall be binding upon the successors and assigns of each Subordinated Creditor, as provided in Section 9 below.

4

AIC000144

2.6    Legends.  Until the Senior Indebtedness is Paid in Full and all commitments to lend under the Loan Documents or Permitting Refinancing Loan Documents have terminated, each of the Subordinated Note Documents at all times shall contain in a conspicuous manner the following legend:

> "This Note and the indebtedness evidenced hereby is subordinate in the manner and to the extent set forth herein and in the Subordination Agreement, dated as of April 16, 2007 (the "Subordination Agreement"), by and among ST Paper, LLC, Oconto Falls Tissue, Inc. and Goldman Sachs Credit Partners L.P., as Administrative Agent and Collateral Agent, to the Senior Indebtedness (as defined in the Subordination Agreement).  The holder of this Note, by its acceptance hereof, shall be bound by the provisions of the Subordination Agreement."

2.7    Restriction on Action by Subordinated Creditors.

(a)    Subordinated Creditors may at any time and from time to time without the consent of or notice to the Administrative Agent, Collateral Agent or any Lender, without incurring liability to the Administrative Agent, Collateral Agent or any Lender, change the manner or place of payment or extend the time of payment of or renew or alter the Subordinated Notes, or amend, restate, supplement or otherwise modify in any manner the Asset Purchase Agreement; provided, that until the Senior Indebtedness is Paid in Full and all commitments to lend under the Loan Documents or Permitted Refinancing Loan Documents have terminated, the Subordinated Creditor shall not, without the prior written consent of Administrative Agent, agree to any amendment, modification or supplement to the Subordinated Note Documents, the effect of which is to (i) increase the maximum principal amount of the Subordinated Indebtedness or increase the rate of interest on any of the Subordinated Indebtedness or make any such interest payable in cash, (ii) shorten the dates upon which payments of principal or interest on the Subordinated Indebtedness are due, (iii) change in a manner adverse to Borrower or add any event of default or add or make more restrictive any covenant with respect to the Subordinated Indebtedness (or Permitted Refinancing Loan Documents), (iv) change the redemption, prepayment or put provisions of the Subordinated Indebtedness, (v) subordinate the Subordinated Indebtedness to any other debt, (vi) alter the repayment terms of the Subordinated Indebtedness in a manner adverse to Borrower, (vii) take any liens in any assets of Borrower or any of its Subsidiaries or any other assets securing the Senior Indebtedness, or (viii) obtain any guaranties or credit support from any party other than Borrower.

(b)    Until the Senior Indebtedness is Paid in Full, no Subordinated Creditor shall, without the prior written consent of Administrative Agent, take any action to collect, enforce payment or accelerate any of the Subordinated Indebtedness, exercise any of the remedies with respect to the Subordinated Indebtedness set forth in any of the Subordinated Note Documents or that otherwise may be available to any Subordinated Creditor, either at law or in equity, by judicial proceedings (including by filing a Proceeding) or otherwise (an "Enforcement Action"), except as provided in the following sentence.

AIC000145

AIC000146

(c)      Until the Senior Indebtedness is Paid in Full and all commitments to lend under the Loan Documents or Permitted Refinancing Loan Documents have terminated, any liens of Subordinated Creditors in the Collateral which may exist in breach of each Subordinated Creditor's agreement pursuant to subsection 2.7(a)(vii) or Section 16 of this Agreement shall be and hereby are subordinated for all purposes and in all respects to the liens of Collateral Agent in the Collateral, regardless of the time, manner or order of perfection of any such liens.  In the event that any Subordinated Creditor obtains any liens in the Collateral in violation of subsection 2.7(a)(vii) or Section 16 of this Agreement, Subordinated Creditors (i) shall (or shall cause their agent) to promptly execute and/or deliver to Administrative Agent such termination statements and releases as Administrative Agent shall request to effect the release of the liens of such Subordinated Creditor in such Collateral and (ii) shall be deemed to have authorized Administrative Agent to file any and all termination statements required by Administrative Agent in respect of such liens. In furtherance of the foregoing, each Subordinated Creditor hereby irrevocably appoints Administrative Agent its attorney-in-fact, with full authority in the place and stead of such Subordinated Creditor and in the name of such Subordinated Creditor or otherwise, to execute and deliver any document or instrument which such Subordinated Creditor may be required to deliver pursuant to this subsection 2.7(c).

3.      **Continued Effectiveness of this Agreement; Modifications to Senior Indebtedness**.  (a) The terms of this Agreement, the subordination effected hereby, and the rights and the obligations of Subordinated Creditors, Administrative Agent, Collateral Agent and Lenders arising hereunder, shall not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Credit Agreement, any other Loan Document or any Permitted Refinancing Loan Document (to the extent such amendment, modification or supplement is not prohibited under the terms of this Agreement) or any Subordinated Note Documents; (ii) the validity or enforceability of any of such documents; or (iii) any exercise or non-exercise of any right, power or remedy under or in respect of the Senior Indebtedness or the Subordinated Indebtedness or any of the instruments or documents referred to in clause (i) above.

(b) Administrative Agent, Collateral Agent and Lenders may at any time and from time to time without the consent of or notice to any Subordinated Creditor, without incurring liability to any Subordinated Creditor and without impairing or releasing the obligations of any Subordinated Creditor under this Agreement, change the manner or place of payment or extend the time of payment of or renew or alter any Senior Indebtedness, or amend, restated, supplement or otherwise modify in any manner any Loan Document or Permitted Refinancing Loan Document.

4.      **Cumulative Rights, No Waivers**.  Each and every right, remedy and power granted to Administrative Agent,  Collateral Agent or Lenders hereunder shall be cumulative and in addition to any other right, remedy or power specifically granted herein, in the Credit Agreement, the other Loan Documents or Permitted Refinancing Loan Documents or now or hereafter existing in equity, at law, by virtue of statute or otherwise, and may be exercised by Administrative Agent, Collateral Agent or Lenders, from time to time, concurrently or independently and as often and in such order as Administrative Agent, Collateral Agent or Lenders may deem expedient.  Any failure or delay on the part of Administrative Agent,

6

AIC000147

AIC000148

Collateral Agent or Lenders in exercising any such right, remedy or power, or abandonment or discontinuance of steps to enforce the same, shall not operate as a waiver thereof or affect Administrative Agent's, Collateral Agent's or Lenders' right thereafter to exercise the same, and any single or partial exercise of any such right, remedy or power shall not preclude any other or further exercise thereof or the exercise of any other right, remedy or power, and no such failure, delay, abandonment or single or partial exercise of Administrative Agent's, Collateral Agent's or Lenders' rights hereunder shall be deemed to establish a custom or course of dealing or performance among the parties hereto.

     5.    **Modification**.  Any modification or waiver of any provision of this Agreement, or any consent to any departure by Administrative Agent, Collateral Agent or any Subordinated Creditor therefrom, shall not be effective in any event unless the same is in writing and signed by Administrative Agent, Collateral Agent and the holders of greater than 50% of the then outstanding principal balance of the Subordinated Indebtedness, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific instance and for the specific purpose given.  Any notice to or demand on any Subordinated Creditor in any event not specifically required of Administrative Agent or Collateral Agent hereunder shall not entitle any Subordinated Creditor to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

     6.    **Additional Documents and Actions**.  Each Subordinated Creditor at any time, and from time to time, after the execution and delivery of this Agreement, upon the request of Administrative Agent or Collateral Agent and at the expense of Borrower, promptly will execute and deliver such further documents and do such further acts and things as Administrative Agent or Collateral Agent may request in order to effect fully the purposes of this Agreement.

     7.    **Notices**.  All notices and other communications provided for hereunder shall be in writing and shall be mailed, facsimiled or delivered to the following addresses:

| | |
|---|---|
| If to OFTI: | Oconto Falls Tissue, Inc.<br>c/o Tissue Products Technology Corp.<br>1555 Glory Road<br>Green Bay, Wisconsin 54304<br>Attention: Ron van den Heuvel |
| If to any other Subordinated Creditor: | To the address specified in a joinder delivered to Administrative Agent |
| If to Borrower: | ST Paper, LLC<br>1555 Glory Road<br>Green Bay, Wisconsin 54304<br>Attention: Sharad Tak |

7

AIC000149

AIC000150

with a copy to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Ken S. Wyman

If to Collateral Agent or
Administrative Agent:

Goldman, Sachs & Co.
30 Hudson Street, 17th Floor
Jersey City, NJ 07302
Attention: Pedro Ramirez
Telecopier: (212) 428-1622

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention: Kirk A. Davenport, Esq.

or to any other address, as to any of the parties hereto, as such party shall designate in a written notice to the other parties hereto. All notices sent pursuant to the terms of this Section 7 shall be effective, (i) if mailed, when received or three days after deposited in the mails, whichever occurs first, (ii) if transmitted by facsimile, on the date of transmission if transmitted before 4:00 p.m. (New York time) otherwise on the next Business Day, (iii) if delivered by personal delivery, upon delivery, or (iv) if delivered by overnight courier one (1) Business Day after delivery to the courier, in each case, properly addressed.

8.  **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

9.  **Successors and Assigns**.  This Agreement shall inure to the benefit of the successors and assigns of Administrative Agent, Collateral Agent and Lenders and shall be binding upon the successors and assigns of Subordinated Creditors and Borrower.

10.  **Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

11.  **Defines Rights of Creditors; Subrogation.**

A.  The provisions of this Agreement are solely for the purpose of defining the relative rights of Subordinated Creditors, Administrative Agent, Collateral Agent and Lenders

8

AIC000151

AIC000152

and shall not be deemed to create any rights or priorities in favor of any other party, including, without limitation, Borrower. As between Borrower and Subordinated Creditors, nothing contained herein shall impair the unconditional and absolute obligation of Borrower to Subordinated Creditors to pay the Subordinated Indebtedness as such Subordinated Indebtedness shall become due and payable in accordance with the Subordinated Note Documents.

B.    Subject to the Payment in Full of the Senior Indebtedness and termination of all commitments to lend under the Loan Documents or Permitted Refinancing Loan Documents, in the event and to the extent cash, property or securities otherwise payable or deliverable to the holders of the Subordinated Indebtedness shall have been applied pursuant to this Agreement to the payment of Senior Indebtedness, then and in each such event, the holders of the Subordinated Indebtedness shall be subrogated to the rights of each holder of Senior Indebtedness to receive any further payment or distribution in respect of or applicable to the Senior Indebtedness; and, for the purposes of such subrogation, no payment or distribution to the holders of Senior Indebtedness of any cash, property or securities to which any holder of Subordinated Indebtedness would be entitled except for the provisions of this Agreement shall, and no payment over pursuant to the provisions of this Agreement to the holders of Senior Indebtedness by the holders of the Subordinated Indebtedness shall, as between Borrower, its creditors other than the holders of Senior Indebtedness and the holders of Subordinated Indebtedness, be deemed to be a payment by Borrower to or on account of Senior Indebtedness.

12.    **Conflict**. In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of any of the Subordinated Note Documents, the provisions of this Agreement shall control and govern.

13.    **Statement of Indebtedness to Subordinated Creditors**. Borrower will furnish to Administrative Agent upon demand, a statement of the indebtedness owing from Borrower to Subordinated Creditors, and will give Administrative Agent access to the books of Borrower in accordance with the Credit Agreement so that Administrative Agent can make a full examination of the status of such indebtedness.

14.    **Headings**. Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

15.    **Termination**. This Agreement shall terminate upon the Payment in Full of the Senior Indebtedness and termination of all commitments to lend under the Loan Documents and Permitted Refinancing Loan Documents.

16.    **No Contest of Senior Indebtedness or Liens; No Security for Subordinated Indebtedness**. Each Subordinated Creditor agrees that it will not, and will not encourage any other party to, at any time, contest the validity, perfection, priority or enforceability of the Senior Indebtedness or liens in the Collateral granted to Collateral Agent pursuant to the Credit Agreement, the other Loan Documents or the Permitted Refinancing Loan Documents or accept or take any collateral security for the Subordinated Indebtedness.

9

NY\1211310.8

AIC000153

AIC000154

17.    APPLICABLE LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

18.    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH SUBORDINATED CREDITOR, ADMINISTRATIVE AGENT, COLLATERAL AGENT AND BORROWER HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH SUBORDINATED CREDITOR AND BORROWER HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF THE STATE OF NEW YORK AS ITS AGENT FOR SERVICE OF PROCESS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE SUCH PARTY AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 7 AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF SUBORDINATED CREDITORS, THE ADMINISTRATIVE AGENT, COLLATERAL AGENT AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF ADMINISTRATIVE AGENT, COLLATERAL AGENT, SUBORDINATED CREDITOR AND BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO IN THE FIRST SENTENCE OF THIS SECTION AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT SUBORDINATED CREDITOR OR BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH SUCH PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT.

19.    WAIVER OF RIGHT TO JURY TRIAL. EACH SUBORDINATED CREDITOR, BORROWER, ADMINISTRATIVE AGENT AND COLLATERAL AGENT HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS

NY\1211310.8

AIC000155

AIC000156

AGREEMENT, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION HEREWITH, OR ARISING FROM THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH SUBORDINATED CREDITOR AND BORROWER HEREBY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ADMINISTRATIVE AGENT, COLLATERAL AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ADMINISTRATIVE AGENT, COLLATERAL AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH SUBORDINATED CREDITOR AND BORROWER HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND COLLATERAL AGENT ENTERING INTO THIS AGREEMENT.

[*The remainder of this page is intentionally left blank.*]

11

AIC000157

AIC000158

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be executed as of the date first above written.

OCONTO FALLS TISSUE, INC.

By: _____

Name: Ronald H. Van Den Heuvel

Title: President

ST PAPER, LLC

By:_____

Name:

Title:

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Administrative Agent and Collateral Agent

By:_____

Authorized Signatory

OFTI Subordination Agreement

AIC000159

AIC000160

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be executed as of the date first above written.

OCONTO FALLS TISSUE, INC.

By:_____

    Name:

    Title:

ST PAPER, LLC

By:_____

Name: Sahil Tak

Title:   Vice President

GOLDMAN SACHS CREDIT PARTNERS L.P., as Administrative Agent and Collateral Agent

By:_____

    Authorized Signatory

OFTI Subordination Agreement

AIC000161



AIC000162

IN WITNESS WHEREOF, the parties hereto have caused this Subordination Agreement to be executed as of the date first above written.

OCONTO FALLS TISSUE, INC.

By:_____

    Name:

    Title:

ST PAPER, LLC

By:_____

    Name:

    Title:

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Administrative Agent and Collateral Agent

By:_____

    Authorized Signatory

BRUCE H. MENDELSOHN
AUTHORIZED SIGNATORY

OFTI Subordination Agreement

AIC000163

AIC000164



| | Loan Policy of Title Insurance |
|---|---|
| **First American Title** | ISSUED BY |
| | **First American Title Insurance Company** |
| **Loan Policy** | POLICY NUMBER |
| | **5011300-1192758e** |

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at the address shown in Section 17 of the Conditions.

## COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.

**(Covered Risks Continued on Page 2)**

In Witness Whereof, First American Title Insurance Company has caused its corporate name to be hereunto affixed by its authorized officers as of Date of Policy shown in Schedule A.

**First American Title Insurance Company**

Dennis J. Gilmore
President

Timothy Kemp
Secretary

For Reference:

**File #:** TI-94292
**Loan #:** N/A

Issued By:

**Bay Title & Abstract, Inc.**
345 S. Monroe Avenue
Green Bay, WI 54301

(This Policy is valid only when Schedules A and B are attached)

This Jacket was created electronically and constitutes an original document

Copyright 2006-2009 American Land Title Association. All rights reserved. The use of this form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AIC000165

Policy # :  5011300-1192758e                                                          COVERED RISKS (Continued)

5.  The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning restricting, regulating, prohibiting, or relating to
    (a)  the occupancy, use, or enjoyment of the Land;
    (b)  the character, dimensions, or location of any Improvement erected on the Land;
    (c)  the subdivision of land; or
    (d)  environmental protection
    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6.  An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7.  The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8.  Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9.  The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title.  This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage
    (a)  forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
    (b)  failure of any person or Entity to have authorized a transfer or conveyance;
    (c)  the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
    (d)  failure to perform those acts necessary to create a document by electronic means authorized by law;
    (e)  a document executed under a falsified, expired, or otherwise invalid power of attorney;
    (f)  a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
    (g)  a defective judicial or administrative proceeding.

10.  The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11.  The lack of priority of the lien of the Insured Mortgage upon the Title
    (a)  as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an Improvement or work related to the Land when the Improvement or work is either
        (i)  contracted for or commenced on or before Date of Policy; or
        (ii)  contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and
    (b)  over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12.  The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13.  The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title
    (a)  resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
    (b)  because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
        (i)  to be timely, or
        (ii)  to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14.  Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
        (i)  the occupancy, use, or enjoyment of the Land;
        (ii)  the character, dimensions, or location of any improvement erected on the Land;
        (iii)  the subdivision of land; or
        (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

AIC000166

Policy # :   5011300-1192758e

**EXCLUSIONS FROM COVERAGE (Continued)**

3.   Defects, liens, encumbrances, adverse claims, or other matters

    (a)   created, suffered, assumed, or agreed to by the Insured Claimant;

    (b)   not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c)   resulting in no loss or damage to the Insured Claimant;

    (d)   attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

    (e)   resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-

business laws of the state where the Land is situated.

5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a)   a fraudulent conveyance or fraudulent transfer, or

    (b)   a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11 (b).

**CONDITIONS**

**1.   DEFINITION OF TERMS**

The following terms when used in this policy mean:

    (a)   "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.

    (b)   "Date of Policy": The date designated as "Date of Policy" in Schedule A.

    (c)   "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

    (d)   "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

      (i)   the amount of the principal disbursed as of Date of Policy;

      (ii)   the amount of the principal disbursed subsequent to Date of Policy;

      (iii)   the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

      (iv)   interest on the loan;

      (v)   the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

      (vi)   the expenses of foreclosure and any other costs of enforcement;

      (vii)   the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

      (viii)   the amounts to pay taxes and insurance; and

      (ix)   the reasonable amounts expended to prevent deterioration of improvements;

But the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

    (e)   "Insured": The Insured named in Schedule A.

      (i)   The term "Insured" also includes

        (A)   the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is obligor under the provisions of Section 12(c) of these Conditions;

        (B)   the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable

electronic transactions law;

        (C)   successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

        (D)   successors to an Insured by its conversion to another kind of Entity;

        (E)   a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

          (1)   if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

          (2)   if the grantee wholly owns the named Insured, or

          (3)   if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

        (F)   any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

      (ii)   With regard to (A), (B), (C), (D), and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

    (f)   "Insured Claimant": An Insured claiming loss or damage.

    (g)   "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.

    (h)   "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

    (i)   "Land": The land described in Schedule A, and affixed improvements that by law constitute real property.  The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

    (j)   "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

AIC000167

CONDITIONS (Continued)

(k)  "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l)  "Title": The estate or interest described in Schedule A.

(m)  "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

**2.   CONTINUATION OF INSURANCE**

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3.   NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**4.   PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5.   DEFENSE AND PROSECUTION OF ACTIONS**

(a)  Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action.

It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)  The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured.

The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)  Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

**6.   DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)  In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)  The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**7.   OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)  To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the

AIC000168

Policy # : 5011300-1192758e

time of payment or tender of payment and that the Company is obligated to pay; or

(ii) To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**8.   DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of:

(i) the Amount of Insurance,

(ii) the Indebtedness,

(iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i) the Amount of Insurance shall be increased by 10%, and

(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d) In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9.   LIMITATION OF LIABILITY**

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11.   PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12.   RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a) The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations

(i) The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

AIC000169

Policy # :  5011300-1192758e

CONDITIONS (Continued)

(ii)  If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c)  The Company's Rights Against Non-insured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13.  ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.  Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**14.  LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a)  This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company.  In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)  Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c)  Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d)  Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions.  Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15.  SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16.  CHOICE OF LAW; FORUM**

(a)  Choice of Law:  The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefore in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy.  In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)  Choice of Forum:  Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**17.  NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at **First American Title Insurance Company, Attn: Claims National Intake Center, 1 First American Way, Santa Ana, CA 92707.  Phone: 888-632-1642.**

AIC000170

**Bay Title & Abstract, Inc.**
345 S. Monroe Avenue Green Bay, WI 54301
Phone: (920) 431-6100   Fax: (920) 431-6101
Issuing Agent for:
First American Title Insurance Co.
1650 W. Big Beaver Road P.O. Box 1289 Troy, MI 48099

# Mortgage Schedule A

File Number: TI-94292-FA

Policy Number:   5011300-1192758e
Loan No.:   N/A

Amount of Insurance: $7,150,000.00

Date of Policy: 12/13/2013, at 3:07:00PM

1. Name of Insured: Ability Insurance Company its successors and/or assigns as their interest may appear as defined in paragraph 1.e. of the policy Definition of Terms

2. The estate or interest in the Land that is encumbered by the Insured Mortgage is: Fee Simple

3. Title is vested in:

Green Box NA Green Bay, LLC,
a Wisconsin limited liability company

4. The Insured Mortgage and its assignments, if any, are described as follows:

Mortgage and Security Agreement executed by Green Box NA Green Bay, LLC, a Wisconsin limited liability company to Maple Bridge Funding, LLC, in the amount of $7,150,000.00, dated December 10, 2013 and recorded December 13, 2013 at 3:07 PM as Doc. No. 2654008.

The foregoing Mortgage and Security Agreement were assigned to Ability Insurance Company in an Assignment of Mortgage dated December 11, 2013 and recorded December 13, 2013 at 3:07 PM as Doc. No. 2654011.

5. The Land referred to in this policy is described as follows:

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of Lot One (1), Vol. 24 Certified Survey Maps, Page 84, Map No. 4035, all being in the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

ALSO KNOWN AS

Lot Two (2), Vol. 41 Certified Survey Maps, Page 100, Map No. 6194; said lot being part of Lots One (1), Two (2) and Three (3), according to the recorded Plat of De Pere Business Park South Addition and part of the Northeast Quarter (NE 1/4) of the Southwest Quarter (SW 1/4); the Northwest Quarter (NW 1/4) of the Southwest Quarter (SW 1/4) and Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4), Section Thirty-two (32), Township Twenty-three (23) North, Range Twenty (20) East, in the City of De Pere, West side of Fox River, Brown County, Wisconsin.

Property Address: 2107 American Boulevard  De Pere, WI 54115

Tax Parcel Number: WD-1042

The Property Address shown herein is for informational purposes only.

6. This policy incorporates by reference those ALTA endorsements selected below:

| | 4-06 | Condominium |
| --- | --- | --- |
| | 4.1-06 | |
| | 5-06 | Planned Unit Development |

**Continued on Next Page**

Schedule A - ALTA Loan Policy of Title Insurance 6/06

Customer Copy

Bay Title & Abstract, Inc.

By: _____
John C. May, President

AIC000171

## Mortgage Schedule A Continued

File Number: TI-94292-FA

Policy Number:   5011300-1192758e
Loan No.:   N/A

| | | |
|---|---|---|
| _____ | 5.1-06 | |
| _____ | 6-06 | Variable Rate |
| _____ | 6.2-06 | Variable Rate - Negative Amortization |
| _____ | 8.1-06 | Environmental Protection Lien - Paragraph b refers to the following state statue(s): |
| _____ | 9-06 | Restrictions, Encroachments, Minerals |
| _____ | 13.1-06 | Leasehold Loan |
| _____ | 14-06 | Future Advance – Priority |
| X | 14.1-06 | Future Advance - Knowledge |
| _____ | 14.3-06 | Future Advance - Reverse Mortgage |
| _____ | 22-06 | Location Endorsement - The type of improvement is a one to four family residential structures, and the street address is as shown above. |

Schedule A - ALTA Loan Policy of Title Insurance 6/06

Customer Copy

Bay Title & Abstract, Inc.

By: _____

John C. May, President

AIC000172

# Mortgage Schedule B-I

File No.:  TI-94292-FA                   Policy No.  5011300-1192758e

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

PART I

1. Taxes and special assessments, actual or pending, which are not yet due and payable.

2. Rights of the public in that portion of the within described premises lying within the limits of public roads and public rights of way.

3. Building setback requirements and utility easement contained on the Plat of De Pere Business Park South Addition recorded in Vol. 20 Plats, Page 125, as Doc. No. 1550790.

4. Building setback requirements, utility easements and notes contained on Map recorded in Vol. 39 Certified Survey Maps, Page 340, as Doc. No. 1724354.

5. Utility Easement contained on Map recorded in Vol. 24 Certified Survey Maps, Page 84 as Doc. No. 1232048.

6. Building setback requirements, utility easements, storm sewer easement and note contained in Map recorded in Vol. 41 Certified Survey Maps, Page 100 as Doc. No. 1763206.

7. Any encroachment, encumbrances, violation, variation, or adverse circumstance affecting the title including discrepancies, conflict in boundary lines, shortages in area, or any facts that would be disclosed by an accurate and complete land survey of the land, and that are not shown in the public records.

8. Roads, ways, streams, easements or claims of easements, or encumbrances, if any, that are not shown by the public records, riparian rights and the title to any filled in lands.

First American Title Insurance Co.

Schedule B-ALTA Loan Policy of Title Insurance          Customer Copy

AIC000173

# Mortgage Schedule B-II

File No.:    TI-94292-FA

Policy No.: 5011300-1192758e

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matter, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

PART II

Absolute Assignment of Leases and Rents executed by Green Box NA Green Bay, LLC, a Wisconsin limited liability company to Maple Bridge Funding, LLC, dated December 10, 2013 and recorded December 13, 2013 at 3:07 PM as Doc. No. 2654009.

The foregoing Absolute Assignment of Leases and Rents were assigned to Ability Insurance Company in an Assignment of Collateral Security dated December 11, 2013 and recorded December 13, 2013 at 3:07 PM as Doc. No. 2654012.

Financing Statement filed pursuant to the Uniform Commercial Code which lists Green Box NA Green Bay, LLC, as Debtor and Maple Bridge Funding, LLC, as Secured Party in the Office of the Register of Deeds for Brown County, Wisconsin on December 13, 2007 at 3:07 PM as Doc. No. 2654010.

First American Title Insurance Co.

Customer Copy

Schedule B-ALTA Loan Policy of Title Insurance

AIC000174

ARNSTEIN & LEHR LLP
*Serving clients for 120 years.*



120 South Riverside Plaza · Suite 1200
Chicago, Illinois 60606
Phone 312.876.7100 · Fax 312.876.0288
www.arnstein.com

Walter J. Starck
312.876.7806
wjstarck@arnstein.com

December *10*, 2013

Maple Bridge Funding, LLC
55 N. Water Street, Suite 3
South Norwalk, CT 06854

     Re:    Mortgage Loan in the amount of $7,150,000.00 from Maple Bridge
           Funding, LLC to Green Box NA Green Bay LLC, for the parcel of real
           estate commonly known as 2107 American Blvd., DePere, Wisconsin (the
           "Project")

Ladies and Gentlemen:

     We have served as counsel to (A) Green Box NA Green Bay, LLC, a Wisconsin
limited liability company ("Borrower"), (B) Environmental Advanced Reclamation
Technology HQ, LLC, a Wisconsin limited liability company ("Corporate Guarantor") and
(c) Ronald H. Van Den Heuval ("Individual Guarantor") in connection with a mortgage
loan in the amount of $7,150,000.00 (the "Loan") being made by you ("Lender") to
Borrower to provide financing for the Project. All initially capitalized terms used but not
defined herein shall have the meanings respectively ascribed to them in the Loan
Documents (defined below).

     The following documents (collectively, the "Loan Documents"), each dated as of
December *10*, 2013, unless otherwise stated, have been executed and delivered to you
with regard to the Loan:

    1.  Promissory Note made by Borrower in favor of Lender.

    2.  Mortgage and Security Agreement made by Borrower in favor of Lender.

    3.  Continuing Unconditional Guaranty made by Corporate Guarantor in favor of
       Lender.

    4.  Continuing Unconditional Guaranty made by Individual Guarantor in favor of
       Lender.

    5.  Environmental Indemnity Agreement made by Borrower and Individual
       Guarantor in favor of Lender.

CHICAGO   HOFFMAN ESTATES   SPRINGFIELD   MILWAUKEE
FORT LAUDERDALE   MIAMI   TAMPA   WEST PALM BEACH   BOCA RATON
Arnstein & Lehr LLP is a member of the International Lawyers Network

AIC000175

ARNSTEIN & LEHR LLP
Maple Bridge Funding, LLC
December _/_9_ 2013
Page 2

6.  Assignment of Rents and Leases made by Borrower in favor of Lender.

In rendering this opinion we have examined the Loan Documents, current certified copies of the articles of organization, operating agreement, and company resolutions of each of Borrower and Corporate Guarantor, current certificates of good standing for Borrower and Corporate Guarantor from the Secretary of State of Wisconsin, the certificate referred to in qualification A below, and such other documents and records pertaining to our clients as in our judgment are necessary or appropriate to enable us to render the opinions expressed below.

For purposes of this opinion, we have assumed that:

a.    The execution and delivery of all Loan Documents and other documents reviewed by us, and the entry into and performance of the transactions contemplated by the Loan Documents, by all parties other than Borrower and each Guarantor have been duly authorized by all necessary actions; the Loan Documents constitute the valid and binding obligations of all parties other than Borrower and each Guarantor.

b.    All natural persons who are signatories to the Loan Documents were legally competent at the time of execution, all signatures on the Loan Documents and other documents reviewed by us (on behalf of parties other than Borrower and each Guarantor) are genuine; the copies of all documents submitted to us are accurate and complete and conform to originals; except for the Loan Documents there are no other documents or agreement among any of such parties that would modify the obligations of the parties with respect to the Loan.

Based upon the foregoing, but subject to the assumptions, qualifications and limitations set forth herein, we are of the opinion that:

1.    Borrower (i) is a Wisconsin limited liability company, (ii) is duly formed, validly existing and in good standing under the laws of the State of Wisconsin, and (iii) is qualified to do business in the State of Wisconsin.

2.    Corporate Guarantor (a) is a Wisconsin limited liability company, (b) is duly formed, validly existing and in good standing under the laws of the State of Wisconsin, and (c) is qualified to do business in the State of Wisconsin.

3.    The Loan Documents have been properly authorized, executed and delivered by or on behalf of Borrower and each Guarantor, as the case may be.

4.    Borrower and Corporate Guarantor have all requisite company authority to execute and deliver the Loan Documents to which they are a party and to perform their respective obligations thereunder.

11356935.2

AIC000176

ARNSTEIN & LEHR LLP
Maple Bridge Funding, LLC
December _10_, 2013
Page 3

5.      The execution and delivery of the Loan Documents by Borrower or either Guarantor, as the case may be, will not: (a) conflict with, constitute an event of default under, or result in a breach of or a violation of the provisions of the organizational documents of Borrower or Corporate Guarantor, (b) result in a violation of any applicable law, statute, ordinance or regulation of the United States or the State of Wisconsin, or, to our knowledge, in violation of (i) any judgment, order, writ, injunction, decree or rule of any court, administrative agency or other governmental authority, or (ii) any determination or award of any arbitrator, (c) conflict with, constitute an event of default under, or result in a breach of or a violation of the provisions of any agreement or other instrument of which we have knowledge to which Borrower or either Guarantor, as the case may be, are a party, or by which their respective properties or assets are bound, or (d) to our knowledge, result in the creation of any lien, charge or encumbrance on any property or assets of Borrower or either Guarantor, as the case may be, except as contemplated by the Loan Documents.

6.      To our knowledge, there are no legal or administrative proceedings pending or threatened before any court or governmental agency against Borrower or either Guarantor or affecting the Project.

7.      The Loan Documents constitute valid and legally binding instruments enforceable against such of Borrower and each Guarantor as are parties thereto in accordance with their terms, except to the extent limited by bankruptcy, insolvency, reorganization or other laws of general application affecting creditors' rights.

8.      No authorizations, approvals or consents of, or filings or registrations with, any governmental or regulatory authority or agency of the State of Wisconsin or any political subdivision thereof are necessary for the execution and delivery by the Parties of the Loan Documents or for the validity or enforceability thereof.

9.      Under choice of law principals applicable under Wisconsin law, the provisions of the Loan Documents to the effect that Wisconsin law shall govern the enforcement and interpretation of the Loan Documents are enforceable.

10.     The Loan Documents do not violate the provisions of any applicable laws of the State of Wisconsin relating to the rate of interest which may be charged upon loans of money.

Our opinions are qualified as follows:

A.      Wherever we indicate that our opinion with respect to the existence or absence of facts is based on our knowledge, our opinion is based solely on (i) the current actual knowledge of the attorneys currently with the firm who have represented Borrower or either Guarantor in connection with the transactions contemplated by the Loan Documents and of any other attorneys presently in our firm whom we have determined are likely, in the course of representing any of said parties, to have

11356935.2

AIC000177

ARNSTEIN & LEHR LLP
Maple Bridge Funding, LLC
December _10_ 2013
Page 4

knowledge of the matters covered by this opinion, (ii) the representations and warranties of said parties contained in the Loan Documents; (iii) and the Borrowers' Certificate which is attached hereto. We have made no independent investigation as to such factual matters. However, we know of no facts which lead us to believe such factual matters are untrue or inaccurate.

B.     Our opinion is limited to the laws of the United States (except as set forth below) and the laws of the State of Wisconsin and political subdivisions thereof in effect on the date hereof as they presently apply. We shall have no continuing obligations to inform you of changes in law or fact subsequent to the date hereof or of facts of which we become aware after the date hereof.

C.     We express no opinion as to matters of title or priority or perfection of liens or security interests with regard to real and personal property. We understand that, with respect to the real and personal property security interests intended to be created by the Loan Documents and the priority of the liens thereof, you will rely on a title insurance policy and such Uniform Commercial Code and other searches as you deem adequate, and, accordingly, we express no opinion to such matters.

D.     We have not reviewed and do not opine as to: (i) compliance by the Project with applicable zoning, health, safety, building, environmental, land use or subdivision laws, ordinances, codes, rules or regulations, (ii) ERISA laws, rules and regulations, or (iii) Federal or state taxation, banking, securities or "blue sky" laws, rules or regulations.

E.     This opinion is limited to the matters set forth herein. No opinion may be inferred or implied beyond the matters expressly contained herein. This opinion is rendered solely for your benefit and that of your participants and assigns and no other person or entity shall be entitled to rely on any matter set forth herein without the express written consent of the undersigned.

Very truly yours,

ARNSTEIN & LEHR LLP

By:  _Walter J. Starck_
       Walter J. Starck, a Partner

WJS:tmm
Attachment

11356935.2

AIC000178

ARNSTEIN & LEHR LLP
Maple Bridge Funding, LLC
December 10, 2013
Page 5


Pursuant to Internal Revenue Service guidance, be advised that any federal tax advice contained in this written or electronic communication, including any attachments or enclosures, is not intended or written to be used and it cannot be used by any person or entity for the purpose of (i) avoiding any tax penalties that may be imposed by the Internal Revenue Service or any other U.S. Federal taxing authority or agency or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

AIC000179