**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ABILITY INSURANCE COMPANY,

                                Plaintiff,

                    v.                                    Civil Action No.:  1:20-cv-03851 (GBD)

ST PAPER, LLC

                                Defendant.

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF PLAINTIFF ABILITY INSURANCE COMPANY</u>**

**TROUTMAN PEPPER
HAMILTON SANDERS LLP**
Angelo A. Stio, III
Melissa A. Chuderewicz
Attorneys for the Plaintiff
875 Third Avenue
New York, NY 10002

# **Table of Contents**

**Page**

I.  PRELIMINARY STATEMENT ................................................................ 1

II. FACTUAL BACKGROUND ................................................................... 3

    A.  The Parties ................................................................................. 3

        1.  Ability is the Duly Assigned Holder of Note 1 .......................... 3

        2.  The Tak Companies ................................................................. 3

    B.  ST's Original Issuance of Note 1 ................................................. 5

    C.  ST Defaults on the GS Loan and Initiates the Refinancing Scheme ................ 6

        1.  ST Paper Obtains the 2010 CDE Loans and Transfers the Money to ST Holdings ......... 6

        2.  ST Holdings Uses a Fraction of the CDE Proceeds to Purchase the GS Loan ............. 7

        3.  ST Holdings Uses the Remaining Proceeds of the CDE Loans to Begin Acquiring ST's Debts to the CDEs ........ 8

    D.  Tak Completes the Refinancing Scheme by Consolidating and Acquiring the CDE Loans ......... 9

    E.  Tak Ensures the "Senior Indebtedness" Will Never Be Paid ............... 10

III. ARGUMENT ...................................................................................... 11

    A.  Legal Standard ........................................................................... 11

    B.  ST Paper Is Liable For Its Failure to Pay Note 1 ................................. 12

    C.  The Subordination Agreement Does Not Relieve ST of its Obligation to Pay Note 1 ......... 13

    D.  ST Paper has Breached the Covenant of Good Faith and Fair Dealing .............. 16

    E.  ST Paper's Affirmative Setoff Defense Fails for Lack of Proof ......................... 19

        1.  ST Paper's Has Failed to Produce Documents Sufficient to Prove Its Setoff Defense Concerning Unassumed Liabilities, Environmental Liabilities and the "Yankee Dryer" Repair ...... 21

        2.  ST's Deficient Production With Respect to OFTI's Purported Misrepresentations ................................. 22

    F.  ST is Not Entitled to a Setoff Under the Compromise Agreement....................... 23

IV. CONCLUSION..................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*9 Bros. Bldg. Supply Corp. v. Buonamicia*,
299 A.D.2d 529 (2d Dep't 2002) ............................................................................17

*Amica Mut. Ins. Co. v. Franklin*,
147 F.3d 238 (2d. Cir. 1998).................................................................................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................11, 12

*APS Tech., Inc. v. Brant Oilfield Mgmt. & Sales, Inc.*,
2015 U.S. Dist. LEXIS 131626 (S.D.N.Y. Sept. 29, 2015)....................................20

*Brew City Redevelopment Group, LLC v. Ferchill Group*,
289 Wis. 2d 795, 807 (2006) ................................................................................12

*Citibank N.A. v. Norse Skogindustrier ASA*,
2016 U.S. Dist. LEXIS 35784 (S.D.N.Y. 2016)....................................................15

*Cross & Cross Properties, Ltd. v. Everett Allied Co.*,
886 F.2d 497 (2d Cir. 1989)........................................................................17, 18, 20

*Dev. Specialists, Inc. v. Peabody Energy Corp. (In re Coudert Bros.)*,
487 B.R. 375 (S.D.N.Y. 2013)...............................................................................13

*F.D.I.C. v. Giammettei*,
34 F.3d 51 (2d Cir. 1994).......................................................................................20

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
696 F. Supp. 2d 368 (S.D.N.Y. 2010)...................................................................20

*Filner v. Shapiro*,
633 F.2d 139 (2d Cir. 1980)...................................................................................17

*Fitzgerald v. Henderson*,
251 F.3d 345 (2d Cir. 2001)...................................................................................20

*Grad v. Roberts*,
14 N.Y.2d 70 (1964) ..............................................................................................17

*Jackson v. Harvest Capital Corp.*,
848 Fed. Appx. 455 (2d Cir. 2021)........................................................................14

ii

*Kulak v. City of New York*,
   88, F.3d 63 (2d Cir. 1996)..................................................................................11, 12

*Law Debenture Trust Co. v. Maverick Debt Corp.*,
   595 F.3d 458 (2d Cir. 2010)......................................................................................13

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
   1 A.D.3d 170 (NY App. Div 2003) .........................................................................7, 14

*In re Livent, Inc. Noteholders Sec. Litig.*,
   355 F. Supp. 2d 722 (S.D.N.Y. 2005).....................................................................20

*Major League Baseball Properties v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)........................................................................................11

*In re Navidea Biopharmaceutical Litig.*,
   2019 U.S. Dist. LEXIS 221211 (S.D.N.Y. Dec. 26, 2019) ..................................16

*Oconto Falls Tissue, Inc. v. ST Paper, LLC*,
   No. 17 CV 104 (Wisc. Cir. Ct (Oconto County)) ..............................................2, 18

*Omni Quartz v. CVS Corp.*,
   287 F.3d 61 (2d Cir. 2002)........................................................................................13

*Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*,
   7 F.3d 1091 (2d Cir. 1993)........................................................................................14

*Shaw Group, Inc. v. Triplefine Int'l Corp.*,
   322 F.3d 115 (2d Cir. 2003)......................................................................................14

**Other Authorities**

Black's Law Dictionary ...............................................................................................15, 16

Fed. R. Civ. P. 56........................................................................................................20

Federal Rule of Evidence 1006..................................................................................22

Local Rule 56.1 ...............................................................................................................3

I.      PRELIMINARY STATEMENT

By this action, Plaintiff Ability Insurance Company ("Ability") is seeking to recover amounts due and owing on a promissory note ("Note 1") that Defendant ST Paper ("ST") executed and delivered to Oconto Falls Tissue, Inc. ("OFTI") on April 16, 2007, and which should have been due and payable on April 16, 2015.  Note 1 had a principal amount of $8 million and accrued interest at a rate of 7.5%  per year since April 16, 2008.  After a series of assignments, it now resides in Ability's hands.

While Note 1 matured on April 16, 2015, ST has never paid a dollar to Ability. ST's refusal is grounded in a Subordination Agreement, which subordinates payment of Note 1 to the repayment of $70 million in financing that Goldman Sachs Capital Partners ("GS" and the "GS Loan", respectively) provided to ST concurrent with issuance of Note 1.  Although the GS Loan was retired by ST's parent in 2010, ST now claims that the debt has actually been "refinanced" such that the Subordination Agreement still relieves it from having to pay Ability.

What ST claims to have been a "refinancing", however, was simply a scheme ("Refinancing Scheme") orchestrated by ST's owner and manager, Sharad Tak ("Tak") to avoid payment of the GS Loan and any payment Note 1.  While the Refinancing Scheme consisted of a complex series of transactions in which money was moved through a number of entities, at the core, it consisted of four steps:

1.    In 2010, Tak caused ST to obtain over $90 million in financing from Community Development Entities ("CDEs")

2.    ST nominally transferred that $90 million to its parent and sole member, ST Paper Holdings, LLC ("ST Holdings"), which is also controlled by Tak.

3.    ST Holdings then purchased the GS Loan for less than $20 million – a fraction of the $69 million owed on the GS Loan and a fraction of the $90 million received from the

1

CDEs (through ST) – effectively retiring the GS debt; and then

4.   In 2017, ST Holdings and another Tak company consolidated and retired all of ST's debt to the CDEs.

The result of the Refinancing Scheme is a fictional debt in the form of two ST promissory notes that (a) are held by ST's parent and affiliate, both of which are controlled by Tak; (b) do not mature until 2040 and 2047; and (c) which Mr. Tak admits may never be paid as Tak believes he can forever "refinance" the notes to avoid paying Ability.

The Court should put an end to the Refinancing Scheme. The ST transactions at issue in this case did not amount to a "refinancing" of the GS Loan under the Subordination Agreement. ST's contention to the contrary distorts the meaning of the term, and renders the commercially absurd result that ST will never have to pay Note 1. As a result, ST's interpretation of the Subordination Agreement is contrary to black letter New York principles of contract interpretation. The Court should say so, and permit Ability to recover on Note 1. Additionally, the Refinancing Scheme amounts to a breach of the implied covenant of good faith and fair dealing for which ST may also be held accountable. Simply put, ST should not be permitted to engage in a "refinancing" that results in a phony debt that is now being used solely for the purpose of preventing Ability from obtaining the benefits it is entitled to receive under Note 1. It is the essence of bad faith. No trial need be had based on the face of the transactions themselves and Tak's undisputed testimony.

Finally, ST's primary affirmative defense of setoff will fail for lack of proof, as ST has not produced any information in discovery sufficient to prove the massive setoffs to which it claims it is entitled, and its newly asserted defense based on the "Compromise Agreement" also fails as a matter of law. The Court should enter summary judgment against ST on all of Ability's claims.

## II.    FACTUAL BACKGROUND

### A.    The Parties

#### 1.    Ability is the Duly Assigned Holder of Note 1

In a parallel action in Wisconsin Circuit Court, ST paper has acknowledged that

Ability is now duly the holder of Note 1.[1]  SMF ¶ 10 ("ST WI MSJ") at 9 ("Note 1 is held by

Ability.").[2]  As set forth in Ability's Complaint, the original beneficiary, OFTI,  assigned Note 1

to SHF XII, LLC d/b/a as Stonehill Capital Group by Endorsement dated April 16, 2007.  SMF ¶

4.  On September 26, 2012, SHF XII, LLC assigned Note 1 to Paper Holdco, LLC by Allonge.

SMF ¶ 5. Then, on December 13, 2012, Paper Holdco, LLC assigned Note 1 to Green Box, NA

Green Bay, LLC ("Green Box") by Allonge.  SMF ¶ 6.

On December 10, 2013, Green Box executed a promissory note in favor of Maple

Bridge Funding, LLC ("Maple Bridge") in the amount of $7,150,000 in connection with loan to

Green Box that was funded by Ability. SMF ¶ 7.  As additional collateral for the funding, Green

Box executed an Assignment of Rights in which it assigned all of its rights to Note 1 to Ability.

SMF ¶¶ 8-9.  On or around March 11, 2015, Green Box defaulted on the loan from Maple Bridge

and as result Ability became the legal holder of Note 1. SMF ¶ 12.

#### 2.    The Tak Companies

Defendant ST is one of a number of companies owned or controlled by Tak that

he used to perpetrate the Refinancing Scheme.  ST is 100% owned and controlled by ST Paper

---

[1] *Oconto Falls Tissue, Inc. v. ST Paper, LLC*, No. 17 CV 104 (Wisc. Cir. Ct. (Oconto County)).  In this parallel action, Plaintiff sought to recover on all four promissory notes issued by ST Paper in April 2015, including the Note held by Ability.  *See* Sec. II.B., *infra*.  ST moved for partial summary judgment in that action, arguing, among other things that Plaintiff could not recover on Note 1 because it had been assigned to Ability.  *See* ST WI MSJ at 9, 15-16.

[2] Citations to "SMF" refer to Plaintiff's Statement of Undisputed Material Facts, submitted with this Motion for Summary Judgement pursuant to Local Rule 56.1.

Holdings, LLC ("ST Holdings").  SMF ¶¶ 15-16.  Both ST and ST Holdings are managed by

Tak.  SMF ¶ 16.  Tak considers ST and ST Holdings to be the same company.  As he testified:

> Yes, I thought we had produced the documents of payment of
> Community Development loans in the closing binder and that
> some of the Senior Indebtedness was transferred to ST Paper
> Holdings, and **ST Paper Holdings now owns 100% of ST Paper.
> So they are considered one in the same companies**.  So there
> may not be any documents of payment of Senior Indebtedness to
> ST Paper Holdings

SMF ¶ 17; Stio Decl., Ex. 25 ("ST Paper 30(b)(6) Tr.") at 84:1-9; *see also id.* at 84:25-85:2 ("ST

Paper Holdings currently owns 100 percent of stock in ST Paper.  So they are considered almost

the same companies").

ST Holdings, in turn, is 100% controlled by Tak Investments, Inc. ("Tak

Investments").  SMF ¶ 18; Stio Decl., Ex. G ("Tak Dep. Tr.") at 18-20.  Tak is the president and

sole director of Tak Investments, which he uses "to conduct some owning and managing

different businesses."[3]  Tak Dep. Tr. at 22-23.  Accordingly, at all times, Tak has had complete

control of ST and ST Holdings through Tak Investments.   Further, consistent with his treatment

of ST and ST Holdings as the same company, Tak has admitted he does not always maintain

records of money transfers between his companies.  Tak Dep. Tr. at 93-94.

The final Tak company relevant to this dispute is WCDLF Investment Fund

XXIV, LLC ("WCDLF Fund XXIV").  *See* Sec. II.C.1, *infra.* As explained below, Tak

Investments acquired WCDLF Fund XXIV in 2017 as part of the Refinancing Scheme to take

control of the purported "Senior Indebtedness" that Tak now claims precludes payment to

Ability.  *Id.*

---

[3] At the time of his deposition, Tak believed (but could not recall) that he owned shares in Tak Investments.
Tak Dep. Tr. at 23.

**B.     ST's Original Issuance of Note 1**

On April 16, 2007, ST and OFTI (along with certain related Parties) entered into the "Second Amended and Restated Asset Purchase Agreement" through which ST acquired a tissue paper mill from OFTI for $86,400,000.  SMF ¶ 22, ("Purchase Agreement").  ST Paper acquired funding for the transaction from two sources. The first was the $70,000,000 GS Loan which was funded by a syndicate of lenders and administered by GS.  SMF ¶ 23.  The GS Loan was to be repaid and retired on March 31, 2013.  *Id.*

The remainder of the purchase price due came from four promissory notes issued by ST to OFTI, including Note 1 ("Seller Notes").  SMF ¶ 24.  Note 1 was made in the amount of $8,000,000 and bore an interest rate of seven and one-half (7.5%) percent accruing annually beginning on April 16, 2018.  SMF ¶ 1.  The entirety of the principal and interest became due upon the note's maturity date of April 16, 2015.  *Id.*

As noted at the outset, Note 1 (along with the other Seller Notes) was subordinated to the $70 million GS Loan pursuant to the terms of the Subordination Agreement, which is governed by New York law.  SMF ¶ 25; Ex. A[4] at 3-4.  The Subordination Agreement provides that no payment of any kind can be made on Note 1 until all "Senior Indebtedness" is repaid in full.  *Id.,* § 2.2.  "Senior Indebtedness" is defined as all "Obligations" under the GS Loan, as well as "all obligations and liabilities incurred with respect to Permitted Refinancings…."  *Id.* at 2.  "Permitted Refinancing" in turn, is defined as "any refinancing of the Senior Indebtedness" provided that such refinancing is documented in "Permitted Refinancing Loan Documents."  *Id.*  What constitutes a "Permitted Refinancing" is not otherwise defined.

---

[4] Citations to "Ex." refer to the exhibits to the Declaration of Angelo Stio, submitted herewith.

### C.     ST Defaults on the GS Loan and Initiates the Refinancing Scheme

On or before May 22, 2009, ST defaulted on the GS Loan. SMF ¶ 26. At the time, the amount due on the GS Loan was approximately $69.3 million.  SMF ¶ 51.  Perhaps fearful that its syndicate lenders would ever recover that debt, GS engaged an investment bank to sell the GS Loan, and found a willing buyer in Macquarie Bank ("Macquarie"), which purchased the debt on March 25, 2010.  Tak Dep. Tr. at 144-146; SMF ¶¶ 27-29.   Macquarie, however, only paid a fraction of the total debt.  Tak Dep. Tr. at 14.  Further, Macquarie's willingness to purchase the debt stemmed from a simultaneously executed Purchase Agreement between Macqaurie Capital (USA) Inc., Tak Investments and ST Holdings which provided that Macquarie would be able to sell the GS Loan to ST Holdings. SMF ¶ 28. In other words, Macquarie purchased the GS Loan knowing it would be sold to ST Holdings.

At the time it defaulted on the GS Loan, ST was faced with not only its obligation to repay the substantial GS Loan debt  -- money which it did not have at the time -- but also its obligation to repay the $30.5 million Seller Notes, with interest, before April 2015.  Tak Dep. Tr. 81:2-7; SMF ¶ 24.  Faced with this prospect, Tak and ST initiated the Refinancing Scheme, which began with a series of transactions on April 29-30, 2010.  *See* SMF ¶¶ 29-69.

### 1.     ST Paper Obtains the 2010 CDE Loans and Transfers the Money to ST Holdings

Tak first obtained over $90 million in new loans to ST through Community Development Entities ("CDE") (the "CDE Loans").  SMF ¶¶ 32-45.  A CDE is a vehicle for the provision of loans, investments, or financial counseling in low income communities, through which investors can obtain tax credits.  Here, Tak caused U.S. Bancorp Community Development Corporation ("USBCDC") and Capmark Capital, Inc. ("Capmark") to issue loans

6

to eight CDEs[5], and those CDEs then loaned those funds to ST.  SMF ¶¶ 32-45.  Put differently,

as all of the transactions occurred over the two days, Tak used the CDEs as a vehicle to funnel

money from the financial institutions to ST.  *See* SMF ¶¶ 31-47. The transactions that evidence

the path from USBCDC / Capmark to the CDEs can be traced in a "Flow of Funds" document

produced by ST Paper and other financing documents as follows:

> 1. <u>USBDC Loan 1</u>:  On June 8, 2009, USBCDC made three capital
>    contributions – totaling $24,500,000 into three separate investment funds.
>    SMF ¶¶ 33-34.  By June 29, 2009, those investment funds had transferred
>    this money to three CDEs. *Id.*
>
> 2. <u>USBDC Loan 2</u>:  On April 30, 2010, USCBDC transferred $41,595,000 to
>    WCDLF Investment Fund XXIV (*supra* Sec. II.A.). SMF ¶¶ 35-37, 47.
>    On the same day, WCDLF Investment Fund XXIV then transferred
>    $40,900,000 to five different CDEs. *Id.*
>
> 3. <u>Capmark Funds</u>:  In June 2006, Capmark Capital, Inc. loaned $21,605,056
>    to Capmark CDF Subfund III Leverage Fund LLC ("Capmark Fund").
>    SMF ¶¶ 38-46.  The Capmark Fund took the proceeds of that loan and
>    invested it in Capmark CDF Subfund III LLC – a Capmark CDE. *Id.*  On
>    April 30, 2010, Capmark Capital made an additional $5 million advance to
>    the same Capmark CDE. *Id.*

Once the money reached the eight CDEs, those entities loaned over $90 million to

ST.  SMF ¶ 47.  When the money reached ST, Tak then caused ST to transfer those funds to *ST*

*Holdings*.  SMF ¶ 48.

## 2. ST Holdings Uses a Fraction of the CDE Proceeds to Purchase the GS Loan

With over $90 million in CDE Loan proceeds in ST Holdings' bank account, Tak

then had ST Holdings purchase the GS Loan from Macquarie.  SMF ¶ 50.  SMF ¶ 29.  ST

Holdings purchased the GS Loan for $19,508,542.08, or approximately 28% of the outstanding

---

[5] The eight CDE's that loaned money to ST as part of the Refinancing Scheme were (i) WCDLF Sub CDE
XXV, LLC; (ii) USBCDE Sub-CDE LX, LLC; (iii) STP2 Sub-CDE, LLC; (iv) NNMF Sub-CDE X, LLC; (v)
CapFund CDE One LLC; (vi) WCDLF Sub-CDE XXIV, LLC; (vi) Capfund CDE One, LLC; (viii) STP/MCH Sub-
CDE LLC.

debt.[6]  SMF ¶ 51.  Following this purchase, Tak / ST controlled the GS debt and the loan was, as

a practical matter, retired.  *Id.*  However, because ST *Holdings* purchased the GS Loan, ST

technically became indebted to ST Holdings, even though Tak treats them as the same company.

*See* II.B, *supra.*

> ### 3. ST Holdings Uses the Remaining Proceeds of the CDE Loans to Begin Acquiring ST's Debts to the CDEs

ST Holdings then took the approximately $60 million remaining from the CDE

Loan proceeds, and laid the foundation for the remainder of the Refinancing Scheme – acquiring

and consolidating the CDE Loans.  SMF ¶¶ 52-62. Accordingly, ST Holdings repaid the

$21,970,150 loan it had received from U.S. Bank, N.A., the proceeds of which ST Holdings had

used to buy all the participation interest in a loan issued by Capmark Inc.  SMF ¶¶  38-46, 54-55.

As such, in a single day, ST Holdings (1) borrowed $21,970,150 from the bank, (2) used those

funds to purchase a participation interest that allowed the Capmark CDE to loan the $21,970,150

to ST, (3) had ST pay that money it received from the Capmark CDE back to ST Holdings, and

then (4) ST Holdings repaid the $21,970,150 bank loan. *Id.* It was an entirely circular series of

transactions designed only maintain the fiction that ST was "refinancing" the GS Loan.

Second, ST Holdings "loaned" $49,251,010 to WCDLF Fund XXIV, which, in

turn, repaid the money USBDC had invested in the CDEs earlier that day.  SMF ¶¶ 52-53. Thus,

the money flowed as follows:  (i) USBDC sent $41,545,000 to WCDLF Fund XXIV; (ii)

WCDLF Fund XXIV sent that $41.5 million to the CDEs; (iii) the CDEs sent $41.5 million to

ST; (iv) ST sent that money to ST Holdings; (v) ST Holdings returned the money to WCDLF

---

[6] ST Paper Holdings also purchased from Macquarie a $3.5 million claim that GS had against ST Paper with respect to another loan.  SMF ¶ 50.

Investment Fund, which repaid USBDC.  SMF ¶¶ 35-37, 47, 52-53.  Once again, it was an entirely circular series of transactions.

> ### D. Tak Completes the Refinancing Scheme by Consolidating and Acquiring the CDE Loans

In 2017, ST Holdings, WCDLF Fund XXIV and Tak Investments completed the Refinancing Scheme by acquiring and consolidating the remaining outstanding CDE Loans into so-called "debts" nominally owed by ST to other Tak companies.  SMF ¶¶ 56-62.  First, on May 2, 2017, WCDLF Fund XXIV entered into a series of "Redemption Agreements" with six of the CDEs. *See* SMF ¶ 60.  By the Redemption Agreements, these six CDEs exchanged the 2010 loans they had made to ST for equity investments the WCDLF Fund XXIV had made to the CDEs.  *Id.*  The net result was that the WCDLF Fund XXIV now owned twelve of the fourteen CDE Loans.  *Id.*  Following the consolidation of these loans, Tak Investments effectively purchased the WCDLF Fund XXIV pursuant to the terms of an April 2010 agreement between ST Holdings, WCDLF Fund XXXIV and USBDC.[7]  SMF ¶ 61.  The net result was that Tak – through Tak Investments – controlled the majority of ST's debts to the CDEs. SMF ¶ 62.

Second, as described above, as part of the April 30, 2010 transactions, ST Holdings had purchased the participation interest in a $21,970,250 loan from Capmark Inc. to the Capmark Fund.  SMF ¶ 44.  On May 2, 2017, the note between the Capmark CDE and ST Paper was assigned to the Capmark Fund pursuant to a Redemption Agreement.  SMF ¶ 57.  The Capmark Fund subsequently assigned the note to USBCDC, which in turn, assigned it to ST Holdings.  SMF ¶¶ 58-59.  As a result of these transactions, either ST Holdings (ST's parent) or WCDLF Fund XXIV (ST's affiliate) owned all of ST's outstanding debt to the CDEs. SMF ¶ 62.

---

[7] ST Paper Holdings interests in the "Pledge Agreement and Investment Put and Call Agreement" was assigned to Tak Investments.

E.      **Tak Ensures the "Senior Indebtedness" Will Never Be Paid**

In 2019, ST issued two new promissory notes to WCDLF Fund XXIV and ST Holdings, purportedly related to the debt nominally held by those companies.  The first, an Amended and Consolidated Promissory Note dated March 19, 2019, was made in favor of WCDLF Fund XXIV Fund and consolidated the CDE Loans owned by that entity into a singular "debt" in the amount of $63,962,000 ("WCDLF Note").  SMF ¶ 63.  The WCDLF Note has a maturity date of April 30, 2040 and does not require a single payment of interest or principal until that date.  SMF ¶ 64.  The second note is dated March 19, 2019 and made in favor of ST Holdings (the "Holdings Note") in the amount of $21,970,250.  SMF ¶ 65.  The Note has a maturity date of April 30, 2047 and similarly requires no payment of principal or interest before that time.  SMF ¶ 66.  Even in the unlikely event that Tak were to cause the timely repayment of this these notes[8] issued to ST Holdings (ST's parent) and WCDLF Fund XXIV (ST's affiliate), no payment on Note 1 would be due for twenty-five (25) more years.  *Id.*

Realistically, however, there is no chance that either of these notes (which Tak owes to no one but himself) will be repaid because Tak believes he is entitled to "refinance" these amounts in perpetuity.  Tellingly, Tak declined to commit to any date by which payment will be made on the so-called "Senior Indebtedness" that he and he alone controls.  *See* Tak Dep. Tr. at 141-44.  As he testified, "ST Paper and entities that hold the note[s]" will decide when repayment is made.  *Id.* at 143:24-142:2; *see also id.* at 141:17-24 ("When these notes are paid, then they are paid.").  But of course, all of these parties are owned by Tak.  His testimony left

---

[8] Notwithstanding multiple discovery requests, ST Paper has not produced any records of having made any payment on either the WCDLF Note or the Holdings Note to date.

little doubt that, come 2040 /2047, ST will simply consult with lawyers and decide how to proceed with refinancing.

> Q:      So when the loan comes due, there could be a conversation with the lawyers at that time about refinancing again?
>
> A:      If [the loan] was paid by the time it comes due, then there will be no need.
>
> Q:      But if it's not paid by the time this comes due, then there could be a need; is that your testimony?
>
> A:      I may not be the manager of those entities at the time because we are talking 20, 30 years from now.
>
> Q:      It's a long time.
>
> A:      Yeah.

*See* Tak Dep. Tr. at 143-44. Accordingly, if this Court does not intervene, Tak's Refinancing Scheme will have succeeded. He no longer has to pay the "Senior Indebtedness" that he owens or the long overdue Seller Notes.

## III.   ARGUMENT

### A.   Legal Standard

Summary judgment is appropriate if "the pleadings, depositions, answers, to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Major League Baseball Properties v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008); Fed. R. Civ. Pr. 56(c). A court considering a motion for summary judgment can also find that the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

Conclusory assertions, or those based on some speculation or suspicion, are insufficient to defeat a motion for summary judgment. *See Kulak v. City of New York*, 88, F.3d

63, 71 (2d Cir. 1996).  Rather, the opposing party must produce admissible evidence, which is more than a mere scintilla of proof, "upon which a jury could properly proceed to find a verdict for the party producing it, upon which the onus of proof is imposed." *Anderson*, 477 U.S. at 251 (internal quotations omitted).

### B.     ST Paper Is Liable For Its Failure to Pay Note 1

Count II of Ability's Complaint is for breach of contract.  As explained in Section II.A (and as ST Paper has admitted in Wisconsin court), Ability is the proper assignee and holder of Note 1.  *See* Sec. II.A; ST Paper Wisc. MSJ at 9.  From the outset, ST has admitted that (1) Note 1 is binding upon it;  (2) Note 1 was made in the amount of $8 million and bore interest at an annual rate of 7.5% beginning on April 16, 2008; (3) Note 1 matured on April 16, 2015; and (4) ST Paper has refused to make payment.  *See* ECF No. 1 (Complaint) ¶¶ 19-20, 74, 76-77; Stio Decl., Ex. V (ECF No. 52 – Amended Answer and Affirmative Defenses) ¶¶ 19-20, 74, 76-77.  Under Wisconsin law[9] the elements of a breach of contract are "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and, (3) damages." *Brew City Redevelopment Group, LLC v. Ferchill Group*, 289 Wis. 2d 795, 807 (2006).  ST's admissions in this case more than satisfy these elements.

In fact, ST's sole defense for refusing to pay Note 1 is its continued contention that purported "Senior Indebtedness" exists under the Subordination Agreement. Answer, ¶¶ 3, 77, 86, Aff. Def. ¶ 2.   But, as demonstrated below (infra at III.C) , ST's contention that the promissory notes held by its corporate parent and affiliate constitute "Senior Indebtedness" is

---

[9] Because Note 1 is governed by Wisconsin law, that State's law technically supplies the elements of Ability's breach of contract claim.  However, the Subordination Agreement is governed by *New York* law. Therefore, New York law must resolve the Parties' disputes related to that Agreement, which predominate this case.

based on an untenable interpretation of the Subordination Agreement, which renders the commercially absurd result that Note 1 will never be paid.  Given the failure to pay Note 1, the Court should award summary judgment to Ability.

>    **C.**    **The Subordination Agreement Does Not Relieve ST of its Obligation to Pay Note 1**

Count I of Ability's Complaint seeks a declaration of the Parties' rights under the Subordination Agreement, and specifically a Declaratory Judgment that no Senior Indebtedness exists under the terms of contract.  Complaint, ¶¶ 66-72.  For purposes of this motion, however, it does not matter whether the Court resolves the Parties' dispute regarding the Subordination Agreement in the context of resolving Ability's Declaratory Judgment claim or ST's defense to the Breach of Contract claim.  In either instance, the issue is ripe for resolution.[10]

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).  "[T]he initial question for the court…is 'whether the contract is unambiguous with respect to the question presented by the parties.'" *Law Debenture Trust Co. v. Maverick Debt Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (citations omitted).  However, even if a contract found is ambiguous, summary judgment may still be granted where either (i) no extrinsic evidence is presented or (ii) the extrinsic evidence offered does not create a dispute of material fact.  *Dev. Specialists, Inc. v. Peabody Energy Corp.* (*In re Coudert Bros.*), 487 B.R. 375, 390 (S.D.N.Y. 2013).  A contract is not ambiguous simply

---

[10]   Where an actual "case or controversy" exists regarding the terms of a contract and a declaration by the Court would finalize the controversy and offer relief from uncertainty, it may issue a declaratory judgment concerning the Parties' rights under the contract.  *See Amica Mut. Ins. Co. v. Franklin*, 147 F.3d 238, 243 (2d. Cir. 1998) (affirming district court's granting of declaratory judgment on proper interpretation of contract upon a motion for summary judgment).  Here, given that ST's refusal to pay Ability is based on its flawed interpretation of the Subordination Agreement governed by New York law, Ability's declaratory judgment claim meets those requirements.

because the Parties advance different interpretation of its terms.   *See Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)

Under New York law, in interpreting a contract, "words and phrases…. should be given their plain meaning, and the contract 'should be construed so as to give full meaning and effect to all of its provisions." *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (citation and internal quotation marks omitted).  Additionally, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (NY App. Div 2003).  Rather, "contracts should be interpreted to produce commercially reasonable results." *Jackson v. Harvest Capital Corp.*, 848 Fed. Appx. 455, 457 (2d Cir. 2021).

ST contends that the WCDLF Note and Holdings Note constitute "Senior Indebtedness" under the terms of the Subordination Agreement.  The contract defines "Senior Indebtedness" as ST's "Obligations" under the documents governing the GS Loan, as well as "all obligations and liabilities incurred with respect to Permitted Refinancings…."  Sec. II.B, *supra.* Because ST Paper's "Obligations" to GS ended over 10 years ago, the nominal promissory notes controlled by Tak can only constitute "Senior Indebtedness" under the Subordination Agreement if they are the product of a "Permitted Refinancing." *See* Stio Decl., Ex. A at 2; Sec. III.B, *supra*. Here, ST Paper's interpretation of the Subordination Agreement stretches the term "refinancing" beyond its plain meaning, and leads to the commercially absurd result that Tak can avoid ever having to make any payment on Note 1.

Black's Law Dictionary defines a "refinancing" as "acquiring a new, larger loan that retires an older, smaller loan over a longer term, using the same assets as collateral."[11] Thus, considering usual and ordinary meaning, a "refinancing" here of ST's debt to GS would have involved ST procuring the CDE Loans and using those new loans (or at least the substantial majority of the proceeds) to repay GS for the full value of the outstanding debt.  That is not what happened.  Instead, on April 30, 2010, ST Paper procured over $90 million from the CDEs, and then transferred those proceeds to a bank account in the name of its parent, ST Holdings.  Sec III.C.1 *supra*.  ST Holdings, in turn, used that $90 million to engage in a series of transactions, only one of which was to buyout the GS Loan for less than $20 million.  *Id.*  Indeed, ST Holdings spent <u>less than 25%</u> of the CDE Loan proceeds to purchase the GS Loan.  Further, when ST Holdings purchased the GS Loans, it was effectively retired (not "refinanced"), because Tak treats ST and ST Holdings as the same company.  Accordingly, while ST may have been indebted to the CDEs as of May 1, 2010, it cannot be said that ST engaged in a "refinancing" by swapping out the GS Loan for the CDE Loans.  ST borrowed money and paid it to ST Holdings; it did not borrow the money and pay off GS.

If that were not enough, the 2017 and 2019 transactions between Tak Investments, WCDLF Fund XXIV, and ST Holdings make it even more clear that what ST has done here is not "refinancing".   Rather, in 2017, Tak (thought Tak Investments) retired all of ST's CDE debts by taking ownership of WCDLF Fund XXIV and causing ST Holdings to buy out the Capmark CDE debt.  *See* Sec. II.D, *supra*.  Thus, not only was ST no longer indebted to GS

---

[11] Black's Law Dictionary Free Online Legal Dictionary 2nd Ed, available at https://thelawdictionary.org/refinancing; *see also Citibank N.A. v.  Norse Skogindustrier ASA*, 2016 U.S. Dist. LEXIS 35784, *11 (S.D.N.Y. 2016) (citing Black's Law Dictionary 10th Ed. (2014) as defining refinancing as the "exchange of an old debt for a new debt.")

Loan, but also no longer indebted to any of the CDEs.   What remained were fictional debts owed by ST to ST Holdings (which is no debt at all given that Tak treats them as "the same company") and to WCDLF Fund XXIV – another entity owned and controlled by Tak.  *Id.*  That the fictional debts will never be repaid is confirmed by (i) the terms of the 2019 Amended and Restated Notes to ST Paper Holdings and WCDLF Fund XXIV, under which no money becomes due until 2040 and beyond; and (ii) Tak's undisputed testimony that those "notes" could themselves be refinanced if he deems it necessary.  SMF ¶¶ 67-70; Tak Dep. Tr. at 143-44.

Accordingly, notwithstanding ST Paper's protests, the promissory notes held by its parent (ST Holdings) and affiliate (WCDLF Fund XXIV) do not amount to a continued "Refinancing" of the original GS Loans, and thus cannot constitute "Senior Indebtedness" under the Subordination Agreement.  To interpret "refinancing" otherwise would lead to a commercially absurd result contrary to New York law.   More specifically, it is commercially absurd to interpret the term "refinancing" in a manner that permits Tak to avoid ever paying on Note 1 by manufacturing "Senior Indebtedness" that ST owes to itself and will never repay. These financial maneuverings did not amount to "refinancing".  They were and are a sham.

### D.    ST Paper has Breached the Covenant of Good Faith and Fair Dealing

Alternatively, ST Paper's "refinancing" of the GS Loan to avoid repaying Note 1 is a breach of the implied covenant of good faith and fair dealing attached to the Subordination Agreement.  "The covenant of good faith and fair dealing is implicit in all contracts; it encompasses 'any promises which a reasonable person in the position of the promisee would be justifiable in understanding were included,' and it prohibits either party from acting in a manner 'which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *In re Navidea Biopharmaceutical Litig.*, 2019 U.S. Dist. LEXIS 221211, at *15-*17, (S.D.N.Y. Dec. 26, 2019).  The covenant of good faith and fair dealing has been

16

stated as the "implied obligation to exercise good faith not frustrate [a] contract[] into which [one has] entered." *Grad v. Roberts*, 14 N.Y.2d 70, 75 (1964). "The covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement." *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980). While the question of whether a party's conduct violates with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, where the undisputed material facts evidence a party's bad faith, the Court may award judgment as a matter of law. *See 9 Bros. Bldg. Supply Corp. v. Buonamicia*, 299 A.D.2d 529, 530 (2d Dep't 2002). That is precisely the case here, where it is undisputed that (1) ST deceptively "refinanced" the GS Loan by turning it into a nominal debt owed to corporate affiliates that will never be enforced; (2) the promissory notes held by its corporate affiliates do not mature for another twenty-six years (or 32 years after Note 1 originally matured); and (3) Tak has testified that the purported "Senior Indebtedness" could be "refinanced" yet again "if there is a need." *See* Sec. II.E, *supra*.

To establish the scope of the implied covenant in any particular case, the court must assess the parties' intent and reasonable expectations in entering the contract. *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) ("the boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract."). In making this assessment, the Court must consider "the specific language of the contract, and the context within which that contract was formed." *Id.* (citations omitted). Here, both factors establish an outer boundary of good faith performance that has clearly been breached by the Refinancing Scheme.

With respect to the contract's formation, the Subordination Agreement was entered as part of ST Paper's $86 million purchase of the OFTI mill.  Sec. II.C, *supra*.  The majority of that purchase was funded by $70 million GS Loan.  *Id.*  While ST Paper agreed to issue the Seller Notes to OFTI to cover the balance of the purchase price, GS understandably wanted to ensure that its lenders were repaid in full before ST started making cash payments to OFTI.  Had ST and OFTI refused to agree to the Subordination Agreement, it is likely that GS would have never loaned the $70 million.  Thus, in the context of the overall transaction, the Subordination Agreement was a means to protect GS's investment above all else, and not a means to enable ST (the buyer) to avoid paying the purchase price altogether.

This is reflected in the language of the Subordination Agreement which states up front in the recitals that the contract served as "an inducement to and as one of the conditions precedent to the agreement of" GS and it syndicate of lenders extending the $70 million loan under the Credit Agreement.  Stio Decl., Ex. A at 8.  It further states GS and its lenders "required the execution and delivery of [the Subordination] Agreement by OFTI and [ST Paper]."  *Id.*  Consistent with this, the Subordination Agreement specifies the "Senior Indebtedness" to which the Seller Notes are subordinated to mean the "Obligations" owed to GS and its lenders.

It is true that the Subordination Agreement contemplates the refinancing of the GS Loan, and that the Seller Notes would continue to be subordinated to the GS debt if the GS Loan was refinanced.  *See* Ex. A at 2.  However, as explained above, the term "refinance" contemplates a transaction in which ST secures a loan from a third party lender (or lenders) and then uses that loan(s) to repay the GS Loan in full.  Sec. III.B.2, *supra*.  In that case, the continued subordination of the Seller Notes would have shielded ST from any claim by OFTI that the Seller Notes were payable simply because GS had been replaced by another lender.

18

In contrast, ST and Tak are now using the "refinancing" term as a sword to avoid having to ever pay Note 1 (or the other three Seller Notes) in perpetuity. Again, ST simply paid ST Holdings to buyout the GS Loan for a fraction of the total debt, and ensure that debt would never be enforced. Further, even though the CDE Loans were not a "refinancing" of the GS debt, those loans have also been retired by Tak Investments. *See* Sec. II.C, *supra.* Thus the so-called "Senior Indebtedness" resides with ST's corporate affiliates, is not due for another twenty-six years, and – according to Tak – likely beyond. These facts are undisputed and dispositive of ST 's bad faith.

### E. ST Paper's Affirmative Setoff Defense Fails for Lack of Proof

In addition to its (incorrect) argument that Ability's recovery is precluded by the Subordination Agreement, ST has also asserted an affirmative defense of setoff, arguing that any recovery under Note 1 must be offset by amounts OFTI allegedly owes ST under certain indemnification provisions in the APA governing the original purchase of the mill. Stio Decl., Ex. V (ECF No. 52) Aff Def. ¶ 4. Specifically, ST Paper contends that:

> Any recovery by the Plaintiff pursuant to Note 1 is offset by amounts owed as a result of Oconto Falls Tissue, Inc.'s obligation to indemnify ST Paper, pursuant to the terms of Note 1 and Article IX of the April 16, 2007 Second Amended and Restated Asset Purchase Agreement ("APA") between ST Paper and Oconto Falls Tissue, Inc. ("OFTI")…. Any recovery by Plaintiff pursuant to Note 1 is offset by the amounts owed by OFTI to ST Paper pursuant to the APA, as Note 1 explicitly references the APA and its indemnification provision as stated in Paragraph 9.4 of the APA. Paragraph 9.4 of the APA states that ST Paper is entitled to set-off against any amounts payable on the Seller Notes the amount of any claim by ST Paper for which ST Paper seeks indemnification pursuant to paragraph 9.1 of the APA. *Id.*

The affirmative defense states further that the setoff consists of four components: ST Paper stated that the setoff is consisted of four components: (i) $2,410,591.92 in unassumed liabilities of OFTI paid by ST Paper post-closing; (ii) $7,918,734.72 in environmental liabilities; (iii)

19

$106,613.23 for equipment damage (later asserted to be "yankee dryer"); and, (iv) a claimed

$76,493,000, which ST Paper subsequently explained resulted from OFTI's alleged pre-purchase

misrepresentations and breaches of warranty related to the production capabilities of the mill.

*Id.* Given the specificity of certain of these amounts, one might expect that ST Paper could

produce detailed evidence regarding these liabilities.  During discovery however, ST failed to

produce evidence sufficient to establish its defense.

   A defendant bears the burden of proof on affirmative defenses. *Fitzgerald v.*

*Henderson*, 251 F.3d 345, 357 (2d Cir. 2001). "Where a Plaintiff uses a summary judgment

motion, in part, to challenge the legal sufficiency of an affirmative defense, it may satisfy its

Rule 56 burden by showing that there is an absence of evidence to support an essential element

of the non-moving party's case." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (internal

quotation marks and citation omitted). "While whatever evidence there is to support an essential

element of an affirmative defense will be construed in a light most favorable to the non-moving

defendants, there is no express or implied requirement in Rule 56 that the moving party support

its motion with affidavits or other similar materials negating the opponent's claim." *Id.* (internal

quotation marks and citation omitted).   As a result, courts in the Second Circuit routinely grant

motions for summary judgment dismissing affirmative defenses that are not supported by

sufficient evidence. *See APS Tech., Inc. v. Brant Oilfield Mgmt. & Sales, Inc.*, 2015 U.S. Dist.

LEXIS 131626, at *13 (S.D.N.Y. Sept. 29, 2015) (dismissing each of the defendant's affirmative

defenses on summary judgment); *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722,

732 (S.D.N.Y. 2005); (granting plaintiff's motion for summary judgment dismissing defendant's

affirmative defenses for lack of evidence); *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F.

Supp. 2d 368, 379 (S.D.N.Y. 2010) (finding plaintiff was entitled to summary judgment on

defendant's affirmative defense because "defendants fail[ed] to adduce any evidence" in support of their defense).

Here, the Parties engaged in months of extensive party and third-party discovery, exchanging of tens of thousands of pages of documents and the taking of party depositions.  It cannot be disputed that time and time again, Ability attempted to seek support for the setoff defense.  Whatever information that exists and is in ST Paper's possession should have been produced.  It was not and therefore the defense fails.

1.      **ST Paper's Has Failed to Produce Documents Sufficient to Prove Its Setoff Defense Concerning Unassumed Liabilities, Environmental Liabilities and the "Yankee Dryer" Repair**

In its initial document requests, Ability requested the production of "all documents relating to" each of the four categories of setoffs that ST had identified as being contained within its defense. *See* Stio Decl., Ex. Y, Req. No. 21-24.  In response to the requests concerning first three categories -- (i) the unassumed liabilities, (ii) the environmental liabilities, and (iii) the "yankee dryer" repair -- (Requests 21-23), ST pointed only to *two documents*: the APA itself and a letter drafted by Mr. Tak in 2010 ("2010 Demand Letter").  *Id.*

The APA itself, of course, does not provide any evidence that ST Paper is entitled to a setoff for anything; it just shows the terms of purchase.  Thus, according to the ST's discovery responses, the sole bases for nearly $11 million of its setoff defense is the 2010 Demand Letter and its attachments.  *Id.* at ST Paper 754-759.  However, the demand letter is simply a demand for payment.  The attachments are only excel spreadsheets identifying amounts allegedly paid by ST.  *Id.*  They are lists of checks, payees and amounts, without narrative.  Thus, even accepting that these payments were made (and there is no evidence they were), the attachments do not evidence how or why these payments fall within the setoff provisions of the APA.

Following review of these spreadsheets, Ability wrote to ST Paper on February 18, 2021 and requested it produce any invoices, checks, bills, or bank statements to support any of the alleged payments listed in Attachments 1, 2, or 3 by letter.  *See* Stio Decl., Ex. Z.  In response, ST Paper admitted that it had no such evidence. *See* Stio Decl., Ex. AA. ("With respect to the documents you sought in Production Request Nos. 21, 22, 23 and 28 relating to ST Paper's affirmative defenses, ST Paper does not possess any bills, invoices, or statements relating to the liabilities it paid beginning in 2007 after the closing of the asset sale.").   Providing ST one last opportunity, Ability wrote again on May 28, 2021 requesting "all invoices, bank records, and other documentation reflecting the payments and costs referenced in Attachments 1-3 of the February 9, 2010 demand letter".  *See* Stio Decl., Ex. BB.  In response, ST repeated that it did not have "any additional records it had not produced showing the payments it made and costs it incurred." *See* Stio Decl., Ex. DD.  ST's failure to produce evidence to substantiate the alleged setoff is fatal the affirmative defense.[12]

## 2.  ST's Deficient Production With Respect to OFTI's Purported Misrepresentations

The remainder of the setoff defense is ST's contention that it is entitled to setoff in excess of $76 million due to the alleged misrepresentations of OFTI concerning the tissue paper mill's production. Here again, Ability requested that ST produce "all documents relating to" this defense *See* Stio Decl., Ex. Y, Req. 24.  Notwithstanding the massive setoff that it claims, ST identified just under 200 pages of documents as responsive, and even these are insufficient to support its contentions.  *Id.* First, not a single document that ST claims support its defense is dated after the closing of the sale of the mill. Thus, while ST contends it has suffered

---

[12] Moreover, the spreadsheet is no admissible as a summary under F.R.E 1006, because the Rule requires that the underlying documentation constituting the summary material be produced.  *See* F.R.E. 1006.

over $76 million in damages since purchasing the mill due to a lack of production capability, it

has not produced any document what the production was after the sale.  More importantly, ST

has not produced a single document that would explain how the alleged lower production rate

produced over $76 million in damages.[13]   As with the first categories of alleged setoffs, Ability

sent follow up requests in February and May 2021 requesting any additional documentation that

ST Paper had to support these amounts, and ST Paper stated that it had none.

   In sum, ST has asserted a claim for setoff in excess of $80 million: (i) nearly $11

million of which it cannot produce proof of having made "setoff" payments or documents that

evidence as to why the payments allegedly made are subject to setoff, and (ii) a claim for a setoff

of over $76 million concerning alleged misrepresentation of the production capabilities of the

mill without the production of a single piece of evidence showing the production of the mill

before closing or after closing, let alone that it was misrepresented.  Because ST has not

produced any evidence sufficient for it to prevail on the setoff defense, Ability is entitled to

summary judgment.

   **F.**  **ST is Not Entitled to a Setoff Under the Compromise Agreement**

   Finally, in its Amended Answer, ST has asserted an additional setoff defense of

"[a]t least $6,500,000 exclusive of interest as a result of a Compromise Agreement dated March

31, 2009 entered into by OFTI, Tissue Products Technology Corp, Tissue Technology, LLC

EcoFibre, Inc and [ST]." Answer Aff. Def. ¶ 5.  The Compromise Agreement purports to resolve

disputes between ST disputes with OFTI and the other parties concerning certain receivables. *See*

Stio Decl., Ex. EE. The agreement provides that if OFTI or the third parties do not pay

---

   [13] ST Paper also has not produced an expert report relating to this subject, notwithstanding its technical
aspects.

$6,500,000 within 120 days of the date of the agreement, then ST can setoff amounts owed to OFTI under the Seller Notes.  The problem for ST, however, is that by 2009, Note 1 had long been assigned to Stonehill Captital, such that OFTI had no rights in that note to "compromise". Stio Decl., Ex. A at "Endorsement" (AIC000136).  Accordingly, ST's "Compromise Agreement" setoff defense also fails.

## IV.   CONCLUSION

For the foregoing reasons, Ability requests that the Court enter summary judgment in its favor on all counts of its Complaint, and also dismiss ST Paper's affirmative setoff defenses.

Respectfully submitted,

By: /s/ Angelo A. Stio, III
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Angelo A. Stio, III
Melissa A. Chuderewicz
Attorneys for the Plaintiff
875 Third Avenue
New York, NY 10002
*Attorneys for Ability Insurance Company*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 16, 2021, a true and correct copy of the foregoing Notice of Appearance was electronically filed with the Clerk of the Court for the United States District Court for the Southern District of New York using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the court's CM/ECF system.

/s/ *Melissa A. Chuderewicz*

1