# EXHIBIT B

FILED
03-08-2019
Clerk of Courts
Oconto County WI
2017CV000104

STATE OF WISCONSIN      CIRCUIT COURT      OCONTO COUNTY

**OCONTO FALLS TISSUE, INC.,**
2077B Lawrence Drive
De Pere, WI 54115

       Plaintiff,

v.

                                   Case No. 17 CV 104
                                   Case Code No. 30303

**ST PAPER, LLC**,
A Delaware limited liability company
106 E. Central Avenue,
Oconto Falls, WI 54154
  and
**VHC, INC.,**
A Wisconsin corporation,
3090 Holmgren Way
Green Bay, WI 54304
  and
**DAVID VAN DEN HEUVEL,**
1180 South Pine Tree Road
De Pere, WI 54115
  and
**NICOLET BANKSHARES, INC.,**
A Wisconsin corporation,
111 North Washington Street
Green Bay, WI 54301
  and
**ABILITY INSURANCE COMPANY,**
A Connecticut corporation
55 North Water Street, Suite 3
South Norwalk, CT 06854

       Defendants.

---

## SUMMONS

---

THE STATE OF WISCONSIN

To each person named above as a defendant:

You are hereby notified that the Plaintiffs named above have filed a lawsuit or other legal action against you. The Amended Complaint, which is attached, states the nature and basis of the legal action.

Within forty-five (45) days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Amended Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to:

**Oconto County Courthouse**
**301 Washington Street**
**Oconto, WI 54153-1699**

and to Plaintiffs' attorney, Michael J. Ganzer, whose address is Terschan, Steinle, Hodan & Ganzer, Ltd., 309 North Water Street, Suite 215, Milwaukee, Wisconsin 53202. You may have an attorney help or represent you.

If you do not provide a proper answer within twenty (20) days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 8th day of March, 2019.

TERSCHAN, STEINLE, HODAN & GANZER, LTD.
ATTORNEYS FOR PLAINTIFF

*Electronically signed by Michael J. Ganzer*

**P.O. ADDRESS:**
309 North Water Street
Suite 215
Milwaukee, Wisconsin 53202
414-258-1010

FILED
03-08-2019
Clerk of Courts
Oconto County WI
2017CV000104

STATE OF WISCONSIN      CIRCUIT COURT      OCONTO COUNTY

OCONTO FALLS TISSUE, INC.

      Plaintiff,

v.                            Case No. 17 CV 104
                               Case Code No. 30303 (Contract other)
ST PAPER, LLC, VHC, INC.,
DAVID VAN DEN HEUVEL,
NICOLET BANKSHARES, INC.,
And ABILITY INSURANCE COMPANY,

      Defendants.

## AMENDED COMPLAINT

Plaintiff, Oconto Falls Tissue, Inc. ("OFTI"), by its attorneys, Terschan, Steinle, Hodan & Ganzer, Ltd., by Michael J. Ganzer, for its Amended Complaint against defendants, ST Paper, LLC, VHC, Inc., David Van Den Heuvel, Nicolet Bankshares Inc. and Ability Insurance Company, states as follows:

### I. INTRODUCTION

1.      This is an action to collect more than $60 million in principal and interest that ST Paper agreed to pay under four (4) subordinated promissory notes in favor of OFTI (the "Seller Notes").

2.      ST Paper issued the Seller Notes as partial payment for the purchase of OFTI's paper mill and related assets in Oconto Falls, Wisconsin in 2007.

3

3.    The purchase price for the mill and related assets was $86.4 million plus other consideration, with the original principal amount of the Seller Notes ($30,589,000) accounting for roughly one-third of the total. See the Closing Statement attached as Exhibit A.

4.      To pay for the other two-thirds, ST Paper secured a $65 million term loan and a $2.8 million revolving loan brokered and administered by Goldman Sachs Credit Partners, L.P. ("Goldman"). These loans were senior to the Seller Notes. In other words, ST Paper was to repay the senior loans first and then the subordinate Seller Notes would become due and payable.

5.      The senior term loan was set to mature no later than March 31, 2013, and the Seller Notes were to become due and fully payable two years later, on April 16, 2015.

6.      By that date, the amount due under the four Seller Notes, including principal and interest, was over $54 million and additional interest continues to accrue. The Seller Notes are attached hereto and incorporated herein and marked as Exhibit B.

7.      ST Paper, however, has never paid and refuses to pay on the Seller Notes. ST Paper claims it has no obligation to pay because there is allegedly still senior debt outstanding, to which the Seller Notes are subordinate. ST Paper claims, moreover, that it expects this supposed senior debt to remain outstanding for "many years."

8.      ST Paper's claims are false. In truth, in 2010 ST Paper fully paid off the original Goldman loans for $24 million—a significant discount that ST Paper negotiated.

9.      On May 5, 2010, Goldman's complete satisfaction of mortgage and security interests was recorded in Oconto County. Accordingly, there is no longer any senior creditor who stands in line to be repaid before OFTI, and the Seller Notes are therefore fully due and payable.

10.     ST Paper then obtained entirely new loans from new creditors for nearly four times the amount of the negotiated payoff to Goldman and then unilaterally declared that these new "loans" are also somehow senior to the Seller Notes. This was a deliberate ruse by ST Paper to try to escape its duty to pay OFTI under the Seller Notes. Upon information and belief, the new "loans" were obtained without any consideration or insufficient consideration.

11.     ST Paper's new loans include (1) a loan of $26,970,150 (roughly the amount of the discounted payoff to Goldman) from a now-defunct company called Capmark and (2) a second "loan" of $63,962,000 (roughly the amount of the original Goldman loan) from seven (7) "community development entities."

12.     In 2010, at or about the same time as the Goldman payoff and the satisfaction of Goldman's mortgage, ST Paper filed two new mortgages on the paper mill to secure the purported new loans.

13.     Upon information and belief, the second of these new "loans" was fictitious; no credit in that amount was actually extended to ST Paper in 2010. Moreover, upon information and belief, ST Paper did not structure these new "loans"—which were issued under the federal seven-year New Markets Tax Credit Program—like a normal commercial loan. Among other things, ST Paper has arranged to make interest-only payments on the $63 million "loan" in order to leave the principal balance on its books indefinitely as an excuse under the subordination agreement to continue avoiding its payment obligations to OFTI.

14.     Based on the foregoing, ST Paper could effectively *never* repay the Seller Notes, thus depriving OFTI of more than one-third of the purchase price for its former paper mill even though the subordination agreement specifically provided that nothing "shall impair [ST Paper's] unconditional and absolute obligation" to pay OFTI when the notes become due.

15.     The Seller Notes and related agreements between the parties prohibit such an absurd and unfair result. OFTI therefore brings this action to vindicate its right to full and immediate payment under the Seller Notes.

16.     In addition to the foregoing, Plaintiff OFTI assigned Note 1 to Defendant Maplebridge Funding, LLC, see Exhibit C, as security for certain lending offered by Maplebridge Funding, LLC (now defunct). This is Note 1 of the four Seller Notes. That Note was then assigned by Maplebridge Funding, LLC to defendant Ability Insurance Company as evinced by Exhibit D attached hereto.

17.     As security, OFTI transferred Notes 3 and 4 to defendant VHC, Inc. for certain lending to the plaintiff company. Said transfer for security purposes was agreed by and between the plaintiff company and defendants VHC, Inc. and David Van Den Heuvel. See Exhibits E and F attached hereto.

## II. PARTIES AND JURISDICTION

18.     Oconto Falls Tissue Inc. is a Wisconsin corporation with its principal place of business at 2077 Lawrence Drive, Suite A, De Pere, Wisconsin 54115.

19.     Defendant ST Paper LLC is a Delaware limited liability company with its principal place of business located at 106 East Central Avenue, Oconto Falls, Wisconsin 54154.

20.     Defendant Ability Insurance Company is, upon information and belief, a Connecticut corporation doing business at 55 North Water Street, Suite 3, South Norwalk, Connecticut 06854. Ability has done substantial business in the State of Wisconsin. Ability Insurance Co. is joined in this lawsuit so as to ensure complete relief is afforded to the parties. Wis. Stat. §803.03.

21.     Defendant VHC, Inc. is a Wisconsin corporation with its principal place of business located at 3090 Holmgren Way, Green Bay, Wisconsin 54304. VHC Inc. is joined in this lawsuit so as to ensure complete relief is afforded to the parties. Wis. Stat. §803.03.

22.     Defendant David Van Den Heuvel is a citizen of the State of Wisconsin residing at 1180 South Pine Tree Road, De Pere, Wisconsin 54115. David Van Den Heuvel is joined in this lawsuit so as to ensure complete relief is afforded to the parties. Wis. Stat. §803.03.

23.     Defendant Nicolet Bankshares, Inc. is a Wisconsin corporation with its principal place of business located at 111 North Washington Street, Green Bay, Wisconsin 54301. Nicolet Bankshares Inc, is joined in this lawsuit so as to ensure complete relief is afforded to the parties. Wis. Stat. §803.03.

24.     Defendants Ability Insurance Company, VHC, Inc., David Ven Den Heuvel and Nicolet Bankshares, Inc. are necessary parties in order for there to be a full and complete adjudication of all matters currently before the Court regarding the seller Notes described herein.

### III. BACKGROUND

**A.     Van Den Heuvel and Tak Develop a Joint Business Plan in 2005 and 2006.**

25.     Ronald Van Den Heuvel is an engineer, entrepreneur, and experienced professional in the paper-tissue industry. For decades, he and other members of his family have operated some of the preeminent tissue-machine contracting companies in the United States and have completed nearly fifty tissue-machine installations. He is no longer an officer or shareholder of the plaintiff corporation.

26.     In 1997, OFTI  acquired from Kimberly-Clark Tissue Company a shuttered paper mill in Oconto Falls, Wisconsin, which Ron Van Den Heuvel and his business partners operated for the next decade.

27.     In 2000, OFTI formed a strategic partnership with Enron, which backed a bond issue.  When Enron filed for bankruptcy in 2001, the bonds and other debt obligations were called, and the Enron trustee sued OFTI for the millions of dollars by which Enron had fraudulently inflated the value of its investment.

28.     This Enron debacle created financial havoc for OFTI, forcing it to obtain alternative financing at much higher cost and to pledge the OFTI mill and other assets as collateral.

29.     To deal with these financial challenges, Mr. Van Den Heuvel began to consider selling the OFTI mill. Eventually, he found an interested buyer named Sharad Tak.

30.     Mr. Tak is an entrepreneur who has since the 1970s acquired or owned businesses in a variety of industries including government contracting, television and radio, electrical power, and commercial real estate.

31.     In or around 2005, while exploring investment opportunities, Tak determined that there was a need for additional, efficient paper-manufacturing operations in the Unites States. He believed that supply was not keeping pace with demand in the paper industry.

32.     While researching the paper industry, Tak learned about Van Den Heuvel, his tissue-installation contracting business, and his acquisition of the paper mill at Oconto Falls. This was precisely the kind of business Tak was interested in pursuing.

33.     Tak approached Van Den Heuvel in 2005 about a possible investment in OFTI. Over the course of the next year or two, the two men developed a joint business plan concerning both OFTI and other, related ventures.

34. Their plan called for Tak or one of his companies to acquire OFTI and two smaller entities, thereby generating sufficient funds to pay off all of OFTI's creditors.

35. Another part of the strategy was for Van Den Heuvel to contribute his talent, experience, and expertise in the paper industry—to which Tak was a newcomer—by acquiring an ownership interest and remaining involved in the new companies.

36. Van Den Heuvel's continued involvement in the business was critical to ensure its success. Among other reasons, Van Den Heuvel had negotiated a long-term off-take contract with SCA, one of the world's largest paper companies, to take virtually all of the paper produced at OFTI. Van Den Heuvel was to help maintain this important relationship with SCA.

37. OFTI was in a challenging financial situation, primarily because of the failed strategic relationship with Enron.

38. Tak brought to the table a history of acquiring and improving distressed companies and an ability to secure financing, including a pre-existing relationship with Goldman.

39. Tak's relationship with Goldman was particularly important because the parties envisioned needing to secure funding of $85 million or more for the purchase of the OFTI mill and the satisfaction of Van Den Heuvel's existing debts, as well as additional funding for more mills around the country.

40. The combination of Tak's experience in business and financial connections with Van Den Heuvel's assets and industry expertise seemed to provide the basis for a successful partnership. So the parties continued to pursue a joint business plan.

41.    Their efforts eventually led to the consummation of several transactions between the parties, including the one at the heart of this lawsuit—the purchase of OFTI's mill and related assets by Tak's company ST Paper.

**B.    ST Paper Purchases OFTI's Mill in 2007 through a Senior Loan from Goldman and Subordinated Notes in Favor of OFTI.**

42.    On April 16, 2007, ST Paper and OFTI entered into a Second Amended and Restated Asset Purchase Agreement (the "Purchase Agreement," attached as Exhibit G) for ST Paper to acquire substantially all of OFTI's assets for a purchase price of $86.4 million.

43.    Under paragraph 2.3 of the Purchase Agreement, ST Paper was to pay the purchase price at closing through a combination of (a) $55,811,000 in cash and (b) $30,589,000 in promissory notes issued to OFTI. See Closing Statement attached as Exhibit A.

44.    To finance the cash portion, Tak and ST Paper turned to a syndicate of lenders represented by Goldman (the "Lenders"). On the same date as the OFTI closing—April 16, 2007—ST Paper entered into a lengthy contract with the Lenders and with Goldman as their agent, pursuant to which ST Paper borrowed $67,811,000 ($65 million term and $2,811,000 revolving) (the "Goldman Loans").  As security for these loans, Goldman took various forms of collateral, including a $70 million mortgage on the paper mill.

45.    To fund the remainder of the purchase price, ST Paper issued four Subordinated Seller Notes dated April 16, 2007 (the "Seller Notes," attached as Exhibit B, under which it promised to pay OFTI an aggregate principal amount of $30,589,000 plus interest at 7.5% per annum.

46.    However, Goldman and the Lenders required that their right to repayment should take priority over OFTI's. This was an express inducement and condition precedent to Goldman's and the Lenders' willingness to enter into the Credit Agreement.

47.     Therefore, the Seller Notes were made subject to a separate Subordination Agreement, also executed on April 16, 2007, between ST Paper, OFTI, and Goldman (as agent for the Lenders), which made payment on the Seller Notes (defined as "Subordinated Indebtedness") junior and subordinate to repayment of the Goldman Loans under the Credit Agreement (defined as "Senior Indebtedness"). A copy of the Subordination Agreement is attached as Exhibit H.

48.     ST Paper was to repay the Goldman Loans by March 31, 2013, under the terms of the Credit Agreement. The Seller Notes were to become due and payable two years later, on April 16, 2015.

### C.     The parties enter into other agreements.

49.     Around the same time as the sale of the paper mill, Tak and Van Den Heuvel also consummated several other transactions, which are not directly at issue here but provide important context regarding the parties' overall relationship and support for this transaction.

50.     First, to ensure Van Den Heuvel's continued involvement in the business—which, as discussed above, was important to ST Paper's success as the new mill owner, particularly concerning the off-take contract with SCA—the parties agreed to a long-term sales and marketing agreement that would pay Tissue Technology, LLC (one of Van Den Heuvel's companies) 4% of certain incoming revenues, or about $200,000 per month, for many years.

51.     Second, to fund necessary improvements to the mill, which Goldman insisted be done so that ST Paper could meet its production and sales projections, the parties jointly borrowed $20 million from Johnson Bank, and Van Den Heuvel pledged an $11.8 million money market account as collateral. In a "Final Business Terms Agreement" dated April 16, 2007, the parties agreed that in the event the bank drew on the collateral, Van Den Heuvel would be compensated with a 22% ownership interest in Tak's investment company.

52. Third, the parties originally intended that, in addition to the purchase of OFTI's mill, Tak would acquire another, related company called Eco Fibre, Inc., which ran a pulp mill. Due to problems finding adequate financing, that purchase was put on the back burner. But the parties agreed to an arrangement to incentivize a future Eco Fibre deal: Tak issued $16.4 million in promissory notes to Van Den Heuvel. If the Eco Fibre deal closed, Van Den Heuvel would forgive the notes; but if it did not, then Van Den Heuvel could either redeem the notes or cancel them in exchange for a 27% ownership interest in Tak's investment company. This arrangement was also set forth in the Final Business Terms Agreement.

        **D.**       **ST Paper Pays Off the Goldman Loans, Yet Refuses to Pay OFTI when the Seller Notes Become Due in 2015.**

53. In 2009, ST Paper encountered financial difficulty and was underperforming. Goldman became concerned about ST Paper's ability to repay the Goldman Loans according to the terms of the Credit Agreement. Goldman therefore began exploring alternative options to maximize its recovery. These included direct negotiations with Tak.

54. Upon information and belief, sometime in 2010, Goldman accepted a payment of approximately $24 million from ST Paper in full satisfaction of the remaining amount owed on the Goldman Loans. On May 5, 2010, a satisfaction on that mortgage was recorded in the Oconto County Recorder's Office extinguishing Goldman's interest. In short, the Goldman Loans were fully paid off and satisfied in 2010.

55. Thus, when the Seller Notes became due and payable several years later, on April 16, 2015, there was no longer any Senior Indebtedness to which the Seller Notes were junior.

56. Therefore, on or about March 27, 2015, OFTI demanded full payment on the Seller Notes in the amount of $54,554,803 (which included accrued interest) by April 16, 2015. A copy of OFTI's letter demanding payment is attached as Exhibit I.

57.     On May 8, 2015, Tak, on ST Paper's behalf, refused to pay because he claimed that unidentified "Senior Indebtedness" was outstanding and would remain outstanding for "many years." A copy of Tak's response is attached as Exhibit J.

### E.     ST Paper is Trying to Escape its Payment Obligations through a Deliberate Ruse.

58.     Although Tak did not identify the "Senior Indebtedness" that is supposedly still outstanding, upon information and belief, he was referring to several supposed new loans that ST Paper allegedly obtained from a group of third parties in 2010, at least some of which ST Paper may have used to fund the $24 million payoff to Goldman.

59.     The Oconto County Register of Deeds recorded a series of documents relating to these new "loans" on or around May 5, 2010—the same date that the satisfaction of Goldman's mortgage was recorded.

60.     The first document is an "Intercreditor Agreement" dated April 30, 2010 between ST Paper and eight "Subsidiary CDEs" (Capmark, CapFund, WCDLF XXIV, WCDLF XXV, NCF, NCF2, USBCDE, and NNMF). A copy of the Intercreditor Agreement is attached as Exhibit K.

61.     Upon information and belief, the Subsidiary CDEs were set up as "Community Development Entities" (CDEs) to receive New Markets Tax Credits (NMTC) that the federal government makes available for certain investments in low-income communities.

62.     According to the Intercreditor Agreement, each CDE extended two loans to ST Paper, totaling $90,932,150 in the aggregate (the "Community Development Loans").

63.     The specific alleged loan amounts were listed in Exhibit C to the agreement, along with the amounts allocated for NMTC purposes:

14

**EXHIBIT C**
**NMTC ALLOCATION AND LOAN AMOUNTS**

| Sub CDE Lender | NMTC Allocation Amount | Loan A Amount | Loan B Amount |
|---|---|---|---|
| WCDLF XXIV | $10,000,000 | $7,427,623 | $2,372,377 |
| WCDLF XXV | $20,000,000 | $14,855,237 | $4,744,763 |
| NCF | $4,000,000 | $3,090,174 | $829,826 |
| NCF2 | $6,000,000 | $4,635,261 | $1,244,739 |
| USBCDE | $6,200,000 | $4,602,840 | $1,535,160 |
| CapFund | $4,200,000 | $3,202,473 | $871,527 |
| Capmark | $26,970,150 | $21,970,150 | $5,000,000 |
| NNMF | $15,000,000 | $11,437,402 | $3,112,598 |
| *TOTALS* | *$92,370,150* | *$71,221,160* | *$19,710,990* |

64.     The Intercreditor Agreement (on page 2) states that each CDE "received one or more sub allocations of new markets tax credits" and that that ST Paper "will benefit from the favorable terms of the Loans made possible by the NMTC Allocations."

65.     ST Paper also executed two mortgages as security for the Community Development Loans. The mortgages were recorded in the Oconto County Register of Deeds Office along with the Intercreditor Agreement.

66.     One of the mortgages was executed in favor of Capmark to secure alleged loans and "and other extensions of credit" in the aggregate principal amount of $26,970,150.

67.     The other  was executed in favor of the seven other CDEs to secure alleged loans and "and other extensions of credit" in the aggregate principal amount of $63,962,000.

68.     Upon information and belief, ST Paper structured the Community Development Loans in such a way that the principal balance will remain on ST Paper's books indefinitely. In other words, ST Paper is trying to use the Community Development Loans as a ruse to indefinitely defer any payments on the Seller Notes.

69.     For example (and without limitation), upon information and belief, ST Paper has arranged to make interest-only payments on the $63 million "loan" in order to leave the principal balance on its books indefinitely.

70.     Furthermore, in Section 5 of the Intercreditor Agreement, ST Paper made full repayment of the $26 million "loan" subordinate to repayment of the $63 million "loan." As a result, some portion of the $26 million loan will also remain on ST Paper's books indefinitely.

71.     In other words, if ST Paper had its way, the Seller Notes would remain stuck behind the new Community Development Loans indefinitely, and OFTI would have no foreseeable prospect of recovering the principal and interest that became due in 2015, which now exceeds $60 million because recovery would be barred by operation of the statute of limitations.

72.     The Community Development Loans do not constitute "Senior Indebtedness" under the Subordination Agreement, they do not enjoy the priority rights created by the Credit Agreement, and they do not take precedence over the Seller Notes.

73.     Instead, the Community Development Loans are entirely new loans on entirely different terms. Among other differences:

> a.  The Goldman Loans were paid off for approximately $24 million, but the principal amount of the new Community Development Loans is allegedly almost four times that figure; and
>
> b.  The Goldman Loans were set to expire by March 31, 2013, but the new Community Development Loans, according to Tak, will remain outstanding for many years, possibly indefinitely.

74.     Declaring that these new "loans"—of much greater value and longer duration—are somehow senior to the Seller Notes would fundamentally change the terms of the deal that OFTI agreed to.

75.     ST Paper has no right to unilaterally place new debts in front of OFTI in priority of payment. OFTI did not agree to give ST Paper such a blank check and never would have agreed to do so, for that would erase the value of the Seller Notes and undermine the whole basis of the

original transaction between OFTI and ST Paper. Moreover, there have never been any written modifications to the Subordination Agreement by substituting parties or any other signatories thereto.

76.   Nor are the new Community Development Loans a "Permitted Refinancing" of the original Goldman Loans under the Subordination Agreement. None of the new "loans" were permitted or in compliance with the original loan documents. Moreover, at least in the case of the $63 million "loan," they were in no way a refinancing the $24 million Goldman payoff.

77.   None of the original loan documents—not the Credit Agreement, not the Goldman mortgage, not the Subordination Agreement, and not any other documents—were assigned to the CDEs.  And the new CDE "loan" documents did not replace, or even purport to replace, the original loan documents. Indeed, they make no mention of the original documents.

78.   The Credit Agreement (in paragraph 9.6(a)) provides that "[n]othing in this Agreement, expressed or implied, shall be construed to confer upon any Person" other than the parties, certain affiliates, and their "respective successors and assigns permitted hereby" any "legal or equitable right." The Credit Agreement then lays out detailed requirements and procedures for a new entity to become a permitted successor or assign.

79.   The CDEs do not meet those requirements and did not follow those procedures. Among other things, they never executed or delivered to Goldman any Assignment Agreement, as would have been required.

80.   That is because the Community Development Loans are not and were not in fact structured to replace or refinance ST Paper's original debt obligations. They are instead wholly new loans, to which OFTI never agreed to subordinate its rights.

81.     By refusing to pay OFTI under the Seller Notes on the basis of the new Community Development Loans, ST Paper is trying to create and exploit a perceived "loophole" in the Subordination Agreement to deprive OFTI of the benefit of its bargain.

82.     The terms of the Subordination Agreement and applicable law prohibit ST Paper's attempt to avoid its obligations. Indeed, paragraph 11.A of the Subordination Agreement expressly states that it "shall not be deemed to create any rights or priorities in favor of any other party," such as the third-party CDEs. Moreover, the same provision states that ST Paper's duty to pay on the Seller Notes is "unconditional and absolute" and that "nothing contained herein shall impair" that obligation.

### F.     Tak Also Breached the Parties' Other Agreements.

83.     In what has unfortunately become a pattern of refusing to honor his commitments to OFTI and related companies including Tissue Technology LLC, Tak also violated the parties' other, related agreements.

84.     Tak breached the sales and marketing agreement by cutting off and refusing to pay Tissue Technology's commissions on incoming sales.

85.     Tak also breached the Final Business Terms Agreement by refusing to confer the agreed ownership interests to Tissue Technology after Johnson Bank drew on his collateral and Tissue Technology cancelled the $16.4 million notes.

86.     OFTI now brings this action, to enforce the Seller Notes and to collect the rest of the consideration that ST Paper agreed to pay when it bought OFTI's paper mill nearly a decade ago.

## IV. CLAIMS FOR RELIEF

### Count One:
### Breach of Contract – ST Paper

87.     OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

88.     The Seller Notes contain valid and enforceable promises to pay.

89.     OFTI is the holder of the Seller Notes and is entitled to enforce them.

90.     The full amount of principal and interest under the Seller Notes became due and payable on April 16, 2015.

91.     There is no outstanding Senior Indebtedness to which the Seller Notes are subordinated.

92.     Therefore, ST Paper has a present obligation to pay the full amount of principal and interest under the Seller Notes.

93.     ST Paper has refused to make such payment in violation of the express terms of the Seller Notes.

94.     In addition, ST Paper's attempts to avoid payment under the Seller Notes, as detailed above, violate the contractual covenant of good faith and fair dealing.

95.     ST Paper's breaches have directly harmed OFTI by depriving it of the value of the Seller Notes and of the underlying assets it sold to ST Paper.

### Count Two (in the alternative):
### Unjust Enrichment – ST Paper

96.     Plaintiff OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

97.     By acquiring and retaining OFTI's former assets without paying full value, ST Paper has been unjustly enriched.

98.     ST Paper's enrichment has been at OFTI's expense, as OFTI still has not received full compensation for the sale of its assets.

99.     It would be unjust and inequitable to allow ST Paper to retain the assets without restitution to OFTI.

## Count Three:
## Breach of Contract – VHC, Inc., David Van Den Heuvel and Nicolet Bankshares, Inc.

100.     Plaintiff OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

101.     On or about September 10, 2010, plaintiff OFTI assigned and transferred Notes 3 and 4 to Defendant VHC, Inc. Prior to that time, OFTI had transferred the original Note to Nicolet National Bank to hold as collateral. Note 4 was still in the possession of OFTI and was provided to VHC, Inc. as collateral.

102.     Both Notes 3 and 4 were always intended to be collateral only in the hands of VHC, Inc.

103.     Despite the transfer of said Seller Notes 3 and 4, it was always the intention of the parties that upon payment of the debt associated with the assignment, the original Notes would be returned to the plaintiff company for the purpose of collecting on the additional proceeds over and above the secured amounts.

104.     On or about December 3, 2010, defendants VHC, Inc. and David Van Den Heuvel acting on behalf of VHC, executed a Settlement Agreement & Release by and between Tak Investments, Inc. and VHC, Inc. regarding Notes and 3 and 4. The Settlement Agreement and Release is attached hereto as Exhibit L.

105.     At all times relative hereto, defendant Nicolet Bankshares acted as the escrow agent for the transaction by and between defendant VHC, Inc. and Tak Investments, Inc.

106.    The agreement by and between Tak Investments, Inc. and VHC, Inc., to which Nicolet Bankshares was a party as the "escrow agent", provided that upon payment of certain debts, Tak Investments, Inc. owed to Nicolet Bankshares, Notes 3 and 4 were to be released and assigned to Tak Investments, Inc. Upon information and belief, the Notes were delivered to Tak Investments Inc. in December of 2018 after the obligations of Tak Investments Inc. were paid in full to Nicolet Bank.

107.    The agreement by and between Tak Investments, Inc., VHC, Inc. and Nicolet Bankshares, Inc. provided that Notes 3 and 4 were to be provided to Tak Investments, Inc. upon payment of a Note to Nicolet Bankshares owed by Tak Investments, Inc. and guaranteed by VHC, Inc. In using the Escrow Agreement, and the subsequent Assignment, VHC, Inc. transferred what is now more than $30 million owed under the two Notes to Tak Investments, Inc. for nothing more than a guarantee to make payments Tak Investments, Inc. was already required to make. The only advantage for VHC, Inc. was that it would insure that its guarantee of the debt of Tak Investments, Inc. to Nicolet Bankshares would be extinguished.

108.    All times relative hereto, VHC, Inc. and its Chief Executive Officer, David Van Den Heuvel, knew that there was significant value in said Notes but nevertheless ignored the fact that the Notes were intended to be security for debts owed by OFTI to VHC, Inc.

109.    The Notes in question were of significantly greater value than the amounts owed by Plaintiff OFTI to VHC, Inc.

110.    As a result of the foregoing, VHC, Inc. breached its contract and agreements with OFTI relating to Notes 3 and 4 thereby entitling OFTI to damages in an undetermined amount.

## Count Four:
### Breach of Fiduciary Duty – VHC, Inc., David Van Den Heuvel and Nicolet Bankshares

111.    Plaintiff OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

112.    When VHC, Inc., at the behest of David Van Den Heuvel, and Nicolet Bankshares, executed the Escrow Agreement dated December 3, 2010, they knew at all times that plaintiff OFTI was owed certain sums of money by ST Paper, LLC reflected in said Notes which was greater than the amount of the Notes at that time.

113.    Despite that knowledge, VHC, Inc., David Van Den Heuvel and Nicolet Bankshares entered into the Escrow Agreement wherein and whereby all interest of plaintiff OFTI was extinguished.

114.    The actions of VHC, Inc., David Van Den Heuvel and Nicolet Bankshares were done in an intentional, reckless and indifferent manner contrary to the duties they all owed to OFTI and as outlined in Wis. Stat. Sec. 409.607, which duties included preserving the amounts owed to OFTI over and above the amounts owed by OFTI to VHC under Notes 3 and 4 and prosecuting the notes against the maker.

115.    Nicolet Bankshares owed a fiduciary duty to plaintiff OFTI because Nicolet Bankshares was holding said Notes for the benefit of OFTI, which was also a customer of Nicolet Bankshares and contrary to the fiduciary duties owed to OFTI.

116.    The actions of Nicolet Bankshares, VHC, Inc. and David Van Den Heuvel all violated their fiduciary duties, done in bad faith, thereby entitling plaintiff OFTI to punitive damages, as well as actual damages, for said breaches.

**Count Five:**
**Fraudulent Transfer – VHC, Inc., David Van Den Heuvel and**
**Nicolet Bankshares**

117.    Plaintiff OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

118.    The transfer of Notes 3 and 4 to Tak Investments, Inc. as described was a fraudulent transfer, as that is described in Chapter 242 of the Wisconsin Statutes, in that the transfer was made without the knowledge or consent of OFTI and in derogation of the rights of OFTI and for no consideration or meager consideration wholly out of proportion to the amounts due under the notes.

119.    Said fraudulent transfer thereby entitles plaintiff OFTI to actual damages, punitive damages, attorney's fees and the costs and disbursements of this action.

**Count Six:**

**Conversion – VHC, Inc. and David Van Den Heuvel**

120.  Plaintiff OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

121. The actions of David Van Den Heuvel and VHC, Inc. converted Notes 3 and 4 for their own and sole benefit, without value and in derogation of the rights of OFTI.

122. David Van Den Heuvel and VHC, Inc. intended thereby to permanently deprive OFTI (and its creditors) of property properly theirs.

123. As a result of the conversion of said Notes, defendants VHC, Inc. and David Van Den Heuvel are indebted to the Plaintiff for compensatory and punitive damages.

**Count Seven:**
**Negligence – VHC, Inc., David Van Den Heuvel and Nicolet Bankshares**

124.  Plaintiff OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

23

125.    The actions of VHC, Inc., David Van Den Heuvel and Nicolet Bankshares, Inc., in transferring Notes 3 and 4 to Tak Investments, Inc., without value and in derogation of the rights of plaintiff OFTI was a breach of the duties owed to plaintiff OFTI which caused damage to said company in an undetermined amount.

**Count 8:**
**Breach of Contract – Ability Insurance Co.**

126.    OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

127.    On or about December 10, 2013, OFTI, as security, assigned its rights to Note 1 to Maplebridge Funding, LLC as a result of a certain loan to an associated company of the plaintiff herein. Said assignment was to constitute additional collateral security for certain obligations. The Note was then assigned to defendant Ability Insurance Co.

128.    Upon information and belief, the Note remains in the possession of defendant Ability Insurance Co. and is held as collateral for certain obligations of OFTI in an undetermined amount.

129.    Upon information and belief, Ability Insurance Co. is holding said Note as collateral, has failed and refused to attempt enforcement of said Note and has failed and refused to permit plaintiff OFTI to sue under said Note in derogation of its duties under Wis. Stat. Sec. 409.607.

130.    Pursuant to the terms of said Note, the amount due under said Note exceeds the amount owed to Ability Insurance Co., with the proceeds thereof due and payable to plaintiff OFTI.

131.    As a result of the foregoing, plaintiff OFTI has been damaged in an undetermined amount.

**Count 9:**
**Negligence – Ability Insurance Company**

132.    OFTI reincorporates herein as if fully set forth all of its preceding allegations of this Amended Complaint.

133.    Despite due demand, Ability Insurance Company, has failed and refused to sue under said Note and have failed and refused to assign said Note to OFTI to sue pursuant to the terms of same.

134.    Ability Insurance Company, has a duty to either enforce the Note or assign it back to plaintiff OFTI so it could sue thereon and has breached that duty thereby causing damages to plaintiff company in an undetermined amount.

## V. RELIEF REQUESTED

WHEREFORE, OFTI seeks a judgment in its favor and against the named defendants, jointly and severally, for compensatory damages in an amount to be determined, with said amount exceeding $60 million and reserves the right to request the appointment of a receiver over ST Paper's assets, and OFTI further  seeks actual and punitive damages, actual attorney's fees, the costs and the disbursements of this action and such other and further relief as the Court deems just.

Dated this 8th day of March, 2019.

TERSCHAN, STEINLE, HODAN & GANZER, LTD.
ATTORNEYS FOR PLAINTIFF,

*ELECTRONICALLY SIGNED BY MICHAEL J. GANZER*

**P. O. ADDRESS:**
309 NORTH WATER STREET
SUITE 215
MILWAUKEE, WI 53202
414-258-1010