# EXHIBIT D

Sharad Tak

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


ABILITY INSURANCE COMPANY,

     Plaintiff,

v.

ST PAPER, LLC  1:20-cv-03851 (GBD)

     Defendant.    Civil Action No.:

              - - -

        Tuesday, May 18th, 2021

              - - -


      Video deposition of SHARAD

TAK, taken pursuant to notice, was held

via BlueJeans, commencing at 10:09

a.m., on the above date, before Jessica

Routhenstein, a Certified Court Reporter

and Notary Public in the Commonwealth of

Pennsylvania.

             -   -   -

       KAPLAN, LEAMAN AND WOLFE
     Registered Professional Reporters
230 South Broad Street, Suite 1303,
    Philadelphia, Pennsylvania 19102
        (215) 922-7112
          -   -   -
  Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

Sharad Tak

Page 80

1    it.

2        Q.    So do you have -- would ST Paper have a

3    copy of the assignment agreement between Goldman

4    Sachs and Macquarie?

5        A.    Probably not.

6        Q.    Was ST Paper current on its payments on

7    the Goldman Sachs loan before the assignment to

8    Macquarie Bank?

9        A.    No, no.

10       Q.    Okay.  Do you have documents that

11   evidence the payment history of that loan?

12       A.    Whatever was there we have provided it.

13   As I mentioned to you already, for two years or

14   two and a half years our records were kept at

15   Mr. Van Den Heuvel's office and ST Paper never

16   received those records, but we probably have the

17   documents provided by Goldman Sachs or a bank,

18   which I think had been provided to you, what --

19   what loans we paid back or what amounts we paid

20   back for interest or principal.

21       Q.    Okay.  Well, we are going to review our

22   records and we might make a further request for

23   those documents.

24            So you said ST was not -- Paper was not

25   current on its payments to Goldman Sachs before

Sharad Tak

Page 81

1   this assignment.  Why was ST not current?

2       A.   ST Paper was not making enough money to

3   make the payments to Goldman Sachs and that is

4   why the loan was -- there was default on the

5   loan.  And Goldman at that time decided to sell

6   the company, ST Paper, and get out of this

7   loan.

8       Q.   That Goldman decided to what the

9   company?  I thought you said --

10      A.   Right, sell the company, sell ST

11  Paper.

12      Q.   So Goldman decided to sell ST Paper to

13  Macquarie Bank?

14      A.   Goldman decided to sell it to anyone who

15  was willing to buy the company and get their

16  debt paid, whatever money they can get paid.  So

17  they hired -- I think they hired an investment

18  banker to look at the possible sale of the

19  company.

20                      -   -   -

21              (Technical difficulties; reporter

22  gives instruction.)

23                      -   -   -

24              THE VIDEOGRAPHER:  Time is 12:46

25  p.m., off the record.

Sharad Tak

Page 105

1   very clear and sometimes you are not.

2           MS. CHUDEREWICZ:  So strange.  Okay.

3   Let me know, can you hear me now?

4           THE WITNESS:  Yes, I can.

5   BY MS. CHUDEREWICZ:

6       Q.   You have owned many companies throughout

7   your career, correct?

8       A.   Yes.

9       Q.   Is it usual for a lender to make a loan

10  and not require payment for 26 years?

11      A.   It depends on the note.  These are very

12  specific NTC loans and they are usually 30 years

13  long.  That's what I was told by U.S. Bank when

14  we borrowed the money.

15      Q.   So if they are usually 30 years loans,

16  would there still usually be an obligation to

17  pay interest on the loan?

18      A.   Yes, there are.  It depends on what has

19  been negotiated.  Most of that --

20           (Technical difficulties; reporter gives

21  instruction.)

22      A.   Infrastructure loans are 30 to 45 years

23  long.

24  BY MS. CHUDEREWICZ:

25      Q.   So on those large infrastructure loans,

Sharad Tak

Page 114

1    A.   Yes.

2    Q.   Do you have documentation evidencing

3 that?

4    A.   We may have our bank documents,

5 although, they were made I guess by electronic

6 transfer.  Otherwise, we may have a letter or

7 something from the bank of these CDs, because we

8 have no default letter, no letter of payments

9 being made.  So you can infer that all these

10 payments were made.

11    Q.   And you can infer that the quarterly

12 payments were made, did you say, because there

13 are none -- ST Paper is not in default on any of

14 them; is that correct?

15    A.   ST Paper was not in default on any of

16 those until they were paid off and until the

17 deal closed, yes, yeah.

18    Q.   We are going to request documentation

19 regarding the payments of those quarterly

20 payments under the various loans.

21         Going to switch gears a little bit now.

22         I am going to show you a document that

23 is being marked as Exhibit 28.

24                        -  -  -

25         (Whereupon, Exhibit 28 was marked for

Sharad Tak

Page 115

1                              identification.)

2                                -   -   -

3    BY MS. CHUDEREWICZ:

4        Q.    And this is an email that was sent from

5    Mr. Van Den Heuvel to you and Alok Mathur.

6            Do you see that?

7        A.    Yes.

8        Q.    Okay.  This email was sent on

9    October 29th, 2006.

10            Do you see that?

11        A.    Yes.

12        Q.    The gentleman that you were talking to

13    us about earlier, I believe you said his name

14    was Alok; was that correct?

15        A.    Yes.

16        Q.    And is this the person that you were

17    referring to?

18        A.    Yes.

19        Q.    There's an attachment to this email and

20    it is labeled "st ebitda".

21            Do you see that?

22        A.    Yes.

23        Q.    And what is ebitda?

24        A.    Let me see the attachment.

25        Q.    Sure.  Other than seeing the attachment,

Sharad Tak

Page 116

1    do you understand what the term ebitda means?

2        A.    Yes.

3        Q.    And what does it mean?

4        A.    It's earnings before taxes and --

5    interest.

6                    -  -  -

7                (Technical difficulties; reporter

8    gives instruction.)

9                    -  -  -

10               THE WITNESS:  This is an accounting

11   term used for ebitda before interest, taxes,

12   depreciation and amortization.

13   BY MS. CHUDEREWICZ:

14       Q.    And what does this attachment show?

15       A.    This attachment shows that Mr. Van Den

16   Heuvel represented that this was the ebitda for

17   the mill before ST Paper would purchase it and

18   do all the improvements.

19       Q.    And there are two columns that are

20   labeled Ron's, which I presume is Mr. Van Den

21   Heuvel, and there's another column for Alok, who

22   was your consultant, correct?

23       A.    Correct.

24       Q.    And what are these two columns

25   comparing?

Sharad Tak

Page 117

1      A.    These two columns are comparing the

2   ebitda for the mill, OFTI.  The one is what

3   Mr. Van Den Heuvel is saying it is, the ebitda

4   is, part time of the production, and other one

5   is our consultant Alok Mathur is presenting that

6   this is what he found after making some

7   adjustments.

8      Q.    And where did Mr. Mathur get his number

9   to do his ebitda calculations?

10     A.    I have explained earlier that Alok also

11  provided the books by Mr. Van Den Heuvel and he

12  had visited and spent many days this Mr. Van Den

13  Heuvel's office and that's where he got his

14  information.

15                    -   -   -

16              (Technical difficulties; reporter

17  gives instruction.)

18                    -   -   -

19              MS. CHUDEREWICZ:  Visited and spent

20  many days.  Jessica, did you understand that?

21              THE REPORTER:  I understood you,

22  yes.

23              MS. CHUDEREWICZ:  Okay.  I don't

24  want to be testifying, but that's what I heard

25  Mr. Tak say.

Sharad Tak

1              THE WITNESS:  Yes, that's correct.

2    BY MS. CHUDEREWICZ:

3       Q.   And why did Mr. Van Den Heuvel send you

4    this ebitda calculation?

5       A.   Because we were doing the dividends and

6    we were asking them questions besides that

7    Goldman Sachs wanted to know what the ebitda was

8    for the mill for which they were going to

9    provide financing of 65, 70 million dollars.

10      Q.   Other than this document, do you have

11   any other documents which allegedly show

12   representations by Mr. Van Den Heuvel or OFTI --

13      A.   If I remember --

14      Q.   Sorry.   -- regarding the capacity of

15   the mill before the closing?

16      A.   As I told earlier in my testimony that

17   purchase agreement had some exhibits attached to

18   it and some exhibits may -- may have these

19   numbers, but I will have to go and check back on

20   it, and you can look at it yourself too.

21      Q.   As part of ST's counterclaims in this

22   litigation, ST contends that there were expenses

23   of OFTI from preclosing that required payment,

24   correct?

25      A.   That's correct.

Sharad Tak

Page 119

1     Q.    And if we look at the counterclaim one.

2              MS. CHUDEREWICZ:  I will mark this

3    as Exhibit 29.

4                        -  -  -

5              (Whereupon, Exhibit 29 was marked for

6                        identification.)

7                        -  -  -

8    BY MS. CHUDEREWICZ:

9     Q.    So I will represent to you that this is

10   an amended answer and affirmative defenses on

11   behalf of ST Paper, LLC that ST Paper has

12   requested be filed, but when I looked on the

13   document this morning it hasn't yet been filed,

14   but I understand that this is the latest

15   pleading from ST Paper that we have received,

16   although it has not been filed.

17             And if we look at the counterclaims,

18   which are at the back of the document -- so this

19   is the first counterclaim that I wanted to look

20   at with you.

21             MR. SMIES:  Just to clarify, these

22   are affirmative defenses, right, not a

23   counterclaim?

24             MS. CHUDEREWICZ:  Yes.  And I am

25   sorry about that misrepresentation.  You are

Sharad Tak

Page 120

1    correct.  They are affirmative defenses.

2              MR. SMIES:  Thanks.

3    BY MS. CHUDEREWICZ:

4         Q.   So if we look at the affirmative defense

5    that is here in paragraph 4, it talks about that

6    any recovery by the plaintiff in this action

7    pursuant to note 1 is offset by amounts owed as

8    a result of Oconto Falls Tissue, Inc.'s

9    obligation to indemnify ST Paper and it goes on

10   from there.

11             Do you see that, Mr. Tak?

12        A.   Yes, yes.

13        Q.   And it talks about different expenses

14   that ST Paper has alleged that are due.  And

15   when did you become aware of these expenses that

16   are identified here?

17        A.   We were aware of the expenses right

18   after ST Paper bought the mill until about two,

19   three, four years continuing.

20        Q.   So you first became aware of these

21   expenses when ST Paper purchased the mill?

22        A.    After ST Paper purchased the mill, ST

23   Paper paid a lot of liabilities of OFTI and the

24   deal was that all these liabilities would be

25   reimbursed by OFTI, but they were not so ST

Sharad Tak

Page 121

1    Paper kept, you know, putting these together and

2    this is combination of those expenses that were

3    incurred plus the liabilities that were paid

4    which belonged to OFTI.

5        Q.    And so for the expenses that you have

6    listed here, do you have documentation of ST

7    Paper paying these expenses?

8        A.    As I explained to you before, for two

9    year's time, from 2007 from the time we bought

10   until after about two years approximately, plus

11   or minus few months, we do not have any record

12   of these -- these different notes we paid

13   because these documents were kept at Mr. Van Den

14   Heuvel's office, but we have our own bank

15   payment records.  So it is kind of difficult to

16   tie those payments records to the bills.

17           (Reporter requests clarification.)

18       A.    To tie the payments to the invoices.

19           MS. CHUDEREWICZ:  I will make a

20   request on the record for any documents that

21   evidence the payment of these expenses by ST

22   Paper and your attorney and I can discuss that

23   and what that means, sir.  I believe that we've

24   already requested that as part of our discovery,

25   but if there's additional documents, I will

Sharad Tak

Page 122

1  discuss it with your attorney.

2  BY MS. CHUDEREWICZ:

3      Q.   All right.  Turning again, we looked at

4  this earlier, the demand letter that you sent to

5  ST Paper, LLC, or excuse me, that you sent to

6  Mr. Van Den Heuvel on February 9th, 2010, I

7  wanted to look at attachment 3 and these have to

8  do with charges that you -- or expenses that you

9  allege were made regarding a Yankee dryer.

10          Do you see that, sir?

11     A.   Yes.

12     Q.   How did you become aware that the dryer

13  was not working?

14     A.   The clothes in the asset purchase

15  agreement that the dyer had been fixed and

16  working and then we found out that there was a

17  crack and it wasn't working properly and so we

18  had to get it fixed before it blew up, and

19  that's why we incurred these expenses.  It's

20  already in the asset purchase agreement that

21  Mr. Van Den Heuvel would take care of it.

22     Q.   How soon after the purchase of the mill

23  in April 2007 did you realize that the dryer was

24  not working properly?

25     A.   It took our people some time to realize

Sharad Tak

Page 123

1    that it wasn't working properly.  And I don't

2    know how long it took, but, yes, we realized it

3    sometime and then we had scheduled to get it

4    fixed.

5         Q.    And what's being represented on this

6    attachment, number 3?

7         A.    The expenses, what we included or

8    incurred in connection with Yankee dryer.

9         Q.    Okay.  So the first two items here are

10   expenses.  Were they paid to these Voith Paper

11   Services, is that who ST Paper paid them to?

12        A.    Yes.

13        Q.    And the third expense is listed as down

14   time for 45 -- 44.5 hours.

15             What does that refer to?

16        A.    That refer that mill was down for so

17   many hours and this is the money we would have

18   made if the mill were operational.

19        Q.    So the mill couldn't -- was not in

20   operation at all, you couldn't do anything until

21   this dryer was fixed; is that -- is that

22   correct?

23        A.    Mill was not operating when dryer was

24   being fixed.

25        Q.    And the expenses that are related to

Sharad Tak

Page 124

1   this Voith Paper Services, do you have any

2   invoices related to those services?

3       A.   As I mentioned, that the documents for

4   couple of years were not available to us.  They

5   were kept at Mr. Van Den Heuvel's office and

6   never transferred to us.

7       Q.   But these expenses --

8       A.   But --

9       Q.   I'm sorry, go on.

10      A.   But we would -- we would see if we have

11  our bank records of payment that is referred

12  here.

13      Q.   So my question is, I understand that

14  there were certain documents that you said were

15  at the OFTI offices and you didn't have access

16  to, but these expenses it looks like, according

17  to the reference line, occurred in 2008, which

18  is after you had purchased the mill, correct?

19      A.   Yes.

20      Q.   So my question is, does ST Paper have

21  invoices related to these repairs?

22      A.   Let me recreate what I said.  In the

23  first couple years all the records were kept at

24  Mr. Van Den Heuvel's office because of our

25  accountant was working in that facility and ST

Sharad Tak

1   Paper was using his SAP system that the last

2   2000 or so, but all the records, invoices,

3   payments, everything was kept on that system.

4          When we parted the company, we moved our

5   offices to ST Paper mill's location and that SAP

6   system, those documents were not transferred, so

7   we do not have any documents for first two years

8   even though ST Paper owned and operated the

9   mill.

10     Q.   Okay.  And let's look at Exhibit -- or

11  attachment 2 to this letter.  And we can make

12  the description larger because I know they are

13  quite small.

14         What is being described in this

15  attachment, what losses, claim losses are being

16  described?

17     A.   The wastewater treatment plant upgrades

18  we had to do to comply with WDNR permit.

19         So Mr. Van Den Heuvel has presented that

20  all the permits are in place and everything is

21  operating perfectly to meet the requirements,

22  but then we realize -- we kept getting letters

23  from WDNR and we had to upgrade the systems in

24  order to comply with WDNR requirements.

25     Q.   And describe for me what's being

Sharad Tak

Page 126

1    depicted in the column titled liquidated

2    damages.

3        A.    There as I understand, liquidated

4    damages are damages that has been incurred,

5    ordering, and unliquidated are which are still

6    all ongoing.

7        Q.    So for -- if we look down for what's

8    being described as C-1 incremental polymer costs

9    to induce settling.  If we look here, it looks

10   like there was liquidated damages in the amount

11   of 180,500.  So what is that your -- explain

12   what that is and what the unliquidated damages

13   of 9,500 mean.

14       A.    Every month we were incurring additional

15   cost.  So 180,500 is the cost incurred today

16   when this letter was sent and remainder is to be

17   incurred every month.

18       Q.    Okay.  So this number -- this liquidated

19   damages number was increasing at that point

20   every month, month over month, right, by

21   9,500?

22       A.    That's correct.  I don't know whether

23   this 9,500 is a monthly charge or yearly charge.

24       Q.    I think that --

25       A.    I'll have to go back and look at the

Sharad Tak

Page 127

1   document.

2       Q.   If we go up a little bit, and we've made

3   it bigger just to see easily, but I think it's

4   monthly.  See, it says month?

5       A.   Okay.  If it says monthly, then that's

6   what it is.

7       Q.   Yeah.  Okay.  And is your response -- so

8   it looks like for these unliquidated damages it

9   looks like the start date for some of these are,

10  if we scroll over, from what we were just

11  looking at it looks like for that --

12          No, the other way, scroll over, go down.

13  Right.

14          So this first charge, it looks like it

15  started to incur in August of 2008.  Is that

16  what that means, that reference to start date

17  August 2008?

18      A.   I -- I -- I don't know.  It might have

19  been in April of 2007.  I would like to go back

20  and look at the document again.  It has been a

21  long time since it was produced.

22      Q.   And again, is this the same, the charges

23  that are here in this document, or excuse me, in

24  this attachment 2, is your testimony the same

25  that there wouldn't be any documentation related

Sharad Tak

1   to these because you were still using the OFTI
2   system at the time that this was -- that these
3   were incurred?
4       A.   These are the additional charges you are
5   paying to meet the requirements, which we should
6   be meeting according to Mr. Van Den Heuvel that
7   we do not have any violations of WDNR and we can
8   meet the requirements.  These are additional
9   charges we are incurring.  So my testimony is
10  our technical people think that we would be
11  spending that much less money if we were already
12  meeting the WDNR requirements.
13      Q.   Right.  And so what I'm saying is, in
14  terms of if we wanted to look at, to the
15  liquidated damages that are noted here in this
16  attachment 2, at the time this letter was sent,
17  if we scroll down, they were roughly -- it was
18  roughly 3.8 million dollars?
19          Do you see that?  That's how much --
20      A.   Yes.
21      Q.   And so what I am asking, and I think I
22  know the answer, but I just want to make sure,
23  is would you have or does ST Paper have
24  documentation of the payment of these additional
25  penalties and costs to W -- what is it?  WDNR?

Sharad Tak

Page 129

1      A.   These payments were not made to WDNR,

2   these were not penalties.  These were the extra

3   expenses we had to spend to be in compliance

4   with their requirements.  If we did not spend

5   this money, we will be out of compliance and

6   WDNR could come and shut all the way down.

7                        -  -  -

8                  (Simultaneous discussion; reporter

9   gives instruction.)

10                       -  -  -

11                 THE WITNESS:  These were not

12  payments made to WDNR, I want you to understand

13  that.

14  BY MS. CHUDEREWICZ:

15     Q.   Thank you.  So do you have documents

16  reflecting these expenses?

17     A.   We have documents for after -- about two

18  years we don't have anything, but after that

19  since we moved offices to our location, we have

20  all the payments we are making for buying the

21  chemicals and all that.

22              Now, how much extra we are paying, I

23  think we will have to go through each bill and

24  our technical people can tell you what

25  percentage of extra chemical -- chemicals had

Sharad Tak

1    been used to stay in compliance.

2        Q.    So is ST Paper alleging that they are

3    still incurring liquidated damages because they

4    have to pay additional expenses in order to keep

5    in compliance?

6        A.    I would have to go back and check.

7    Either we have modified the mill that we are not

8    incurring or we still might be incurring if we

9    didn't have enough capital expenditure to

10   correct these problems.

11             So my answer is I cannot tell you right

12   now whether we are still incurring additional

13   expense or not.

14             By the way, this whole thing is in

15   litigation in -- in -- so these expenses will be

16   sorted out in due course of time.

17                      -  -  -

18             (Technical difficulties; reporter

19   gives instruction.)

20                      -  -  -

21             MS. CHUDEREWICZ:   Oh, okay.

22   BY MS. CHUDEREWICZ:

23       Q.    So according to your testimony, I

24   believe that you stated that you needed to incur

25   these extra expenses in order that you would not

Sharad Tak

Page 131

1    be out of compliance; is that correct?

2        A.   Yes.

3        Q.   And how do you know that?  Did you

4    receive letters?  Do you receive letters saying

5    that you are in compliance or how do you know?

6        A.   We have issued letters from WDNR that we

7    have exceeded these limits from time to time and

8    now we are to report to them some requirements

9    are monthly, some are quarterly, yearly basis

10   and we have to make sure that we don't exceed

11   any of those things.

12            So by expending this extra money, we

13   assure that we don't violate any of the

14   requirements.

15       Q.   I don't believe that we have those

16   letters, so I'm going to make a request for them

17   on the record, those compliance records --

18   letters.

19            So we have been talking about your two

20   thousand -- your February 9th, 2010, letter.

21   Now I would like to show you a document that I

22   will mark as Exhibit 33 -- 30.  30, I'm sorry.

23                        -  -  -

24            (Whereupon, Exhibit 30 was marked for

25                       identification.)

Sharad Tak

Page 132

1                              - - -

2   BY MS. CHUDEREWICZ:

3        Q.    And this is a letter, it's to you, and

4   if you look on the second page, it's from

5   Mr. Van Den Heuvel.

6              Do you recognize this document?

7        A.    Yes.

8        Q.    In the first paragraph Mr. Van Den

9   Heuvel states that he is in receipt of your

10  correspondence dated February 9, 2010, and he's

11  replying to that letter on behalf of a number of

12  entities, Tissue Products Technology, Partners

13  Concept Development, and Oconto Falls Tissue.

14             Do you see that?

15       A.    Yes.

16       Q.    And when did you receive this letter?

17       A.    I must have received on the day he sent

18  it or a day after that.  I don't exactly recall

19  when did I get it.

20       Q.    Do you recall if you received it soon

21  after you sent your February 9th, 2010,

22  letter?

23       A.    I think I might have received it either

24  by email or fax and then we also got in FedEx.

25       Q.    And do you remember when that

Sharad Tak

Page 133

1   occurred?

2      A.   I think look at the date of it and then

3   I can tell you approximately when I signed.

4      Q.   I'm asking you because I don't see a

5   date on the letter, so that's why I wanted to

6   know.

7      A.   Then I think it should be few days after

8   my letter was sent to Mr. Van Den Heuvel.

9      Q.   Okay.  And what did you understand this

10  letter to be conveying to you?

11     A.   I guess this letter, to me, was

12  worthless, so I did not consider much of it.

13     Q.   And why did you think it was

14  worthless?

15     A.   Because it's talking about this loan and

16  that loan and all kinds of things, never

17  answering what my claim was.  I did not think I

18  should get into spitting match with him.

19     Q.   And under number 1, he -- he states that

20  he was not going to pay the expenses you request

21  because the buyer did not fund his 20 million

22  dollars of equity at closing.

23          Do you see that?

24     A.   Yes, I see it.

25     Q.   But earlier I believe you told me that

Sharad Tak

Page 134

1   you did fund the 20 million in equity,

2   correct?

3       A.   Correct.

4       Q.   Also in this section, he refers to

5   attached documentation.  Do you see that?

6            "The senior lending group has been

7   notified of this funding misrepresentation and

8   they have chosen to ignore it"?

9       A.   Yes.

10      Q.   Do you have a copy of that

11  documentation?

12      A.   I have whatever was attached to it,

13  nothing more.

14      Q.   The copy that we've had produced to us

15  had nothing attached to it, which is why I was

16  asking you if you remembered anything being

17  attached to this letter.

18      A.   I don't know.  I would have to go and

19  check back whether we still have it or we don't

20  have it anymore.

21      Q.   Okay.  I will make a request on the

22  record for that, if there is anything.

23           And then under number 2, on the second

24  page, Mr. Van Den Heuvel states that the -- he

25  claims that the environmental issues were caused

Sharad Tak

Page 142

1  the payment had been made, the repayment had

2  been made?

3      A.   Entity who made the note, which is ST

4  Paper and entities that hold the note.

5      Q.   Right.  So of those --

6      A.   So if it's paid, then it will be

7  recorded in the books of ST Paper that it has

8  been paid and there would be documentation.

9      Q.   So for the -- taking for example the ST

10  to ST Holdings note, that note, is it possible

11  for ST Holdings to again refinance the note?

12      A.   ST Holdings is the signer of the note.

13  ST Paper is the one if ST Holdings sells it to

14  someone else or refinance it, I don't know what

15  will happen, but note is due from ST Paper and

16  ST Paper Holdings.  And when ST Paper has the

17  money, it will pay off the note.

18      Q.   But can ST Holdings refinance the

19  note?

20      A.   I don't know.

21      Q.   Who would know that?

22      A.   We will defer to our lawyers and we like

23  to see why ST Holdings will refinance and under

24  what circumstances.

25      Q.   I didn't get the last part of the

Sharad Tak

Page 143

1   answer.

2      A.   Under -- why ST Holdings will refinance

3   and under what circumstances it will refi so we

4   will have to wait and see.

5      Q.   And what do you have to wait and see

6   for?  What is the --

7      A.   Because right now ST Holdings is not

8   refinancing it.

9      Q.   But could it?

10     A.   I don't know the answer.

11     Q.   And is that something that you'd have to

12  talk to, I think before you said your lawyers

13  about?

14     A.   As I said, if there's a need, when the

15  need arise, and if the need arise, then we will

16  talk to the lawyers.

17          If there is no problem, then what's the

18  point of talking about.

19     Q.   So when the loan comes due, could there

20  be a conversation with the lawyers at that time

21  about refinancing again?

22     A.   If it was paid by the time it comes due,

23  then there will be no need.

24     Q.   But if it's not paid by the time this

25  comes due, then there could be a need; is that