UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABILITY INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>ST PAPER, LLC,<br><br>      Defendant. | Case No. 1:20-cv-03851-GBD |

**DEFENDANT ST PAPER, LLC'S RESPONSES TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ABILITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

_____

Pursuant to Rule 56.1 of the Federal Rules of Civil Procedure, ST Paper, LLC ("Defendant" or "ST Paper") responds to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Ability Insurance Company's Motion for Summary Judgment ("Plaintiff's Statement"), subject to the objections and limitations specified below (the "Defendant's Response") .

**I.    "Note 1" and its Assignment to Ability**

1.  By this action, Ability is seeking to recover amounts due under a promissory note ("Note 1") issued by ST Paper, LLC ("Defendant" or "ST") in favor of Oconto Falls Tissue, Inc. ("OFTI") on April 16, 2007. Note 1 was made in the amount of $8,000,000, and bears interest at a rate of 7.5% per year beginning on April 16, 2008. *See* Declaration of Angelo A. Stio ("Stio Decl."), Ex. A ("Note 1"); *see also* ECF No. 1 (Complaint) ¶¶ 1, 20; Stio Decl., Ex. V (ECF No. 52 - Amended Answer and Affirmative Defenses) ¶¶ 1, 20.

**RESPONSE:** Disputed in part. ST Paper disputes that there are any "amounts due" under Note 1 as Senior Indebtedness exists for purposes of the Subordination Agreement. (Declaration of Sharad Tak ("Tak Decl.") ¶¶ 12-18, Ex. H-M, Dkt. # 55 at 3-5; Dkt. # 55-8, 55-9, 55-10, 55-11, 55-12, 55-13.)

2. Note 1 matured on April 16, 2015, at which time the unpaid balance of the principal, as well as all accrued and capital interest, was due. *Id*. at 1.

**RESPONSE:** Disputed. Senior Indebtedness exists for purposes of the Subordination Agreement, which means that Note 1 did not mature. (Tak Decl. ¶¶ 12-18, Ex. H-M, Dkt. # 55 at 3-5; Dkt. # 55-8, 55-9, 55-10, 55-11, 55-12, 55-13.)

3. ST has never made any payment of principal or interest on Note 1. ECF No. 1 ¶ 32; Stio Decl., Ex. V (ECF No. 52) ¶ 32.

**RESPONSE:** Undisputed.

4. OFTI assigned Note 1 to SHF XII, LLC d/b/a as Stonehill Capital Group by Endorsement dated April 16, 2007. *See* Stio Decl., Ex. A at "Endorsement" (AIC000136).

**RESPONSE:** Undisputed.

5. On September 26, 2012, SHF XII, LLC assigned Note 1 to Paper Holdco, LLC by Allonge. *See* Stio Decl., Ex. A at "Allonge" (AIC000135).

**RESPONSE:** Undisputed.

6. On December 10, 2013, Paper Holdco, LLC assigned Note 1 to Green Box, NA Green Bay, LLC ("Green Box") by Allonge. *See* Stio Decl., Ex. A; *see also* Stio Decl., Ex. B at 9.

**RESPONSE:** Undisputed.

7. On December 10, 2013, Green Box executed a Promissory Note in favor of Maple Bridge Funding, LLC ("Maple Bridge") in the amount of $7,150,000. *See* Stio Decl., Ex. C.

**RESPONSE:** Undisputed.

8. On December 11, 2013, Green Box assigned all of its rights to Note 1 to Maple Bridge. *See* Stio Decl., Ex. D.

**RESPONSE:** Undisputed.

9. On December 11, 2013, Maple Bridge executed an Allonge by which it assigned to Ability all of Maple Bridge's rights in Note 1 and the $7,150,000 note made by Green Box. *Id*.

**RESPONSE:** Disputed. The document cited in support of this proposed finding of fact merely indicates that payment of a different promissory note made by Green Box NA Green Bay, LLC in favor of Maple Bridge Funding, LLC would be made to Ability Insurance Company. Ability itself has conceded this in the Wisconsin Action, where it contended in a brief that the Allonge does not evidence the assignment of Note 1 from Maple Bridge to Ability, "but instead evidences the assignment of a promissory note between Green Box and Maple Bridge to Ability." (Second Declaration of Jonathan T. Smies ("Second Smies Decl.") ¶ 2, Ex. A at 2 n.2.)

10. In a parallel action pending before the Wisconsin Circuit Court for Oconto County, ST has represented to the Court on that "Note 1 is held by Ability Insurance Company" and urged the Court to grant it summary judgment on that basis against a claim by OFTI to recover on Note 1. Stio Decl., Ex. B at 9, 15.

**RESPONSE:** Disputed in part. Its brief, ST Paper cited exhibits to the Amended Complaint filed by Oconto Falls Tissue, Inc., and stated the following:

> On December 11, 2013, Mr. Van Den Heuvel signed an Assignment of Rights on behalf of Green Box NA Green Bay, LLC, assigning Note No. 1 to Maple Bridge Funding, LLC. (Am. Compl., Ex. C.) The same day, Maple Bridge Funding, LLC executed an Allonge directing that payment of Note No. 1 would be to the order of Ability Insurance Company. (Am. Compl., Ex. D.) As a result of these transactions, Note No. 1 is held by Ability Insurance Company. Copies of these documents are attached as Exhibits C and D to OFTI's Amended Complaint.

(Dkt. # 57-5 at 5.) While ST Paper made these statements in its brief, ST Paper's ultimate contention was not that Ability had standing to enforce Note 1, but that the plaintiff in that lawsuit, Oconto Falls Tissue, Inc., did not have standing to enforce Note 1. ST Paper stated in its brief: "Plaintiff's own allegations and the documents it attached to its own pleadings conclusively establish that it is without standing to enforce Note No. 1. Indeed, Plaintiff's own allegations stated that Note No. 1 was assigned, and Plaintiff even alleged that a third party was negligent for failure to sue under the Note or assign it back to the Plaintiff." (Dkt # 57-5 at 8.)

3

11.     Ability maintains a copy of the original version of Note 1 in a safe deposit box in Pleasantville, New York, and offered to allow ST to inspect that original document during discovery in this action. *See* Stio Decl., Ex. GG at 5 (Request for Production No. 6); *see also* Stio Decl., Ex. FF ("Charsky Dep. Tr.") at 24:1-23.

**RESPONSE:** Disputed. The response to production of documents signed by counsel for Ability does not establish that "Ability maintains a copy of the original version of Note 1." Further, the deposition testimony cited of Ability's corporate representative, David Charsky, fails to establish that Ability is in possession of the document. Mr. Charsky merely testified when asked whether Ability possesses the original of Note 1, "Yes. I've been told we have the original in a safe deposit box." (Charsky Dep. Tr. at 24:3-6.) This testimony is not based on personal knowledge. Further, Mr. Charsky could only state the following with respect to the document's location: "I think it's in Pleasantville, New York." (Charsky Dep. Tr. at 24:22-23.)

12.     On or around March 11, 2015, Green Box defaulted on the Maple Bridge Loan and as result of that default Ability became the legal holder of Note 1. *See* Stio Decl., Ex. GG.; Stio Decl., Ex. F at 22:8-13 (noting that Green Box defaulted on payments).

**RESPONSE:** Disputed. The exhibits cited merely establish that Green Box defaulted on the loan, not that Ability "became the legal holder of Note 1." No document produced by Ability in the litigation establishes Ability's right to enforce Note 1 as a holder of the instrument. Further, the Allonge document Ability appears to rely upon as a basis of the purported assignment of Note 1 does not reflect such a transfer, but, as Ability itself contended in the Wisconsin Action, "the assignment of a promissory note between Green Box and Maple Bridge to Ability." (Second Declaration of Jonathan T. Smies ("Second Smies Decl.") ¶ 2, Ex. A at 2 n.2.)

## II.   The Subordination Agreement

13.     Note 1 is subject to the terms of an April 16, 2007 Subordination Agreement between ST, OFTI and Goldman Sachs Capital Partners, L.P. ("Goldman Sachs"). The Subordination Agreement provides that no payment on Note 1 (and other promissory notes issued at the same time) may be made until "Senior Indebtedness" is "Paid in Full". *See* Stio Decl., Ex. A "Subordination Agreement" at 3.

**RESPONSE:** Disputed in part. The proper party to the Subordination Agreement is Goldman Sachs Credit Partners, L.P., not Goldman Sachs Capital Partners, L.P. (Dkt. # 57-4 at 9.)

14. The Subordination Agreement is governed by New York law. *See* Stio Decl., Ex. A "Subordination Agreement" at 10.

**RESPONSE:** Undisputed.

### III. The Tak Companies

15. ST is managed solely by Sharad Tak ("Tak"). *See* Stio Decl., Ex. E at 2, Exhibit B.

**RESPONSE:** Undisputed.

16. ST is wholly owned and controlled by ST Paper Holdings, LLC ("ST Holdings"). *See* Stio Decl., Ex. G ("Tak Dep. Tr.") at 16:19-23. ST Holdings is also managed by Tak. Tak Dep. Tr. at 20:20-22.

**RESPONSE:** Undisputed.

17. Tak, the manager of both ST and ST Holdings, testified at deposition that ST and ST Holdings are considered "one and the same companies." *See* Stio Decl., Ex. W ("ST Paper 30(b)(6) Tr.") at 84:1-9.

**RESPONSE:** Undisputed that Mr. Tak so testified, though as a matter of law the two companies are separate and distinct legal entities with ST Paper being considered a disregarded entity for tax purposes.

18. ST Holdings is wholly controlled by Tak Investments, Inc. ("Tak Investments"). *See* Stio Decl., Ex. F at 2, Exhibit B (at 7). Tak is the president and sole director of Tak Investments. Tak Dep. Tr. at 22:14-19.

**RESPONSE:** Undisputed.

19. Tak testified at his deposition that, at times, financial transactions between ST Holdings and Tak Investments are not reflected on the books of the companies. Tak Dep. Tr. at 93:13-94:14.

**RESPONSE:** Undisputed.

20. Tak Investments is also the sole member of WCDLF Investment Fund XXIV, LLC ("WCDLF Fund XXIV"). Tak Dep. Tr. at 26:7-27:24; *see also* Stio Decl., Ex. H at 1; Ex. I at 1-2.

**RESPONSE:** Undisputed.

### IV. ST Issues Note 1 in April 2007

21. Between 1997 and 2007, OFTI owned and operated a paper mill in Oconto Falls, Wisconsin for the purpose of manufacturing paper-tissue. During this time frame, OFTI was owned (in part) and controlled by Ronald Van Den Heuval. ECF No. 1 ¶ 11; Stio Decl., Ex. V (ECF No. 52) ¶ 11.

**RESPONSE:** Undisputed.

22. On April 16, 2007, ST and OFTI (along with certain related Parties) entered into the "Second Amended and Restated Asset Purchase Agreement" through which ST acquired the tissue paper mill from OFTI for $86,400,000. *See* Stio Decl., Ex. J ("Purchase Agreement").

**RESPONSE:** Undisputed.

23. ST procured $70,000,000 in funding for the purchase of the mill through loan from a syndicate of lenders ("GS Loan"), which was administered by Goldman Sachs Credit Partners, LP. The GS Loan was be repaid and terminate on March 31, 2013. *See* Stio Decl., Ex. K at 26.

**RESPONSE:** Undisputed.

24. The remainder of the purchase price came from the four promissory notes issued by ST to OFTI, including Note 1 ("Seller Notes"). ECF No. 1 ¶ 16; Stio Decl., Ex. V (ECF No. 52) ¶ 16 (admitting that Seller Notes were source of payment besides GS Loan); *see also* ST Wisc. MSJ at 8.

**RESPONSE:** Undisputed.

25. As above, Note 1 (along with the other Seller Notes) was subordinated to the $70 million GS Loan pursuant to the terms of the Subordination Agreement. *See* Stio Decl., Ex. A "Subordination Agreement" at 1.

**RESPONSE:** Undisputed.

26. On or before May 22, 2009, ST defaulted on the GS Loan. Tak Dep. Tr. at 79-80:9.

**RESPONSE:** Undisputed.

27. Following the default, GS engaged an investment bank to sell the GS Loan. Tak Dep. Tr. at 81:12-19.

**RESPONSE:** Undisputed.

28. On March 8, 2010, Macquarie Capital (USA) Inc. ("Macquarie Capital"), Tak Investments, and ST Holdings entered into a Purchase Agreement. The Purchase Agreement was amended twice, once on March 18, 2010 and once on April 30, 2010. The purpose of the Purchase Agreement, and its amendments, was to allow for the purchase of the GS Loan by Macquarie Bank Limited ("Macquarie Bank") and for its resale to ST Holdings. *See* Stio Decl., Ex. L.

**RESPONSE:** Disputed in part. With Amendment No. 2 to the Purchase Agreement, Tak Investments, Inc., not ST Paper Holdings, LLC, was to be the purchaser of the GS Loan. (Dkt. # 57-17 at 2.)

29. On March 25, 2010, Macquarie Bank purchased the GS Loan from GSCP for the price of $20 million pursuant to a Purchase and Sale Agreement. Tak Dep. Tr. at 145:3-10; *see also* Stio Decl., Ex. M at Annex-1.

**RESPONSE:** Undisputed.

## V. The Refinancing Scheme

30. Following the sale of the GS Loan to Macquarie Bank, Tak first caused ST and ST Holdings to participate in a series of transactions on April 30, 2010 whereby ST (1) obtained over $90 million in loans from certain "Community Development Entities" (CDEs); (2) transferred all the proceeds of the loans to ST Holdings; and then (3) ST Holdings purchased the GS Loan from Macquarie Bank at a fraction of the debt, and then began the process of reacquiring the CDE debt. *See* ¶¶ 31- 55, *infra*.

**RESPONSE:** Disputed in part. As stated in Amendment No. 2 to the Purchase Agreement, Tak Investments, Inc., not ST Paper Holdings, LLC, purchased the GS Loan from Macquarie Bank. (Dkt. # 57-17 at 2.)

### 1. ST Obtains the CDE Loans

31. ST received the April 30, 2010 CDE Loans from eight CDEs. The CDEs were Capmark CDF Subfund III LLC, WCDLF Sub CDE XXV, LLC, WCDLF Sub CDE XXIV, LLC, USBCDE Sub-CDE LX, LLC, STP2 Sub-CDE, LLC, NNMF Sub-CDE X, LLC, CapFund CDE One LLC, and STP/NCF Sub-CDE LLC. *See* Stio Decl., Ex. B (ST Wisc. MSJ) at 7.

**RESPONSE:** Undisputed.

32. The CDEs received funding for the CDE Loans from two financial institutions: U.S. Bancorp Community Development Corp. ("USBDC") and Capmark Capital, Inc. ("Capmark Inc."). *See* ¶¶ 33-40, *infra*.

**RESPONSE:** Undisputed.

#### a. Flow of Funds From USBDC to CDEs

33. In June of 2009, U.S. Bancorp Community Development Corp. made three equity investments: $10,000,000 to the WCDLF Fund XXIV; $10,500,00 to the WCDLF XXV Investment Fund, LLC and $4,000,000 to the SIMHS Investment Fund, LLC., Stio Decl., Ex. N

at 3 (WCDLF Fund XXIV Fund Amended Operating Agreement recitals setting forth reciting history of payments), which were in turn invested in three CDEs as follows:

   (a)  WCDLF Fund XXIV, in turn used the $10,000,000 to make an equity investment in the WCDLF Sub CDE XXIV, LLC in the same amount on June 8, 2009. *Id*.

   (b)  The WCDLF XXV Investment Fund, LLC used its $10,500,000 to make an equity investment in the WCDLF Sub CDE XXV, LLC in the same amount on June 8, 2009. *Id*.

   (c)  The SIMHS Fund used the $4,000,000 from the U.S. Bancorp to make an equity investment in the same in the STP/NCF Sub-CDE LLC on June 29, 2009. *Id*.

 **RESPONSE:** Undisputed.

   34.  On April 30, 2010, the WCDLF Fund XXIV merged with the WCDLF Investment Fund XXV, LLC and the SIMHS Investment Fund, LLC, leaving WCDF Fund XXIV being the surviving entity with the $24.5 million debt to the three CDEs identified above. *Id*.

 **RESPONSE:** Undisputed.

   35.  Additionally, on April 30, 2010, WCDLF Fund XXIV received a capital contribution from the USBDC in the amount of $41,595,000 ("Bridge Funds"). *Id*. at 4; *see also* Stio Decl., Ex. O ("ST Flow of Funds") at 3.

 **RESPONSE:** Undisputed.

   36.  On the same day, WCDLF Fund XXIV used those Bridge Funds to make "qualified equity investments" into: WCDLF Sub CDE XXIV, LLC, USBCDE Sub-CDE LX, LLC, STP2 Sub-CDE, LLC, NNMF Sub-CDE X, LLC, CapFund CDE One LLC, WCDLF Sub-CDE XXV, LLC, and USBCDE Sub-CDE LX, LLC totaling $41,595,000. *See* ST Flow of Funds at 4-6.

**RESPONSE:** Undisputed.

37. Thus, by April 30, 2010, the CDEs identified in ¶ 35 had received $66,095,000 in funds from USBDC that had flowed through WCDLF Fund XXIV (as it existed on that date). WCDLF Fund XXIV thus held that debt to the CDEs. *See* ¶¶ 32- 35, *supra*.

**RESPONSE:** Undisputed.

### b. Flow of Funds from Capmark Inc. to the CDEs

38. On November 3, 2006, Capmark Inc. loaned Capmark CDF Subfund III Leverage Fund LLC $26,605,056. *See* Stio Decl., Ex. P at 1.

**RESPONSE:** Undisputed.

39. Capmark CDF Subfund III Leverage Fund LLC then made an equity investment of $35,959,056 to Capmark CDF Subfund III LLC, Stio Decl., Ex. KK, which in turn loaned $21,970,150 to Capmark CDF Subfund VII LLC. *See Id*.

**RESPONSE:** Undisputed.

40. Capmark CDF Subfund VII LLC used those funds to purchase all of the participation interest in the November 3, 2006 Capmark Inc. loan to Capmark CDF Subfund III Leverage Fund. *See* Stio Decl., Ex. II at 1.

**RESPONSE:** Undisputed.

41. On April 30, 2010, Capmark Inc. deposited $5 million in the bank account of Capmark CDF Subfund III LLC. ST Flow of Funds at 3.

**RESPONSE:** Undisputed.

42. Therefore, Capmark CDF Subfund III LLC had $5 million to loan to ST, and Capmark CDF Subfund VII LLC had $21,970,150 to loan to ST.

**RESPONSE:** Undisputed.

43. On April 30, 2010, ST Holdings received a $21,970,150 loan from U.S. Bank, N.A. *See* ST Flow of Funds at 9.

**RESPONSE:** Undisputed.

44. ST Holdings used those funds to purchase from Capmark CDF Subfund VII LLC the participation interest it had purchased in the interest in the November 3, 2006 Capmark Inc. loan to Capmark CDF Subfund III Leverage Fund. *Id.*; *see also See* Stio Decl., Ex. II at 1.

**RESPONSE:** Undisputed.

45. Capmark CDE Subfund VII LLC used the payment from ST Holdings to repay the $21,970,150 loan it had received from Capmark CDF Subfund III LLC. ST Flow of Funds at 10.

**RESPONSE:** Undisputed.

46. Thus on April 30, 2010, Capmark CDF Subfund III LLC had 26,970,150 to loan to ST.

**RESPONSE:** Undisputed.

    **c.**    **The CDEs Loan Money to ST Which Transfers the Funds to ST Holdings**

47. On April 30, 2010, the eight CDEs identified above – with the money from USBDC and Capmark -- made the CDE Loans to ST, which consisted of 16 different loans to ST (two loans per CDEs) totaling $90,932,150. Flow of Funds at 10- 14.

**RESPONSE:** Undisputed.

48. On the same day, ST then transferred the proceeds of the CDE Loans to ST Holdings in two installments. The first installment was $83,013,871 and identified as the

11

"repayment of debt". The second installment was $9,407,223.23 for the funds to make a "payment of liabilities payable to Holdings." Flow of Funds at 14-15.

**RESPONSE:** Undisputed.

### 2. ST Holdings Spends the CDE Loans

49. ST Holdings then spent the proceeds of the CDE Loans that ST obtained. For purposes of this dispute, three transactions (which constitute the majority) of the spending are relevant. *See* ¶¶ 50-55, *infra*.

**RESPONSE:** Undisputed.

50. First, consistent with the March 8, 2010 Purchase Agreement (*see* ¶ 28, *supra*), ST Holdings paid at total of $22,071,521.01 to Macquarie Bank to (a) purchase the GS Loan, (b) purchase a second debt to GS in the amount of $3,522,451.64, and (c) obtain a $2 million protective loan. ST Flow of Funds at 18; *see also* Stio Decl., Ex. Q at Schedule 1.

**RESPONSE:** Undisputed.

51. Of the $22+ million that ST Holdings paid to Macquarie Bank, the total purchase price for the GS Loan was $19,508,547.10. At the time, the GS Loan balance was $69,350,000. Thus, ST Holdings purchased the GS Loan debt for 28.1468% of the outstanding balance of the GS Loan. Stio Decl., Ex. Q at Schedule 1.

**RESPONSE:** Undisputed.

52. Second, ST Holdings loaned $49,251,010 to WCDLF Fund XXIV, or approximately the same amount of money that WCDLF Fund XXIV had received from USBDC earlier that day. ST Flow of Funds at 16. WCDLF Fund XXIV then promptly repaid USBDC. ST Flow of Funds at 17.

**RESPONSE:** Undisputed.

53. Thus USBCDC had loaned WCDLF Fund XXIV approximately $49 million, which in turn paid that money to certain CDEs, which in turn paid that money to ST, which in turn paid that money to ST Holdings, which in turn lent that money back to WCDLF Fund XXIV, which repaid the approximately $49 million loan it had received that same day. *See* ¶¶ 35-37, 47-51, *supra*.

**RESPONSE:** Undisputed.

54. Third, ST Holdings repaid the $21,970,150 loan it had received from U.S. Bank, N.A. ST Flow of Funds at 15.

**RESPONSE:** Undisputed.

55. Specifically, ST Holdings borrowed $21,970,150 from U.S. Bank, N.A., paid that money to Capmark CDF Subfund VII LLC, who in turn paid that money to Capmark CDF Subfund III LLC, who in turn paid that money to ST, who in turn paid that money to ST Holdings, who then repaid the entire $21,970,150 loan it had received that day. *See* ¶¶ 37-47, 53, *supra*.

**RESPONSE:** Undisputed.

**VI.  The Tak Companies Complete Acquiring and Consolidating the CDE Loans**

56. Through a series of transactions, all of the CDE Loans were assigned to companies controlled by Tak on May 2, 2017. *See* ¶¶ 57-61, *infra*.

**RESPONSE:** Undisputed.

57. On May 2, 2017, Capmark CDF Subfund III, LLC assigned to Capmark CDF Subfund III Leverage Fund, LLC all of its interest in Capmark CDF Subfund, LLC's loan to ST. *See* Stio Decl., Ex. JJ at 1.

**RESPONSE:** Undisputed.

58. On May 2, 2017, Capmark CDF Subfund III Leverage Fund, LLC assigned to USBCDC all of its interest in Capmark CDF Subfund, LLC's loan to ST. *See* Stio Decl., Ex. KK at 1.

**RESPONSE:** Undisputed.

59. On May 2, 2017, USBCDC assigned to ST Holdings all of its interest in Capmark CDF Subfund, LLC's loan to ST. *See* Stio Decl., Ex. LL at 1-2.

**RESPONSE:** Undisputed.

60. On May 2, 2017, each of the remaining seven (7) CDEs assigned their remaining CDE Loans to WCDLF Fund XXIV through a series of redemption agreements. *See* Stio Decl., Ex. S at 1-2, Exhibit A.

**RESPONSE:** Undisputed.

61. On May 2, 2017, Tak Investments became the sole shareholder of the WCDLF Fund XXIV through a Membership Interest Purchase Agreement by and between WCDLF Fund XXIV, Tak Investments, ST Holdings, U.S. Bancorp and the USB Flip Fund-ST Paper, LLC. *See* Stio Decl., Ex. H at 1; *see also* Stio Decl., Ex. I at 1-2.

**RESPONSE:** Undisputed.

62. The net result of these transactions was that either ST Holdings or WCDLF Fund XXIV (now controlled by Tak) owned "debt" that ST theoretically owed to the CDEs.

**RESPONSE:** Undisputed.

**VII. Amended Promissory Notes**

63. On March 19, 2019, ST executed an Amended and Consolidated Promissory Note in favor of WCDLF Fund XXIV in the amount of $63,962,000 ("WCDLF Note"), which amount constituted all of the alleged CDE debt in its possession. *See* Stio Decl., Ex. U at 1, Exhibit A.

**RESPONSE:** Undisputed.

64. No payment of principal or interest is due under the WCDLF Note until April 30, 2040. *Id*. at 2.

**RESPONSE:** Undisputed.

65. On March 19, 2019, ST executed a Second Amended and Restated Promissory Note in the amount of $21,970,150 to ST Holdings ("Holdings Note"), amended the terms of the $21,970,250 loan from Capmark CDF Subfund III LLC to ST. *See* Stio Decl., Ex. at 1.

**RESPONSE:** Undisputed.

66. No payment of principal or interest is due under the Holdings Note until April 30, 2047. *Id*. at 2.

**RESPONSE:** Undisputed.

**VIII. ST's Current Position**

67. ST contends that it remains indebted to ST Holdings (its parent and sole member) in the amount of $21,970,150 under the Holdings Note and indebted to WCDLF (its affiliate) in the amount of $63,962,000 under the WCDLF Note. *See* Stio Decl., Ex. X at 3 (Response to Interrogatory No. 4).

**RESPONSE:** Undisputed.

68. ST contends that the Holdings Note and the WCDLF Note, which it owes only to its corporate affiliates, constitute a "Permitted Refinancing" of the original GS Loan within the meaning of the Subordination Agreement. *Id*. at 4 (Response to Interrogatory No. 7).

**RESPONSE:** Undisputed.

69. ST contends that, provided it in fact pays the WCDLF Note on the maturity date, no payment of Note 1 will be due until at least April 30, 2047. *Id*. at 4 (Response to Interrogatory No. 6).

**RESPONSE:** Undisputed.

70. Tak testified both the Holdings Note and WCDLF Note could be "refinanced" again in the future further extending the maturity dates and time until payments under Note 1 are due. *See* Tak Dep. Tr. at 143-44.

**RESPONSE:** Disputed. The cited testimony does not establish that Mr. Tak testified that the notes could be refinanced again in the future. Instead, Mr. Tak testified that ST Paper Holdings, LLC "is not refinancing it." (Tak Dep. Tr. at 143:7-8.) To the question of whether ST Paper Holdings, LLC could refinance the debt, Mr. Tak stated: "I don't know the answer." (Tak Dep. Tr. at 143:10.)

### IX. The Compromise Agreement

71. On March 31, 2009, a Compromise Agreement was executed by ST, OFTI, Tissue Products Technology Corp., Eco Fibre, LLC ("EFI"), and Tissue Technology, LLC ("TTL"). *See* Stio Decl., Ex. EE.

**RESPONSE:** Undisputed.

72. At the time of the Compromise Agreement's execution, Note 1 was held by SHF XII, LLC d/b/a as Stonehill Capital Group who is not a party to the Compromise Agreement. *See* Stio Decl., Ex. A.

**RESPONSE:** Undisputed.

Dated this 10th day of September, 2021.

Respectfully submitted,

**GODFREY & KAHN, S.C.**

By: *Electronically signed by Jonathan T. Smies*

    Katherine Stadler
    NY Bar No. 4938064
    One East Main Street
    Madison, WI 53703
    Phone: 608-257-3911
    Fax: 608-257-0609
    Email: kstadler@gklaw.com

    Jonathan T. Smies
    Admitted Pro Hac Vice
    200 South Washington St., Suite 100
    Green Bay, WI 54301-4298
    Phone: 920-432-9300
    Fax: 920-436-7988
    Email: jsmies@gklaw.com

**TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT LLP**

    Carl F. Regelmann
    900 Third Avenue
    New York, New York 10022
    (212) 508-6700
    regelmann@thsh.com

*Attorneys for Defendant ST Paper, LLC*