UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABILITY INSURANCE COMPANY,<br><br>                                  Plaintiff,<br><br>             v.<br><br>ST PAPER, LLC<br><br>                                  Defendant. | Civil Action No.: 1:20-cv-03851 (GBD) |

## DECLARATION OF ANGELO A. STIO, III, ESQ.  IN SUPPORT OF PLAINTIFF'S REPLY BRIEF ON MOTION FOR SUMMARY JUDGMENT

ANGELO A. STIO, III hereby declares, pursuant to 28 U.S.C. § 1746 as follows:

1. I am a partner in the law firm Troutman Pepper Hamilton Sanders, LLP, attorneys for Plaintiff Ability Insurance Company ("Plaintiff") in the above captioned matter. I am fully familiar with the facts and circumstances discussed below.

2. I submit this Declaration in support of Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment.

3. Attached hereto as Exhibit A is a true and accurate copy of excerpts from the transcript of the deposition of David Charsky taken on July 27, 2021 ("Charsky Tr.").

DATED: New York, NY
Executed: September 24, 2021

                                                                    /s/ Angelo A. Stio, III
                                                                   ANGELO A. STIO, III

# Ex. A

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2
     -------------------------------------------------------------
 3
     ABILITY INSURANCE COMPANY,
 4
             Plaintiff,
 5
        -vs-                         Case No.:   1:20-cv-03851-GBD
 6
     ST PAPER, LLC,
 7
             Defendant.
 8
     -------------------------------------------------------------
 9

10          VIDEOCONFERENCE
            DEPOSITION OF:    DAVID G. CHARSKY
11

12          DATE:             July 27, 2021

13
            TIME:             1:38 p.m. - 2:51 p.m. (EST)
14

15          DEPONENT
            LOCATION:         TROUTMAN PEPPER HAMILTON
16                            SANDERS LLP
                              3000 Two Logan Square
17                            Eighteenth and Arch Streets
                              Philadelphia, Pennsylvania
18

19

20   REPORTED BY:
     CARRIE S. BOHRER, RPR, RMR, CRR
21   BAY REPORTING SERVICE, INC.
     www.bayreportingservice.com
22   920-432-5662

23

24

25
```

```
 1                    A P P E A R A N C E S
 2
         TROUTMAN PEPPER HAMILTON SANDERS LLP, by
 3       FRANK H. GRIFFIN IV, Attorney at Law
         3000 Two Logan Square
 4       Eighteenth and Arch Streets
         Philadelphia, Pennsylvania  19103
 5       215-981-4247
         frank.griffin@troutman.com
 6           appeared via videoconference
             on behalf of the Plaintiff
 7

 8       TROUTMAN PEPPER HAMILTON SANDERS LLP, by
         ANGELO A. STIO III, Attorney at Law
 9       301 Carnegie Center, Suite 400
         Princeton, New Jersey  08540
10       609-951-4125
         angelo.stio@troutman.com
11           appeared via videoconference
             on behalf of the Plaintiff
12

13       JILL GETTMAN, Attorney at Law
         10250 Regency Circle, Suite 105
14       Omaha, Nebraska  68114
         402-871-8000
15       jgettman@gettmanmills.com
             appeared via videoconference
16           on behalf of the Plaintiff

17
         GODFREY & KAHN, S.C., by
18       JONATHAN T. SMIES, Attorney at Law
         Riverwalk Plaza
19       200 South Washington Street, Suite 100
         Green Bay, Wisconsin  54301
20       920-432-9300
         jsmies@gklaw.com
21           appeared via videoconference
             on behalf of the Defendant
22
23                        *  *  *  *  *

24

25
                                                             2
```

```
 1                        I N D E X

 2    EXAMINATION BY:                                      PAGE

 3      Mr. Smies ....................................      4

 4
      EXHIBITS MARKED:                              PAGE ID'D
 5
      NONE
 6

 7    REQUESTED INFORMATION:                               PAGE

 8     1)      Investment management agreement
               between Monroe Capital and Ability
 9             Insurance Company ...................... 11

10     2)      Any documents that reflect Ability's
               recovery or proceeds from the sale,
11             net of any expenses, for taking it
               through American Boulevard property
12             through foreclosure .................... 17

13     3)      Any emails that were overlooked that
               relate to any matters with respect to
14             Note Number 1 .......................... 20

15     4)      Total of payments made on the Green Box
               debt ................................... 22
16
       5)      Document that reflects the reduction
17             of the amount due under the mortgage
               after the sale of the mortgage itself .. 37
18

19

20

21

22

23

24

25
                                                               3
```

```
 1                TRANSCRIPT OF PROCEEDINGS
 2                THE COURT REPORTER:  This deposition
 3      of David G. Charsky is being conducted remotely.
 4      I have verified the witness's identity by
 5      viewing his photo ID.
 6           Mr. Charsky, would you please raise your
 7      right hand and I will swear you in.
 8                DAVID G. CHARSKY, called as a witness
 9      herein, having been first duly sworn/affirmed,
10      was examined and testified as follows:
11                           EXAMINATION
12   BY MR. SMIES:
13   Q    Good afternoon, Mr. Charsky.  My name is
14        Jon Smies, and I'm an attorney with Godfrey &
15        Kahn in our Green Bay, Wisconsin office.  I
16        represent ST Paper, LLC, the defendant in a
17        lawsuit filed by Ability Insurance in the
18        Southern District Court, and I am taking
19        testimony today pursuant to a notice of
20        deposition directed to a representative or
21        representatives of Ability Insurance Company
22        under Rule 30(b)(6) of the Rules of Civil
23        Procedure.  And that is -- I understand that you
24        are being produced by the plaintiff as the
25        representative for these matters of testimony.
```

4

1        Is that your understanding today?
2  A    **Yes, that's my understanding.**
3  Q    Great.  Why don't you tell me first of all
4        what's your position with Ability?
5  A    **Currently I am the vice president and treasurer**
6        **of Ability Insurance Company.**
7            MR. STIO:  Hey, Jonathan, can we just
8        put the stipulation on the record that objections
9        to form are going to preserve the objection so
10       that this goes smoother?
11           MR. SMIES:  Yeah, that is fine, if
12       there's an objection as to form.
13           MR. STIO:  Okay.  Thank you.
14  Q    So, Mr. Charsky, how long have you been with
15       Ability?
16  A    **In this current role, seven years.**
17  Q    What about any prior roles?
18  A    **Yeah, previous to that I was the third-party**
19       **administrator in the accounting area for this**
20       **company.  But I was not a named officer of the**
21       **company at that time.**
22  Q    How long did you serve in that capacity?
23  A    **Five years.  So altogether around twelve --**
24       **twelve to thirteen years I've been working on**
25       **the Ability account.**

5

```
 1          Insurance Company.
 2   Q      Okay.  Is he also an employee of ACAP?
 3   A      Yes, he is.
 4   Q      Anybody else?
 5   A      No.
 6   Q      Are you aware of Ability Insurance Company's
 7          ownership?
 8   A      Yes.
 9   Q      And what is the ownership?  Is it a privately
10          held corporation?
11   A      Yes, it's privately held.
12   Q      And are you an investor in Ability Insurance?
13   A      No, I'm not.
14   Q      Okay.  So, Mr. Charsky, you've been with Ability
15          in one capacity or another now for some time.
16          Are you -- were you at all involved in any of
17          the events giving rise to the claims at issue
18          here in this case involving, for example, the
19          transfer of Note 1 from Maple Bridge Funding,
20          LLC to Ability?
21   A      I was involved in the funding of the original
22          promissory note, the 7.15 million.
23   Q      All right.  Let's step back I guess for a
24          minute.  You understand that there's an entity
25          called Maple Bridge Funding, LLC that's had some
```

1        involvement in this series of transactions; is
2        that fair?
3    A   Yes.
4    Q   And are you aware of any relationship between
5        Ability and Maple Bridge Funding?
6    A   **Yeah, so Maple Bridge Funding is an LLC set up**
7        **to fund mortgage investments by one of our**
8        **investment managers called Monroe Capital.**
9    Q   And how do you know that about Maple Bridge
10       Funding, LLC?  Is that a related entity to
11       Ability in some respect?
12   A   **No, there's no relation at all.  It's -- it's an**
13       **LLC of Monroe Capital.**
14   Q   Okay.  So Monroe Capital, is there any relation
15       between Monroe Capital, that entity, and Ability?
16   A   **Yes.  There was at the time an administrative --**
17       **or I'm sorry -- an investment management**
18       **agreement between Monroe Capital and Ability**
19       **Insurance Company.**
20   Q   Okay.  And that was -- under that agreement, if
21       you know, was Monroe Capital then acting as the
22       investment manager for Ability?
23   A   **Yes.**
24              MR. SMIES:  Okay.  Counsel, I don't
25       believe I've seen that document, and maybe it's

11

1    not in the scope of any prior request, but I
2    would just make a request now on the record for
3    that investment management agreement.
4              MR. GRIFFIN:  I'll take your request
5    under advisement.  I don't believe it was
6    responsive to the requests, but we'll take the
7    request under advisement.
8              MR. SMIES:  Thank you.
9  Q  So you mentioned, Mr. Charsky, that there was
10   some funding of a promissory note originally.
11   Do you have a sense of how Ability participated
12   in that funding?
13 A  Yes.
14 Q  All right.  Can you explain to me that
15   transaction?
16 A  So --
17             MR. GRIFFIN:  Objection to the form
18   of the question.  Go ahead, Dave.
19 A  **Okay.  So Ability Insurance Company provided the**
20   **funding for that promissory note, the 7.15**
21   **million.  But it was underwritten and sourced by**
22   **our investment manager Monroe Capital.**
23 Q  Okay.  So the note -- the original note you're
24   referencing was between -- it was given by -- I
25   guess it was made by Green Box NA Green Bay, LLC

12

```
 1            in favor of Maple Bridge Funding, LLC; is that
 2            your understanding?
 3      A     Yes.
 4      Q     Okay.  But the actual funding of the monies paid
 5            to Green Box NA Green Bay, LLC was, you're
 6            saying, provided by Ability in the first
 7            instance; is that fair?
 8      A     Yes, and then was assigned -- the note and all
 9            collateral associated with the note was assigned
10            to Ability Insurance Company.
11      Q     Right.  I think the two occurred fairly close in
12            time, if I recall.  It could be that on
13            December 10th, 2013 Green Box made the note to
14            Maple Bridge Funding and then on December 11th of
15            2013 it was an allonge executed for the payment
16            to be ordered to Ability Insurance Company by
17            Maple Bridge Funding, LLC by Tim O'Shea.  Does
18            that comport with your recollection of the
19            facts?
20                  MR. GRIFFIN:  Objection to the form
21            of the question.
22      A     I can't confirm the exact dates.  But yes, that
23            time frame sounds about when the initial funding
24            was sent to Green Box.
25      Q     Okay.  And the sequence is correct, that is,
```

13

1   loan to Green Box.  And then after that what did
2   Ability -- what steps did Ability take to
3   collect, if any, after funding the loan?
4   Because that was back in 2013.  Do you know what
5   the immediate -- what the terms of that note
6   were as far as payment to Ability?
7                MR. GRIFFIN:  Objection to form.
8  A  **So no communication with Maple Bridge.  We**
9     **communicate with Monroe Capital.**
10 Q  Okay.
11 A  **Who's, again, the asset manager on the account**
12    **and the loan.  So yes, we'd communicate interest**
13    **payments on that loan --**
14 Q  Were there --
15 A  **-- to make sure they were coming in.**
16 Q  I'm sorry to interrupt.  Were there payments
17    made on the Green Box loan?
18 A  **Yes.  Initially, yes, there were a few payments**
19    **made.  Interest was paid on the loan.**
20 Q  So it was sort of an interest-only situation for
21    a period of time?
22 A  **Yes.**
23 Q  Do you know how long payments were made or how
24    much?
25 A  **I'd have to check the records.  But a few months'**

21

1           worth of payments.
2                   MR. SMIES:  That's information I would
3           be interested in seeing, Counsel, and if it's
4           already produced forgive me, but to the extent
5           you can find the total of payments made on the
6           Green Box debt, I would like that produced.
7                   MR. GRIFFIN:  Understood.
8    Q      So at some point it became evident, I take it,
9           that Green Box wasn't going to pay all that was
10          due under the Green Box note?  Is that a fair
11          summary of the history with Ability?
12   A      Correct.  And interest stopped being paid on the
13          account.
14   Q      Do you know if that was before or after there
15          was a declaration of bankruptcy?
16   A      I'm not sure.
17   Q      Did you take any steps to attempt to collect on
18          that debt before initiating foreclosure, any
19          correspondence with Green Box?
20   A      No correspondence with Green Box.  It would all
21          go through the investment manager, Monroe
22          Capital, who has the relationship with -- you
23          know, with Green Box.
24   Q      That's Tim O'Shea?
25   A      Yes.  He's one of the principals.

22

1  Q    And who are some other principals at Monroe
2       Capital?
3  A    **There's just Tim O'Shea and Jason Harkavy are**
4       **the two individuals I would have dealt with at**
5       **Monroe.**
6  Q    So you have them to thank for introducing you to
7       Mr. Van Den Heuvel, I guess?
8  A    **Never met him.**
9  Q    Okay.  Getting you involved in this whole thing
10      I guess is a better way of putting it.
11           So you today in this litigation are seeking
12      to enforce what's been described as Note Number 1.
13      Do you understand that to be the case?
14 A    **Yes.**
15 Q    And that was a note executed by ST Paper made to
16      Oconto Falls Tissue, Inc. on April 16th, 2007?
17      Is that your understanding?
18 A    **I'm not sure of the exact date, but yes.**
19 Q    What -- so in seeking to enforce and to collect
20      on Note Number 1, is there any agreement in place
21      with any third party regarding the proceeds of
22      any effort to collect on Note Number 1?
23 A    **No.**
24 Q    So from Ability's point of view, it is the only
25      party that's entitled to any proceeds from

23

| | | |
|---|---|---|
| 1 | | collection on Note Number 1; is that fair? |
| 2 | A | That's correct. |
| 3 | Q | And does Ability possess the original of Note |
| 4 | | Number 1? |
| 5 | A | Yes.  I've been told we have the original in a |
| 6 | | safe deposit box. |
| 7 | | MR. SMIES:  All right.  That's |
| 8 | | something I have asked to inspect and I haven't |
| 9 | | flown out there to take a look at it, and I |
| 10 | | don't know where "out there" is, frankly, but, |
| 11 | | Counsel, I guess if we need to we can coordinate |
| 12 | | on that if I'm heading out east or -- |
| 13 | | MR. GRIFFIN:  If you want to take a |
| 14 | | flight out here to take a look at it we're happy |
| 15 | | to arrange it. |
| 16 | | MR. SMIES:  Okay.  So it's there in |
| 17 | | your neck of the woods, TJ, in Philadelphia or |
| 18 | | New York? |
| 19 | | MR. GRIFFIN:  I believe so.  Dave, do |
| 20 | | you want to tell him exactly where you believe |
| 21 | | it is, in Connecticut or -- |
| 22 | | THE WITNESS:  I think it's in |
| 23 | | Pleasantville, New York. |
| 24 | | MR. SMIES:  Okay. |
| 25 | | THE WITNESS:  Just north of New York |

24

```
 1            City.
 2    Q       All right.
 3                    MR. STIO:  We'll get you the address.
 4            Just shoot us a note, and we'll get you the
 5            address so you can make whatever arrangements
 6            you need.
 7                    MR. SMIES:  Thank you, Angelo.  I
 8            appreciate that.
 9                    MS. GETTMAN:  This is Jill Gettman.
10            I'm counsel for Ability.  We also have office
11            policies we'll have to coordinate because we
12            have -- and we also have office policies that
13            you have to be vaccinated to be in that
14            location (inaudible) --
15                    THE COURT REPORTER:  You're cutting
16            out, Jill.  I can't understand what you're
17            saying.
18                    MR. SMIES:  Yeah, we'll figure it out.
19            I didn't hear it all about policies in New York
20            State and everything but --
21                    MS. GETTMAN:  Dave and I were trying
22            to coordinate -- sorry.  (Inaudible.)
23                    MR. GRIFFIN:  I believe Ms. Gettman
24            was just trying to represent that there are
25            policies that would have to be followed for
```

25